# AUSTIN- BERGSTROM INTERNATIONAL AIRPORT USE AND LEASE AGREEMENT



# THE CITY OF AUSTIN, TEXAS
# &
# FRONTIER AIRLINES, INC.

## AUSTIN-BERGSTROM INTERNATIONAL AIRPORT

### AUSTIN, TEXAS

EXHIBIT A

ARTICLE 23 - NON WAIVER OF RIGHTS.................................................................54

ARTICLE 24 - INVALIDITY OF CLAUSES..............................................................55

ARTICLE 25 - APPROVAL BY LESSOR..................................................................55

ARTICLE 26 -  ECONOMIC NON-DISCRIMINATION.............................................55

ARTICLE 27 - PUBLIC USE, FEDERAL GRANTS AND NONDISCRIMINATION ..................55

ARTICLE 28 - TITLE TO AIRLINE INSTALLED IMPROVEMENTS AND PROPERTY..........58

ARTICLE 29 - NOTICES...........................................................................................58

ARTICLE 30 ~ BOND ORDINANCES .....................................................................59

ARTICLE 31 - MISCELLANEOUS PROVISIONS ....................................................61

(6)    **Airport** means Austin-Bergstrom International Airport.

(7)    **Applicable Law** means all federal, state and local laws, codes, ordinances, rules, regulations, judgments, decrees, or directives of any Governmental Authority applicable to the parties, the Airport, or the Premises during the term of this Agreement.

(8)    **Apron** mean the paved aircraft parking apron extending from the outside wall of the Terminal building used to park aircraft and to load and unload passengers and cargo, as the same may be expanded or altered from time to time. The Apron is depicted in **Exhibit C.**

(9)    **Apron Fee** means the fee charged for the use of aircraft loading and unloading positions on the Terminal Apron, as described in Article 5.

(10)   **Bond Ordinance** means any ordinance or indenture or both, adopted by the City Council of the City authorizing the issuance of bonds, notes, or other obligations for the Airport and securing such obligations by a pledge of revenues or net revenues of the Airport, or any ordinance or indenture supplemental thereto.

(11)   **Common Space** means any space in the Terminal excluding Joint Use Premises that is used for a common purpose by multiple Air Carriers, and includes the baggage claim circulation area, baggage claim device area, and common baggage storage area, and the areas used for screening of passengers and baggage at the Terminal.

(12)   **CUPPS** means Common Use Passenger Processing Systems generally accepted in the commercial aviation industry, including associated self service kiosks and other equipment.

(13)   **Director** means the Executive Director of Aviation for the City of Austin or his or her designee, or such other officer to whom the duties and authority of the Director may be assigned by the City Manager of the City, or by any agency, board or authority which may subsequently succeed to the jurisdiction of City over the Airport.

(14)   **Exclusive Use** means the right of Airline to exclusively use those areas of the Premises leased to Airline for its sole use and occupancy, subject to the terms, covenants, and conditions of this Agreement, including administrative office space, lost and unclaimed

passenger hold rooms, and ticket counter space.

(25) Premises shall mean the space in the Terminal and associated aircraft loading positions leased to Airline, as described on **Exhibit A-1** and shown on **Exhibit A-2**, attached hereto and incorporated herein.

(26) Rent means any fee or charge payable by Airline under this Agreement for the use or occupancy of the Premises or other space at the Airport, including rentals for the Premises and Aircraft Loading Positions, Apron Fees, RON Fees, and Terminal Equipment Fees.

(27) RON Fee means the fee payable by Airline for the use of an Aircraft parking position other than a Gate leased to Airline for a period equal to or greater than four (4) hours, as described in Article 5.

(28) Signatory Airline means an Air Carrier with scheduled air service to and from the Airport which has executed an Airport Use and Lease Agreement in a form substantially the same as this Agreement.

(29) Terminal shall mean the Barbara Jordan Terminal at the Airport, including its appurtenant and ancillary facilities.

(30) Terminal Equipment Fees means the fees payable by Airline for the use of Lessor-provided terminal equipment as described in Article 5.

(31) Transportation Security Administration or TSA shall mean the agency of the United States Department of Homeland Security that regulates airport and aviation security, or successor agency.

B. **Interpretations** – In this Agreement, the following rules of interpretation shall apply:

(1) Headings and underlinings are for convenience only and do not affect the interpretation of an agreement.

(2) Words importing the singular include the plural and vice versa and the masculine, feminine or neuter gender shall include all genders. The word "or" is not exclusive.

(3) The words "hereof," "herein," and "hereunder" and words of similar import when used

## ARTICLE 2 - TERM OF AGREEMENT

The term of this Agreement shall commence on the Effective Date, and subject to the parties rights of termination hereunder, remain in effect for a term of five (5) years. If, upon expiration of the primary five year term, the parties have not entered into a new use and lease agreement, this Agreement shall remain in effect from month to month thereafter until terminated by either party upon thirty (30) days' prior written notice.

## ARTICLE 3 - AIRPORT OPERATION AND MAINTENANCE

A.    Throughout the term of this Agreement, Lessor shall operate, maintain, manage and control the Airport in a first class, efficient, economical and businesslike manner, and in accordance with Applicable Law. Lessor shall operate and maintain the land, runways, taxiways (including keeping runways, taxiways and public ramp areas reasonably free and clear of foreign objects that may be harmful to aircraft and aircraft engines), navigation aids, lighting, equipment, entrances, exits, roads, parking areas and all other public facilities and appurtenances within the boundaries of the Airport.

B.    Airline shall operate and maintain at its own expense its leased conditioned and unconditioned space on the apron level of the Terminal Building, but excluding Common Space and Joint Use Facilities. Airline shall operate any Terminal Equipment under its control, including loading bridges, in accordance with the manufacturer's specifications and Lessor's published operating procedures. Airline may not modify or alter any Terminal Equipment, or operate such Terminal Equipment in any other or alternative manner without the prior written approval of the Director. Airline, at Airline's expense, must return the Terminal Equipment to the condition that existed just prior to the Airline's use, normal wear and tear and Lessor approved modifications excepted, upon request from the Lessor. Lessor may charge Airline for any additional costs incurred by Lessor due to the failure of Airline to comply with the requirements of this Section.

C.    Lessor shall own, operate and maintain the baggage handling systems; the cost of which shall be recovered through the Terminal Equipment Fee.

D.    Lessor agrees to use commercially reasonable efforts to obtain the maximum amount of grants and participating funds for the Airport from the United States of America (or any agency

(1) The landing, taking off, flying over, taxiing, pushing, towing, parking, loading and unloading of aircraft of its choice; including the right to handle other airlines;

(2) The repairing, maintaining, conditioning and servicing of aircraft and other equipment in areas designated by Lessor;

(3) The sale of air transportation tickets and services, conveniences and facilities related to air travel and the processing of passengers and their baggage for air travel; the sale, handling and providing of mail, freight and express services and conveniences related thereto and the performance of other activities connected with the operation of its Air Carrier Service;

(4) The training at the Airport of personnel in the employ of, or to be employed by Airline and the testing of aircraft and other equipment owned, or operated by Airline; provided, that (1) such training and testing to be incidental to the use of the Airport in the operation by Airline of its Air Carrier Service, and (b) such training and testing will not unreasonably hamper, or interfere with the use of the Airport and its facilities by other users entitled to the use thereof;

(5) The sale, disposal, or exchange, of Airline's aircraft, engines, accessories, aviation fuels, ground vehicle fuels, oil, greases, lubricants and other materials, supplies and equipment related to its Air Carrier Service;

(6) The right to purchase at the Airport, or elsewhere, from any person, or company of its choice, the requirements of aviation fuel, ground vehicle fuel, lubricating oil, greases and all other such materials and supplies and services; and except for a reasonable annual permit fee, no charges, fees, licenses, excise taxes, tolls or other charges upon any such purchases shall be charged, or collected by Lessor from Airline, or from any other person: for the privilege of or in connection with the purchasing, handling, loading, unloading, servicing, storing, using, or transporting to, from, or at the Airport, such materials and supplies or other property in connection with Airline's business;

(7) The servicing by Airline, or its suppliers, at appropriate locations, of aircraft and other equipment owned, or operated by Airline, or its suppliers of materials and furnisher of services, by truck, or otherwise; with aviation fuel, ground vehicle fuel, lubricating oil,

communications facilities are demonstrated to cause radio interference, Airline shall modify or cease its use of such radio facilities to eliminate the interference;

(11)   The conduct of any other function, or operation reasonably necessary to the proper performance and operation by Airline of its Air Carrier Service;

(12)   The right of reasonable ingress to and egress from the Airport and the Premises leased to Airline, or used by Airline in common with others; subject to the provisions of this Agreement; for Airline, its employees, passengers, invitees, suppliers of materials and furnisher of services; its or their aircraft, equipment, vehicles, or machinery and other property; without charge to Airline, its employees, suppliers of materials and furnisher of services.

(13)   Subject to availability, the right to lease space in the Terminal Building on an Exclusive Use basis to operate and maintain club rooms ("Airline Club") for Airline's guests, invitees, and passengers and the right to serve food and beverages, including alcoholic beverages in the Airline Club with or without charge.  Airline shall comply with all Applicable Law pertaining to the operation and maintenance of the Airline Club, the sale or serving of food and beverages (including alcoholic beverages), sanitation, and public health and safety. Airline shall obtain and maintain in force and effect all licenses and permits necessary for the operation of an Airline Club from the applicable Governmental Authorities. Airline shall pay to the appropriate Governmental Authority when due all occupation, sales and use taxes arising out of the operation of the Airline Club. Airline shall provide, at its sole expense, complete and proper arrangements for cleaning the Airline Club and for the proper handling and disposal of garbage and other Airline Club trash and refuse.  The Lessor reserves the right to charge Airline applicable percentages of its gross revenues from the sale of food and beverages consistent with the percentages charged to food and beverage concessionaires at the Airport.

(14)   The rights granted herein to Airline may be exercised by Airline or by an Affiliate. Airline shall give the Director written notice of any Affiliates that will be operating at the Airport at least three (3) business days before the Affiliate commences service at the Airport. As between the Lessor and Airline, an Affiliate shall be considered Airline's

buildings rentals, Apron Fees, terminal equipment fees, fuel facility fees and other charges to be paid by Airline to Lessor for the various facilities and services of the Airport, shall be established. In establishing such fees, rentals and charges, Lessor shall observe the principles and the methodology contained in this Article and Exhibit D-0 through D-11, attached and incorporated herein.

| | |
|---|---|
| **Exhibit D-0** | General Principles and Methodology |
| **Exhibit D-1** | Basic Project Costs and Funding Sources |
| **Exhibit D-2** | Allocation of Project Costs to Cost Centers - Debt Service |
| **Exhibit D-3** | Acreage Allocation Worksheet |
| **Exhibit D-4** | Summary of Debt Service |
| **Exhibit D-5** | Operations and Maintenance Expenses |
| **Exhibit D-6** | Terminal Space Analysis |
| **Exhibit D-7** | Terminal Space Allocations |
| **Exhibit D-8** | Terminal Rental Rates |
| **Exhibit D-9** | Terminal Apron Fees |
| **Exhibit D-10** | Terminal Equipment Fees |
| **Exhibit D-11** | Landing Fees |

**B.    Passenger Terminal Building**

Airline shall pay Lessor Rent for those areas of the Terminal used or occupied by Airline, including Passenger Holdrooms, Ticket Counter Space, Ticket Counter Queuing Space, Airline Ticket Office Space, and Airline operations space. Rent for space leased to Airline on a Preferential Use or Exclusive Use basis is stated in terms of a price per square foot per year in accordance with **Exhibits D-0 and D-6, D7 and D-8.** Lessor may establish a per use fee for Terminal Joint Use Facilities in accordance with the allocation of costs set forth in such Exhibits.

**C.    Apron Fee**

Airline shall pay an Apron Fee for the Preferential or Joint Use of the aircraft loading and unloading positions serving the Terminal. The computation for the Apron Fee is shown on **Exhibit D-0 and D-9.** The Apron Fee is in addition to, and is not included in, the Landing Fee. The Apron Fee for Joint Use aircraft loading and unloading positions will be a per use

to Airline, for a period equal to or greater than four (4) hours.

**H.  Other Fees**

Lessor reserves the right to assess, and Airline agrees to pay ground rentals and/or reasonable charges in an amount to recover costs and expenses for the use of Lessor-provided facilities after consultation with Airline.

**I.  Employee Ground Vehicle Parking**

Lessor shall make available to Airline's employees who are based or employed at the Airport reasonably adequate automobile parking facilities on or near the Airport. Subject to availability of space, Lessor may make available parking to Airline's flight crews or other employees (commonly referred to as "commuters") who live in the Austin area, but are based at another airport. Lessor may charge a vehicular parking fee, in an amount sufficient to cover return on capital investment and costs associated with the development, operation, supervision, and maintenance of the parking facilities. Lessor may charge different parking fees to Airline's airport employees and to commuters.

**J.  Initial And Final Computation Of Fees And Charges**

(1)  Initial Computation.

(a)  No later than ninety (90) days before the end of each Fiscal Year, the Signatory Airlines, including Airline, shall submit to Lessor in writing their composite landed weight forecast for the ensuing Fiscal Year.  If landed weight forecasts are not received by the Lessor, Lessor may make its own calculations of landing weights.  No later than sixty (60) days before the end of each Fiscal Year and within thirty (30) days after submission of a draft budget to the City Council, Lessor shall submit in writing to the Signatory Airlines its budgetary forecast of Airport operating expenses for the ensuing Fiscal Year and its calculation of proposed Signatory Airline landing fee and terminal building rental rates for the ensuing Fiscal Year, all in a manner consistent with this Article and the cost accounting principles and procedures currently used by Lessor at the Airport, which principles and procedures shall be consistently applied from year to year throughout the term hereof.

20th day of the month and following receipt of a written report from Airline, Lessor will transmit to Airline an invoice for Common Space charges due for the preceding month. Airline shall pay to Lessor the rentals and other charges due for the preceding month within thirty (30) days following the date of the invoice for Common Space charges from Lessor.

(3)   <u>Landing Fees.</u>  Airline shall furnish to Lessor on, or before, the fifth workday of each month during the term hereof, a written report, in a form approved by Lessor, showing Airline's Fee Landings at Airport during the preceding month. Such report shall include (a) the number and the type of aircraft and the Maximum Certificated Gross Landing Weight thereof, (b) the number of aircraft landings, by types of aircraft, for which it provided ground handling services of any kind or others which do not have written agreements with Lessor to use the airport, and (c) the names and addresses of operators of such aircraft, in order that Lessor may submit to such operators appropriate invoices for landing fees and other charges as applicable.

Airline shall calculate and pay to Lessor the monthly Landing Fees within twenty (20) days following the date of Airline's landing fee report for a month, without notice, demand, or invoice. Lessor shall notify Airline in writing if it disputes the amount or calculation of the Landing Fee.

(4)   <u>Disputes.</u>  If a dispute arises between the Lessor and Airline with respect to any obligation or alleged obligation of the Airline to pay money to the Lessor, the Airline shall pay the full amount, subject to the right of Airline to protest the amount claimed in writing to the Director. The payment under protest by the Airline of the amount claimed by the Lessor to be due shall not waive any of Airline's rights. If a court or other body having jurisdiction determines that all or any part of the protested payment was not due, then the Lessor shall promptly reimburse the airline any amount determined as not due plus interest at the lesser of the rate specified in Texas Government Code Section 2251.025 or the maximum lawful rate ("Statutory Rate").

(5)   <u>Late Payment Penalty.</u> If Airline fails to pay Rent, Landing Fees, or any other, charge or fee under this Agreement in full within five (5) business days of the due date, Lessor

---

Security Deposit, and may, by written notice to Airline, reasonably increase the amount of the Security Deposit to an amount equal to three times Airline's average monthly amount of rentals and fees payable under this Agreement during the immediately preceding twelve month period. Such notice shall include a calculation of the revised Security Deposit. Airline shall within thirty (30) days of receipt of such written notice from Lessor increasing the Security Deposit, deposit the additional security with Lessor by certified check or supplemental or amended letter of credit.

(4)     Lessor shall have the right, but not the obligation, to apply all or any part of the Security Deposit to cure any default of Airline under this Agreement, including, but not limited to, (a) any arrearages of Rent, Landing Fees, and other fees and charges payable by Airline under this Agreement, (b) the cost to repair or restore any damage to the Premises, or (c) any other amounts due from Airline under this Agreement. In such event, Airline must deposit with Lessor an amount equal to the amount so applied by Lessor within ten (10) business days of written notice from Lessor of the nature and amount of the application.

(5)     Lessor shall return the Security Deposit to Airline in accordance with Article 5 L (1) above or, if applicable, less any amounts applied by Lessor under Article 5 L (4), within sixty (60) days after the later of the expiration or termination date of this Agreement, or the date that Airline surrenders possession of the Premises to Lessor.

**M.     Records and Audit.**

Airline shall at all times maintain and keep true and complete books, financial records, and accounts (collectively "Records") regarding Airline's compliance with the terms of this Agreement in accordance with generally accepted accounting principles in the United States and Applicable Law, including all Records that document or relate to Airline's activities at the Airport required to be reported under this Agreement, or upon which any fee or charge payable by Airline hereunder is based. Airline shall retain such Records for the greater of (i) three (3) years from the end of the fiscal year to which they pertain, (ii) the applicable retention period provided in 14 CFR Part 249, or (iii) the period of time specified in Airline's normal document and record retention policy. If, prior to the expiration of the foregoing record retention period,

Except for the expenses referred to above, the cost of an audit of Airline records by Lessor shall be borne by Lessor; provided, however, the total cost of the audit shall be paid by Airline if:

(1)     The audit reveals an underpayment of ten percent or more by category of rentals, fees, and charges due on an annual basis, as determined by such audit, or

(2)     Airline has failed to produce and maintain true and complete records substantially in accordance with this Agreement.

### ARTICLE 6 - PASSENGER FACILITY CHARGES (PFC)

Lessor may assess, amend and collect PFCs in accordance with Applicable Law.  The following shall apply to the collection of PFCs; provided, however, in the event of a conflict between Applicable Law related to PFCs and the provisions of this Article, Applicable law shall govern:

A.      Airline shall hold the net principal amount of all PFCs that are collected by Airline or its agents on behalf of the Lessor pursuant to Applicable Law, including 49 U.S.C. App. § 1513 and the PFC Regulations thereunder, in trust for Lessor.  No trust account shall be required except as provided in Article 6 B below.  For purposes of this section, net principal amount shall mean the total principal amount of all PFCs that are collected by Airline or its agents on behalf of the Lessor, reduced by all amounts that Airline is permitted to retain pursuant to Section 158.53(a) of the PFC Regulations.  Airline shall provide Lessor a copy of the annual audit of PFCs required by Section 158.69 of the PFC Regulations.

B.      In the event that Airline fails to make payments of PFCs to Lessor in accordance with the PFC Regulations, Director may require Airline to establish a PFC trust account pursuant to this Article 6 B.  In the event Director requires Airline to establish a PFC trust account, and notwithstanding Section 158.49 of the PFC Regulations, upon receipt of PFCs that are collected by Airline or its agents on behalf of Lessor, Airline shall establish, and shall deposit the net principal amount of such PFCs in, a trust account for Lessor's benefit ("Trust Account").  Lessor and Airline agree that the Trust Account shall be held in the name of Airline as trustee for Lessor, provided that Lessor and Airline mutually agree to terms upon which amounts may be withdrawn from such account upon the joint direction of Lessor and Airline.  If Lessor and Airline do not agree, the Trust Account shall be held by an independent third party bank trustee, in which event such trustee's fees shall be payable by the Lessor.  Lessor shall have the right to

## ARTICLE 7- ASSIGNMENT AND USE OF TERMINAL GATES, TICKET COUNTER
POSITIONS AND OTHER LEASED SPACE

A.   **Gate Assignment.**

   (1)   Subject to availability, Lessor shall assign Airline one or more Gate(s) in the Terminal on
         a Preferential-use basis, in accordance with the minimum Gate use requirements in
         Article 7.C., for all scheduled flights, subject to specific gate use procedures for off-
         schedule flights (resulting from ground delays, air traffic control delays, extended
         ground time, etc.). Lessor may operate one or more Gates as Joint Use Facilities to
         serve (a) international arrivals and departures, (b) commuter operations, and (c) those
         Air Carriers that do not meet the minimum gate use requirements or do not otherwise
         have Preferential Use of a Gate. Gate procedures for off-schedule flights will be
         established or revised by Lessor after consultation with the Airlines. In developing such
         procedures for off-schedule flights, priority will be given to assigning Airline gates
         nearest to Airline's preferentially assigned Gate(s).

   (2)   Airline will have priority in using Gates which are assigned to it on a Preferential Use
         basis to accommodate its flights. However, Lessor may assign such Gates for use by
         other Air Carriers in periods when the Gates are not in use by Airline, so long as the
         other Air Carrier vacates Airline's Preferential Use Gate prior to Airline's flights.

   (3)   The Gate(s) to be assigned to Airline at the passenger terminal building are designated in
         Exhibit A. Lessor may, in accordance with the procedures set forth in this Article and
         upon written notification to Airline, convert one or more Gate(s) assigned to Airline on
         a Preferential Use basis to a Joint Use Facility, or to reassign such Gate(s) to another Air
         Carrier if Airline's scheduled average gate utilization (including Affiliates) falls below the
         minimum levels established in Article 7 C.

B.   **Assignment of Ticket Counter Positions.**

   (1)   Subject to availability, Lessor shall assign Airline ticket counter positions in the
         passenger terminal building on a Preferential-use basis, in accordance with the minimum
         ticket counter use requirements in Article 7.C., for all scheduled flights. Lessor may

---

demonstrated an average utilization of at least five departures per day during the Test Period. In addition, Airline must make available, as necessary, proportionate amounts of ticket counter, ticket office space, and bag makeup areas, regardless of whether such space is leased to Airline on an Exclusive or Preferential Use basis.

(2)     If Airline qualifies under Article 7.C.(1) above for the Preferential Use of a Gate, Airline may lease, subject to availability, a sufficient amount of ticket counter space to operate at least two ticketing positions. Lessor shall use reasonable efforts to accommodate Airline requests to lease additional ticket counter space or positions, subject to availability. If as a result of the periodic evaluations of Gate usage under Article 7.C.(1), above, Airline is required to relinquish one or more Gates, Lessor may be required to also relinquish a proportionate amount of ticket counter space or positions.

(3)     If Lessor requires Airline to relinquish Gates, ticket counter positions and other space, Lessor and Airline will confer to determine which Gates, ticket counters, and space will be relinquished. If after twenty (20) days of good faith negotiations, no agreement has been reached, Lessor shall select the Gates, ticket counters, ticket office space, and other space to be relinquished. The cost of any reconfiguration of Airline's Exclusive Use Space or Preferential Use Space required by this provision shall either be paid by Lessor (without subsequent charge back to the Terminal Airline Area rate base), or passed on to the Air Carrier obtaining the rights to the relinquished space. If Airline is unable to operate all of its flights from Airline's remaining Gate(s) or ticket counter positions, and:

(a)     the Gates or ticket counter space relinquished by Airline is converted into a Joint Use Facility, Airline shall have priority in the use of the relinquished Gate or ticket counter space over other users of the Joint Use Facility for those of its flights which, because of a schedule conflict, cannot be operated from Airline's remaining Gates or ticket counter space, as applicable; or

(b)     the Gates or ticket counter space relinquished by Airline is assigned to another air carrier on a Preferential Use basis, and Airline is unable to make arrangements with another Air Carrier at the Airport to accommodate those of its flights which, because of a schedule conflict, cannot be operated from

F.   Whenever Airline's Preferential Use Gates(s) is used by others, Airline may charge such other users a reasonable fee not to exceed its direct costs and expenses related to providing such facilities plus an administrative overhead charge up to fifteen (15%) percent.

G.   Lessor may modify, reconfigure, reassign, reallocate or relocate the ticket counter positions, ticket offices, operations space, and other terminal space Preferentially or Exclusively leased to Air Carriers serving the Airport to (a) improve the utilization or functional capacity of the Terminal (b) to implement terminal capital improvement projects, or (c) as necessary due to casualty or an event of force majeure.  If Lessor determines it is necessary to modify, reassign, reconfigure, reallocate or relocate airline terminal leased space, Lessor shall consult with the affected Air Carriers.  Lessor shall consider the input of the Air Carriers in good faith, but Lessor shall make the necessary decisions regarding modification, reconfiguration, reassignment, reallocation or relocation for each of the affected Air Carriers, including, if applicable, Airline.  Lessor shall not relocate an Air Carrier against its will to premises that are materially greater in area or that would result in increased Rent when compared to the Premises under lease by that Air Carrier at the time of the relocation.  To the extent reasonably possible, Lessor shall provide the relocated Air Carriers with space that meets their operational requirements.  If Lessor implements a plan to modify, reconfigure, reassign, reallocate or relocate terminal space that is unacceptable to the affected Air Carriers, including, if applicable, Airline, and an affected Air Carrier reasonably determines that the proposed new premises are inadequate to meet its operational requirements, or to maintain its competitive position at the Airport, that Air Carrier may terminate this Agreement without penalty upon ninety (90) days' prior written notice to Lessor.

## ARTICLE 8 - ACCOMMODATION OF REQUESTING AIRLINES

Lessor shall accommodate the needs of an Air Carrier  that seeks to initiate air passenger service to the Airport, but does not then lease space at the Airport, or an incumbent Air Carrier  that seeks to expand its service to the Airport (collectively, a "Requesting Airline") as follows:

A.   If available, Lessor shall grant the Requesting Airline the use of Gates, ticket counter, office, baggage make-up, and related terminal space that are not currently under lease to another airline serving the Airport, or that are designated as Joint Use Facilities.  If there are insufficient

shall consider:

    (a)   the average number of flight arrivals and departures per Gate per day;

    (b)   potential flight scheduling conflicts;

    (c)   potential labor conflicts;

    (d)   the location of Gates, ticket counters and other Preferential Use Premises or Joint Use Facilities; and

    (e)   operational and other matters deemed appropriate by the Director.

(3)   In the event the Director grants a Requesting Airline the right of shared use of all or a portion of Airline's Premises:

    (a)   the Requesting Airline shall indemnify Airline in writing from claims for damages and personal injury arising out of Requesting Airline's use of Airline's Premises to the same extent as Airline indemnifies Lessor under this Agreement;

    (b)   the Requesting Airline shall reimburse Airline for Airline's direct costs and expenses related to providing such facilities plus administrative overhead not to exceed fifteen (15%) percent; and

    (c)   Airline shall be excused from its obligation to indemnify Lessor under Article 13, for claims for damages or personal injury to caused by, or resulting from, Requesting Airline's use of Airline's Premises, except to the extent caused by or resulting from the negligence or willful misconduct of Airline, or Airline's agents, employees or contractors.

### ARTICLE 9 – AIRLINE ALTERATIONS AND ADDITIONS

A.   **Airline Modification or Additions to Premises.**  Airline shall make no alterations, or additions to its Premises leased hereunder without the prior written approval of Lessor. If Airline proposes to make any modification, alteration or addition to its Premises, Airline shall follow the procedures set forth in the City of Austin Airport Design Review Policies and Procedures – Policy & Procedures for the ABIA Design Review Committee, as amended or revised from time to time ("Design Review Policies"). The alterations or additions must comply

**ARTICLE 10 - TERMINAL DEVELOPMENT AND CONSTRUCTION/RELOCATION OF AIRLINE PREMISES**

A. **Lessor's Terminal Development and Construction Rights.**

   (1)   Airline acknowledges that, in order that the Airport and the Terminal may be suitable for the volume and character of air traffic, flight activity, and passenger traffic, Lessor may, from time to time, undertake construction, repair or other activities related to the expansion, operation, maintenance and repair of the Terminal or the Airport, which will require temporary accommodation by Airline.  In addition, Lessor reserves the right to permanently reconfigure the Terminal, in whole or in part as necessary to accommodate the construction or expansion of the Terminal, or construction of connections to other terminals or facilities at the Airport, or to relocate or reconfigure the Premises and Joint Use Facilities.  Lessor agrees to use reasonable efforts to minimize disruption in Airline's business operations during such period of construction.

   (2)   Without limiting the generality of the foregoing, Lessor may temporarily or permanently close, alter, change, modify and/or relocate any entrances, passageways, doors and doorways, corridors, elevators, escalators or other parts of the Common Areas, Joint Use Facilities or the Terminal and the Premises; and Lessor may at any time and from time to time make such changes, alterations, additions, improvements, repairs or replacements in or to the Common Areas, Joint Use Facilities, and Terminal, as well as in or to the entrances, passages, elevators, escalators, and stairways thereof, as it may deem necessary or desirable, and to change the arrangement and/or location of entrances, passageways, doors and doorways, and corridors, elevators, stairs, toilets, or other public parts of the Common Areas, Common Use Facilities or the Terminal and the Premises, and may stop or interrupt any service or utility system, when necessary by reason of accident or emergency or construction work until the necessity for the interruption or stoppage has ended.

B. **Notice of Construction Activities.**  Except in an emergency, Lessor shall provide Airline not less than five (5) days' advance notice of construction activities.

C. **Access.**  Lessor shall provide reasonably adequate means of ingress and egress to Airline's

to Airline. If Airline reasonably expects it will directly incur relocation costs for work not included in the scope of the project, or which is not performed by Lessor or Lessor's contractors, Airline shall provide Lessor with a written estimate of its projected relocation costs for project budgeting purposes. Relocation costs include reasonable and documented costs and expenses incurred by Airline to move Airline's affected personnel, equipment, and operations to the new location, and the cost to replace Airline equipment or fixtures that are not reasonably capable of being moved. Lessor shall not be responsible to reimburse Airline, however, for (i) any costs assumed or paid directly by Lessor, or (ii) any indirect, incidental, or consequential, costs incurred by Airline as a result of the relocation, including loss of income or revenue, or increased operating or maintenance costs. To seek reimbursement of relocation costs incurred by Airline, Airline shall submit a written claim to Lessor, together with all necessary and appropriate supporting documentation within sixty (60) days after the move has been completed. Lessor shall pay relocation costs incurred by Airline within thirty (30) days after receipt of a proper claim. Reimbursement of relocation costs may be in the form of a credit against Rent or Additional Rent payable by Airline under this Agreement.

### ARTICLE 11 - AIRPORT SECURITY AND SAFETY

A.    Security.

(1)    Compliance with Transportation Security Regulations.  Airline shall comply with all Applicable Laws governing airport or aviation security, including Transportation Security Regulations (Title 49 CFR Chapter XII) and the Airport Security Plan. Lessor reserves the right to install security devices in or on the Premises, as it deems necessary to comply with Transportation Security Regulations or the Airport Security Plan.

(2)    Security Costs. All costs and expenses incurred by Lessor associated with screening for security reasons, of passengers and other persons, baggage and hand-carried objects entering the Sterile Areas of the Terminal, or to provide facilities to perform such screening, in order to comply with Applicable Law, including Federal Security Regulations  49 CFR Part 1544,  will be paid for by Airline and other Air Carriers operating from the Terminal which are required to, or actually do, use the screening services; and such costs and expenses incurred by the Airport will be prorated among

(b)   Airline shall utilize the Lessor's CUPPS if and when installed at the Airline's Preferential Use Premises. The costs associated with such use, including but not limited to the periodic replacement of all required CUPPS equipment, cabling, power and ongoing maintenance, shall be assessed to Airline as a Terminal Equipment Fee, which shall be paid by Airline in accordance with Article 5 above.

(c)   Airline hereby agrees that Lessor may install CUPPS equipment at the Airline's Preferential Use Premises. Lessor may also install CUPPS equipment in the circulation space and other public areas of the Terminal, as well as other areas on the Airport, including the parking garages and lots. Upon installation of such CUPPS equipment by Lessor, Airline agrees to transition from the use of any existing self-service devices of Airline to Lessor's CUPPS system. The entire cost of such installation, including but not limited to the removal and disposal of existing equipment, the initial purchase and periodic replacement of all required CUPPS equipment, cabling, power and ongoing maintenance, shall be assessed to Airline as a Terminal Equipment Fee, which shall be paid by Airline to Lessor in accordance with Article 5 above.

(3)   Airline may opt out of Lessor's CUPPS program by written notice given to Lessor within thirty (30) days after receipt of the notice referred to in Article 12.A(1). If Airline does not affirmatively opt out, Airline shall be deemed to have agreed to participate the CUPPS program. If Airline elects to opt out, Terminal Equipment Fees assessed to Airline shall not include CUPPS costs, but (i) Airline may not install, operate or maintain any of its proprietary terminal equipment or passenger processing kiosks in the circulation space and other public areas of the Terminal, the parking garages and lots, or any location in the Terminal or on the Airport other than at Airline's leased Gates and ticket counter and ticket counter queuing space, (ii) the placement of Airline's proprietary terminal equipment or passenger processing kiosks within Airline's Premises shall comply with applicable Airport design standards, (iii) any rights hitherto granted to Airline by Lessor to place its proprietary terminal equipment or passenger processing kiosks at any other location on the Airport shall be revoked and without further force or

use of the PDS for data transmission. Shared Tenant Services include data transmission lines (Frame Relay, ISDN, and T1) or Airline may choose to use the PDS to connect to an alternate provider at the demarcation point. Airline shall be responsible for, and pay all data communication service charges, including installation, maintenance, moves, adds, changes; excluding, however installation and move charges that arise out a relocation of Airline's Premises under Article 10.

(5) <u>Television Service.</u> Airline may contract with a provider of cable access television service in the Austin area for television service in those areas of the Premises it leases on an Exclusive Use basis. Airline may not install television sets in the passenger holdrooms, the ticket lobby, or other area accessible by the public. Airline may not install satellite dishes, antennae or similar receiving devices on the Premises. Airline shall be responsible for, and pay, all charges, including installation, maintenance, moves, adds, changes, PDS and cable channel charges.

(6) <u>Invoicing and Payment.</u>     Airline must apply for and sign the Airport Shared Telephone System Terms of Usage. Airline understands that it shall be billed monthly for its PDS and STS charges under this Article. Payment for PDS and STS charges is not included in the monthly Premises rent and must be paid by Airline as provided in the STS Terms of Usage. Non-payment of telephone service charges shall be grounds for discontinuance of service and an event of default under this Agreement.

(7) <u>Computer Networks.</u> Airline shall, at its sole expense, procure, install and maintain all computer networks within the Premises.

## ARTICLE 13 - INDEMNITY

A.   **Indemnity.**   AIRLINE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS LESSOR AND ITS EMPLOYEES, AGENTS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "INDEMNIFIED PARTIES"), FROM AND AGAINST ALL COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES, EXPENSES, AND COURT COSTS), LIABILITIES, DAMAGES, CLAIMS, SUITS, ACTIONS, AND CAUSES OF ACTIONS WHATSOEVER ("CLAIMS"), TO THE FULL EXTENT ARISING OUT OF (A) ANY BREACH OF THIS AGREEMENT BY AIRLINE OR ITS AGENTS, EMPLOYEES, AFFILIATES, SUBTENANTS, OR CONTRACTORS, (COLLECTIVELY THE "AIRLINE PARTIES") (B) ANY

that instituted or threatened to institute any type of action or proceeding, the basis of such claim, action, or proceeding; and the name of any person against whom such claim is being made or threatened. Such written notice shall be delivered either personally or by mail and shall be directly sent to the Austin City Attorney, 301 West 2nd Street, Austin, Texas 78701, and to Lessor.

## ARTICLE 14.  INSURANCE

A.  Airline shall, without expense to Lessor, obtain and cause to be kept in force throughout the term of this Agreement, including any renewals, or extensions thereof, the insurance policies and coverages as provided in this Article.  Airline shall deliver certificates of insurance, for itself and its contractors, verifying the coverage listed below to the Director prior to commencing operations pursuant to this Agreement.  If coverage period ends during the Term of the Agreement, Airline shall, prior to the end of the coverage period, forward a new Certificate of Insurance to Lessor as verification of continuing coverage for the duration of the Term of this Agreement.

(1)  <u>Workers' Compensation and Employers' Liability</u>.  Worker's compensation insurance shall be provided with limits consistent with statutory benefits outlined in the Texas Workers' Compensation Act (Texas Labor Code Title 5) and minimum policy limits for employers' liability of $1,000,000 bodily injury each accident, $1,000,000 bodily injury by disease policy limit and $1,000,000 bodily injury by disease each employee.

(2)  <u>Commercial General Liability Insurance.</u>  Commercial General Liability Insurance shall be provided with a minimum bodily injury and property damage per occurrence limit of $250,000,000 for coverage A (Bodily Injury and Property Damage) and coverage B (Personal and Advertising Injury); Personal Injury with respect to other than passengers limited to $25,000,000; and $1,000,000 product/completed operations minimum limit of liability.   The policy shall contain blanket contractual liability coverage for liability assumed under this contract.

(3)  <u>Hangarskeepers Insurance</u>.  Hangarskeepers Liability shall be provided with a minimum limit of $10,000,000.

additional insured shown on any policy. It is intended that policies required in this Agreement covering Lessor and the Airline, shall be considered primary coverage as applicable.

(d)     If insurance policies are not written for amounts specified above, the Airline shall carry Umbrella or Excess Liability Insurance for any differences in amounts specified. If Excess Liability Insurance is provided, it shall follow the form of the primary coverage.

(e)     Lessor shall be entitled, upon request to inspect copies of policies and endorsements thereto at a mutually acceptable location and time, and may make any reasonable requests for deletion or revision or modification of particular policy terms, conditions, limitations, or exclusions except where policy provisions are established by law or regulations binding upon either of the parties hereto or the underwriter on any such policies or if the change would result in the imposition of an additional premium or cost which neither the Airline or Lessor is willing to assume.

(f)     Lessor reserves the right to review insurance requirements set forth during the Term of this Agreement and to make reasonable adjustments to insurance coverage, limits, and exclusions when deemed necessary and prudent by Lessor based upon changes in statutory law, court decisions, the claims history of the industry or financial condition of the insurance company as well as the Airline. Airline shall have ninety (90) days in which to implement any changes under this section.

(g)     The Airline shall not cause any insurance to be canceled nor permit any insurance to lapse during the term of this Agreement that is related to Airline's operations at the Airport. All policies shall be endorsed to require thirty (30) days' prior notice to Lessor before cancellation or termination.

(h)     Airline shall be responsible for deductibles and self-insured retentions, if any, stated in policies. All deductibles or self-insured retentions shall be disclosed on the certificates of insurance.

responsible Governmental Authority as being hazardous, toxic, radioactive, or that presents an actual or potential hazard to human health or the environment if improperly used, handled, treated, stored, disposed, discharged, generated or released. Hazardous Materials specifically include, without limitation, asbestos and asbestos-containing materials, petroleum products, solvents, and pesticides.

(3)     Environmental Claims – shall refer to all claims, demands, suits, actions, judgments, and liability arising out of the use, handling, treatment, storage, disposal, discharge, or transportation of Hazardous Materials for: (i) removal, remediation, assessment, transportation, testing and disposal of Hazardous Materials as directed by any Government Authority, court order, or Environmental Law; (ii) bodily injury, or death; (iii) damage to or loss of use of property of any person; (iv) injury to natural resources; (v) fines, penalties, costs, fees, assessments, taxes, demands orders, directives or any other requirements imposed in any manner by any Governmental Authority under Environmental Laws; and (vi) costs and expenses of cleanup, remediation, assessment testing, investigation, transportation and disposal of a Hazardous Material spill, release, or discharge that is material or reportable under Environmental Law or the SWPPP.

(4)     Lessor Environmental Party – shall include the Lessor, and its elected and non-elected officials, officers, agents, employees, contractors, successors, and assigns.

(5)     Airline Environmental Party – shall include the Airline, and its directors, officers, agents, employees, contractors, successors, and assigns.

(6)     SWPPP – means the Airport Storm Water Pollution Prevention Plan and Spill Response Plan, which is incorporated by reference.  The SWPPP  is posted on the Lessor's website at www.ci.austin.tx.us/austinairport/swppp.htm (as of the Effective Date).

B.     **Compliance.**  In its operations at the Airport, Airline shall strictly comply with applicable Environmental Laws, including any permits, licenses or authorizations granted thereunder, the Airport Environmental Policies and Procedures including the SWPPP, and generally accepted industry environmental practices and standards. Without limiting the generality of the foregoing provision, Airline shall not use or store Hazardous Materials on or at the Airport except as reasonably necessary in the ordinary course of Airline's permitted activities at the Airport, and

responsible for Hazardous Materials that

    (a)    exist on the Airport prior to the date that Airline commenced air operations at the Airport, except to the extent that an Airline Environmental Party disturbed or caused known pre-existing Hazardous Materials to migrate so as to give rise to an Environmental Claim, or

    (b)    are generated, used, handled, treated, stored, disposed, released, discharged or transported on the Airport by a person other than an Airline Environmental Party.

    (3)    All reporting requirements under Environmental Laws with respect to Hazardous Materials generated, used, handled, treated, stored, disposed, discharged, spilled, released, or transported to spills, releases, or discharges of by an Airline Environmental Party at the Airport under any law are the responsibility of Airline.

D.    **Indemnity.** IN ADDITION TO ANY OTHER INDEMNITIES IN THIS AGREEMENT, AIRLINE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE LESSOR ENVIRONMENTAL PARTIES FROM ANY AND ALL ENVIRONMENTAL CLAIMS (INCLUDING REASONABLE ATTORNEY'S FEES, LITIGATION AND INVESTIGATION EXPENSES, AND COURT COSTS) TO THE EXTENT ARISING FROM OR CAUSED BY THE USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE, OR TRANSPORTATION OF HAZARDOUS MATERIALS BY AN AIRLINE ENVIRONMENTAL PARTY ON OR AT THE AIRPORT, THE VIOLATION OF ANY ENVIRONMENTAL LAW BY AN AIRLINE ENVIRONMENTAL PARTY, OR THE FAILURE OF AN AIRLINE ENVIRONMENTAL PARTY TO COMPLY WITH THE TERMS, CONDITIONS AND COVENANTS OF THIS ARTICLE.

THE FOREGOING INDEMNITY SHALL NOT APPLY TO ENVIRONMENTAL CLAIMS TO THE EXTENT ARISING FROM OR CAUSED BY:

    (1)    ENVIRONMENTAL CONDITIONS EXISTING ON THE AIRPORT PRIOR TO THE DATE AIRLINE COMMENCED OPERATIONS AT THE AIRPORT, EXCEPT TO THE EXTENT THAT AN AIRLINE ENVIRONMENTAL PARTY EITHER DISTURBED OR CAUSED KNOWN PRE-EXISTING HAZARDOUS MATERIALS TO MIGRATE, SO AS TO GIVE RISE TO AN ENVIRONMENTAL CLAIM, OR

    (2)    THE USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE, OR

Lessor shall provide Airline with written notice of those NPDES and TPDES stormwater discharge permit requirements that Airline shall be obligated to perform from time to time at the Airport, including, but not limited to: certification of non-stormwater discharges; collection of stormwater samples in the event of an actual or threatened Hazardous Material spill, release, or discharge; assistance in development, implementation, or preparation of stormwater pollution prevention or similar plans; implementation of "good housekeeping" measures or "Best Management Practices"; implement SWPPP policies and procedures, train staff as required by its TPDES permit, perform SWPPP inspections, provide de-icing usage records to the Department, report large releases immediately as defined by the Spill Response Plan, and maintenance of necessary records. Such written notice shall include applicable deadlines. Airline, within thirty (30) days of receipt of such written notice, shall notify Lessor in writing if it disputes any of the stormwater discharge permit requirements it is being directed to undertake. If Airline does not provide such timely notice, it is deemed to assent to undertake such requirements. If Airline provides Lessor with written notice, as required above, that it disputes such NPDES or TPDES stormwater discharge permit requirements, Lessor and Airline agree to negotiate a prompt resolution of their differences. Airline warrants that it will not object to Lessor notices required pursuant to this paragraph unless Airline has a good faith basis to do so.

Lessor and Airline agree to provide each other upon request, with any non-privileged information collected and submitted to any Government Authority pursuant to applicable NPDES or TPDES stormwater regulations.

Airline agrees to participate in any reasonable manner requested by Lessor in any Lessor organized task force or other work group established to coordinate stormwater activities at the Airport.

G.   **Natural Resource and Energy Conservation and Management.** Airline shall comply with Applicable Law pertaining to recycling and energy or natural resource conservation and management. Lessor may establish and implement an Environmental Management System for the Airport after notice to, and consultation with, the Signatory Airlines. Airline shall cooperate with Lessor in the implementation of such conservation and management policies and programs.

of the Premises leased hereunder without the prior written approval of Lessor. If Airline voluntarily suspends, or abandons service to the Airport for a period of sixty (60) days or longer, Airline may, subject to the prior consent of the Director, sublease all, or any part of the Premises leased to it hereunder to another scheduled Air Carrier providing daily service to the Airport; provided, however, Airline shall continue to be responsible to Lessor for the payment of all rentals and other charges for commonly and preferentially leased areas, when such are due hereunder, for the full term of this Agreement. Nothing contained in this Article shall affect the rights of Lessor to (i) terminate this Agreement pursuant to Article 22 if Airline voluntarily abandons its conduct of its Air Carrier Service at the Airport for a period of thirty (30) days, or (ii) reassign Airline's Gates under Article 7 D if Airline discontinues commercial air service to the Airport.

## ARTICLE 19 - SURRENDER OF POSSESSION

Airline shall peaceably, quit, deliver up and surrender to Lessor the possession of the Premises leased to Airline, or to Airline in common with others, at the termination of Agreement, by expiration, or otherwise, or of any renewal, or extension thereof. Airline shall restore the Premises and make such repairs as may be necessary to restore the Premises to substantially the same condition as the Premises were upon inception of Airline's occupancy thereof, reasonable wear and tear, fire or other casualty, and Lessor-authorized improvements excepted. Airline may at any time during the term, or any renewal, or extension hereof, and for thirty (30) days after the termination hereof, remove its trade fixtures and equipment situated on the Premises which were installed, or placed by it, at its expense in, on or about the Premises; subject, however, to any valid lien which Lessor may have thereon for unpaid rents, fees or charges, and further provided that Airline shall repair any damage to the Premises cause by such removal. If Airline fails or neglects to remove all or any portion of its trade fixtures or equipment within such thirty (30) day period, Lessor, at Lessor's option, may:

A.   Remove such property to a public warehouse for storage, or retain the same in Lessor's possession, and after the expiration of thirty (30) days sell the same, with or without notice and at public or private sale, in accordance with Applicable Law, the proceeds of which shall be applied first to the expenses of the removal, storage and sale, second to any sum owed by Airline to Lessor, and any balance remaining shall be paid to Airline. If the expenses of such removal, storage and sale exceed the proceeds of the sale, then Airline shall pay such excess to the Lessor

(1)   Airline shall fail to pay any installment of Rent, Additional Rent, Landing Fees, or PFCs when due, and such failure shall continue for thirty (30) days after delivery by Lessor to Airline of written notice specifying such failure;

(2)   Airline shall fail to keep, perform, or observe any of the non-monetary covenants, agreements, terms, or provisions contained in this Agreement that are to be kept or performed by Airline, and Airline shall fail to cure such failure within thirty (30) days after delivery by Lessor to Airline of written notice specifying the failure; provided, however, if the failure is curable, but cannot be cured within such 30-day period, a Airline Default shall not occur if Airline commences the cure of the failure during such 30-day period and thereafter diligently and continuously pursues the cure to completion;

(3)   An involuntary petition shall be filed against Airline under applicable Bankruptcy Law, and such petition or appointment is not discharged or stayed within one hundred twenty (120) days after the happening of such event; or

(4)   Airline shall make an assignment of its interest in the Premises for the benefit of creditors, shall file a voluntary petition under applicable Bankruptcy law, or seek relief under any other law for the benefit of debtors; or

(5)   A receiver of Airline, or of all or substantially all of the assets of Airline, shall be appointed; or

(6)   Airline shall be lawfully divested of, or prevented by any final action of any Governmental Authority, from conducting and operating its Air Carrier Service at the Airport; or

(7)   Airline voluntarily abandons its conduct of its Air Carrier Service at the Airport for a period of thirty (30) days for any reason not excused under Article 20.

B.   **Remedies of Lessor.** If an Airline Default occurs, Lessor may at any time thereafter and without waiving any other rights hereunder or available to Lessor at law or in equity (Lessor's rights being cumulative), do any one or more of the following:

(1)   Lessor may terminate this Agreement by giving Airline not less than ten (10) days' prior written notice of termination, in which event this Agreement and the rights and interest

default, and all costs and expenses incurred by Lessor in performing such obligations of Airline (Lessor's administrative and overhead costs) shall be deemed Additional Rent payable by Airline to Lessor.

(4)   Lessor may exercise any other right or remedy available to Lessor under this Agreement or at law or in equity.

(5)   All Rent and other sums not paid on or before the date due shall bear interest at the lesser of one and one half percent (1 ½%) per month, or the maximum lawful rate, from the date due until paid in full.

C.   **Default by Lessor.**   The following shall be deemed a default by Lessor ("Lessor Default") and a material breach of this Agreement:

(1)   Lessor shall fail to keep, perform, or observe any of the covenants, agreements, terms, or provisions contained in this Agreement that are to be kept or performed by Lessor, and Lessor shall fail to cure such failure within thirty (30) days after delivery by Airline to Lessor of written notice specifying the failure; provided, however, if the failure is curable, but cannot be cured within such 30-day period, a Lessor Default shall not occur if Lessor commences the cure of the failure during such 30-day period and thereafter diligently and continuously pursues the cure to its completion.

D.   **Airline's Remedies.**   If a Lessor Default occurs, Airline may, at any time thereafter and without waiving any other rights hereunder or available to Airline at law or in equity (Airline's rights being cumulative), do any one or more of the following:

(1)   Airline may terminate this Agreement by giving Lessor written notice thereof, in which event this Agreement and the leasehold estate hereby created and all interest of Airline and all parties claiming by, through, or under Airline shall automatically terminate upon the effective date of such notice; and Airline shall thereafter be released of all other duties, obligations and responsibilities with respect to this Agreement, except such provisions, including, but not limited to, Airline's indemnity obligations that shall survive termination.

(2)   Airline may exercise any other right or remedy available to Airline, except as limited by Applicable Law or the terms of this Agreement.

twenty (120) days, the same shall be repaired with due diligence by Lessor, and the rental allocable to that portion of Airline's Premises rendered untenantable shall be abated for the period from the occurrence of the casualty to the completion of the repairs.

C.    If the damage arising from a casualty is so extensive as to render a material part, or all, of Airline's Premises untenantable, and not reasonably capable of being repaired within one hundred twenty (120) days, or such Premises, or material part thereof, is completely destroyed, Lessor shall notify Airline whether the space shall be repaired.  If Lessor elects to repair the space, it shall be repaired with due diligence by Lessor, and the rental allocable to that portion of Airline's Premises rendered untenantable, shall be abated for a period from the occurrence of the casualty to the completion of the repairs. If Lessor elects not to repair, or during the time that repairs are being made, Lessor shall use commercially reasonable efforts to provide Airline with temporary substitute space, if available, at such rent as is reasonable for comparable space otherwise leased by Lessor. If Lessor elects not to repair the damage, and is unable to provide Airline with adequate substitute premises, Airline may terminate this Agreement without penalty upon thirty (30) days written notice to Lessor.

D.    The damaged areas shall be restored to substantially the same condition as they were in prior to the casualty.  The cost of repair or reconstruction of the Premises under this Article shall be paid by Lessor, to the extent of insurance proceeds received by Lessor; except if the casualty was caused by the negligence or willful misconduct of Airline, or Airline's agents, sublessees, employees, or contractors, the cost of repair and reconstruction shall be paid by Airline. The cost of repair or restoration performed by Lessor in excess of the amount of insurance proceeds, if any, shall be recoverable from the Air Carriers operating from the Terminal in accordance with the Agreement and Applicable Law.

### ARTICLE 23 - NON WAIVER OF RIGHTS

Continued performance by either party hereto pursuant to the terms of this Agreement after a default of any of the terms, covenants and conditions herein contained to be performed, kept, or observed, by the other party hereto, shall not be deemed a waiver of any right to terminate this Agreement for any subsequent default and no waiver of any such default shall be construed, or act, as a waiver of any subsequent default.

including the expenditure of federal funds for the development of the Airport in accordance with the provisions of the FAA's Airport Improvement Program, or in order to impose and use passenger facilities charges under 49 U.S.C. Section 40117 or any successor thereto.

B.   **Compliance with Law.**   At all times during the term of this Agreement, Airline shall, in connection with its activities and operations at the Airport comply with and conform to Applicable Law.   Airline shall comply with all applicable provisions of the Americans With Disabilities Act of 1990 (42 U.S.C. Section 12101), as may be amended from time to time, and federal regulations promulgated thereunder.   Subject to prior approval of the Director, Airline shall make, at its own expense, all non-structural improvements, repairs and alterations to its Preferential Use Space, equipment, and personal property that are required to comply with or conform to any of such statutes, ordinances, or regulations.

C.   **Non-discrimination**

    (1)   General.   In the use and occupation of the Airport, Airline shall not unlawfully discriminate against any person or class of persons by reason of race, color, religion, sex, national origin or ancestry, age, or physical or mental handicap.

    (2)   Civil/Human Rights Laws.   In its operations at the Airport and in its use of the Airport, Airline shall not, on the grounds of race, color, religion, sex, national origin or ancestry, or age, discriminate or permit discrimination against any person or group of persons in any manner prohibited by Part 21 of the Federal Aviation Regulations, the Civil Rights Act of 1964, as amended, the Equal Pay Act of 1963, the Rehabilitation Act of 1973, and Chapter 5-4 of the Austin City Code.   Without limiting the generality of the foregoing, Airline agrees to not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or ancestry, or age, in accordance with Applicable Law.   Airline agrees to take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, national origin or ancestry, age, or physical or mental handicap.   Such action shall include, but not be limited to: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; selection for training; and

or receiving the services or benefits of any program or activity covered by this Section 14.03. Airline assures that it will require that any covered suborganization similarly will undertake affirmative action programs and that the suborganization will require assurance from the suborganizations' suborganization, as required by 14 CFR, Part 152, Subpart E, to the same effect.

### ARTICLE 28 – TITLE TO AIRLINE INSTALLED IMPROVEMENTS AND PROPERTY

As to improvements and property installed and paid for by Airline under the terms of this Agreement, Airline will retain title to all of its trade fixtures and equipment only, except as may otherwise be provided for in this Agreement, or other agreements between the parties hereto, and Airline shall have the right any time during the term of this Agreement and prior to its expiration or early termination to remove any and all of its trade fixtures and equipment from the Airport, provided Airline is not in default in its payments hereunder.   All Lessor property damaged by or as a result of the removal of Airline's property shall be restored at Airline's expense to the same or better condition that it was prior to such damage.   Any and all property not removed by Airline prior to the expiration or early termination of this Agreement as provided herein, shall thereupon become a part of the land upon which it is located and title thereto shall thereupon vest in the Lessor; provided, however, Airline shall not abandon any of its property on the Leased Premises without prior written consent of the Director, and Lessor reserves the right to remove any property abandoned by Airline at Airline's expense.

### ARTICLE 29 – NOTICES

Any notice provided for or permitted to be given hereunder must be in writing and may be given by (a) depositing same in the United States Mail, postage prepaid, registered or certified, with return receipt requested, addressed as set forth in this Article 30; (b) hand delivering the same to the party to be notified; or (c) overnight courier of general use in the business community of Austin, Texas.   Notice given in accordance herewith shall be deemed delivered and effective on the earlier of actual receipt or three (3) business days next following deposit thereof in accordance with the requirements above.

Notices shall be sent to the following persons and addresses, or to such other person and address

(1)     that this Agreement is unmodified and in full force and effect (or if there have been modifications, a description of such modifications and that the Agreement as modified is in full force and effect);

(2)     that the Lessor is not in default under any provision of this Agreement, or if in default, the nature thereof in detail; and

(3)     such further matters as may be reasonably requested by the Lessor, it being intended that such statements may be relied upon by the parties involved in such issuance of Bonds.

C.     **Bond Covenants.** Airline understands and agrees that the City of Austin has covenanted in its Bond Ordinances authorizing the issuance of prior lien bonds that it will at all times fix, charge, impose, and collect rentals, rates, fees, and other charges for the use of the Airport system, and, to the extent it may legally do so, revise the same as may be necessary or appropriate, in order that in each Fiscal Year the net revenues will be at least sufficient to equal the larger of either:

(1)     all amounts required to be deposited in such Fiscal Year to the credit of the debt service fund and the debt service reserve fund, and any debt service or debt service reserve fund or account referred to in the Bond Ordinance for revenue bonds and subordinate obligations, or

(2)     an amount, together with other available funds, not less than 125% of the debt service requirements for the prior lien bonds for such Fiscal Year.

Therefore, the Lessor and Airline agree that the Lessor may adjust Airline rentals, rates, fees, and other charges at the Airport system if such adjustment is necessary to enable the Lessor to meet the rate covenant contained in the ordinance authorizing the issuance of the prior lien bonds, as follows:

(3)     The Lessor will increase total Airfield Area costs by the amount necessary, if any, such that Net Revenues  equal 125% of the Prior Lien Bonds debt service requirements. Such amount shall be referred to as the Incremental Landing Fee Charge.

(4)     As soon as possible following the close of any Fiscal Year in which there was an Incremental Landing Fee Charge, the Lessor will refund Airline's landing fees by an

F.   **Governing Law.** This Agreement shall be deemed to have been made in, and be construed in accordance with the laws of the State of Texas.

G    **Inspection of Lessor Records.** Airline, at its expense and upon reasonable notice, shall have the right to inspect the books, records, and other data of the Lessor relating to the provisions and requirements hereof provided such inspection is made during regular business hours.

H.   **Successors and Assigns.** All of the terms, provisions, covenants, stipulations, conditions, and considerations in this Agreement shall extend to and bind the legal representatives, successors, and permitted assigns of the respective parties hereto.

I.   **Entire Agreement.** This Agreement, together with all exhibits attached hereto, constitutes the entire Agreement between the parties on the subject matter hereof. This Agreement supersedes and replaces all prior agreements between the parties hereto with respect to the leasing by Airline of the Premises, including the Amended and Restated Austin-Bergstrom International

**EXHIBITS**

| | |
|---|---|
| A-1 | Description of Premises |
| A-2 | Premises Drawings - Terminal Area |
| B | Airport Layout Plan - Airfield Area Description |
| C | Airport Layout Plan - Apron Description |
| D-0 | Airport Rates and Charges - General Principles and Methodology |
| D-1 | Basic Project Costs and Funding Sources |
| D-2 | Allocation of Project Costs to Cost Centers - Debt Service |
| D-3 | Acreage Allocation Worksheet |
| D-4 | Summary of Debt Service |
| D-5 | Operations and Maintenance Expenses |
| D-6 | Terminal Space Analysis |
| D-7 | Terminal Space Allocations |
| D-8 | Terminal Rental Rates |
| D-9 | Terminal Apron Fees |
| D-10 | Terminal Equipment Fees |
| D-11 | Landing Fees |

**Exhibit A-1**
**Description of Premises**

**Exhibit A-2**
**Premises Drawings - Terminal Area**



**Exhibit B**
**Airport Layout Plan – Airfield Area Description**

**Exhibit C**
**Airport Layout Plan - Apron Description**

**Exhibit D-0**
**Airport Rates and Charges - General Principles**
**and Methodology**

(a) any allowance for depreciation;

(b) costs of capital improvements;

(c) reserves for major capital improvements, Airport System operations, maintenance or repair;

(d) any allowance for redemption of, or payment of interest or premium on, Prior Lien Bonds, Revenue Bonds and Subordinate Obligations;

(e) any liabilities incurred in acquiring or improving properties of the Airport System;

(f) expenses of lessees under Special Facilities Leases and operation and maintenance expenses pertaining to Special Facilities to the extent they are required to be paid by such lessees pursuant to the terms of the Special Facilities Leases;

(g) any charges or obligations incurred in connection with any lawful Airport System purpose, including the lease, acquisition, operation or maintenance of any facility or property benefiting the Airport System, provided that the payment of such charges or obligations is expressly agreed by the payee to be payable solely from proceeds of the Capital Fund;

(h) liabilities based upon the City's negligence or other ground not based on contract; and

(i) so long as Federal Payments are excluded from Gross Revenues, an amount of expenses that would otherwise constitute Operation and Maintenance Expenses for such period equal to the Federal Payments for such period.

8. <u>Productive Space</u> shall mean the total useable space in the Terminal, excluding Support Space, leasable lessee maintained space, and space related to the EDS baggage handling system, as more particularly shown and described on Exhibit D-6, attached hereto. Productive Space includes airline leasable space (e.g. ticket counters, back offices and holdrooms), concession space, restrooms, circulation space, security checkpoints, and the inbound baggage area.

9. <u>Support Space</u> shall mean all space in the Terminal other than Productive Space and leasable lessee maintained space, as more particularly shown and described on Exhibit D-6, attached hereto. Support Space includes common service areas, apron level service roadway, rooftop mechanical room/storage space, and areas used for administrative services.

## II.

The Terminal conditioned space rental rate for the Fiscal Year shall be the sum of the Operations and Maintenance Rate and the Capital Cost Recovery Rate, which shall be calculated as follows and as illustrated in Exhibit D-8:

1. The Operations and Maintenance Rate shall be calculated by dividing the estimated Operation and Maintenance Expenses, Operation and Maintenance Reserve Fund and bad debt expense allocable to the Terminal Building by the total Productive Space in the Terminal Building.

2. The Capital Cost Recovery Rate shall be calculated by dividing the total annual capital cost recovery charges allocable to Airline Leasable Space by the total amount

      c.      Debt Service and Coverage attributed to Terminal Equipment, and

      d.      Terminal Equipment prorata share of any fund deposits required by the Bond Ordinance.

2.      The estimated Terminal Equipment Fee per gate required shall then be determined by dividing the Terminal Equipment costs by the number of leased aircraft gates.

### VI.

Landing fees shall be determined by multiplying the landing fee rate as forecasted and shown on Exhibit D-11, times the total number of thousand pound units of Maximum Certified Gross Landing Weight of Airline's aircraft making Fee Landings at Airport during the preceding month.

The Landing Fee rate for the Fiscal Year shall be calculated as follows and as illustrated in Exhibit D-11:

1.      The estimated total Airfield Area costs shall be calculated by adding:

      a.      Direct and indirect operations and maintenance costs allocable to the Airfield Area, and

      b.      Annual Amortization charges attributed to the Airfield Area.

      c.      Debt Service and Coverage attributed to the Airfield Area, and

      d.      Airfield Area prorata share of any fund deposits required by the Bond Ordinance.

2.      The revenues estimated from fuel flowage fees shall then be subtracted from the total Airfield Area cost to determine the estimated net Airfield Area cost.

3.      The estimated net Airfield Area costs shall be divided by the composite landed weight forecast of the Signatory Airlines and other airlines under agreement with the Lessor for the ensuing Fiscal Year to determine the Signatory Airline landing fee rate for the Fiscal Year. In the Year-end Adjustment to Actual computation described in Article 5.I.(2), Lessor shall use actual total landed weight (including non-signatory carriers) as the basis for computing the Landing Fee.

EXHIBIT B-1

BAART PROJECT COST ALLOCATION WORKSHEET
Actual Incurred Costs as of September 30, 2008
Austin-Bergstrom International Airport
City of Austin, Department of Aviation

EXHIBIT 7 (p.1 of 2)

BASIC PROJECT COSTS AND FUNDING SOURCES

City of Austin Department of Aviation

**EXHIBIT D-3**
**ALLOCATION OF PROJECT COSTS TO COST CENTERS**
**DEBT SERVICE**
Austin-Bergstrom International Airport
City of Austin, Department of Aviation

| | Total allocable project costs | | Airline | | | | | Non-airline commercial | | | Non-commercial | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Terminal | Airfield | Apron | Curbside Conveyor | Fuel Facility | Cargo | GA | Other | Terminal | Parking | PRM/CTS | FBO | North Infrastructure | South Infrastructure |
| **Direct Costs** | | | | | | | | | | | | | | | | |
| Land acquisition | | | | | | | | | | | | | | | | |
| **Direct Costs** | | | | | | | | | | | | | | | | |
| Noise mitigation (acquisition of schools) | $16,634,340 | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Demolition | 14,473,979 | — | — | — | — | — | — | — | — | — | — | — | — | 14,473,979 | — |
| Airport utilities | 7,379,241 | — | — | — | — | — | — | — | — | — | — | — | 952,607 | 6,426,634 | — |
| Telecommunications | 8,621,777 | — | — | — | — | — | — | — | — | — | — | 1,236,456 | — | 5,941,167 | 1,444,353 |
| Security system | 3,744,829 | 3,744,829 | — | — | — | — | — | — | — | — | — | — | — | — | — |
| **Passenger Terminal Complex** | | | | | | | | | | | | | | | | |
| Terminal complex | 40,376,613 | 17,610,674 | — | — | — | — | — | — | — | 22,442,539 | — | — | — | — | — |
| Concession kiosks | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Terminal equipment | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Parking structures | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| **Airfield Facilities** | | | | | | | | | | | | | | | | |
| Terminal apron | 664,741 | — | — | 664,741 | — | — | — | — | — | — | — | — | — | — | — |
| Terminal apron expansion | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Air cargo apron | 2,189,658 | — | 2,189,658 | — | — | — | — | — | — | — | — | — | — | — | — |
| Edit survey system | 3,370,122 | — | 3,370,122 | — | — | — | — | — | — | — | — | — | — | — | — |
| Airfield service roads | 448,342 | — | 448,342 | — | — | — | — | — | — | — | — | — | — | — | — |
| Airfield cross taxiway | 349,251 | — | 349,251 | — | — | — | — | — | — | — | — | — | — | — | — |
| West runway and taxiway | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Steel Fueling (fuel) apron | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| General aviation | 1,037,343 | — | — | — | — | — | — | — | — | — | — | — | — | — | 1,037,343 |
| GA lease expansion | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Airfield lighting and equipment | 1,616,787 | — | 1,616,787 | — | — | — | — | — | — | — | — | — | — | — | — |
| Miscellaneous airfield costs | 44,211 | — | 44,211 | — | — | — | — | — | — | — | — | — | — | — | — |
| **Landside Facilities** | | | | | | | | | | | | | | | | |
| Terminal access road | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Terminal parking/bookkeeping | 26,796,541 | — | — | — | — | — | — | — | — | — | 26,796,541 | — | — | — | — |

EXHIBIT D-1 (page 3 of 3)
ALLOCATION OF PROJECT COSTS TO COST CENTERS - DEBT SERVICE
Austin-Bergstrom International Airport
City of Austin, Department of Aviation

| Indirect Costs | Total allocable project costs | Airfield Terminal | Airfield | Apron | Customs Corridor | Fed Fuel/DF | Non-Utility (Aeronautical) Cargo | GA | Other | Non-aeronautical Terminal | Parking | PFROATS | PFS | North Infrastructure | South Infrastructure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program management services | 10,683,766 | 3,232,141 | 2,386,007 | 196,723 | $ — | 375,361 | $ — | $ — | $ — | 3,049,124 | 2,476,649 | 1,176,191 | 123,503 | $ — | $ — |
| Financial and legal services | 2,290,693 | 694,998 | 496,423 | 34,795 | — | 118,635 | — | — | — | 555,268 | 772,885 | 26,940 | 19,141 | — | — |
| Preliminary planning services | 732,444 | 148,261 | 126,755 | 4,453 | — | 33,577 | — | — | — | 160,349 | 275,514 | 8,073 | 3,346 | — | — |
| Supplying goods, materials testing | 3,782,463 | 1,593,146 | 1,108,629 | 23,669 | — | 286,612 | — | — | — | 1,298,282 | 1,766,724 | 44,049 | 46,242 | — | — |
| Owner-controlled insurance program | 3,526,271 | 1,089,238 | 976,294 | 23,639 | — | 203,497 | — | — | — | 1,146,684 | 1,607,181 | 57,611 | 41,618 | — | — |
| Small business assistance program | 3,488,440 | 1,113,783 | 1,044,634 | 33,053 | — | 271,363 | — | — | — | 1,224,122 | 1,675,813 | 61,600 | 43,864 | — | — |
| IOC Project | 53,323 | 10,979 | 10,228 | 328 | — | 2,612 | — | — | — | 11,425 | 16,327 | 986 | 436 | — | — |
| ADA, relocation test equipment | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Other replacement costs | 1,056,832 | 298,542 | 193,272 | 6,204 | — | 48,598 | — | — | — | 223,599 | 328,770 | 11,332 | 8,862 | — | — |
| Management reserve | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| **Total Indirect Costs** | 25,634,239 | 7,180,136 | 6,364,268 | 322,164 | $ — | 1,370,364 | $ — | $ — | $ — | 7,789,953 | 9,640,563 | 1,411,783 | 289,901 | $ — | $ — |
| **Direct and Indirect Costs** | 179,764,186 | 220,717,607 | 527,413,276 | 1,885,671 | $ — | 3,733,576 | $ — | $ — | $ — | 553,162,425 | 544,081,569 | 5,471,527 | 5,510,556 | 23,858,439 | $ — |
| **Allocated infrastructure costs** | n/a | 226,709,171 | 33,512,499 | 32,512,499 | — | 17,299,195 | — | — | — | 35,015,651 | 35,015,651 | — | — | -15,727,713,039 | -7,362,261,091 |
| **Total service allocation** | 175,264,110 | 524,036,778 | 547,023,646 | 1,750.0% | 57,299,195 | 4,052% | 0.000% | 0.000% | 552,162,425 | 24.662% | 9.902% | 0.640% | 55,161,756 | 4.524% | 2.821% |

EXHIBIT D-3

## ACREAGE ALLOCATION WORKSHEET

| Rentable acreage by Area | Total allocable acreage | Terminal | Airfield | Apron | Fuel Facility | Cargo | GA | Other | Non-terminal Terminal | Parking | Unrentable acreage | Rentable non-office area North area | Rentable non-office area South area | For O&M Allocation Rentable non-office area (by parcel) North area | South area |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Terminal building | 6.9 | 3.0 | | | | | | | 3.9 | | | | | | |
| Central plant | 2.3 | 1.0 | | | | | | | 1.3 | | | | | | |
| Roadways | 100.7 | | | | | | | | | | 100.7 | | | | |
| Airfield | 843.7 | | 732.6 | | | | | | | | | | | | |
| Terminal apron | 66.7 | | | 20.0 | | | | | | | | | | | |
| | | | | 60.7 | | | | | | | | | | | |
| Air cargo | 56.2 | | | | | 56.2 | | | | | | 56.2 | | 56.2 | |
| General aviation | 18.4 | | | | | | 18.4 | | | | | | 18.4 | | 18.4 |
| State Fueling Board | 12.8 | | | | | | | 12.8 | | | | 12.8 | | 12.8 | |
| National Guard | 51.8 | | | | | | | 51.8 | | | | | 51.8 | | 51.8 |
| Airport maintenance complex | 14.7 | | 7.4 | 1.6 | | | | 4.2 | | | | | | | |
| In-flight catering | 6.9 | | | | 6.9 | | | | | | | | | | |
| Fuel farm | 3.0 | | | | | | | 3.0 | | | | | | | |
| Car rental | 37.5 | | | | | | | 6.9 | | 37.5 | | 37.5 | | 3.0 | |
| Surface parking | 9.2 | | | | | | | | | 9.2 | | 9.2 | | 37.5 | |
| Parking garage | 92.8 | | | | | | | | | 92.8 | 92.8 | 92.8 | | 92.8 | |
| ARFF | 2.8 | | 2.8 | | | | | | | | | | | | |
| FAA | 13.1 | | 13.1 | | | | | | | | | | | | |
| GSEM | 3.4 | | 3.4 | | | | | | | | | | | | |
| Belly freight | 3.4 | | 3.4 | | | | | | | | | | | | |
| RCCF | 4.8 | | | | | | | 4.8 | | | | | 4.8 | | 4.8 |
| Other buildings and areas | 2,603.1 | | | | | | | 80.3 | 9.4 | 139.5 | 2,380.1 | | | | |
| **Total rentable acreage** | 4,242.2 | 7.2 | 751.7 | 82.3 | 6.9 | 56.2 | 18.4 | 80.3 | 9.4 | 139.5 | 3,185.8 | 104.5 | 75.0 | 184.3 | 75.0 |
| **Rentable % by cost center** | | 0.6327% | 66.1431% | 7.2419% | 0.6072% | 4.4175% | 1.6319% | 7.0662% | 0.8327% | 12.2750% | | | | | |
| **Non-office rentable acreage** | 297.8 | | | | | 16.8593% | 6.1793% | 26.9809% | 3.1625% | 46.8489% | | 59.22% | 41.78% | 58.22% | 41.78% |
| **Rentable % for non-office cost centers** | n.a. | n.a. | n.a. | n.a. | n.a. | | | | | | n.a. | | | | |

EXHIBIT B-4

SUMMARY OF DEBT SERVICE—NEW AIRPORT
Austin-Bergstrom International Airport
City of Austin, Department of Aviation
For Fiscal Years ending September 30

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **NEW AIRPORT** | | | | | | |
| Airport Revenue First Lien Bonds | | | | | | |
| Series 1995A | $28,416,904 | $28,417,528 | $19,961,489 | $9,972,146 | $9,972,146 | $ — |
| Series 1995B | 2,397,619 | 2,394,230 | 2,321,421 | 168,184 | — | — |
| Series 1993 | 73,200 | 72,200 | 75,260 | 1,986,120 | — | — |
| Series 1993 Refunding | — | — | — | 1,066,156 | 4,586,230 | 4,492,750 |
| Series 2003 Refunding | — | — | — | 4,113,284 | 4,436,599 | 26,498,723 |
| Series 2005 Refunding Adjust Expense | — | — | — | — | — | (1,830,991) |
| Total First Lien Bond Payable | (990,283) | (969,460) | (23,406,006) | (29,706,023) | (930,821) | (17,120,691) |
| **Total First Lien Bond debt service** | $30,490,823 | $30,485,004 | $22,866,068 | $22,790,373 | $23,589,170 | $16,064,227 |
| | | | | | | |
| Less: PFC revenue (a) | 16,052,354 | 9,545,090 | 9,973,444 | 12,596,401 | 11,642,611 | 12,704,608 |
| **Less: Debt service reduction (deferment) (b)** | 2,146,167 | 1,972,700 | | | | |
| | | | | | | |
| Less: Net debt service (c) | $19,194,653 | $19,446,256 | $15,892,897 | $19,363,159 | $19,418,863 | $19,923,772 |
| Debt Service Requirements | 134,176,610 | 247,146,296 | 265,682,697 | 2,771,601 | 1,564,324 | 4,003,840 |
| Debt service coverage (x) | | 4,794,039 | 1,771,461 | 3,504,935 | 3,504,935 | |
| | | | | | | |
| Variable Rate Revenue Notes, Series A (d) | 2,284,621 | 3,113,542 | 2,313,340 | 2,894,759 | 2,544,941 | 546,117 |
| | | | | | | |
| General Obligation Airport Bonds (e) | | | | | | |
| Series 1996 | 956,619 | 814,384 | 525,033 | 51,299 | 50,911 | |
| Series 1997 (GOs) | 20,197 | 24,235 | 52,324 | 1,297 | 1,362 | 2,446 |
| Series 1997 (COs) | 1,348 | 1,347 | 1,347 | 1,842 | | 82 |
| Series 1998 (COs) | 256,182 | 21,222 | 57,756 | 12,932 | 1,029 | |
| Series 1998 (GOs) | 837 | 853 | 54 | 24,605 | 11,057 | |
| Series 1999 (GOs) | 22,791 | 25,361 | 22,961 | 46,395 | 73,135 | 103 |
| Series 2000 | 152,999 | (11,471) | 49,365 | 5,111 | 73,11 | 26,881 |
| Series 2004 | | | | | | 3,047 |
| **Total** | $25,436,197 | $380,490 | $1,129,310 | $547,579 | $624,806 | $694,557 |
| | | | | | | |
| **Allocation to cost centers** | | | | | | |
| Airfield area | 34,500,604 | 37,202,062 | 35,902,914 | 33,290,123 | 35,391,152 | 34,728,025 |
| Terminal areas | 372,251 | 480,226 | 281,692 | 774,409 | 195,428 | 462,149 |
| Terminal complex | 5,037,153 | 5,602,660 | 5,770,284 | 3,010,709 | 3,170,546 | 4,686,226 |
| Fuel facility | 511,574 | 930,137 | 997,461 | 887,060 | 871,396 | 978,498 |
| Other automated areas (f) | | | | | | |
| | | | | | | |
| **Non-terminated cost centers** | | | | | | |
| Parking | 2,726,154 | 2,886,299 | 2,807,219 | 1,983,341 | 1,613,792 | 4,296,975 |
| Terminal complex | 3,110,974 | 3,135,389 | 3,640,911 | 2,534,346 | 4,990,941 | 2,960,201 |
| Other non-terminated areas (g) | 1,473,457 | 1,323,297 | 1,404,439 | 1,414,131 | 1,276,761 | 2,969,760 |
| | | | | | | |
| PFACTS | 188,324 | 203,413 | 300,828 | 195,442 | 382,260 | 224,103 |
| PGG | 154,607 | 144,649 | 143,982 | 391,138 | 283,289 | 154,183 |
| **Total** | 152,394,827 | 157,470,226 | 152,090,756 | 153,412,164 | 154,517,493 | 153,933,461 |
| | | | | | | |
| Current Obligation Airport Bonds (e) | | | | | | |
| | 11,177 | | 65,162 | 3,116 | 8,013 | 35,196 |
| **Total** | 152,394,827 | 157,470,226 | 152,090,756 | 153,412,164 | 154,517,493 | 153,933,461 |

EXHIBIT D-5

OPERATION AND MAINTENANCE EXPENSES
Atlanta-Hartsfield International Airport
City of Atlanta, Department of Aviation
For Fiscal Years ending September 30

Actual

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| **By function** | | | | | | |
| *Administration* | | | | | | |
| Administration/management | $4,686,980 | $4,317,036 | $4,202,856 | $4,422,371 | $4,886,151 | $4,182,954 |
| PRO/GTS | 281,628 | 407,462 | 402,311 | 477,300 | 429,330 | 378,444 |
| City support services | 3,622,513 | 3,042,741 | 3,236,131 | 3,611,266 | 2,740,209 | 2,951,130 |
| *Operations and maintenance* | | | | | | |
| Landside operations | 777,615 | 1,014,007 | 907,425 | 1,133,467 | 1,161,088 | 833,336 |
| Operations | 6,156,897 | 6,573,124 | 7,101,969 | 7,316,675 | 7,256,431 | 7,735,027 |
| Parking | 4,158,673 | 4,332,738 | 4,325,342 | 4,744,885 | 5,270,127 | 5,596,919 |
| Casual services | 961,179 | 893,368 | 952,893 | 1,050,672 | 5,275,177 | 1,085,442 |
| Airfield maintenance | 1,468,237 | 1,244,799 | 1,899,649 | 2,194,374 | 2,235,740 | 2,229,514 |
| Grnd environment/Landside mgmt | 2,367,562 | 2,332,352 | 4,633,600 | 4,076,349 | 2,239,899 | 1,952,666 |
| Building maintenance | 3,307,629 | 3,262,564 | 2,472,286 | 3,937,417 | 4,639,730 | 1,721,228 |
| Utilities | 3,362,171 | 3,461,586 | 3,205,442 | 5,184,732 | 4,085,556 | 4,475,465 |
| ACDBE | 3,665,684 | 2,725,119 | 6,447,516 | 4,285,732 | 1,385,991 | 4,798,635 |
| Security | 703,374 | 949,965 | 815,265 | 943,797 | 4,891,057 | 6,301,379 |
| Planning, engineering, construction | | | | | 1,250,326 | 1,284,389 |
| **Total expenses by function** | $40,794,607 | $36,960,391 | $43,766,562 | $44,674,747 | $48,879,336 | $45,284,646 |
| **By object** | | | | | | |
| Salaries | $17,820,894 | $19,071,077 | $19,306,066 | $17,593,321 | $19,608,301 | $21,168,348 |
| Contractual services | 20,721,390 | 10,998,964 | 21,674,331 | 26,185,666 | 25,373,511 | 17,572,094 |
| Commodities | 1,750,165 | 1,222,200 | 1,489,233 | 1,606,166 | 1,925,755 | 2,642,582 |
| Capital | 493,108 | 876,420 | 1,016,279 | 1,997,588 | 1,133,462 | 1,283,322 |
| **Total expenses by object** | $40,794,607 | $36,960,391 | $43,766,562 | $44,674,747 | $48,879,336 | $45,284,646 |
| **By cost center** | | | | | | |
| Airfield area | $8,488,713 | $8,730,040 | $9,446,812 | $10,172,508 | $10,410,039 | $11,247,856 |
| Terminal apron | 2,909,364 | 2,506,634 | 3,053,027 | 3,468,461 | 3,544,417 | 3,719,796 |
| Terminal equipment | 916,988 | 892,751 | 1,186,687 | 1,411,999 | 1,943,947 | 2,304,228 |
| Terminal complex | 11,833,343 | 11,442,256 | 19,224,678 | 19,323,391 | 25,972,941 | 22,956,412 |
| Parking | 7,972,696 | 7,798,479 | 8,455,229 | 5,581,568 | 6,856,648 | 6,635,792 |
| Other buildings and areas | 1,538,773 | 1,690,233 | 1,766,497 | 1,989,281 | 2,075,191 | 3,254,403 |
| PRO/GTS | 381,628 | 407,462 | 402,311 | 477,300 | 429,330 | 378,444 |
| Remarketing fees (a) | 126,906 | 177,503 | 172,301 | 161,912 | 175,761 | 129,341 |
| **Total expenses by cost center** | $40,336,907 | $36,960,391 | $43,766,562 | $44,674,747 | $48,879,336 | $45,284,646 |

(a) Represents O&M costs associated with remarketing for variable rate bonds, and 2007 Refunding Bonds throughout the fiscal year. Therefore, amounts listed in debt service costs and allocated accordingly (see Debt Service exhibit).

EXHIBIT E-A
TERMINAL SPACE ANALYSIS
At Rate

| | Total space (sf) | Productive space (b) | Leasable Leased Maintained | Support space (s) | Leased Conditioned space | Leased Unconditioned space | Unassigned space | Common space (h) | Public space (h) | PFC-eligible square feet |
|---|---|---|---|---|---|---|---|---|---|---|

*(Table body numerals are not legibly reproducible at this resolution.)*

**Exhibit D-7**
**Terminal Space Allocations**

**Exhibit D-8**
**Terminal Rental Rates**

**Exhibit D-9**
**Terminal Apron Fees**

**Exhibit D-10**
**Terminal Equipment Fees**

**Exhibit D-11**
**Landing Fees**

# FRONTIER
## A I R L I N E S

**Index ID:** _10.STO.1884_

## Contract Approval Form

Rev. 02/01/10

### Step 1 – State Business Case

| | |
|---|---|
| Department: | FAC - Properties & Facilities  _STO_ |
| Dept Contact: | Jeff Campbell |
| Phone: | 720-374-4466 |
| Required Approval Completion Date: | mid April |
| Reason for date: | Prior agreement to be cancelled |

Contract With: **City of Austin, Texas**
Address: Austin-Bergstrom International Airport
3600 Presidential Blvd. Suite 411
Austin, Texas 78719
Vendor Contact: Frederick Scott
Vendor Phone: 512-530-7507

#### Financial Data

Financial Impact: Expense to F9
Total **Annual** Amount of Contract: $1,073,533
If Barter, list commitment:

If Expense:
- Choose payment frequency: Monthly  $89,461
- Was the transaction approved in current FY budget? Yes (Attach Budget Page)
- Does this transaction involve Capital Budget: No   EJ Number:

#### Contract Term

Term: 5 year  _D9_
Start Date: 10.01.10
Effective Date: 10.01.10
Expiration Date: 09.30.15 _14_

#### Contract Description

Contract Type: New Agreement   Use and Lease Agreement

Describe Agreement's Purpose: Provides logistic, procedure and definition regarding use and lease of AUS Airport. Frontier leases certain areas preferentially (attached profile & exhibit A-2) and Landing fees.

Give Justification for Approval: Continuing operations in AUS

List Downsides to Agreement: Yet to reach concurrence with the Airport on additional ATO space.

### Step 2 – Obtain Departmental Approval

I confirm this project is in budget, otherwise justified, and represents a business transaction that supports this department's strategic business goals.

| Date Submitted | Title | Name | Signature | Date Approved |
|---|---|---|---|---|
| 3-26-10 | Manager/Director | Jeff Campbell | _Jeff Campbell_ | 3-26-10 |
| 3-26-10 | SVP/VP | Scott Durgin | _OK via Email_ | 3-26-10 |

### Step 3 – Submit to Contracts Administrator for Legal/Officer Review & Approval

| Requirements | Title | Name | Signature | Date Approved |
|---|---|---|---|---|
| All Contracts | Legal | Val Tyler | | |
| All Contracts | VP - Administration | Scott Durgin | | |
| As Needed | CFO - Republic | Hal Cooper | | |

### Step 4 – Sponsor Obtains Signature on Agreement from Authorized VP/Officer

### Step 5 – Agreement Routing

Two (2) original sets of the Agreement should be fully-executed for every transaction. Frontier will retain one (1) fully-executed original set and the other party will retain one (1) fully-executed original set. Contracts Administration maintains all original fully-executed documents (including the Contract Approval Form and associated Budget Documentation) by scanning a copy into the Alchemy document repository and storing the hardcopy at an off-site document storage facility.

**It is important to remember that without a fully-executed contract, services should not commence nor should payment be remitted.**

**Campbell, Jeff**

| | |
|---|---|
| **From:** | Chris Czarnecki [Chris.Czarnecki@wnco.com] |
| **Sent:** | Monday, March 15, 2010 11:10 AM |
| **To:** | Anastas, Mike; chris.collison@aa.com; christopher.sandifer@united.com; hal.fahrenbruch@usairways.com; Campbell, Jeff; kenneth.gregg@coair.com; Stine, Mike |
| **Subject:** | AUS Lease/execution |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Just wanted to give you a heads-up that the airport will send everyone a letter soon asking for signed leases by mid-April. The letter will also provide written 30 day notice that the month-to-month extension will terminate.

Chris

1

Cost Center #       3439
Account #           650210
Fleet Type          000
Account Description  Landing Fees

Back to: summary/A1

## COMPONENTS OF ACCOUNT

| | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | 2010 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A320 | $   - | $   - | $   - | $   - | $ 7,768 | $13,709 | $14,166 | $14,166 | $13,709 | $14,166 | $13,709 | $14,166 | $105,558 |
| A319 | $28,955 | $32,412 | $28,523 | $26,362 | $18,583 | $12,965 | $13,397 | $13,397 | $12,965 | $14,261 | $14,693 | $15,126 | $231,638 |
| A318 | $10,591 | $ 3,666 | $10,999 | $11,814 | $13,443 | $12,221 | $12,628 | $12,628 | $12,221 | $11,814 | $10,591 | $10,999 | $133,615 |
| TOTAL | $39,546 | $36,078 | $39,521 | $38,175 | $39,794 | $38,895 | $40,191 | $40,191 | $38,895 | $40,241 | $38,994 | $40,290 | $ 470,811 |

## COMPONENT DETAIL & COMPUTATIONS

| | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-320 Departs @100% | 0 | 0 | 0 | 0 | 17 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| A-319 Departs @100% | 67 | 75 | 66 | 61 | 43 | 30 | 31 | 31 | 30 | 33 | 34 | 35 |
| A-318 Departs @100% | 26 | 9 | 27 | 29 | 33 | 30 | 31 | 31 | 30 | 29 | 26 | 27 |
| A-320 Departs @99.8% | 0 | 0 | 0 | 0 | 16.966 | 29.94 | 30.938 | 30.938 | 29.94 | 30.938 | 29.94 | 30.938 |
| A-319 Departs @99.8% | 66.866 | 74.85 | 65.868 | 60.878 | 42.914 | 29.94 | 30.938 | 30.938 | 29.94 | 32.934 | 33.932 | 34.93 |
| A-318 Departs @99.8% | 25.948 | 8.982 | 26.946 | 28.942 | 32.934 | 29.94 | 30.938 | 30.938 | 29.94 | 28.942 | 25.948 | 26.946 |

A320 weight  142,198
A319 weight  134,460
A318 weight  126,764

| | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Landing Fee rate per 1,000 lbs. | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 |

29-April-2010


To:     Jeff  Campbell
        Properties  &  Facilities

RE:     The  Agreement between  Frontier  Airlines  and
        City of Austin, TX

IID:    10.STO.1884

---

The  above  mentioned  Agreement  has  successfully  completed  the  internal
review  process.   Since  the  appropriate  Frontier  Officer  has  already  signed
the  Agreement,  please  forward  two  (2)  original  sets  to  the  outside  party
with  the  requirement  that  they  countersign  and  return  one  (1)  original  to
you.   I  will  need  the  fully  executed  original  documents  (including  the
Contract  Approval  Form)  to  satisfy  Frontier's  Contract  Retention
requirements.   If  you  have  any  questions,  please  let  me  know.


Thanks,




Jeremy  S.  Craft
Contracts  Administrator

**FRONTIER AIRLINES**
7001  Tower  Road
Denver,  CO     80249
☎:  720.374.4427