**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MAXINE WHITE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | |
| **FRONTIER AIRLINES, INC.,** | § | |
| | § | |
| **Defendant/Third Party Plaintiff,** | § | |
| | § | **CIVIL ACTION NO.  1:16-CV-1266(LY)** |
| **v.** | § | |
| | § | **JURY DEMAND** |
| **THE AUSTIN FIRE DEPARTMENT,** | § | |
| **THE CITY OF AUSTIN AVIATION** | § | |
| **DEPARTMENT, AUSTIN-** | § | |
| **BERGSTROM INTERNATIONAL** | § | |
| **AIRPORT,** | § | |
| **THE CITY OF AUSTIN AND** | § | |
| **HUNTLEIGH USA CORPORATION,** | § | |
| | § | |
| **Third-Party Defendants.** | | |

---

**AFFIDAVIT OF TIMOTHY S. POLGAR**

---

**STATE OF COLORADO**    §
                                              §
**COUNTY OF DENVER**       §

      **BEFORE ME**, the undersigned authority, on this day personally appeared Timothy S. Polgar, who under oath stated as follows:

      1.      My name is Timothy S. Polgar, Director of Ground Handling Contracts for Frontier Airlines, Inc. ("Frontier"). I am over eighteen (18) years of age. I have never been convicted of a crime and am legally competent to make this Affidavit, which is true and correct, is based on my personal knowledge, and is made voluntarily and not under duress.

---

EXHIBIT D

2.      I have been in this position since October 5, 2015.  I have worked in the airline industry for over 15 years.

3.      I have reviewed the Motion to Dismiss filed by Huntleigh USA Corporation ("Huntleigh"), Frontier's documents related to the incident, Frontier's invoices from Huntleigh, Plaintiff's Complaint, Frontier's Third-Party Complaint and various contracts between Huntleigh and Frontier.

4.      Frontier flies to over 60 airports.  At each of those airports, wheelchair services are available to Frontier's customers and are provided by various outside vendors hired by Frontier. To be clear, Frontier outsources the entirety of wheelchair services to third-party vendors and does not, at any airport where it flies, provide any such services directly to its customers.

5.      Frontier currently uses Huntleigh as its wheelchair service provider at several airport locations, including Austin, Cleveland, Portland, Colorado Springs, Kansas City, New Orleans, and Washington (DCA). In fact, Huntleigh recently executed the proposed renewal of the Frontier/Huntleigh contract for Austin Bergstrom International Airport ("AUS"), attached hereto as Exhibit 1.

6.      Frontier regularly extends to Huntleigh opportunities to obtain additional business by providing wheelchair services to Frontier's customers at other airports.

7.      At each airport, Huntleigh is retained to provide wheelchair services that comport with industry standards, including, without limitation, compliance with 14 CFR 382[1], which includes providing special equipment and specially trained personnel to assist persons with

---

[1] Huntleigh's own website identifies that its personnel training comports and complies with 14 CFR 382.
http://www.huntleighusa.com/aviationrelatedservices.html.

reduced mobility in accordance with all Federal, State, local, and airport rules and regulations, as well as the CFR requirements that apply to those services.

8.      Frontier does not provide any wheelchair services through any of its own personnel.  On the day of the alleged incident involving Ms. Maxine White, Huntleigh provided the wheelchair services to Frontier's customers, and Flight Services & Systems ("FSS") provided the ramp handling and customer support (check-in, ticketing, gate functions, etc.) services. FSS is also an independent contractor to Frontier. No Frontier employees were directly involved with the interactions with Ms. White on the day of the alleged incident.

9.      On the day of the alleged incident involving Ms. White, Frontier had not retained, formally or informally, directly or indirectly, any party other than Huntleigh to provide wheelchair services to Frontier's customers.

10.      As of the date of this Affidavit, Frontier has been unable to locate the written agreement between Frontier and Huntleigh for the wheelchair services that Huntleigh provided to Frontier's customers at AUS which was in effect on the date of the alleged incident.

11.      However, as a sample of the contractual terms into which Frontier regularly enters with Huntleigh, attached hereto as <u>Exhibit 2</u> are currently binding written contracts executed by Huntleigh for the performance of services at the Austin, Cleveland, Kansas City, New Orleans, Portland, and Colorado Springs airports, all of which contain almost identical indemnification and services provisions that are consistent with terms agreed upon between Frontier and other wheelchair service providers.

12.      In relevant part, each and every contract provides that Huntleigh will:

> (p)rovide special equipment, facilities, and specially trained personnel, for
> assistance to persons with reduced mobility (PRMs) ("Wheelchair
> Services").

_____

13.    With respect to liability, indemnity and insurance, Huntleigh regularly agrees to:

indemnify, defend and hold harmless Frontier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by Huntleigh (or anyone directly or indirectly employed by Huntleigh or anyone for whose acts Huntleigh may be liable) in the performance or non-performance of services, including but not limited to death of or injury to any person or persons….

14.    Additionally, Huntleigh regularly agrees to:

Defend, indemnify and hold (Frontier) harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services under Annex B including, without limitation, DOT, FAA, CBP, EPA or any Airport Authority and/or any violation of any environmental laws or regulations, arising out of the acts or omissions of (Huntleigh's) employees, agents or subcontractors.

15.    With respect to insurance, Huntleigh regularly agrees to provide insurance for Frontier and Frontier is listed as an Additional Insured under Huntleigh's insurance policy.

16.    With respect to subcontracting, Huntleigh regularly agrees that they will not subcontract wheelchair services out to another party.

17.    While Frontier was the carrier with which Plaintiff chose to travel, Huntleigh was (and still is) responsible under contract, express or implied, to ensure all of Frontier's customers, including the Plaintiff, are safely transported, without injury, between the terminal and the airplane.

18.    Frontier's Federal Aviation Administration accepted Customer Service Manual permits the carrying of a passenger, strapped into an aisle chair, up the stairs to an aircraft when boarding from the ramp is necessitated and a boarding ramp is not available.

19.    If there was, or is, ever an issue or concern with boarding a customer onto a Frontier airplane at AUS, it was, and is, Huntleigh's responsibility to provide the service and to

obtain the passenger's consent to such service.  If the passenger did, or does, not consent, it was, and is, Huntleigh's obligation to involve a Frontier Complaint Resolution Officer to resolve the issue with the customer, and to instruct Frontier on what requirements and protocol must be followed pursuant to Huntleigh's service guidelines.

20.     On the day of the alleged incident, Huntleigh was the only company that Frontier retained to provide wheelchair services to Frontier's customers at AUS.

21.     Frontier paid Huntleigh for providing wheelchair services to Frontier's customers at AUS on the day of the alleged incident.

22.     When Maxine White arrived at AUS on the day of the alleged incident, the only service provider from whom she could have received wheelchair services was Huntleigh. Similarly, the only customer service representative with which she could have engaged in connection with her Frontier flight was FSS, as Frontier's engaged independent contractor. Frontier had no other representatives on site at AUS on the day in question.

23.     If Huntleigh did not provide wheelchair services to the Plaintiff when the Plaintiff was a traveling customer of Frontier's on the day of the alleged incident, then Huntleigh's omission would have been in breach of its agreement (express or implied) with Frontier for Huntleigh to provide such services for which Frontier paid Huntleigh. With respect to Maxine White, it was Huntleigh's responsibility to provide wheelchair services to her on Frontier's behalf as Frontier's engaged third party vendor. Any failure by Huntleigh to provide wheelchair services to Maxine White (as Frontier's customer) is in violation of that responsibility. Allowing an improperly trained third party (public servant or otherwise) to provide wheelchair services to a Frontier customer is a violation of that responsibility.

*[Signature Carried Forward on Following Page]*

Further Affiant sayeth not.

Timothy S. Polgar, Affiant

**SUBSCRIBED AND SWORN TO** before me, the undersigned authority, on this 15th day of November, 2017, to certify which witness my hand and official seal.

Notary Public – State of _Colorado_

LINDSAY RYAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20084019924
MY COMMISSION EXPIRES JUNE 12, 2020

---

**STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE**

**ANNEX B5.0 – LOCATION(s), AGREED SERVICES AND CHARGES**

to the Standard Ground Handling Agreement (SGHA) of 2013

| | |
|---|---|
| between: | **Frontier Airlines, Inc.** |
| having its principal office at: | 4545 Airport Way<br>Denver, CO 80239 |

and hereinafter referred to as the "Carrier"

| | |
|---|---|
| and: | **Huntleigh USA Corporation** |
| having its principal office at: | 545 E. John Carpenter Freeway, Suite 175<br>Irving, TX 75062 |

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

| | |
|---|---|
| effective from | September 16, 2017 |
| This Annex B5.0 for | |
| the location(s): | Austin-Bergstrom International Airport (the "Airport" and "AUS") |
| is valid from: | September 16, 2017 |
| and replaces: | N/A |

---

**PREAMBLE:**

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full.  By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

---

EXHIBIT 1

**PARAGRAPH 1.  HANDLING SERVICES AND CHARGES**

1.1.    For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

**SECTION 2. PASSENGER SERVICES**
**2.1.3**   When requested by the Carrier,
(a)  provide
special equipment and specially trained personnel, for assistance to
2.  persons with reduced mobility (PRMs) ("Wheelchair Services")
7.  other – line coordinator services

**SECTION 6. SUPPORT SERVICES**
**6.2**      **Automated/Computer or Manual Recording Systems**
**6.2.2**   Perform the following functions in
(b) Handling Company's system
for
(11) Other functions – Wheelchair Services dispatch, tracking, data compilation (request times, response times, move information, compliments, complaints, etc.)

1.2.    Rates (in USD) for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

| Hourly Resources | Regular Rate/Hr | Holiday/Overtime Rate/Hr |
|---|---|---|
| Wheelchair Agent | $10.71 | $16.07 |
| Supervisor | $11.40 | $17.10 |
| Management Fee | $15.56 | $15.56 |

Twenty percent (20%) of the total cost for the airport will be split evenly amongst all airlines/companies that are a party to the services and eighty percent (80%) of the cost will be allocated to the airlines/companies based on the proportion of the passengers such airline/company has out of the total number of passengers. For avoidance of doubt, the exact monthly amount that carrier will be charged may vary each month depending on the number of parties to the services and the total number of passengers each month.

Performance Credits (Effective October 1, 2017)

Monthly Performance

|  |  | Station Monthly Departures | | |
|---|---|---|---|---|
|  |  | <63 | 63-212 | >212 |
| Wheelchairs | <95% of Planned Pushes w/in 10 mins. | 1% off of monthly invoice | | |
|  | <97% of Unplanned Pushes w/in 20 mins. | 1% off of monthly invoice | | |
|  | >30 Minute Unattended or Wait(s) | $200 per Occurrence | | |
|  | Missing Wheelchair Data | $200/Day | $500/Day | $1,000/Day |
| Complaint(s) | Verified complaint re service for which the Handling Company can't disprove | $50 per Occurrence | | |

| Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint |

1.3. In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling Company may request a renegotiation of rates upon ninety (90) days' written notice to the Carrier.

1.4. No extra charges beyond what is specifically stated above will be made for providing services on ~~legal holidays~~, weekends, evenings, or at night.

1.5. Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

## PARAGRAPH 2.  ADDITIONAL SERVICES AND CHARGES

2.1. All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3.  DISBURSEMENTS

3.1. Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

## PARAGRAPH 4.  LIMIT OF LIABILITY AND INDEMNIFICATION

4.1 Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:
- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors.  However, nothing contained in this section shall be construed as an indemnity by the Handling Company against any loss, liability or claim caused solely by the acts or omissions of the

Carrier, its directors, officers, employees and agents, unless caused by the negligence or misconduct of Contractor, its directors, officers, employees or agents."

4.2     The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.

## PARAGRAPH 5.  INSURANCE

5.1.    The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1)      The Carrier is included as an Additional Insured as their interests may appear.

2)      All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3)      This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4)      Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5)      In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6)      Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6.  AREA OF RESPONSIBILITY

6.1     The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: None.

## PARAGRAPH 7.  TRANSFER OF SERVICES

7.1     Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

## PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT

8.1     Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH).  The Handling Company's invoices shall include the following information for payment:
            Bank Name: Bank of Texas
            ABA No. 111014325
            Credit the Account of: Huntleigh USA Corporation, 545 E. John Carpenter
            Freeway, Suite 175, Irving, TX 75062
            Acct. No. 8094121172
            Ref: _____
            Invoice Number(s):  _____

8.2     With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier through the Coupa Supplier Network.  All invoices must contain a description of the goods and/or services, the applicable pricing, and the purchase order number.  Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier on a monthly basis, after the completion of each calendar month of service.  Payment of undisputed amounts will be due thirty (30) days after the Carrier's receipt of each invoice.  In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing.  Both Parties shall then seek in good faith to resolve the disputed amount(s).  Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

## PARAGRAPH 9.  SUPERVISION AND ADMINISTRATION

9.1     The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for

the Carrier by other organization(s) under cover of separate agreement(s):  All Airport services.

## PARAGRAPH 10.  DURATION, MODIFICATION, AND TERMINATION

10.1    Duration

10.1.1  Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from September 16, 2017 through September 15, 2020 (the "Initial Term") and thereafter until terminated by either Party upon ninety (90) days' prior written notice to the other Party.

10.1.2  In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.2    Modification

10.2.1  Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3    Termination

10.3.1  Notwithstanding Sub-Paragraph 10.1.1 of this Annex B, this Annex B may be terminated by Carrier upon one-hundred-twenty (120) days' written notice to the Handling Company.

10.3.2  The Carrier will provide notice to the Handling Company of any service failures.  The Handling Company shall have thirty (30) days from written notice to cure any deficiencies.  After thirty (30) days if the deficiencies have not been sufficiently corrected to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement for cause upon 30 days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

10.3.3  In the event that the Handling Company plans to cease operations at the Airport, the Handling Company may terminate this Agreement without penalty upon ninety (90) days' written notice to the Carrier, on that condition that such termination shall not take place prior to the Handling Company's ceasing of all operations at the Airport.

## PARAGRAPH 11.  NOTIFICATION

11.1    In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

> To Carrier:
> Frontier Airlines, Inc.
> 4545 Airport Way
> Denver, Colorado 80239
> U.S.A.
> Telephone:  720-374-4200
> Facsimile:  Not Authorized for Notification
> Attn:  General Counsel
> Attn:  Director, Ground Handling Contracts

       To Handling Company:
       Huntleigh USA Corporation
       545 E. John Carpenter Freeway, Suite 175
       Irving, TX 75062
       U.S.A.
       Telephone:  972-719-9182
       Facsimile:  972-719-9181
       Electronic Mail:  rsporn@huntleighusa.com
       Attn:  Richard Sporn

## PARAGRAPH 12.  GOVERNING LAW

12.1    In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2    In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13.  FORCE MAJEURE

13.1    Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2    If either Party is affected by a Force Majeure event, such affected Party shall promptly notify the other Party of the nature and extent of the circumstances in question.

13.3    Notwithstanding any other provision of this Agreement neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, for any delay in performance or other non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to a Force Majeure event.

13.4    If any event of Force Majeure occurs, the date(s) for performance of the obligation(s) affected shall be postponed for so long as is made necessary by the event of Force Majeure, provided that if any Force Majeure event continues for a period exceeding one (1) month, either Party shall have the right to terminate this Annex B forthwith on written notice to the other Party.

13.5    The Party affected by Force Majeure shall take all reasonable steps available to it to minimize the effects of Force Majeure on the performance of its obligations under this Agreement.

13.6    For the purpose of this Agreement "Force Majeure" means any circumstances that is not reasonably foreseeable and beyond the reasonable control of the Party relating to its performance of this Annex B, including: acts of God, fires, floods, explosions, acts or restraints of governments or public authorities, war, revolution, riot or civil commotion, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences.

**PARAGRAPH 14.  TRAINING**

14.1     All training shall be provided by the Handling Company and the Handling Company's
sole expense.

14.2     No employee of the Handling Company may work a flight of the Carrier's unless
training has been received, completed, and passed in accordance with the Handling
Company's training policy.  Fill-ins are not acceptable if they are not properly trained
and appropriately signed-off to handle the Carrier's flight(s).

**PARAGRAPH 15.  COMPLIANCE WITH LAWS**

15.1     The Handling Company shall comply with all applicable federal, state and local laws
and executive orders and regulations issued pursuant thereto, including without
limitation Airport rules and to the extent applicable to this Annex B, the provisions
contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. §
60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-
300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air
Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of
Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R.
Part 35).

15.2     The Handling Company shall secure any and all permits or licenses that may be
required by any governmental or Airport authority in order to perform the Handling
Services, shall comply with all workers' compensation, employer's liability and other
Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations
required of an employer performing the Services. The Handling Company shall also
make all reports and remit all withholding or other reductions from the compensation
paid its employees as may be required by any Federal, State, County, Municipal, or
Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to
those provided elsewhere in this Annex B.

15.3     Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the
Handling Company shall not discriminate against any otherwise qualified individual
with a disability, by reason of such disability, in performing services under this Annex
B.  In any matter relating to the Handling Company's provision of services under this
Annex B to qualified individuals with a disability, the Handling Company's
employees shall comply with any directives of the Carrier.

15.4     Failure to comply with any provision of this Paragraph 15 by the Handling Company
shall constitute a breach of this Annex B and the Carrier shall have the right to
immediately terminate this Annex B.

**PARAGRAPH 16.  CONFIDENTIALITY AND DATA PROTECTION**

16.1     The information contained in this Agreement and any subsequent amendments or
supplements hereto, as well as any other information relating to the Parties' business
(including, but not limited to, financial, operational, personal data of the Parties'
respective employees, officers or customers, operating manuals, procedures and know-
how) is strictly confidential and must not be shared with any third party other than a

Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3    Prior written consent to any disclosure shall be obtained from the Carrier.  In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

16.4    The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5    To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier.  Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6    The obligations in this Paragraph 16 shall continue to bind the Parties after the
        expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17.  ANTI BRIBERY AND CORRUPTION

17.1    The Carrier has strict anti-corruption policies and practices. The Handling Company
        undertakes that it will not, at any time before, during, or after the term of this
        Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in
        relation to the transaction which is the subject of this agreement or the provision of the
        services which is capable of being interpreted as a corrupt practice or bribery for the
        purpose of any applicable law, US or other.

17.2    Each Party shall promptly report to the other Party any request or demand for any undue
        financial or other advantage of any kind received by it in connection with the
        performance of this Agreement or additional/other business.

## PARAGRAPH 18.  MISCELLANEOUS

18.1    Each provision of this Agreement is severable and distinct from the others.  Both Parties
        intend that every such provision shall be and remain valid and enforceable to the fullest
        extent permitted by law.  If any such provision is or at any time becomes to any extent
        invalid, illegal or unenforceable under any enactment or rule of law, it shall to that
        extent be deemed not to form part of this Agreement but (except to that extent in the
        case of that provision) it and all other provisions of this Agreement shall continue in full
        force and effect and their validity, legality and enforceability shall not be thereby
        affected or impaired.

18.2    In case of any inconsistency between this Annex B and the Main Agreement, the
        provisions of this Annex B shall prevail.

18.3    The relationship of the Parties is that of independent contractors dealing at arm's length.
        Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall
        constitute the Parties as partners, joint venturers or co-owners, or constitute either Party
        as the agent, employee or representative of the other, or empower either Party to act for,
        bind or otherwise create or assume any obligation on behalf of the other, and neither
        Party shall hold itself out as having authority to do the same. This Agreement does not
        prevent either of the Parties from entering into similar agreement with third parties in
        respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to
        this Agreement.

18.4    The Parties acknowledge and agree that a breach by the other Party of any of the terms
        of this Agreement may result in irreparable and continuing damage to the other for
        which there may or will be no adequate remedy at law, and that in the event of such
        breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a
        decree for specific performance and such other and further relief as may be appropriate.

18.5    This Agreement may be entered into in the form of two or more counterparts each
        executed by one or both of the Parties but, taken together, executed by both and,
        provided that both the Handling Company and the Carrier so enter into the Agreement,

each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6    All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program.  The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred.  The Handling Company is required to go through setup, maintain compliance, and will be responsible for all associated fees.  More information can be obtained at http://frontier.globalrms.com/.

Signed the ____ day of _____, 2017        Signed the 26 day of September, 2017

At Denver, Colorado, U.S.A.                      at _____ Irving , TX _____

for and on behalf of                             for and on behalf of
**Frontier Airlines, Inc.**                          **Huntleigh USA Corporation**


By: _____           By: _____
Name: Howard Diamond                             Name: Richard Sporn
Title: SVP & General Counsel                     Title: CEO

## Frontier Airlines, Inc.

**Standard Agreement**
**For**
**Wheelchair Services**
**For location**
**Cleveland Hopkins International Airport ("CLE")**

STANDARD GROUND HANDLING AGREEMENT — SIMPLIFIED PROCEDURE Annex B — Location(s), Agreed Services and Charges

to the Standard Ground Handling Agreement (SGHA) of January 2008

between:     FRONTIER AIRLINES, INC.

having its principal office at:    7001 TOWER ROAD, DENVER, CO 80249

and hereinafter referred to as 'the Carrier'

and:     HUNTLEIGH USA CORPORATION

having its principal office at:    545 E. JOHN CARPENTER FREEWAY, SUITE 175, IRVING, TX  75062


and hereinafter referred to as 'the Handling Company'

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

effective from: 12/16/15

This Annex B for the location(s):        CLE

replaces:      N/A

and is valid from:      12/16/15

PREAMBLE:

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of January 2008 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties mentioned confirm that they are familiar with the aforementioned Main Agreement and Annex A.

EXHIBIT 2

PARAGRAPH 1: HANDLING SERVICES AND CHARGES

1.1 For a single ground handling consisting of the arrival and the subsequent departure at agreed timings of the same aircraft, Handling Company shall provide the following services of Annex A at the following rates.

1.1.1    Section 2.1.3 as follows:

2.1.3 (a)(2) – Provide special equipment, facilities and specially trained personnel, for assistance to persons with reduced mobility (PRMs) ( "Wheelchair Services")

1.1.2    Service Level Agreement

Any "offsets," or credits, relating to the SLAs below shall be made no later than two months after the calendar month in which the SLA offset was incurred.  For example, if Wheelchair Service Request Responsiveness fell below 95 for the month of January, then the credit would appear in the March invoice sent to Carrier.

- Passenger Complaints – Handling Company shall provide an offset in the amount of $50 to Carrier for each passenger complaint submitted or received for which Handling Company was alleged at fault and for which Handling Company can't disprove.

- Wheelchair moves/pushes – the target service level for passenger wait time is 95% within 10 minutes of the request for Wheelchair Services.  The following scale will be used to determine service levels and associated Incentives / Penalties:

|  | Planned pushes | Unplanned pushes | Incentives / Penalties |
|---|---|---|---|
| Goal | Within 10 min. | Within 20 min. | |
| Performance Level | <95% | <97% | (-1%) |
|  | 95.1% - 105% | 97.1 – 105% | 0% |
|  | >105.1% | No incentive due to incremental time | 1% |

1.2 Charges

1.2.1    For Wheelchair Services, Carrier shall pay Handling Company $ 50.00 per turn (flight arrival and departure).

1.2.2    In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling company will have the right to negotiate the per turn rates with 90 days advance written notice.

1.3 Handling Company will perform all the required security, background and drug checks according to the requirements of the U.S. Department of Transportation and Safety Administration and the United States Customs and Border Protection.

1.4 Handling Company will provide all wheelchairs required for the Wheelchair Services provided to the Carrier.  The Handling Company will be responsible for any Operational and Maintenance requirements for the wheelchairs and warrant their serviceability at all times

1.5 No extra charges shall apply for services provided at night, on Saturday or Sunday and legal holidays.

PARAGRAPH 2: ADDITIONAL SERVICES AND CHARGES

2.1 All services not included in Paragraph 1 of this Annex will be charged at the current market rate. The rate will reflect the time parameters of the agreement and be agreed upon in writing by both parties. Email notification and the corresponding conference will be validated by use of signed, copied, and scanned electronic documentation and provide satisfactory evidence of the arrangement.

PARAGRAPH 3: DISBURSEMENTS

3.1 Any disbursements made by the Handling Company on behalf of the Carrier will be reimbursed by the Carrier at cost price.

PARAGRAPH 4: LIABILITY, INDEMNITY AND INSURANCE

4.1 Sub-Article 8.5 of the Main Agreement is modified to read in full as follows: "Notwithstanding Sub-Article 8.1, Handling Company shall indemnify, defend and hold harmless Carrier, its directors, officers, employees and agents from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by Handling Company (or anyone directly or indirectly employed by Handling Company or anyone for whose acts Handling Company may be liable) in the performance or nonperformance of services under this Annex B, including but not limited to: death of or injury to any person or persons; false arrest, detention, imprisonment, searches or malicious prosecution; libel, slander and/or defamation of character; violations of the right of privacy; or the loss, theft, damage or destruction of property, including the property of Carrier, Handling Company and third persons

Furthermore, Handling Company shall defend, indemnify and hold Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors."

4.3 Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at Handling Company's expense, not less than $10,000,000 Combined Single Limit, each occurrence, aggregate where applicable, or such higher limit as may be carried, and as respects Personal Injury Liability $25,000,000 each offense providing Comprehensive General Liability, including Bodily Injury, Property Damage, Products and Completed Operations, Hangarkeepers Legal, Premises, Contractual Liability, on restrictive premises auto and mobile equipment. Handling Company will issue a certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions;

1) Carrier is included as an Additional Insured as their interests may appear.
2) All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.
3) This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.
4) Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.
5) In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).
6) Provide a waiver of subrogation against the Additional Insureds.
7) Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

4.4 Handling Company must also obtain and maintain in full force and effect during the term of this Agreement, at Handling Company's expense, Workers Compensation and Employers Liability Insurance in an amount not less

than $1,000,000 each accident/injury /disease covering its employees. Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

PARAGRAPH 5: TRANSFER OF SERVICES

5.1 For purposes of the location(s) specified in this Annex B, Sub-Article 3.1. of the Main Agreement is hereby deleted and replaced by the following:

    3.1    Upon the Carrier's written authorization only, the Handling Company may delegate any of the agreed services to subcontractors who provide the same services on the same basis to Handling Company in connection with its own operations. Handling Company shall nevertheless be responsible to Carrier for the proper rendering of such services as if they had been performed by Handling Company itself.

PARAGRAPH 6: ACCOUNTING AND SETTLEMENT

6.1 Notwithstanding the provisions of Article 7 of the Main Agreement to which this Annex B refers, all accounts shall be settled between the local offices of Carrier and the Handling Company. Handling Company shall invoice Carrier once each month. All invoices will be settled within forty-five (45) days of the date of invoice.

6.2 Handling Company shall invoice Carrier monthly with the charges arising from the provisions of the handling services of Annex A and as listed in this Annex B at the rates and charges in the Annex B. Invoices shall be sent electronically to: APInvoices@flyfrontier.com.

Carrier shall remit the total amount of such invoice in United States funds via Automated Clearing House ("ACH") to:

        Bank of Texas
        Dallas, Texas
        ABA/Routing # 111014325
        Beneficiary Account # _8094121172
        Beneficiary Name and Address:
        Huntleigh USA Corporation
        545 E John Carpenter Fwy, Ste 175
        Irving, TX  75062

PARAGRAPH 7: SUPERVISION AND ADMINISTRATION

7.1 The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for Carrier by the organization(s) under this agreement:

PARAGRAPH 8: TRAINING

8.1 Carrier acknowledges and agrees that the training provided by Handling Company to Handling Company's employees and subcontractors with respect to Handling Company's own operations is equal to or greater than the training provided by Carrier for its operations. In the event (i) Carrier operates an aircraft type that is different from the aircraft types operated by Handling Company or (ii) Carrier's handling procedures differ from those covered under Handling Company's training and the Carrier wants Handling Company to observe such differences, then Carrier shall document said differences and provide the differences training to Handling Company's employees and subcontractors. Carrier agrees to provide Handling Company with documented training records indicating that Handling Company's employees and subcontractors have been provided adequate differences training prior to start-up of services.

**\*For all training requirements; refer to Station Administration Manual, Chapter 40 for details**

8.2 All training of Handling Company's employees and subcontractors that may be required by Handling Company or by Carrier for Handling Company to perform the services covered by this Annex B shall be provided by Carrier at the airport specified in this Annex B, or such other location as mutually agreed, at Carrier's sole cost and expense. Carrier shall be invoiced by Handling Company for the time required for such training in an amount equal to Handling Company's hourly labor rate at the applicable straight or overtime rate plus Handling Company's costs and expenses.

PARAGRAPH 9: DURATION, MODIFICATION AND TERMINATION

9.1 Notwithstanding Sub-Articles 11.4 & 11.5 of the Main Agreement, this Annex B shall continue in force for a period of three years after the effective date, and thereafter until terminated by either party giving 60 (sixty) days prior written notice to the other party.

9.1.1 The duration of this agreement shall be seasonal in nature as it pertains to climatic need. This Annex B shall be reviewed and revalidated on an annual basis in concordance with the dates noted in the preamble of this agreement.

9.1.2 notwithstanding Sub-Article 11.4 and 11.5 of the Main Agreement, or any other provision to the contrary and without prejudice to any other rights and remedies pursuant to this Agreement, in the event Handling Company fails or neglects to observe or perform any obligation in this Agreement, Carrier may terminate the Agreement by giving thirty (30) days prior written notice to Handling Company.

9.2 Any modification to this Annex B shall be made by a written amendment signed by both Parties.

PARAGRAPH 10: NOTIFICATION

10.1   In accordance Sub-article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective parties as follows:

To Carrier:  Frontier Airlines, Inc.
7001 Tower Road
Denver, CO – USA 80249
Telephone: 720-374-4367
Fax: 720-374-9297
Email: howard.diamond@FLYFRONTIER.COM
Attn:  General Counsel

To Handling Company:  Huntleigh USA Corporation
545 E. John Carpenter Freeway, Suite 175
Irving, TX - USA 75062
Telephone: 972-719-9182
Fax: 972-719-9181
Email: rsporn@huntleighusa.com
Attn: Richard Sporn

PARAGRAPH 11: GOVERNING LAW

11.1   In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the state of Colorado.

11.2   In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Courts of Colorado.

| | |
|---|---|
| Signed on  12 / 23 / 2015 | Signed on  12 / 4 / 15 |
| at   Denver, Colorado | at  Irving, TX |
| for and on behalf of   **Frontier Airlines, Inc.** | for and on behalf of   **Huntleigh USA Corporation** |
| by  _Howard Diamond_<br>SVP & General Counsel | by  _Richard Sporn_ |

**AMENDMENT NO. 1 to ANNEX B2.0**
between
**HUNTLEIGH USA CORPORATION**
and
**FRONTIER AIRLINES**
for
**COLORADO SPRINGS MUNCIPAL AIRPORT - COS**
valid from April 14, 2016

This Amendment No. 1, effective from February 1, 2017, is for the purpose of adding revised pricing for COS.

The per rate flight stated in Paragraph 1.2 is revised to read as follows:

"USD $60.34 per flight (a 2% reduction from $61.57 due to payments based on projected costs)"

Except as expressly amended above, all other terms and conditions of the Annex B shall remain in full force and effect.

On behalf of:

**FRONTIER AIRLINES.**

By: _____
　　　　Howard Diamond

Title: SVP & General Counsel

Date: ___2-14-17___

On behalf of:

**HUNTLEIGH USA CORPORATION**

By: _____
　　　　Richard Sporn

Title: CEO

Date: ___1/23/17___

1

# STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE

## ANNEX B3.0 – LOCATION(s), AGREED SERVICES AND CHARGES

to the Standard Ground Handling Agreement (SGHA) of 2013

between:   **Frontier Airlines, Inc.**

having its principal office at:   7001 Tower Road
Denver, CO 80249

and hereinafter referred to as the "Carrier"

and:   **Huntleigh USA Corporation**

having its principal office at:   545 E. John Carpenter Freeway, Suite 175
Irving, TX 75062

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

effective from   July 16, 2016

This Annex B3.0 for

the location(s):   Kansas City International Airport (the "Airport" and "MCI")

is valid from:   July 16, 2016

and replaces:   N/A

---

## PREAMBLE:

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

---

## PARAGRAPH 1.  HANDLING SERVICES AND CHARGES

1.1. For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 2. PASSENGER SERVICES

2.1.3  When requested by the Carrier,
(a) provide
special equipment and specially trained personnel, for assistance to
2.  persons with reduced mobility (PRMs) ("Wheelchair Services")

### SECTION 6. SUPPORT SERVICES

6.2  **Automated/Computer or Manual Recording Systems**

6.2.2  Perform the following functions in
(b) Handling Company's system
for
(11) Other functions – Wheelchair Services dispatch, tracking, data compilation (request times, response times, move information, compliments, complaints, etc.)

STAFFING: Hourly coverage and agent quantity will be set by the Carrier's General Manager for MCI and such coverage may change from time to time.  The initial coverage shall be two (2) agents for each flight from two (2) hours prior to the scheduled departure times until thirty (30) minutes after the actual departure times.

1.2. Rates for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

USD $11.00 per labor hour – non Holidays
USD $16.50 per labor hour – Holidays

Performance Credits (Effective August 1, 2016)

Monthly Performance

|  |  | Station Monthly Departures | | |
|---|---|---|---|---|
|  |  | <63 | 63-212 | >212 |
| Wheelchairs | <95% of Planned Pushes w/in 10 mins. | 1% off of monthly invoice | | |
|  | <97% of Unplanned Pushes w/in 20 mins. | 1% off of monthly invoice | | |
|  | >30 Minute Unattended or Wait(s) | $200 per Occurrence | | |
|  | Missing Wheelchair Data | $200/Day | $500/Day | $1,000/Day |
| Complaint(s) | Verified complaint re service for which the Handling Company can't disprove | $50 per Occurrence | | |
| Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint | | |

1.3. In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling Company may request a renegotiation of rates upon ninety (90) days' written notice to the Carrier.

1.4.   No extra charges will be made for providing services on legal holidays, weekends, evenings, or at night.

1.5.   Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

## PARAGRAPH 2.  ADDITIONAL SERVICES AND CHARGES

2.1.   All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3.  DISBURSEMENTS

3.1.   Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

## PARAGRAPH 4.  LIMIT OF LIABILITY AND INDEMNIFICATION

4.1   Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:

- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors. However, nothing contained in this section shall be construed as an indemnity by the Handling Company against any loss, liability or claim caused solely by the acts or omissions of the Carrier, its directors, officers, employees and agents, unless caused by the negligence or misconduct of Contractor, its directors, officers, employees or agents."

4.2   The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.

## PARAGRAPH 5. INSURANCE

5.1.  The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1)  The Carrier is included as an Additional Insured as their interests may appear.
2)  All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.
3)  This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.
4)  Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.
5)  In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).
6)  Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6.  AREA OF RESPONSIBILITY

6.1   The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: None.

## PARAGRAPH 7.  TRANSFER OF SERVICES

7.1   Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

## PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT

8.1   Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH).  The Handling Company's invoices shall include the following information for payment:

      Bank Name: Bank of Texas
      ABA No. 111014325
      Credit the Account of: Huntleigh USA Corporation, 545 E. John Carpenter Freeway, Suite 175, Irving, TX 75062
      Acct. No. 8094121172
      Ref: _____
      Invoice Number(s): _____

8.2   With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier via email at apinvoices@flyfrontier.com.

Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier on a monthly basis, after the completion of each calendar month of service.  Payment of undisputed amounts will be due thirty (30) days after the Carrier's receipt of each invoice.  In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing.  Both Parties shall then seek in good faith to resolve the disputed amount(s).  Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

## PARAGRAPH 9.  SUPERVISION AND ADMINISTRATION

9.1   The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for the Carrier by other organization(s) under cover of separate agreement(s):  All Airport services.

## PARAGRAPH 10.  DURATION, MODIFICATION, AND TERMINATION

10.1   Duration

10.1.1 Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from July 16, 2016 through July 31, 2019 (the "Initial Term") and thereafter until terminated by either Party upon sixty (60) days' prior written notice to the other Party.

10.1.2 In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.2   Modification

10.2.1 Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3   Termination

10.3.1 The Carrier will provide notice to the Handling Company of any service failures. The Handling Company shall have thirty (30) days from written notice to cure any deficiencies. After thirty (30) days if the deficiencies have not been sufficiently corrected to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement for cause upon 30 days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

10.3.2 In the event that the Handling Company plans to cease operations at the Airport, the Handling Company may terminate this Agreement without penalty upon ninety (90) days' written notice to the Carrier, on that condition that such termination shall not take place prior to the Handling Company's ceasing of operations at the Airport.

## PARAGRAPH 11. NOTIFICATION

11.1   In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

> To Carrier:
> Frontier Airlines, Inc.
> 7001 Tower Road
> Denver, Colorado 80249
> U.S.A.
> Telephone:  720-374-4200
> Facsimile:  Not Authorized for Notification
> Electronic Mail:  howard.diamond@flyfrontier.com
> Attn:  General Counsel
>          -and-
> Electronic Mail:  timothy.polgar@flyfrontier.com
> Attn:  Director, Ground Handling Contracts
>
> To Handling Company:
> Huntleigh USA Corporation
> 545 E. John Carpenter Freeway, Suite 175
> Irving, TX 75062
> U.S.A.

Telephone:  972-719-9182
Facsimile:  972-719-9181
Electronic Mail:  rsporn@huntleighusa.com
Attn:  Richard Sporn

## PARAGRAPH 12.  GOVERNING LAW

12.1    In accordance with Article 9 of the Main Agreement, this Annex B shall be governed
by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2    In accordance with Article 9 of the Main Agreement, courts for the resolution of
disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13.  FORCE MAJEURE

13.1    Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2    If either Party is affected by a Force Majeure event, such affected Party shall promptly
notify the other Party of the nature and extent of the circumstances in question.

13.3    Notwithstanding any other provision of this Agreement neither Party shall be deemed
to be in breach of this Agreement, or otherwise be liable to the other, for any delay in
performance or other non-performance of any of its obligations under this Agreement
to the extent that the delay or non-performance is due to a Force Majeure event.

13.4    If any event of Force Majeure occurs, the date(s) for performance of the obligation(s)
affected shall be postponed for so long as is made necessary by the event of Force
Majeure, provided that if any Force Majeure event continues for a period exceeding one
(1) month, either Party shall have the right to terminate this Annex B forthwith on
written notice to the other Party.

13.5    The Party affected by Force Majeure shall take all reasonable steps available to it to
minimize the effects of Force Majeure on the performance of its obligations under this
Agreement.

13.6    For the purpose of this Agreement "Force Majeure" means any circumstances that is
not reasonably foreseeable and beyond the reasonable control of the Party relating to its
performance of this Annex B, including: acts of God, fires, floods, explosions, acts or
restraints of governments or public authorities, war, revolution, riot or civil commotion,
despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of
such acts, events or occurrences.

## PARAGRAPH 14.  TRAINING

14.1    All training shall be provided by the Handling Company and the Handling Company's
sole expense.

14.2    No employee of the Handling Company may work a flight of the Carrier's unless
training has been received, completed, and passed in accordance with the Handling

Company's training policy. Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

## PARAGRAPH 15.   COMPLIANCE WITH LAWS

15.1    The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

15.2    The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

15.3    Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B. In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

15.4    Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

## PARAGRAPH 16.   CONFIDENTIALITY AND DATA PROTECTION

16.1    The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any

aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3   Prior written consent to any disclosure shall be obtained from the Carrier.  In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

16.4   The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5   To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier. Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6   The obligations in this Paragraph 16 shall continue to bind the Parties after the expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17.  ANTI BRIBERY AND CORRUPTION

17.1   The Carrier has strict anti-corruption policies and practices. The Handling Company undertakes that it will not, at any time before, during, or after the term of this

Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in relation to the transaction which is the subject of this agreement or the provision of the services which is capable of being interpreted as a corrupt practice or bribery for the purpose of any applicable law, US or other.

17.2 Each Party shall promptly report to the other Party any request or demand for any undue financial or other advantage of any kind received by it in connection with the performance of this Agreement or additional/other business.

## PARAGRAPH 18. MISCELLANEOUS

18.1 Each provision of this Agreement is severable and distinct from the others. Both Parties intend that every such provision shall be and remain valid and enforceable to the fullest extent permitted by law. If any such provision is or at any time becomes to any extent invalid, illegal or unenforceable under any enactment or rule of law, it shall to that extent be deemed not to form part of this Agreement but (except to that extent in the case of that provision) it and all other provisions of this Agreement shall continue in full force and effect and their validity, legality and enforceability shall not be thereby affected or impaired.

18.2 In case of any inconsistency between this Annex B and the Main Agreement, the provisions of this Annex B shall prevail.

18.3 The relationship of the Parties is that of independent contractors dealing at arm's length. Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall constitute the Parties as partners, joint venturers or co-owners, or constitute either Party as the agent, employee or representative of the other, or empower either Party to act for, bind or otherwise create or assume any obligation on behalf of the other, and neither Party shall hold itself out as having authority to do the same. This Agreement does not prevent either of the Parties from entering into similar agreement with third parties in respect of services defined herein. Article 3.2 of the Main Agreement shall not apply to this Agreement.

18.4 The Parties acknowledge and agree that a breach by the other Party of any of the terms of this Agreement may result in irreparable and continuing damage to the other for which there may or will be no adequate remedy at law, and that in the event of such breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a decree for specific performance and such other and further relief as may be appropriate.

18.5 This Agreement may be entered into in the form of two or more counterparts each executed by one or both of the Parties but, taken together, executed by both and, provided that both the Handling Company and the Carrier so enter into the Agreement, each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6 All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program. The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred. The Handling

Company is required to go through setup, maintain compliance, and will be responsible for all associated fees.  More information can be obtained at http://frontier.globalrms.com/.

Signed the _30th_ day of _August_ , 2016

At Denver, Colorado, U.S.A.

for and on behalf of
**Frontier Airlines, Inc.**

By: _____
Name: Howard Diamond
Title: SVP & General Counsel

Signed the _11_ day of _ July _, 2016

at ___ Irving, Tx _____ __

for and on behalf of
**Huntleigh USA Corporation**

By: _____
Name: Richard Sporn
Title: CEO

# STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE

## ANNEX B – LOCATION(s), AGREED SERVICES AND CHARGES

to the Standard Ground Handling Agreement (SGHA) of 2013

between:                                         **Frontier Airlines, Inc.**

having its principal office at:            7001 Tower Road
                                                         Denver, CO 80249

and hereinafter referred to as the "Carrier"

and:                                              **Huntleigh USA Corporation**

having its principal office at:            545 E. John Carpenter Freeway, Suite 175
                                                         Irving, TX 75062

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

effective from                                  March 17, 2016

This Annex B 1.0 for

the location(s):                                Louis Armstrong New Orleans International Airport (the
                                                         "Airport" and "MSY")

is valid from:                                   March 17, 2016

and replaces:                                   N/A

---

**PREAMBLE:**

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

---

## PARAGRAPH 1. HANDLING SERVICES AND CHARGES

1.1. For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 2. PASSENGER SERVICES
**2.1.3**   When requested by the Carrier,
    (a) provide
    special equipment and specially trained personnel, for assistance to
    2.  persons with reduced mobility (PRMs) ("Wheelchair Services")

### SECTION 6. SUPPORT SERVICES
**6.2**   **Automation/Computer Systems**
**6.2.2**   Perform the following functions in
    (b) Handling Company's system
    for
    (11) Other functions – Wheelchair Services dispatch, tracking, data compilation (request times, response times, move information, compliments, complaints, etc.)

1.2. Rates for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

    USD $53.90 per flight (a 2% reduction from $55.00 due to payments based on projected costs)

Performance Credits (Effective April 1, 2016)

Monthly Performance

| | | Station Monthly Departures | | |
|---|---|---|---|---|
| | | <63 | 63-212 | >212 |
| Wheelchairs | <95% of Planned Pushes w/in 10 mins. | 1% off of monthly invoice | | |
| | <97% of Unplanned Pushes w/in 20 mins. | 1% off of monthly invoice | | |
| | >30 Minute Unattended or Wait(s) | $200 per Occurrence | | |
| | Missing Wheelchair Data | $200/Day | $500/Day | $1,000/Day |
| Complaint(s) | Verified complaint re service for which the Handling Company can't disprove | $50 per Occurrence | | |
| Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint | | |

1.3. In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling Company may request a renegotiation of rates upon ninety (90) days' written notice to the Carrier.

1.4. No extra charges will be made for providing services on legal holidays, weekends, evenings, or at night.

1.5. Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

## PARAGRAPH 2. ADDITIONAL SERVICES AND CHARGES

2.1.    All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3. DISBURSEMENTS

3.1.    Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

## PARAGRAPH 4. LIMIT OF LIABILITY AND INDEMNIFICATION

4.1    Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:

- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors. However, nothing contained in this section shall be construed as an indemnity by the Handling Company against any loss, liability or claim caused solely by the acts or omissions of the Carrier, its directors, officers, employees and agents, unless caused by the negligence or misconduct of Contractor, its directors, officers, employees or agents."

4.2    The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.

## PARAGRAPH 5. INSURANCE

5.1.    The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1)    The Carrier is included as an Additional Insured as their interests may appear.

2)    All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3)    This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4)    Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5)    In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6)    Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6.  AREA OF RESPONSIBILITY

6.1    The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: None.

## PARAGRAPH 7.  TRANSFER OF SERVICES

7.1    Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

## PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT

8.1    Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH).  The Handling Company's invoices shall include the following information for payment:
> Bank Name: Bank of Texas
> ABA No. 111014325
> Credit the Account of: Huntleigh USA Corporation, 545 E. John Carpenter Freeway, Suite 175, Irving, TX 75062
> Acct. No. 8094121172
> Ref: _____
> Invoice Number(s): _____

8.2    With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier via email at apinvoices@flyfrontier.com.

Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier approximately fifteen (15) days in advance of each month's scheduled service and the Carrier shall pay the Handling Company the projected costs within thirty (30) days of receipt of the Handling Company's invoice. Any overpayment or underpayment as a result of schedule changes, etc., shall be addressed in the following month's projected invoice.  In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing.  Both Parties shall then seek in good faith to resolve the disputed amount(s).  Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

## PARAGRAPH 9.  SUPERVISION AND ADMINISTRATION

9.1    The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for the Carrier by other organization(s) under cover of separate agreement(s):  All Airport services.

## PARAGRAPH 10.  DURATION, MODIFICATION, AND TERMINATION

10.1    Duration
10.1.1  Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from March 17, 2016 through March 31, 2019 (the

"Initial Term") and thereafter until terminated by either Party upon sixty (60) days' prior written notice to the other Party.

10.1.2 In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.2 Modification

10.2.1 Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3 Termination

10.3.1 The Carrier will provide notice to the Handling Company of any service failures. The Handling Company shall have thirty (30) days from written notice to cure any deficiencies. After thirty (30) days if the deficiencies have not been sufficiently corrected to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement for cause upon 30 days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

10.3.2 In the event that the Handling Company plans to cease operations at the Airport, the Handling Company may terminate this Agreement without penalty upon ninety (90) days' written notice to the Carrier, on that condition that such termination shall not take place prior to the Handling Company's ceasing of operations at the Airport.

## PARAGRAPH 11.  NOTIFICATION

11.1  In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

> To Carrier:
> Frontier Airlines, Inc.
> 7001 Tower Road
> Denver, Colorado 80249
> U.S.A.
> Telephone:  720-374-4200
> Facsimile:  Not Authorized for Notification
> Electronic Mail:  howard.diamond@flyfrontier.com
> Attn:  General Counsel
>            -and-
> Electronic Mail:  timothy.polgar@flyfrontier.com
> Attn:  Director, Ground Handling Contracts

> To Handling Company:
> Huntleigh USA Corporation
> 545 E. John Carpenter Freeway, Suite 175
> Irving, TX 75062
> U.S.A.
> Telephone:  972-719-9182
> Facsimile:  972-719-9181

Electronic Mail: rsporn@huntleighusa.com
Attn: Richard Sporn

## PARAGRAPH 12.  GOVERNING LAW

12.1   In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2   In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13.  FORCE MAJEURE

13.1   Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2   If either Party is affected by a Force Majeure event, such affected Party shall promptly notify the other Party of the nature and extent of the circumstances in question.

13.3   Notwithstanding any other provision of this Agreement neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, for any delay in performance or other non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to a Force Majeure event.

13.4   If any event of Force Majeure occurs, the date(s) for performance of the obligation(s) affected shall be postponed for so long as is made necessary by the event of Force Majeure, provided that if any Force Majeure event continues for a period exceeding one (1) month, either Party shall have the right to terminate this Annex B forthwith on written notice to the other Party.

13.5   The Party affected by Force Majeure shall take all reasonable steps available to it to minimize the effects of Force Majeure on the performance of its obligations under this Agreement.

13.6   For the purpose of this Agreement "Force Majeure" means any circumstances that is not reasonably foreseeable and beyond the reasonable control of the Party relating to its performance of this Annex B, including: acts of God, fires, floods, explosions, acts or restraints of governments or public authorities, war, revolution, riot or civil commotion, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences.

## PARAGRAPH 14.  TRAINING

14.1   All training shall be provided by the Handling Company and the Handling Company's sole expense.

14.2   No employee of the Handling Company may work a flight of the Carrier's unless training has been received, completed, and passed in accordance with the Handling Company's training policy.  Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

## PARAGRAPH 15.  COMPLIANCE WITH LAWS

15.1    The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

15.2    The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

15.3    Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B. In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

15.4    Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

## PARAGRAPH 16.  CONFIDENTIALITY AND DATA PROTECTION

16.1    The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the

Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3   Prior written consent to any disclosure shall be obtained from the Carrier.  In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

16.4   The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5   To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier.  Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6   The obligations in this Paragraph 16 shall continue to bind the Parties after the expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17. ANTI BRIBERY AND CORRUPTION

17.1   The Carrier has strict anti-corruption policies and practices. The Handling Company undertakes that it will not, at any time before, during, or after the term of this Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in relation to the transaction which is the subject of this agreement or the provision of the

services which is capable of being interpreted as a corrupt practice or bribery for the purpose of any applicable law, US or other.

17.2   Each Party shall promptly report to the other Party any request or demand for any undue financial or other advantage of any kind received by it in connection with the performance of this Agreement or additional/other business.

## PARAGRAPH 18.  MISCELLANEOUS

18.1   Each provision of this Agreement is severable and distinct from the others.  Both Parties intend that every such provision shall be and remain valid and enforceable to the fullest extent permitted by law.  If any such provision is or at any time becomes to any extent invalid, illegal or unenforceable under any enactment or rule of law, it shall to that extent be deemed not to form part of this Agreement but (except to that extent in the case of that provision) it and all other provisions of this Agreement shall continue in full force and effect and their validity, legality and enforceability shall not be thereby affected or impaired.

18.2   In case of any inconsistency between this Annex B and the Main Agreement, the provisions of this Annex B shall prevail.

18.3   The relationship of the Parties is that of independent contractors dealing at arm's length.  Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall constitute the Parties as partners, joint venturers or co-owners, or constitute either Party as the agent, employee or representative of the other, or empower either Party to act for, bind or otherwise create or assume any obligation on behalf of the other, and neither Party shall hold itself out as having authority to do the same. This Agreement does not prevent either of the Parties from entering into similar agreement with third parties in respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to this Agreement.

18.4   The Parties acknowledge and agree that a breach by the other Party of any of the terms of this Agreement may result in irreparable and continuing damage to the other for which there may or will be no adequate remedy at law, and that in the event of such breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a decree for specific performance and such other and further relief as may be appropriate.

18.5   This Agreement may be entered into in the form of two or more counterparts each executed by one or both of the Parties but, taken together, executed by both and, provided that both the Handling Company and the Carrier so enter into the Agreement, each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6   All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program.  The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred.  The Handling Company is required to go through setup, maintain compliance, and will be

responsible for all associated fees.  More information can be obtained at
http://frontier.globalrms.com/.

Signed the ____ day of _____, 2016     Signed the 16 day of _April_____, 2016

At Denver, Colorado, U.S.A.                    at _Irving, TX_____

for and on behalf of                           for and on behalf of
**Frontier Airlines, Inc.**                    **Huntleigh USA Corporation**

By: _Howard Diamond_____                   By: _____
Name: Howard Diamond                           Name: Richard Sporn
Title: SVP & General Counsel                   Title: CEO

# STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE

## ANNEX B4.0 – LOCATION(s), AGREED SERVICES AND CHARGES

to the Standard Ground Handling Agreement (SGHA) of 2013

| | |
|---|---|
| between: | **Frontier Airlines, Inc.** |
| having its principal office at: | 4545 Airport Way<br>Denver, CO 80239 |

and hereinafter referred to as the "Carrier"

| | |
|---|---|
| and: | **Huntleigh USA Corporation** |
| having its principal office at: | 545 E. John Carpenter Freeway, Suite 175<br>Irving, TX 75062 |

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

| | |
|---|---|
| effective from | September 16, 2017 |
| This Annex B4.0 for | |
| the location(s): | Portland International Airport (the "Airport" and "PDX") |
| is valid from: | September 16, 2017 |
| and replaces: | N/A |

## PREAMBLE:

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

## PARAGRAPH 1.  HANDLING SERVICES AND CHARGES

1.1.   For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 2. PASSENGER SERVICES
**2.1.3**   When requested by the Carrier,
(a)  provide
special equipment and specially trained personnel, for assistance to
2.  persons with reduced mobility (PRMs) ("Wheelchair Services")
7.  other – line coordinator services

### SECTION 6. SUPPORT SERVICES
**6.2**       **Automated/Computer or Manual Recording Systems**
**6.2.2**   Perform the following functions in
(b)  Handling Company's system
for
(11) Other functions – Wheelchair Services dispatch, tracking, data compilation (request times, response times, move information, compliments, complaints, etc.)

1.2.   Rates (in USD) for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

| Hourly Resources | Regular Rate/Hr | Holiday/Overtime Rate/Hr |
|---|---|---|
| Wheelchair Agent | $14.84 | $22.25 |
| Dispatcher | $17.47 | $26.20 |
| Line Coordinator | $15.39 | $23.08 |

One-hundred percent (100%) of the cost will be allocated to the airlines/companies serviced by the Handling Company based on the proportion of the passengers such airline/company has out of the total number of passengers of all airlines/companies serviced by the Handling Company, as applicable to each service type (Wheelchair Services and Line Coordinator Services). For avoidance of doubt, the exact monthly amount that carrier will be charged may vary each month depending on the number of parties to the services and the total number of passengers each month.

Performance Credits (Effective October 1, 2017)

Monthly Performance

| | | Station Monthly Departures | | |
|---|---|---|---|---|
| | | <63 | 63-212 | >212 |
| Wheelchairs | <95% of Planned Pushes w/in 10 mins. | 1% off of monthly invoice | | |
| | <97% of Unplanned Pushes w/in 20 mins. | 1% off of monthly invoice | | |
| | >30 Minute Unattended or Wait(s) | $200 per Occurrence | | |
| | Missing Wheelchair Data | $200/Day | $500/Day | $1,000/Day |
| Complaint(s) | Verified complaint re service for which the Handling Company can't disprove | $50 per Occurrence | | |

| Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint |
|---|---|---|

1.3.    In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling Company may request a renegotiation of rates upon ninety (90) days' written notice to the Carrier.

1.4.    No extra charges beyond what is specifically stated above will be made for providing services on ~~legal holidays~~, weekends, evenings, or at night.

1.5.    Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

## PARAGRAPH 2.  ADDITIONAL SERVICES AND CHARGES

2.1.    All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3.  DISBURSEMENTS

3.1.    Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

## PARAGRAPH 4.  LIMIT OF LIABILITY AND INDEMNIFICATION

4.1     Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:

- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors.  However, nothing contained in this section shall be construed as an indemnity by the Handling Company against any loss, liability or claim caused solely by the acts or omissions of the

Carrier, its directors, officers, employees and agents, unless caused by the negligence or misconduct of Contractor, its directors, officers, employees or agents."

4.2   The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.

## PARAGRAPH 5. INSURANCE

5.1.   The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1)   The Carrier is included as an Additional Insured as their interests may appear.

2)   All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3)   This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4)   Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5)   In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6)      Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6.  AREA OF RESPONSIBILITY

6.1     The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: None.

## PARAGRAPH 7.  TRANSFER OF SERVICES

7.1     Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

## PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT

8.1     Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH).  The Handling Company's invoices shall include the following information for payment:
        Bank Name: Bank of Texas
        ABA No. 111014325
        Credit the Account of: Huntleigh USA Corporation, 545 E. John Carpenter Freeway, Suite 175, Irving, TX 75062
        Acct. No. 8094121172
        Ref: _____
        Invoice Number(s): _____

8.2     With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier through the Coupa Supplier Network.  All invoices must contain a description of the goods and/or services, the applicable pricing, and the purchase order number.  Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier on a monthly basis, after the completion of each calendar month of service.  Payment of undisputed amounts will be due thirty (30) days after the Carrier's receipt of each invoice.  In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing.  Both Parties shall then seek in good faith to resolve the disputed amount(s).  Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

## PARAGRAPH 9.  SUPERVISION AND ADMINISTRATION

9.1     The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for

the Carrier by other organization(s) under cover of separate agreement(s):  All Airport services.

## PARAGRAPH 10.  DURATION, MODIFICATION, AND TERMINATION

10.1    Duration

10.1.1  Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from September 16, 2017 through September 15, 2020 (the "Initial Term") and thereafter until terminated by either Party upon ninety (90) days' prior written notice to the other Party.

10.1.2  In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.2    Modification

10.2.1  Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3    Termination

10.3.1  Notwithstanding Sub-Paragraph 10.1.1 of this Annex B, this Annex B may be terminated by Carrier upon one-hundred-twenty (120) days' written notice to the Handling Company.

10.3.2  The Carrier will provide notice to the Handling Company of any service failures.  The Handling Company shall have thirty (30) days from written notice to cure any deficiencies.  After thirty (30) days if the deficiencies have not been sufficiently corrected to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement for cause upon 30 days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

10.3.3  In the event that the Handling Company plans to cease operations at the Airport, the Handling Company may terminate this Agreement without penalty upon ninety (90) days' written notice to the Carrier, on that condition that such termination shall not take place prior to the Handling Company's ceasing of all operations at the Airport.

## PARAGRAPH 11.  NOTIFICATION

11.1    In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

> To Carrier:
> Frontier Airlines, Inc.
> 4545 Airport Way
> Denver, Colorado 80239
> U.S.A.
> Telephone:  720-374-4200
> Facsimile:  Not Authorized for Notification
> Attn:  General Counsel
> Attn:  Director, Ground Handling Contracts

To Handling Company:
Huntleigh USA Corporation
545 E. John Carpenter Freeway, Suite 175
Irving, TX 75062
U.S.A.
Telephone:  972-719-9182
Facsimile:  972-719-9181
Electronic Mail:  rsporn@huntleighusa.com
Attn:  Richard Sporn

## PARAGRAPH 12.  GOVERNING LAW

12.1   In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2   In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13.  FORCE MAJEURE

13.1   Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2   If either Party is affected by a Force Majeure event, such affected Party shall promptly notify the other Party of the nature and extent of the circumstances in question.

13.3   Notwithstanding any other provision of this Agreement neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, for any delay in performance or other non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to a Force Majeure event.

13.4   If any event of Force Majeure occurs, the date(s) for performance of the obligation(s) affected shall be postponed for so long as is made necessary by the event of Force Majeure, provided that if any Force Majeure event continues for a period exceeding one (1) month, either Party shall have the right to terminate this Annex B forthwith on written notice to the other Party.

13.5   The Party affected by Force Majeure shall take all reasonable steps available to it to minimize the effects of Force Majeure on the performance of its obligations under this Agreement.

13.6   For the purpose of this Agreement "Force Majeure" means any circumstances that is not reasonably foreseeable and beyond the reasonable control of the Party relating to its performance of this Annex B, including: acts of God, fires, floods, explosions, acts or restraints of governments or public authorities, war, revolution, riot or civil commotion, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences.

**PARAGRAPH 14.  TRAINING**

14.1   All training shall be provided by the Handling Company and the Handling Company's sole expense.

14.2   No employee of the Handling Company may work a flight of the Carrier's unless training has been received, completed, and passed in accordance with the Handling Company's training policy.  Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

**PARAGRAPH 15.  COMPLIANCE WITH LAWS**

15.1   The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

15.2   The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

15.3   Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B.  In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

15.4   Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

**PARAGRAPH 16.  CONFIDENTIALITY AND DATA PROTECTION**

16.1   The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a

Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3    Prior written consent to any disclosure shall be obtained from the Carrier.  In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

16.4    The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5    To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier.  Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6    The obligations in this Paragraph 16 shall continue to bind the Parties after the expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17.  ANTI BRIBERY AND CORRUPTION

17.1    The Carrier has strict anti-corruption policies and practices. The Handling Company undertakes that it will not, at any time before, during, or after the term of this Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in relation to the transaction which is the subject of this agreement or the provision of the services which is capable of being interpreted as a corrupt practice or bribery for the purpose of any applicable law, US or other.

17.2    Each Party shall promptly report to the other Party any request or demand for any undue financial or other advantage of any kind received by it in connection with the performance of this Agreement or additional/other business.

## PARAGRAPH 18.  MISCELLANEOUS

18.1    Each provision of this Agreement is severable and distinct from the others.  Both Parties intend that every such provision shall be and remain valid and enforceable to the fullest extent permitted by law.  If any such provision is or at any time becomes to any extent invalid, illegal or unenforceable under any enactment or rule of law, it shall to that extent be deemed not to form part of this Agreement but (except to that extent in the case of that provision) it and all other provisions of this Agreement shall continue in full force and effect and their validity, legality and enforceability shall not be thereby affected or impaired.

18.2    In case of any inconsistency between this Annex B and the Main Agreement, the provisions of this Annex B shall prevail.

18.3    The relationship of the Parties is that of independent contractors dealing at arm's length. Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall constitute the Parties as partners, joint venturers or co-owners, or constitute either Party as the agent, employee or representative of the other, or empower either Party to act for, bind or otherwise create or assume any obligation on behalf of the other, and neither Party shall hold itself out as having authority to do the same. This Agreement does not prevent either of the Parties from entering into similar agreement with third parties in respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to this Agreement.

18.4    The Parties acknowledge and agree that a breach by the other Party of any of the terms of this Agreement may result in irreparable and continuing damage to the other for which there may or will be no adequate remedy at law, and that in the event of such breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a decree for specific performance and such other and further relief as may be appropriate.

18.5    This Agreement may be entered into in the form of two or more counterparts each executed by one or both of the Parties but, taken together, executed by both and, provided that both the Handling Company and the Carrier so enter into the Agreement,

each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6    All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program.  The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred.  The Handling Company is required to go through setup, maintain compliance, and will be responsible for all associated fees.  More information can be obtained at http://frontier.globalrms.com/.

Signed the _____ day of _____, 2017

At Denver, Colorado, U.S.A.

for and on behalf of
**Frontier Airlines, Inc.**

By: _____
Name: Howard Diamond
Title: SVP & General Counsel

Signed the  26  day of  September , 2017

at _____ Irving, TX _____

for and on behalf of
**Huntleigh USA Corporation**

By: _____
Name: Richard Sporn
Title: CEO