**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MAXINE WHITE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **FRONTIER AIRLINES, INC.,** | § | |
| | § | |
| **Defendant/Third Party Plaintiff,** | § | **CIVIL ACTION NO.  1:16-CV-1266(LY)** |
| | § | |
| **v.** | § | **JURY DEMAND** |
| | § | |
| **THE AUSTIN FIRE DEPARTMENT,** | § | |
| **THE CITY OF AUSTIN AVIATION** | § | |
| **DEPARTMENT,   AUSTIN-BERGSTROM** | § | |
| **INTERNATIONAL AIRPORT,** | § | |
| **THE CITY OF AUSTIN** | § | |
| **HUNTLEIGH USA CORPORATION, AND** | § | |
| **FLIGHT SERVICES & SYSTEMS, INC.,** | § | |
| | § | |
| **Third-Party Defendants.** | § | |

**DEFENDANT/THIRD-PARTY PLAINTIFF FRONTIER AIRLINES, INC.'S**
**THIRD AMENDED THIRD-PARTY COMPLAINT**

Defendant/Third-Party Plaintiff, Frontier Airlines, Inc. ("Frontier"), pursuant to Rule 14 of the

Federal Rules of Civil Procedure, files this Third Amended Third-Party Complaint (the "Complaint")

against the Austin Fire Department (the "AFD"), the City of Austin Aviation Department (the "Aviation

Department"), the Austin-Bergstrom International Airport ("ABIA"), the City of Austin (the "City"),

Huntleigh USA Corporation ("Huntleigh"), and Flight Services & Systems, Inc. ("FSS") and would

respectfully show the Court as follows:

**I.**
**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the dispute between Plaintiff Maxine White and Frontier.

EXHIBIT A

2.     This Complaint asserts that Third-Party Defendants, the AFD, the Aviation Department, ABIA, the City, Huntleigh, and FSS are liable to Frontier for the liability, if any, Frontier may owe to Plaintiff.  The claims asserted in this Complaint arise out of the same facts and circumstances as those of the original complaint (ECF Nos. 1-2) filed by Plaintiff ("Plaintiff's Complaint"), so that this Court may exercise supplemental jurisdiction over this third-party action under 28 U.S.C. §1367(a).

3.     Plaintiff alleges violation of the Americans with Disability Act (the "ADA"). Therefore, this Court has jurisdiction over the federal question raised by Plaintiff's Complaint as well.

4.     Venue is proper in this Court, pursuant to 28 U.S.C. §1391, in that the events giving rise to this lawsuit occurred in this judicial district.

## II.
## FRONTIER'S CLAIMS ARE NOT BARRED BY IMMUNITY

5.     The City, the Aviation Department and ABIA are not subject to governmental immunity because they performed certain proprietary acts that form the basis of this suit.

6.     In addition, the City, the Aviation Department and ABIA are not subject to governmental immunity because Plaintiff's claims fall under one of the exceptions, namely premises liability, for ABIA and the Aviation Department's failure to provide the proper equipment for Plaintiff to access and board the Frontier flight.

7.     Moreover, the City and the AFD are not subject to governmental immunity because Plaintiff's claims also fall under the exception for premises liability in that the City, through the AFD, had actual notice of the lack of proper equipment and took negligent action for Plaintiff to access and board the aircraft.

8.     Last, the City, the AFD, the Aviation Department and ABIA are not subject to governmental immunity because Plaintiff's claims, if proven, establish gross negligence on the part of the City, the AFD, the Aviation Department and ABIA.

### III.
### PARTIES

9.     Plaintiff Maxine White is a resident of Travis County, Texas.

10.    Frontier is an airline carrier doing business in Austin, Texas.

11.    Huntleigh has appeared in this action.

12.    The City, the AFD, the Aviation Department and ABIA have appeared and answered in this action.

13.    FSS, a designated responsible third-party, is an Ohio corporation with a principal place of business in Cleveland, Ohio.

### IV.
### PROCEDURAL BACKGROUND

14.    Plaintiff's Complaint (ECF Nos. 1-2.) is a personal injury case alleging that Plaintiff was injured while boarding a Frontier flight on June 10, 2015.  Plaintiff alleges that on the day of the incident she was traveling from Austin, Texas to Denver, Colorado aboard a flight operated by Frontier. Plaintiff alleges that the boarding gate for the flight was not equipped with a handicap ramp for boarding, but rather passengers accessed and boarded the flight from the tarmac via stairs.

15.    Plaintiff alleges that she suffered "severe physical injuries as well as mental and physical trauma" due to the manner in which she was boarded onto the plane. (ECF Nos. 1-2.)

16.    Plaintiff alleges that she is seeking "monetary relief over $200,000" as well as exemplary damages. (*Id.*, at ¶5.)

17.    Plaintiff further alleges that a wheelchair-accessible ramp was required to be available for boarding pursuant to the ADA, and alleges that, because it was not available, "Plaintiff was loaded into a 'rescue chair' and carried up the stairs despite expressing concern for her safety." (*Id.*, at ¶10.)

18.     Plaintiff has set forth causes of action sounding in negligence, negligent training and supervision, vicarious liability, and infliction of bodily injury. (*Id.*, ¶¶14 – 32.)

19.     Frontier removed the case to this Court on December 2, 2016.  The initial scheduling conference was held on April 25, 2017.  The Scheduling Order (ECF No. 10.) provides that any additional parties must be added by July 21, 2017.

20.     Plaintiff amended her complaint on July 21, 2017, adding claims alleging that Frontier violated 14 CFR 382, the Air Carrier Access Act (the "ACAA"), and Chapter 121 of the Texas Human Rights Code.

21.     Frontier brought a third-party action by summons and complaint filed on July 21, 2017. The City filed its answer on August 17, 2017.  Huntleigh filed a motion to dismiss or, in the alternative, requested a more definite statement on August 25, 2017.

22.     Frontier amended its original third-party complaint on October 20, 2017. Huntleigh filed a second motion to dismiss Frontier's First Amended Third-Party Complaint on November 1, 2017.

23.     Frontier further amended its third-party complaint and responded in opposition to Huntleigh's second motion to dismiss on November 29, 2017. Huntleigh replied to Frontier's opposition in support of its motion to dismiss on December 5, 2017.

### V.
### FACTUAL BACKGROUND GIVING RISE TO THE THIRD PARTY ACTION

### The City of Austin

24.     Frontier operates commercial air service operations at ABIA pursuant to a contract with the City.  Pursuant to the contract, attached hereto as <u>Exhibit A</u>, the City "acting by and through the Executive Director of the Department of Aviation," leases Gate 24 to Frontier for its flight operations.

25.     Under the contract, the City must:

operate, maintain, manage, and control the Airport in a first class, efficient, economical and businesslike manner, and in accordance with "Applicable Law." "Applicable Law" is a defined term in the contract meaning: . . . all federal, state and local laws, codes, ordinances, rules, regulations . . . of any Governmental Authority applicable to the parties, the Airport, or the Premises during the term of this Agreement.

26. Article 9 of the contract entitled "Airline Alterations and Additions," drafted by the City, provides in Part B:

B. **Modification Required to Accommodate Disabled Persons**. If Lessor is required by Applicable Law or an order of a Governmental Authority to modify the areas leased or occupied by Airline, or to install additional equipment therein, in order to accommodate Airline's disabled passengers during the term of this Agreement, Lessor shall give the Airline prompt notice of the receipt of such governmental order to undertake such modifications, or additions, in order that Airline may present its views, or objections, or participate in the planning of such, to the extent that its interest is involved. Then:

(1) if the areas or equipment (including boarding assistance devices) are Exclusively or Preferentially leased to or used by Airline, the Rent paid by Airline for such areas or equipment shall be adjusted to include Lessor's cost to modify such areas or install additional equipment, amortized over a reasonable period of time in accordance with generally accepted accounting principles; and

(2) if the areas or equipment are Common Use or Joint Use Facilities, the Rent paid by Airline and other users thereof shall be adjusted to include Lessor's cost to modify such areas or install additional equipment, amortized over a reasonable period of time in accordance with generally accepted accounting principles.

(3) The Rent adjustment under this Article shall be effective as of the first day of the month following the completion of such modifications, or the installation of such equipment, as applicable.

Unless otherwise specified in **Exhibit A**, each of Airline's Preferential Use Gates are equipped with passenger loading bridges. If Airline elects to operate any aircraft at the Airport which cannot be boarded using the loading bridges provided by Lessor, Airline shall be solely responsible to satisfy its obligations under the Air Carrier Access Act [49 U.S.C, 1374(c)] and the regulations promulgated thereunder (14 CFR §382.23) with respect to aircraft covered by 14 CFR Part 121.

(*See* Exhibit A at p. 29.)

27. Plaintiff was a customer of Frontier who was provided assistance by the City boarding a Frontier aircraft. As such, the City owed a duty of care to Plaintiff, including the duty to act with the same degree of care for Plaintiff's safety and well-being that would be exercised by a reasonably cautious and prudent person under the same or similar circumstances.

28.     Plaintiff alleges that she was injured during her transport between the airport terminal and the aircraft.

29.     Frontier submitted a public information request to the City on April 17, 2017.  The City responded on April 24, 2017 with an incident report and a letter to Plaintiff that had not been disclosed to Frontier prior to that date. (*See* Exhibit B.)

30.     The "Incident Detail Report" (the "IDR") indicates that firemen from Austin Fire Rescue 2 and 5:

> [R]esponded to Gate 1 as requested by a phone call from Frontier Airlines for assistance helping a disabled passenger board the 737.  The aircraft was parked on the RON out from Gate 2 and with an air-stair attached. We used an aisle chair to take the patient up the stairs. (*See* Exhibit B at p. 5.)

31.     Further, the IDR reads that the firemen, "provided manpower for a lift assist onto Frontier Airlines aircraft located at the hardstand using an aisle chair provided by Air Ops." (*Id.*)

32.     In addition to the IDR, the City also provided an email response to a "Citizen Assistance Form" dated July 20, 2015 (the "CAF Response").  The CAF Response was addressed to Plaintiff's email address and was authored by Stephanie Tucker, Airport Property Manager for ABIA.  In relevant part, Ms. Tucker stated:

> . . .the Aviation Department has purchased an air stair with a wheelchair lift.  The air stair is designed to accommodate various aircraft classes that operate at the airport.  The lift will be used in anomalies and emergencies to ensure the safe loading and disembarkation of passengers from planes. (*Id.*)

33.     The City, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to safely transport Plaintiff, a third-party beneficiary of the contract and the City's services, from the airport terminal to the aircraft safely.

34.     The City, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to provide the necessary required equipment to safely transport Plaintiff, a third-party beneficiary of the contract and the City's services, from the airport terminal to the aircraft.

35.     The City, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to stop an improper transport of Plaintiff, a third-party beneficiary of the contract and the City's services, from the airport terminal to the aircraft as required by their safety procedures and applicable law.

36.     The City, its agents, servants and employees acted negligently in their operation, maintenance, control, care and supervision of their airport services and premises.

37.     The City's negligence was the direct and proximate cause of Plaintiff's injuries.

38.     The City's breach of contract is the direct and proximate cause of Plaintiff's injuries.

## Huntleigh Corporation

39.     Frontier had a contract with Huntleigh to provide wheelchair services for its customers on the day of the incident.[1]

40.     Frontier has been unable to locate a copy of that contract.

41.     Frontier has located and produced all 2015 invoices delivered by Huntleigh to Frontier that show a written agreement between Huntleigh and Frontier whereby Huntleigh was to provide services for Frontier customers using wheelchairs at ABIA, including invoices for Huntleigh's services dating from June 1, 2015 to June 30, 2015 which cover the date of Plaintiff's alleged incident. *See* Exhibit C.

---

[1] Frontier hires contractors to provide wheelchair services for its customers at all airports to which it flies, including ABIA. Frontier does not provide any wheelchair services through its own personnel, and in fact, does not employ any full-time Frontier personnel at ABIA at any time, including on the day of the alleged incident. Frontier personnel were not directly involved with the interactions with Plaintiff on the day of the alleged incident.

42.    Attached hereto and incorporated herein for all purposes as <u>Exhibit D</u> is the Affidavit of Frontier's Manager of Ground Handling Contracts, which details the relationship between Huntleigh and Frontier.  Indeed, Huntleigh executed a renewal of their contract with Frontier at ABIA as of September 29, 2017 (*See* Attachment 1).  Frontier's current contract with Huntleigh at ABIA tracks the same boilerplate indemnification and services provisions as its contracts with Huntleigh and other independently contracted service providers at other airports.[2]

43.    Huntleigh is, and was on the date of the alleged incident, a "contractor" as defined in the ACAA at 14 CFR 382.7.

44.    All wheelchair services provided by Huntleigh are provided pursuant to the ACAA.

45.    Huntleigh was responsible for providing boarding assistance to Frontier passengers compliant with ACAA requirements set forth in Chapter 5, "Assisting Air Travelers with Disabilities Boarding, Deplaning and During the Flight."

46.    Pursuant to ACAA Chapter 5, Huntleigh had a duty to provide trained personnel with a "proficiency in the use of the boarding assistance equipment and procedures regarding the safety and dignity of passengers receiving boarding assistance."

47.    The 2015 invoices establish a contractual relationship by which Huntleigh provided wheelchair services for at least eight airlines at ABIA for the month of June 2015, including Delta, Continental, JetBlue, Frontier, United, Mesa/USAir, USAir and PSA/USAir.[3]

---

[2]  Frontier contracts with Huntleigh at other US Airports.  The boilerplate contract language from a different airport where Huntleigh provides wheelchair services for Frontier as a "Handling Company," provides, with respect to Frontier, the "Carrier" to: "indemnify, defend and hold harmless Carrier, its directors, officers, employees, and agents from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to interest, court costs, and attorneys' fees, which in any way arise out of or result from any act(s) or omission(s) by Handling Company or anyone for whose acts Handling Company may be liable in the performance or non-performance of services under this [Contract], including, but not limited to: death of or injury to any person or persons. . ."  *See* <u>Exhibit D</u> at Attachment 2.
[3]  Upon information and belief, review of Huntleigh's contracts with these other air carriers will establish similar, if not identical, performance and indemnification clauses.

48.     According to the June 2015 invoice, Huntleigh provided wheelchair services to 21,346 individual airport passengers among those eight airlines.

49.     Frontier paid Huntleigh $5,811.86 for its share of wheelchair services for the convenience and safety of passengers for the month of June 2015.  In exchange for this monthly fee, Huntleigh agreed to handle all wheelchair services for Frontier, which services include wheelchair agents, management, and a supervisor provided by Huntleigh.

50.     Based on the dates of Huntleigh's invoices, one of the passengers for whom Huntleigh provided, or should have provided, wheelchair services was Plaintiff, a third-party beneficiary of the contractual relationship between Frontier and Huntleigh.

51.     Huntleigh, as the only wheelchair provider for Frontier at ABIA, would have been made aware of Plaintiff's request for wheelchair services on or prior to the day of the alleged incident.[4]

52.     Plaintiff alleges that she was injured during her transport between the airport terminal and the aircraft.

53.     Huntleigh's standard service contract provides that wheelchair services must comply with industry standards and all Federal, State, local and airport rules and regulations in accordance with the requirements set forth in 14 CFR 382, which include, without limitation, providing special equipment and specially trained personnel for assistance to persons with reduced mobility.

54.     Huntleigh was responsible under its contract with Frontier for ensuring Plaintiff's safe transportation from the terminal to the plane, including obtaining Plaintiff's consent to the method of such transportation.

55.     According to the ACAA, without Plaintiff's consent, Huntleigh was required to notify Frontier's appointed and trained Complaint Resolution Officer, and then provide instructions on what procedures must be followed. (14 CFR 382.151(c).)

56.     If Huntleigh did not provide wheelchair services to Plaintiff from the terminal to the plane on the day of the alleged incident, then Huntleigh's omission would have been in breach of its agreement (express or implied) with Frontier for Huntleigh to provide such services for which Frontier paid Huntleigh. It was Huntleigh's responsibility to provide wheelchair services to Plaintiff on Frontier's behalf as Frontier's engaged third-party vendor. Any failure by Huntleigh to provide wheelchair services to Plaintiff (as Frontier's customer) is in breach of that responsibility. Allowing an improperly trained third party (public servant or otherwise) to provide wheelchair services to a Frontier customer is a further breach of that responsibility.

57.     Huntleigh, its agents, servants and employees owed a duty of care to Plaintiff, including the duty to act with the same degree of care for her safety and well-being that would be exercised by a reasonably cautious and prudent person under the same or similar circumstances.

58.     Huntleigh, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to safely transport Plaintiff, a third-party beneficiary of the contract and Huntleigh's services, from the airport terminal to the aircraft safely.

59.     Huntleigh, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to provide or arrange for the necessary required equipment to safely transport Plaintiff, a third-party beneficiary of the contract and Huntleigh's services, from the airport terminal to the aircraft.

60.     Huntleigh, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to stop an improper transport of Plaintiff, a third-party beneficiary of the contract and

Huntleigh's services, from the airport terminal to the aircraft as required by their safety procedures and applicable law.

61.     Huntleigh, its agents, servants and employees acted negligently in their operation, maintenance, control, care and supervision of their wheelchair services.

62.     Huntleigh's negligence was the direct and proximate cause of Plaintiff's injuries.

63.     Huntleigh's breach of contract is the direct and proximate cause of Plaintiff's injuries.

## Flight Services & Systems

64.     Frontier and FSS were parties to a contract dated August 14, 2012 whereby FSS was to provide ground-handling services for Frontier's customers. *See* Exhibit E. Such contract was in effect on the day of the alleged incident.

65.     Again, Frontier does not employ any full-time Frontier personnel at ABIA at any time, including on the day of the alleged incident and Frontier personnel were not directly involved with the interactions with Plaintiff on the day of the alleged incident. *See* Exhibit D.

66.     The contract incorporates by reference the 2004 Standard Ground Handling Agreement promulgated by the International Air Transport Association.

67.     Under such contract, FSS was obligated to perform, among other duties, "passenger services," which included providing "special equipment, facilities, and specially-trained personnel for assistance to persons with reduced mobility (PRMs)":

**SECTION 2. PASSENGER SERVICES**

2.1    **General**

2.1.1  Inform passengers and/or public about time of arrival and/or departure of Carrier's aircraft and surface transport.

2.1.2  Make arrangements for stopover, transfer and transit passengers and their baggage and inform them about services available at the airport.

2.1.3  When requested by the Carrier,

    (a) provide

    special equipment, facilities and specially trained personnel, for assistance to

    1.  unaccompanied minors.

    3.  VIPs.

    4.  transit without visa passengers (TWOVs).

    5.  deportees.

    7.  others, as specified by the Carrier.

    (b) arrange for

    special equipment, facilities and specially trained personnel, for assistance to

    2.  persons with reduced mobility (PRMs).

    3.  VIPs.

    4.  transit without visa passengers (TWOVs).

    5.  deportees.

    6.  special medical transport.

    7.  others, as specified by the Carrier.

68.    With respect to departure, FSS was obligated to perform the following duties:

2.2.15  At the gate perform

    (a) verification of cabin baggage

    (b) boarding process

    (c) reconciliation of passenger numbers with aircraft documents prior to departure

    (d) other gate functions as specified by the Carrier

69.    Specifically, FSS was required under the contract to provide the following services in connection with the boarding of passengers:

3.6    **Loading and Unloading**

3.6.1  (a) Provide

    (c) Operate

    (1) passenger steps.

    (3) loading bridges.

3.6.3  (a) Provide

    (c) Operate

    equipment for loading and/or unloading.

3.6.4  (a) Provide

    delivery and pick-up of

    (1) Baggage

    (2) Mobility devices

    at aircraft doors or other agreed points

70.    Further, FSS was obligated under the contract to have the "appropriate quantity of maintained and functioning. . . .mobility assistive devices" to aid in the boarding of passengers requiring mobility assistance.

The Handling Company shall supply, operate, fuel, and maintain, at its own expense sufficient quantities of Ground Service Equipment (GSE) to perform the Services. Should the Carrier provide any GSE or other equipment, the Handling Company will be responsible to fuel and maintain (utilizing a progressive or preventative maintenance program approved by the Carrier) the GSE and other equipment at the Handling Company's sole expense, except that the Carrier will be responsible for all single item repairs in excess of $1,000, unless the repairs are required as a result of the Handling Company's negligence or failure to properly maintain.  The minimum quantity of GSE (of appropriate specifications) shall be as follows:

- one pushback tractor and have access to another as a spare
- one tow bar and have access to another as a spare
- two belt loaders
- two baggage tractors
- ten baggage carts
- access to an air start unit
- access to a GPU
- access to a conditioned air cart
- one lavatory service vehicle and access to another as a spare
- one water service cart and access to another as a spare
- access to air stairs
- wheelchairs/aisle chairs – must have appropriate quantity of maintained and functioning wheelchairs, aisle chairs, and mobility assistive devices

71.     With respect to liability, FSS agreed to "indemnify, defend and hold harmless" Frontier for personal injury claims related to the services FSS provided under the contract. As stated in the contract:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:
- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.
Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors."

72.     Significantly, pursuant to the contract, FSS was also required to obtain insurance covering liabilities relating to FSS services, while giving Frontier the added protection of designating it as an Additional Insured under FSS's insurance policy.

The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

73.     Plaintiff was identified as a PRM in her flight reservation.

74.     FSS is, and was on the date of the alleged incident, a "contractor" as defined in the ACAA at 14 CFR 382.7, and so is (and was) responsible for providing boarding assistance to Frontier passengers compliant with ACAA requirements set forth in Chapter 5, "Assisting Air Travelers with Disabilities Boarding, Deplaning and During the Flight."

75.     Pursuant to ACAA Chapter 5, FSS had a duty to provide trained personnel with a "proficiency in the use of the boarding assistance equipment and procedures regarding the safety and dignity of passengers receiving boarding assistance."

76.     Contemporaneous electronic correspondence between Frontier and the FSS General Manager, Ernestine Trejo, from the day following the date of the alleged incident confirms FSS personnel controlled, supervised and maintained the necessary equipment to facilitate the boarding of *all* Frontier passengers, including those requiring mobility assistance. (*See* Exhibit F.)

77.     Plaintiff alleges that she was injured during her transport between the airport terminal and the aircraft.

78.     FSS was responsible under its contract with Frontier for ensuring Plaintiff's safe transportation from the terminal to the plane, specifically, arranging for the appropriate method of transportation.

79.     Alternatively, if FSS did not arrange for wheelchair services to be provided to Plaintiff during her transport from the terminal to the aircraft on the day of the alleged incident, then FSS's omission would have been in breach of its agreement with Frontier for FSS to make such arrangements for Plaintiff on behalf of Frontier has Frontier's engaged third-party vendor. Any failure by FSS to make such arrangements for Plaintiff (as Frontier's customer) is in breach of that responsibility. Allowing an improperly trained third party (public servant or otherwise) to transport Plaintiff from the terminal to the plane is a further breach of that responsibility.

80.     FSS, its agents servants and employees owed a duty of care to Plaintiff, including the duty to act with the same degree of care for her safety and well-being that would be exercised by a reasonably cautious and prudent person under the same or similar circumstances.

81.     FSS, its agents, servants and employees breach their duty to Frontier and Plaintiff when they failed to arrange for the transport of Plaintiff, a third-party beneficiary of the contract and FSS's services, from the airport terminal to the aircraft safely.

82.     FSS, its agents, servants and employees breach their duty to Frontier and Plaintiff when they failed to provide or arrange for the necessary required equipment to safely transport Plaintiff, a third-party beneficiary of the contract and FSS's services, from the airport terminal to the aircraft.

83.     FSS, its agents, servants and employees breached their duty to Frontier and Plaintiff when they failed to stop an improper transport of Plaintiff, a third-party beneficiary of the contract and FSS's services, from the airport terminal to the aircraft as required under the contract and applicable law.

84.     FSS, its agents, servants and employees acted negligently in their operation, maintenance, control, care and supervision of their ground-handling services.

85.     FSS's negligence was the direct and proximate cause of Plaintiff's injuries.

86.     FSS's breach of contract is the direct and proximate cause of Plaintiff's injuries.

## VI.
## FIRST CAUSE OF ACTION AGAINST CITY, AVIATION DEPARTMENT AND ABIA
## (BREACH OF CONTRACT)

87.     Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

88.     The City, the Aviation Department, and/or ABIA breached its contract with Frontier by failing to provide the services pursuant to the contract.

## VII.
## SECOND CAUSE OF ACTION AGAINST CITY, AVIATION DEPARTMENT AND ABIA
## (CONTRACTUAL INDEMNIFICATION)

89.     Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

90.     The City, the Aviation Department, and/or ABIA breached its contract with Frontier by failing to provide the services pursuant to the contract.

91.     While denying all liability, if Frontier is found liable for damages to Plaintiff in connection with the claims asserted in Plaintiff's Complaint, and if such liability accrues as a result of a breach of the contractual relationship between Frontier and the City, the Aviation Department, and/or ABIA for the wrongful and/or negligent conduct of the City, by and through the Aviation Department and/or ABIA, Frontier is entitled to indemnification from the City, the Aviation Department, and/or ABIA for any such damages and all of its costs, including attorney's fees.

**VIII.**
**THIRD CAUSE OF ACTION AGAINST CITY, AVIATION DEPARTMENT, ABIA, AND AFD**
**(NEGLIGENCE)**

92.    Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

93.    In the event and to the extent that any party is adjudged to have any liability to Plaintiff with respect to any claims asserted in Plaintiff's Complaint, the City, by and through the Aviation Department, ABIA, and their respective agents, servants and employees, acted negligently in the operation, maintenance, control, care and supervision of airport services and premises by failing to provide the proper equipment to transport Plaintiff.

94.    The City, by and through the AFD, failed to exercise due care in transporting Plaintiff on the date of the alleged incident.

95.    In the event and to the extent that any party is adjudged to have any liability to Plaintiff with respect to any claims asserted in Plaintiff's Complaint, the City's, the Aviation Department's, ABIA's and AFD's agents, servants and employees acted negligently in their control and care of Plaintiff while transporting Plaintiff on the date of the alleged incident.

96.    The City's conduct, by and through the negligent actions of the agents, servants and employees of the Aviation Department, ABIA, and the AFD, was the direct and proximate cause of Plaintiff's injuries.

**IX.**
**FOURTH CAUSE OF ACTION AGAINST CITY, AVIATION DEPARTMENT, ABIA, AND**
**AFD**
**(CONTRIBUTION)**

97.    Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

98.     The City, the Aviation Department, and/or ABIA breached its contract with Frontier by failing to provide services pursuant to the contract.

99.     The AFD's agents, servants and employees breached their duty of control and care while transporting Plaintiff on the date of the alleged incident.

100.     In the event and to the extent that Frontier is adjudged to have any liability to Plaintiff with respect to any claims asserted in Plaintiff's Complaint, Frontier is entitled to contribution from the City, the Aviation Department, ABIA and/or AFD for such portion of the judgment, in whole or in part, that is attributable to their conduct.

## X.
## FIRST CAUSE OF ACTION AGAINST HUNTLEIGH
## (BREACH OF CONTRACT)

101.     Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

102.     Huntleigh breached its contract with Frontier by failing to provide services pursuant to the contract.

103.     While denying all liability, if Frontier is found liable for damages to Plaintiff in connection with the claims asserted in Plaintiff's Complaint, and if such liability accrues as a result of a breach of the contractual relationship between Frontier and Huntleigh by third-party defendant Huntleigh, Frontier is entitled to recover from Huntleigh any such damages and all of its costs, including attorney's fees.

## XI.
## SECOND CAUSE OF ACTION AGAINST HUNTLEIGH
## (CONTRACTUAL INDEMNIFICATION)

104.     Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

105.    Huntleigh breached its contract with Frontier by failing to provide services pursuant to the contract.

106.    While denying all liability, if Frontier is found liable for damages to Plaintiff in connection with the claims asserted in Plaintiff's Complaint, and if such liability accrues as a result of a breach of the contractual relationship between Frontier and Huntleigh or the wrongful and/or negligent conduct of Huntleigh, Frontier is entitled to indemnification from Huntleigh for any such damages and all of its costs, including attorney's fees.

**XII.**
**THIRD CAUSE OF ACTION AGAINST HUNTLEIGH**
**(NEGLIGENCE)**

107.    Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

108.    Huntleigh was obligated to exercise due care in providing the wheelchair services pursuant to its contract with Frontier.

109.    Huntleigh was obligated to provide wheelchair services pursuant to the requirements of the ACAA.

110.    In the event and to the extent that any party is adjudged to have any liability to Plaintiff with respect to any claims asserted in Plaintiff's Complaint, Huntleigh's agents, servants and employees acted negligently in their operation, maintenance, control, care and supervision of their wheelchair services and personnel.

111.    Huntleigh's conduct was the direct and proximate cause of Plaintiff's injuries.

**XIII.**
**FOURTH CAUSE OF ACTION AGAINST HUNTLEIGH**
**(CONTRIBUTION)**

112.    Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

113.    Huntleigh breached its contract with Frontier by failing to provide services pursuant to the contract.   In addition, Huntleigh's agents, servants and employees acted negligently in their operation, maintenance, control, care and supervision of their wheelchair services and personnel.

114.    In the event and to the extent that Frontier is adjudged to have any liability to Plaintiff with respect to any claims asserted in Plaintiff's Complaint, Frontier is entitled to contribution from Huntleigh for such portion of the judgment, in whole or in part, that is attributable to Huntleigh's conduct.

## XIV.
## FIRST CAUSE OF ACTION AGAINST FSS
## (BREACH OF CONTRACT)

115.    Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

116.    FSS breached its contract with Frontier by failing to provide services pursuant to the contract.

117.    While denying all liability, if Frontier is found liable for damages to Plaintiff in connection with the claims asserted in Plaintiff's Complaint, and if such liability accrues as a result of a breach of the contractual relationship between Frontier and FSS by third-party defendant FSS, Frontier is entitled to recover from FSS any such damages and all of its costs, including attorney's fees.

## XV.
## SECOND CAUSE OF ACTION AGAINST FSS
## (CONTRACTUAL INDEMNIFICATION)

118.    Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

119.   FSS breached its contract with Frontier by failing to provide services pursuant to the contract.

120.   While denying all liability, if Frontier is found liable for damages to Plaintiff in connection with the claims asserted in Plaintiff's Complaint, and if such liability accrues as a result of the breach of the contractual relationship between Frontier and FSS for the wrongful and/or negligent conduct of FSS, Frontier is entitled to indemnification from FSS for any such damages and all of its costs, including attorney's fees.

## XVI.
## THIRD CAUSE OF ACTION AGAINST FSS
## (NEGLIGENCE)

121.   Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

122.   FSS was obligated to exercise due care in overseeing the ground-handling of Frontier's passengers pursuant to its contract with Frontier. FSS failed to exercise due care in arranging and/or transporting Plaintiff on the date of the alleged incident.

123.   If necessary, FSS was obligated to provide wheelchair services to Frontier passengers pursuant to the requirements of the ACAA.

124.   In the event and to the extent that any party is adjudged to have any liability to Plaintiff with respect to any claims asserted in Plaintiff's Complaint, FSS and their respective agents, servants and employees, acted negligently in the operation, maintenance, control, care and supervision of ground handling, passenger, and wheelchair services by failing to provide proper equipment to Plaintiff and failing to safely transport Plaintiff.

125.   In the event and to the extent that any party is adjudged to have any liability to Plaintiff with respect to any claims asserted in Plaintiff's Complaint, FSS and their respective agents, servants

and employees, acted negligently in their control and care of Plaintiff while arranging and/or providing her transportation on the date of the alleged incident FSS's conduct, by and through the negligent actions of its agents, servants and employees, was the direct and proximate cause of Plaintiff's injuries.

## XVII.
## FOURTH CAUSE OF ACTION AGAINST FSS
## (CONTRIBUTION)

126.    Frontier restates and incorporates by reference the allegations set forth above, as though they were fully set forth herein.

127.    FSS breached its contract with Frontier by failing to provide services pursuant to the contract.   In addition, FSS's agents, servants and employees acted negligently in their operation, maintenance, control, care and supervision of their wheelchair services and personnel.

128.    In the event and to the extent that any party is adjudged to have any liability to Plaintiff with respect to any claims asserted in Plaintiff's Complaint, Frontier is entitled to contribution from FSS for such portion of the judgment, in whole or in part, that is attributable to FSS's conduct.

WHEREFORE, Defendant/Third-Party Plaintiff Frontier Airlines, Inc., demands judgment on its claims against Third-Party Defendants City of Austin, the Austin Fire Department, the Austin Aviation Department, Austin-Bergstrom International Airport, Huntleigh USA Corporation and Flight Services & Systems, Inc., and requests such other relief as the Court deems just, proper and equitable.

DATED:  December 13, 2017

Respectfully submitted,

By:    /s/ Patrick J. Comerford
       Patrick J. Comerford, Esq.
       State Bar No. 24096724

       **SMITH ROBERTSON, LLP**
       221 West 6th Street, Suite 1100
       Austin, Texas 78701
       p: (512)-225-5810
       f: (512)-225-5838
       pcomerford@smith-robertson.com

       **ATTORNEY FOR DEFENDANT/THIRD-PARTY PLAINTIFF FRONTIER AIRLINES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 13, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Joel A. Levine
Law Offices of Joel A. Levine, PLLC
5407 Parkcrest Drive, Suite 300
Austin, Texas  78731
*joel@joelalevine.com*

Mr. George S. McCall
Mr. Matthew Clay Sapp
Drinker Biddle & Reath LLP
1717 Main Street, Suite 5400
Dallas, Texas  75201-7367
george.mccall@dbr.com
*matt.sapp@dbr.com*

Joanna Lippmann Salinas, Esq.
Fletcher, Farley, Shipman & Salinas, L.L.P.
1717 West 6th Street, Suite 300
Austin, Texas  78703
*joanna.salinas@fletcherfarley.com*

# AUSTIN- BERGSTROM INTERNATIONAL AIRPORT USE AND LEASE AGREEMENT



# THE CITY OF AUSTIN, TEXAS
# &
# FRONTIER AIRLINES, INC.

## AUSTIN-BERGSTROM INTERNATIONAL AIRPORT

### AUSTIN, TEXAS

EXHIBIT A

ARTICLE 23 - NON WAIVER OF RIGHTS................................................................54

ARTICLE 24 - INVALIDITY OF CLAUSES............................................................55

ARTICLE 25 - APPROVAL BY LESSOR................................................................55

ARTICLE 26 -  ECONOMIC NON-DISCRIMINATION...........................................55

ARTICLE 27 - PUBLIC USE, FEDERAL GRANTS AND NONDISCRIMINATION.........................55

ARTICLE 28 - TITLE TO AIRLINE INSTALLED IMPROVEMENTS AND PROPERTY.................58

ARTICLE 29 - NOTICES................................................................................58

ARTICLE 30 ~ BOND ORDINANCES................................................................59

ARTICLE 31 - MISCELLANEOUS PROVISIONS......................................................61

(6)    **Airport** means Austin-Bergstrom International Airport.

(7)    **Applicable Law** means all federal, state and local laws, codes, ordinances, rules, regulations, judgments, decrees, or directives of any Governmental Authority applicable to the parties, the Airport, or the Premises during the term of this Agreement.

(8)    **Apron** mean the paved aircraft parking apron extending from the outside wall of the Terminal building used to park aircraft and to load and unload passengers and cargo, as the same may be expanded or altered from time to time.  The Apron is depicted in **Exhibit C.**

(9)    **Apron Fee** means the fee charged for the use of aircraft loading and unloading positions on the Terminal Apron, as described in Article 5.

(10)    **Bond Ordinance** means any ordinance or indenture or both, adopted by the City Council of the City authorizing the issuance of bonds, notes, or other obligations for the Airport and securing such obligations by a pledge of revenues or net revenues of the Airport, or any ordinance or indenture supplemental thereto.

(11)    **Common Space** means any space in the Terminal excluding Joint Use Premises that is used for a common purpose by multiple Air Carriers, and includes the baggage claim circulation area, baggage claim device area, and common baggage storage area, and the areas used for screening of passengers and baggage at the Terminal.

(12)    **CUPPS** means Common Use Passenger Processing Systems generally accepted in the commercial aviation industry, including associated self service kiosks and other equipment.

(13)    **Director** means the Executive Director of Aviation for the City of Austin or his or her designee, or such other officer to whom the duties and authority of the Director may be assigned by the City Manager of the City, or by any agency, board or authority which may subsequently succeed to the jurisdiction of City over the Airport.

(14)    **Exclusive Use** means the right of Airline to exclusively use those areas of the Premises leased to Airline for its sole use and occupancy, subject to the terms, covenants, and conditions of this Agreement, including administrative office space, lost and unclaimed

passenger hold rooms, and ticket counter space.

(25)  Premises shall mean the space in the Terminal and associated aircraft loading positions leased to Airline, as described on **Exhibit A-1** and shown on **Exhibit A-2**, attached hereto and incorporated herein.

(26)  Rent means any fee or charge payable by Airline under this Agreement for the use or occupancy of the Premises or other space at the Airport, including rentals for the Premises and Aircraft Loading Positions, Apron Fees, RON Fees, and Terminal Equipment Fees.

(27)  RON Fee means the fee payable by Airline for the use of an Aircraft parking position other than a Gate leased to Airline for a period equal to or greater than four (4) hours, as described in Article 5.

(28)  Signatory Airline means an Air Carrier with scheduled air service to and from the Airport which has executed an Airport Use and Lease Agreement in a form substantially the same as this Agreement.

(29)  Terminal shall mean the Barbara Jordan Terminal at the Airport, including its appurtenant and ancillary facilities.

(30)  Terminal Equipment Fees means the fees payable by Airline for the use of Lessor-provided terminal equipment as described in Article 5.

(31)  Transportation Security Administration or TSA shall mean the agency of the United States Department of Homeland Security that regulates airport and aviation security, or successor agency.

B.   Interpretations – In this Agreement, the following rules of interpretation shall apply:

(1)  Headings and underlinings are for convenience only and do not affect the interpretation of an agreement.

(2)  Words importing the singular include the plural and vice versa and the masculine, feminine or neuter gender shall include all genders.  The word "or" is not exclusive.

(3)  The words "hereof," "herein," and "hereunder" and words of similar import when used

## ARTICLE 2 - TERM OF AGREEMENT

The term of this Agreement shall commence on the Effective Date, and subject to the parties rights of termination hereunder, remain in effect for a term of five (5) years.  If, upon expiration of the primary five year term, the parties have not entered into a new use and lease agreement, this Agreement shall remain in effect from month to month thereafter until terminated by either party upon thirty (30) days' prior written notice.

## ARTICLE 3 - AIRPORT OPERATION AND MAINTENANCE

A.     Throughout the term of this Agreement, Lessor shall operate, maintain, manage and control the Airport in a first class, efficient, economical and businesslike manner, and in accordance with Applicable Law. Lessor shall operate and maintain the land, runways, taxiways (including keeping runways, taxiways and public ramp areas reasonably free and clear of foreign objects that may be harmful to aircraft and aircraft engines), navigation aids, lighting, equipment, entrances, exits, roads, parking areas and all other public facilities and appurtenances within the boundaries of the Airport.

B.     Airline shall operate and maintain at its own expense its leased conditioned and unconditioned space on the apron level of the Terminal Building, but excluding Common Space and Joint Use Facilities.  Airline shall operate any Terminal Equipment under its control, including loading bridges, in accordance with the manufacturer's specifications and Lessor's published operating procedures. Airline may not modify or alter any Terminal Equipment, or operate such Terminal Equipment in any other or alternative manner without the prior written approval of the Director.  Airline, at Airline's expense, must return the Terminal Equipment to the condition that existed just prior to the Airline's use, normal wear and tear and Lessor approved modifications excepted, upon request from the Lessor.  Lessor may charge Airline for any additional costs incurred by Lessor due to the failure of Airline to comply with the requirements of this Section.

C.     Lessor shall own, operate and maintain the baggage handling systems; the cost of which shall be recovered through the Terminal Equipment Fee.

D.     Lessor agrees to use commercially reasonable efforts to obtain the maximum amount of grants and participating funds for the Airport from the United States of America (or any agency

(1)     The landing, taking off, flying over, taxiing, pushing, towing, parking, loading and unloading of aircraft of its choice; including the right to handle other airlines;

(2)     The repairing, maintaining, conditioning and servicing of aircraft and other equipment in areas designated by Lessor;

(3)     The sale of air transportation tickets and services, conveniences and facilities related to air travel and the processing of passengers and their baggage for air travel; the sale, handling and providing of mail, freight and express services and conveniences related thereto and the performance of other activities connected with the operation of its Air Carrier Service;

(4)     The training at the Airport of personnel in the employ of, or to be employed by Airline and the testing of aircraft and other equipment owned, or operated by Airline; provided, that (1) such training and testing to be incidental to the use of the Airport in the operation by Airline of its Air Carrier Service, and (b) such training and testing will not unreasonably hamper, or interfere with the use of the Airport and its facilities by other users entitled to the use thereof;

(5)     The sale, disposal, or exchange, of Airline's aircraft, engines, accessories, aviation fuels, ground vehicle fuels, oil, greases, lubricants and other materials, supplies and equipment related to its Air Carrier Service;

(6)     The right to purchase at the Airport, or elsewhere, from any person, or company of its choice, the requirements of aviation fuel, ground vehicle fuel, lubricating oil, greases and all other such materials and supplies and services; and except for a reasonable annual permit fee, no charges, fees, licenses, excise taxes, tolls or other charges upon any such purchases shall be charged, or collected by Lessor from Airline, or from any other person: for the privilege of or in connection with the purchasing, handling, loading, unloading, servicing, storing, using, or transporting to, from, or at the Airport, such materials and supplies or other property in connection with Airline's business;

(7)     The servicing by Airline, or its suppliers, at appropriate locations, of aircraft and other equipment owned, or operated by Airline, or its suppliers of materials and furnisher of services, by truck, or otherwise; with aviation fuel, ground vehicle fuel, lubricating oil,

communications facilities are demonstrated to cause radio interference, Airline shall modify or cease its use of such radio facilities to eliminate the interference;

(11) The conduct of any other function, or operation reasonably necessary to the proper performance and operation by Airline of its Air Carrier Service;

(12) The right of reasonable ingress to and egress from the Airport and the Premises leased to Airline, or used by Airline in common with others; subject to the provisions of this Agreement; for Airline, its employees, passengers, invitees, suppliers of materials and furnisher of services; its or their aircraft, equipment, vehicles, or machinery and other property; without charge to Airline, its employees, suppliers of materials and furnisher of services.

(13) Subject to availability, the right to lease space in the Terminal Building on an Exclusive Use basis to operate and maintain club rooms ("Airline Club") for Airline's guests, invitees, and passengers and the right to serve food and beverages, including alcoholic beverages in the Airline Club with or without charge.  Airline shall comply with all Applicable Law pertaining to the operation and maintenance of the Airline Club, the sale or serving of food and beverages (including alcoholic beverages), sanitation, and public health and safety. Airline shall obtain and maintain in force and effect all licenses and permits necessary for the operation of an Airline Club from the applicable Governmental Authorities. Airline shall pay to the appropriate Governmental Authority when due all occupation, sales and use taxes arising out of the operation of the Airline Club. Airline shall provide, at its sole expense, complete and proper arrangements for cleaning the Airline Club and for the proper handling and disposal of garbage and other Airline Club trash and refuse.  The Lessor reserves the right to charge Airline applicable percentages of its gross revenues from the sale of food and beverages consistent with the percentages charged to food and beverage concessionaires at the Airport.

(14) The rights granted herein to Airline may be exercised by Airline or by an Affiliate. Airline shall give the Director written notice of any Affiliates that will be operating at the Airport at least three (3) business days before the Affiliate commences service at the Airport. As between the Lessor and Airline, an Affiliate shall be considered Airline's

buildings rentals, Apron Fees, terminal equipment fees, fuel facility fees and other charges to be paid by Airline to Lessor for the various facilities and services of the Airport, shall be established. In establishing such fees, rentals and charges, Lessor shall observe the principles and the methodology contained in this Article and Exhibit D-0 through D-11, attached and incorporated herein.

| Exhibit D-0 | General Principles and Methodology |
| Exhibit D-1 | Basic Project Costs and Funding Sources |
| Exhibit D-2 | Allocation of Project Costs to Cost Centers - Debt Service |
| Exhibit D-3 | Acreage Allocation Worksheet |
| Exhibit D-4 | Summary of Debt Service |
| Exhibit D-5 | Operations and Maintenance Expenses |
| Exhibit D-6 | Terminal Space Analysis |
| Exhibit D-7 | Terminal Space Allocations |
| Exhibit D-8 | Terminal Rental Rates |
| Exhibit D-9 | Terminal Apron Fees |
| Exhibit D-10 | Terminal Equipment Fees |
| Exhibit D-11 | Landing Fees |

**B.     Passenger Terminal Building**

Airline shall pay Lessor Rent for those areas of the Terminal used or occupied by Airline, including Passenger Holdrooms, Ticket Counter Space, Ticket Counter Queuing Space, Airline Ticket Office Space, and Airline operations space. Rent for space leased to Airline on a Preferential Use or Exclusive Use basis is stated in terms of a price per square foot per year in accordance with **Exhibits D-0 and D-6, D7 and D-8.** Lessor may establish a per use fee for Terminal Joint Use Facilities in accordance with the allocation of costs set forth in such Exhibits.

**C.     Apron Fee**

Airline shall pay an Apron Fee for the Preferential or Joint Use of the aircraft loading and unloading positions serving the Terminal. The computation for the Apron Fee is shown on **Exhibit D-0 and D-9.** The Apron Fee is in addition to, and is not included in, the Landing Fee. The Apron Fee for Joint Use aircraft loading and unloading positions will be a per use

to Airline, for a period equal to or greater than four (4) hours.

**H.   Other Fees**

Lessor reserves the right to assess, and Airline agrees to pay ground rentals and/or reasonable charges in an amount to recover costs and expenses for the use of Lessor-provided facilities after consultation with Airline.

**I.   Employee Ground Vehicle Parking**

Lessor shall make available to Airline's employees who are based or employed at the Airport reasonably adequate automobile parking facilities on or near the Airport. Subject to availability of space, Lessor may make available parking to Airline's flight crews or other employees (commonly referred to as "commuters") who live in the Austin area, but are based at another airport. Lessor may charge a vehicular parking fee, in an amount sufficient to cover return on capital investment and costs associated with the development, operation, supervision, and maintenance of the parking facilities. Lessor may charge different parking fees to Airline's airport employees and to commuters.

**J.   Initial And Final Computation Of Fees And Charges**

    (1)   Initial Computation.

        (a)   No later than ninety (90) days before the end of each Fiscal Year, the Signatory Airlines, including Airline, shall submit to Lessor in writing their composite landed weight forecast for the ensuing Fiscal Year. If landed weight forecasts are not received by the Lessor, Lessor may make its own calculations of landing weights. No later than sixty (60) days before the end of each Fiscal Year and within thirty (30) days after submission of a draft budget to the City Council, Lessor shall submit in writing to the Signatory Airlines its budgetary forecast of Airport operating expenses for the ensuing Fiscal Year and its calculation of proposed Signatory Airline landing fee and terminal building rental rates for the ensuing Fiscal Year, all in a manner consistent with this Article and the cost accounting principles and procedures currently used by Lessor at the Airport, which principles and procedures shall be consistently applied from year to year throughout the term hereof.

20th day of the month and following receipt of a written report from Airline, Lessor will transmit to Airline an invoice for Common Space charges due for the preceding month. Airline shall pay to Lessor the rentals and other charges due for the preceding month within thirty (30) days following the date of the invoice for Common Space charges from Lessor.

(3)  <u>Landing Fees.</u>  Airline shall furnish to Lessor on, or before, the fifth workday of each month during the term hereof, a written report, in a form approved by Lessor, showing Airline's Fee Landings at Airport during the preceding month. Such report shall include (a) the number and the type of aircraft and the Maximum Certificated Gross Landing Weight thereof, (b) the number of aircraft landings, by types of aircraft, for which it provided ground handling services of any kind of others which do not have written agreements with Lessor to use the airport, and (c) the names and addresses of operators of such aircraft, in order that Lessor may submit to such operators appropriate invoices for landing fees and other charges as applicable.

Airline shall calculate and pay to Lessor the monthly Landing Fees within twenty (20) days following the date of Airline's landing fee report for a month, without notice, demand, or invoice. Lessor shall notify Airline in writing if it disputes the amount or calculation of the Landing Fee.

(4)  <u>Disputes.</u>  If a dispute arises between the Lessor and Airline with respect to any obligation or alleged obligation of the Airline to pay money to the Lessor, the Airline shall pay the full amount, subject to the right of Airline to protest the amount claimed in writing to the Director. The payment under protest by the Airline of the amount claimed by the Lessor to be due shall not waive any of Airline's rights. If a court or other body having jurisdiction determines that all or any part of the protested payment was not due, then the Lessor shall promptly reimburse the airline any amount determined as not due plus interest at the lesser of the rate specified in Texas Government Code Section 2251.025 or the maximum lawful rate ("Statutory Rate").

(5)  <u>Late Payment Penalty.</u>  If Airline fails to pay Rent, Landing Fees, or any other, charge or fee under this Agreement in full within five (5) business days of the due date, Lessor

Security Deposit, and may, by written notice to Airline, reasonably increase the amount of the Security Deposit to an amount equal to three times Airline's average monthly amount of rentals and fees payable under this Agreement during the immediately preceding twelve month period. Such notice shall include a calculation of the revised Security Deposit. Airline shall within thirty (30) days of receipt of such written notice from Lessor increasing the Security Deposit, deposit the additional security with Lessor by certified check or supplemental or amended letter of credit.

(4)     Lessor shall have the right, but not the obligation, to apply all or any part of the Security Deposit to cure any default of Airline under this Agreement, including, but not limited to, (a) any arrearages of Rent, Landing Fees, and other fees and charges payable by Airline under this Agreement, (b) the cost to repair or restore any damage to the Premises, or (c) any other amounts due from Airline under this Agreement. In such event, Airline must deposit with Lessor an amount equal to the amount so applied by Lessor within ten (10) business days of written notice from Lessor of the nature and amount of the application.

(5)     Lessor shall return the Security Deposit to Airline in accordance with Article 5 L (1) above or, if applicable,, less any amounts applied by Lessor under Article 5 L (4), within sixty (60) days after the later of the expiration or termination date of this Agreement, or the date that Airline surrenders possession of the Premises to Lessor.

**M.     Records and Audit.**

Airline shall at all times maintain and keep true and complete books, financial records, and accounts (collectively "Records") regarding Airline's compliance with the terms of this Agreement in accordance with generally accepted accounting principles in the United States and Applicable Law, including all Records that document or relate to Airline's activities at the Airport required to be reported under this Agreement, or upon which any fee or charge payable by Airline hereunder is based. Airline shall retain such Records for the greater of (i) three (3) years from the end of the fiscal year to which they pertain, (ii) the applicable retention period provided in 14 CFR Part 249, or (iii) the period of time specified in Airline's normal document and record retention policy. If, prior to the expiration of the foregoing record retention period,

Except for the expenses referred to above, the cost of an audit of Airline records by Lessor shall be borne by Lessor; provided, however, the total cost of the audit shall be paid by Airline if:

(1) The audit reveals an underpayment of ten percent or more by category of rentals, fees, and charges due on an annual basis, as determined by such audit, or

(2) Airline has failed to produce and maintain true and complete records substantially in accordance with this Agreement.

### ARTICLE 6 - PASSENGER FACILITY CHARGES (PFC)

Lessor may assess, amend and collect PFCs in accordance with Applicable Law. The following shall apply to the collection of PFCs; provided, however, in the event of a conflict between Applicable Law related to PFCs and the provisions of this Article, Applicable law shall govern:

A. Airline shall hold the net principal amount of all PFCs that are collected by Airline or its agents on behalf of the Lessor pursuant to Applicable Law, including 49 U.S.C. App. § 1513 and the PFC Regulations thereunder, in trust for Lessor. No trust account shall be required except as provided in Article 6 B below. For purposes of this section, net principal amount shall mean the total principal amount of all PFCs that are collected by Airline or its agents on behalf of the Lessor, reduced by all amounts that Airline is permitted to retain pursuant to Section 158.53(a) of the PFC Regulations. Airline shall provide Lessor a copy of the annual audit of PFCs required by Section 158.69 of the PFC Regulations.

B. In the event that Airline fails to make payments of PFCs to Lessor in accordance with the PFC Regulations, Director may require Airline to establish a PFC trust account pursuant to this Article 6 B. In the event Director requires Airline to establish a PFC trust account, and notwithstanding Section 158.49 of the PFC Regulations, upon receipt of PFCs that are collected by Airline or its agents on behalf of Lessor, Airline shall establish, and shall deposit the net principal amount of such PFCs in, a trust account for Lessor's benefit ("Trust Account"). Lessor and Airline agree that the Trust Account shall be held in the name of Airline as trustee for Lessor, provided that Lessor and Airline mutually agree to terms upon which amounts may be withdrawn from such account upon the joint direction of Lessor and Airline. If Lessor and Airline do not agree, the Trust Account shall be held by an independent third party bank trustee, in which event such trustee's fees shall be payable by the Lessor. Lessor shall have the right to

# ARTICLE 7- ASSIGNMENT AND USE OF TERMINAL GATES, TICKET COUNTER POSITIONS AND OTHER LEASED SPACE

**A.  Gate Assignment.**

(1)  Subject to availability, Lessor shall assign Airline one or more Gate(s) in the Terminal on a Preferential-use basis, in accordance with the minimum Gate use requirements in Article 7.C., for all scheduled flights, subject to specific gate use procedures for off-schedule flights (resulting from ground delays, air traffic control delays, extended ground time, etc.).  Lessor may operate one or more Gates as Joint Use Facilities to serve (a) international arrivals and departures, (b) commuter operations, and (c) those Air Carriers that do not meet the minimum gate use requirements or do not otherwise have Preferential Use of a Gate.  Gate procedures for off-schedule flights will be established or revised by Lessor after consultation with the Airlines.  In developing such procedures for off-schedule flights, priority will be given to assigning Airline gates nearest to Airline's preferentially assigned Gate(s).

(2)  Airline will have priority in using Gates which are assigned to it on a Preferential Use basis to accommodate its flights.  However, Lessor may assign such Gates for use by other Air Carriers in periods when the Gates are not in use by Airline, so long as the other Air Carrier vacates Airline's Preferential Use Gate prior to Airline's flights.

(3)  The Gate(s) to be assigned to Airline at the passenger terminal building are designated in Exhibit A.  Lessor may, in accordance with the procedures set forth in this Article and upon written notification to Airline, convert one or more Gate(s) assigned to Airline on a Preferential Use basis to a Joint Use Facility, or to reassign such Gate(s) to another Air Carrier if Airline's scheduled average gate utilization (including Affiliates) falls below the minimum levels established in Article 7 C.

**B.  Assignment of Ticket Counter Positions.**

(1)  Subject to availability, Lessor shall assign Airline ticket counter positions in the passenger terminal building on a Preferential-use basis, in accordance with the minimum ticket counter use requirements in Article 7.C., for all scheduled flights.  Lessor may

demonstrated an average utilization of at least five departures per day during the Test Period. In addition, Airline must make available, as necessary, proportionate amounts of ticket counter, ticket office space, and bag makeup areas, regardless of whether such space is leased to Airline on an Exclusive or Preferential Use basis.

(2)  If Airline qualifies under Article 7.C.(1) above for the Preferential Use of a Gate, Airline may lease, subject to availability, a sufficient amount of ticket counter space to operate at least two ticketing positions. Lessor shall use reasonable efforts to accommodate Airline requests to lease additional ticket counter space or positions, subject to availability. If as a result of the periodic evaluations of Gate usage under Article 7.C.(1), above, Airline is required to relinquish one or more Gates, Lessor may be required to also relinquish a proportionate amount of ticket counter space or positions.

(3)  If Lessor requires Airline to relinquish Gates, ticket counter positions and other space, Lessor and Airline will confer to determine which Gates, ticket counters, and space will be relinquished. If after twenty (20) days of good faith negotiations, no agreement has been reached, Lessor shall select the Gates, ticket counters, ticket office space, and other space to be relinquished. The cost of any reconfiguration of Airline's Exclusive Use Space or Preferential Use Space required by this provision shall either be paid by Lessor (without subsequent charge back to the Terminal Airline Area rate base), or passed on to the Air Carrier obtaining the rights to the relinquished space. If Airline is unable to operate all of its flights from Airline's remaining Gate(s) or ticket counter positions, and:

(a)  the Gates or ticket counter space relinquished by Airline is converted into a Joint Use Facility, Airline shall have priority in the use of the relinquished Gate or ticket counter space over other users of the Joint Use Facility for those of its flights which, because of a schedule conflict, cannot be operated from Airline's remaining Gates or ticket counter space, as applicable; or

(b)  the Gates or ticket counter space relinquished by Airline is assigned to another air carrier on a Preferential Use basis, and Airline is unable to make arrangements with another Air Carrier at the Airport to accommodate those of its flights which, because of a schedule conflict, cannot be operated from

F.  Whenever Airline's Preferential Use Gates(s) is used by others, Airline may charge such other users a reasonable fee not to exceed its direct costs and expenses related to providing such facilities plus an administrative overhead charge up to fifteen (15%) percent.

G.  Lessor may modify, reconfigure, reassign, reallocate or relocate the ticket counter positions, ticket offices, operations space, and other terminal space Preferentially or Exclusively leased to Air Carriers serving the Airport to (a) improve the utilization or functional capacity of the Terminal (b) to implement terminal capital improvement projects, or (c) as necessary due to casualty or an event of force majeure.  If Lessor determines it is necessary to modify, reassign, reconfigure, reallocate or relocate airline terminal leased space, Lessor shall consult with the affected Air Carriers.  Lessor shall consider the input of the Air Carriers in good faith, but Lessor shall make the necessary decisions regarding modification, reconfiguration, reassignment, reallocation or relocation for each of the affected Air Carriers, including, if applicable, Airline. Lessor shall not relocate an Air Carrier against its will to premises that are materially greater in area or that would result in increased Rent when compared to the Premises under lease by that Air Carrier at the time of the relocation.  To the extent reasonably possible, Lessor shall provide the relocated Air Carriers with space that meets their operational requirements.  If Lessor implements a plan to modify, reconfigure, reassign, reallocate or relocate terminal space that is unacceptable to the affected Air Carriers, including, if applicable, Airline, and an affected Air Carrier reasonably determines that the proposed new premises are inadequate to meet its operational requirements, or to maintain its competitive position at the Airport, that Air Carrier may terminate this Agreement without penalty upon ninety (90) days' prior written notice to Lessor.

### ARTICLE 8 - ACCOMMODATION OF REQUESTING AIRLINES

Lessor shall accommodate the needs of an Air Carrier  that seeks to initiate air passenger service to the Airport, but does not then lease space at the Airport, or an incumbent Air Carrier  that seeks to expand its service to the Airport (collectively, a "Requesting Airline") as follows:

A.  If available, Lessor shall grant the Requesting Airline the use of Gates, ticket counter, office, baggage make-up, and related terminal space that are not currently under lease to another airline serving the Airport, or that are designated as Joint Use Facilities.  If there are insufficient

shall consider:

    (a)    the average number of flight arrivals and departures per Gate per day;

    (b)    potential flight scheduling conflicts;

    (c)    potential labor conflicts;

    (d)    the location of Gates, ticket counters and other Preferential Use Premises or Joint Use Facilities; and

    (e)    operational and other matters deemed appropriate by the Director.

(3)    In the event the Director grants a Requesting Airline the right of shared use of all or a portion of Airline's Premises:

    (a)    the Requesting Airline shall indemnify Airline in writing from claims for damages and personal injury arising out of Requesting Airline's use of Airline's Premises to the same extent as Airline indemnifies Lessor under this Agreement;

    (b)    the Requesting Airline shall reimburse Airline for Airline's direct costs and expenses related to providing such facilities plus administrative overhead not to exceed fifteen (15%) percent; and

    (c)    Airline shall be excused from its obligation to indemnify Lessor under Article 13, for claims for damages or personal injury to caused by, or resulting from, Requesting Airline's use of Airline's Premises, except to the extent caused by or resulting from the negligence or willful misconduct of Airline, or Airline's agents, employees or contractors.

## ARTICLE 9 – AIRLINE ALTERATIONS AND ADDITIONS

A.    **Airline Modification or Additions to Premises.**  Airline shall make no alterations, or additions to its Premises leased hereunder without the prior written approval of Lessor. If Airline proposes to make any modification, alteration or addition to its Premises, Airline shall follow the procedures set forth in the City of Austin Airport Design Review Policies and Procedures – Policy & Procedures for the ABIA Design Review Committee, as amended or revised from time to time ("Design Review Policies"). The alterations or additions must comply

**ARTICLE 10 - TERMINAL DEVELOPMENT AND CONSTRUCTION/RELOCATION OF AIRLINE PREMISES**

A.  **Lessor's Terminal Development and Construction Rights.**

    (1)    Airline acknowledges that, *in order that the Airport and the Terminal may be suitable for the volume and character of air traffic, flight activity, and passenger traffic*, Lessor may, from time to time, undertake construction, repair or other activities related to the expansion, operation, maintenance and repair of the Terminal or the Airport, which will require temporary accommodation by Airline.  In addition, Lessor reserves the right to permanently reconfigure the Terminal, in whole or in part as necessary to accommodate the construction or expansion of the Terminal, or construction of connections to other terminals or facilities at the Airport, or to relocate or reconfigure the Premises and Joint Use Facilities.  Lessor agrees to use reasonable efforts to minimize disruption in Airline's business operations during such period of construction.

    (2)    Without limiting the generality of the foregoing, Lessor may temporarily or permanently close, alter, change, modify and/or relocate any entrances, passageways, doors and doorways, corridors, elevators, escalators or other parts of the Common Areas, Joint Use Facilities or the Terminal and the Premises; and Lessor may at any time and from time to time make such changes, alterations, additions, improvements, repairs or replacements in or to the Common Areas, Joint Use Facilities, and Terminal, as well as in or to the entrances, passages, elevators, escalators, and stairways thereof, as it may deem necessary or desirable, and to change the arrangement and/or location of entrances, passageways, doors and doorways, and corridors, elevators, stairs, toilets, or other public parts of the Common Areas, Common Use Facilities or the Terminal and the Premises, and may stop or interrupt any service or utility system, when necessary by reason of accident or emergency or construction work until the necessity for the interruption or stoppage has ended.

B.  **Notice of Construction Activities.**  Except in an emergency, Lessor shall provide Airline not less than five (5) days' advance notice of construction activities.

C.  **Access.**  Lessor shall provide reasonably adequate means of ingress and egress to Airline's

to Airline. If Airline reasonably expects it will directly incur relocation costs for work not included in the scope of the project, or which is not performed by Lessor or Lessor's contractors, Airline shall provide Lessor with a written estimate of its projected relocation costs for project budgeting purposes. Relocation costs include reasonable and documented costs and expenses incurred by Airline to move Airline's affected personnel, equipment, and operations to the new location, and the cost to replace Airline equipment or fixtures that are not reasonably capable of being moved. Lessor shall not be responsible to reimburse Airline, however, for (i) any costs assumed or paid directly by Lessor, or (ii) any indirect, incidental, or consequential, costs incurred by Airline as a result of the relocation, including loss of income or revenue, or increased operating or maintenance costs. To seek reimbursement of relocation costs incurred by Airline, Airline shall submit a written claim to Lessor, together with all necessary and appropriate supporting documentation within sixty (60) days after the move has been completed. Lessor shall pay relocation costs incurred by Airline within thirty (30) days after receipt of a proper claim. Reimbursement of relocation costs may be in the form of a credit against Rent or Additional Rent payable by Airline under this Agreement.

## ARTICLE 11 - AIRPORT SECURITY AND SAFETY

A.   Security.

(1)   <u>Compliance with Transportation Security Regulations</u>.  Airline shall comply with all Applicable Laws governing airport or aviation security, including Transportation Security Regulations (Title 49 CFR Chapter XII) and the Airport Security Plan. Lessor reserves the right to install security devices in or on the Premises, as it deems necessary to comply with Transportation Security Regulations or the Airport Security Plan.

(2)   <u>Security Costs.</u> All costs and expenses incurred by Lessor associated with screening for security reasons, of passengers and other persons, baggage and hand-carried objects entering the Sterile Areas of the Terminal, or to provide facilities to perform such screening, in order to comply with Applicable Law, including Federal Security Regulations  49 CFR Part 1544,  will be paid for by Airline and other Air Carriers operating from the Terminal which are required to, or actually do, use the screening services; and such costs and expenses incurred by the Airport will be prorated among

(b)    Airline shall utilize the Lessor's CUPPS if and when installed at the Airline's Preferential Use Premises. The costs associated with such use, including but not limited to the periodic replacement of all required CUPPS equipment, cabling, power and ongoing maintenance, shall be assessed to Airline as a Terminal Equipment Fee, which shall be paid by Airline in accordance with Article 5 above.

(c)    Airline hereby agrees that Lessor may install CUPPS equipment at the Airline's Preferential Use Premises. Lessor may also install CUPPS equipment in the circulation space and other public areas of the Terminal, as well as other areas on the Airport, including the parking garages and lots. Upon installation of such CUPPS equipment by Lessor, Airline agrees to transition from the use of any existing self-service devices of Airline to Lessor's CUPPS system. The entire cost of such installation, including but not limited to the removal and disposal of existing equipment, the initial purchase and periodic replacement of all required CUPPS equipment, cabling, power and ongoing maintenance, shall be assessed to Airline as a Terminal Equipment Fee, which shall be paid by Airline to Lessor in accordance with Article 5 above.

(3)    Airline may opt out of Lessor's CUPPS program by written notice given to Lessor within thirty (30) days after receipt of the notice referred to in Article 12.A(1). If Airline does not affirmatively opt out, Airline shall be deemed to have agreed to participate the CUPPS program. If Airline elects to opt out, Terminal Equipment Fees assessed to Airline shall not include CUPPS costs, but (i) Airline may not install, operate or maintain any of its proprietary terminal equipment or passenger processing kiosks in the circulation space and other public areas of the Terminal, the parking garages and lots, or any location in the Terminal or on the Airport other than at Airline's leased Gates and ticket counter and ticket counter queuing space, (ii) the placement of Airline's proprietary terminal equipment or passenger processing kiosks within Airline's Premises shall comply with applicable Airport design standards, (iii) any rights hitherto granted to Airline by Lessor to place its proprietary terminal equipment or passenger processing kiosks at any other location on the Airport shall be revoked and without further force or

use of the PDS for data transmission. Shared Tenant Services include data transmission lines (Frame Relay, ISDN, and T1) or Airline may choose to use the PDS to connect to an alternate provider at the demarcation point. Airline shall be responsible for, and pay all data communication service charges, including installation, maintenance, moves, adds, changes; excluding, however installation and move charges that arise out a relocation of Airline's Premises under Article 10.

(5)   Television Service.   Airline may contract with a provider of cable access television service in the Austin area for television service in those areas of the Premises it leases on an Exclusive Use basis.   Airline may not install television sets in the passenger holdrooms, the ticket lobby, or other area accessible by the public.   Airline may not install satellite dishes, antennae or similar receiving devices on the Premises.   Airline shall be responsible for, and pay, all charges, including installation, maintenance, moves, adds, changes, PDS and cable channel charges.

(6)   Invoicing and Payment.       Airline must apply for and sign the Airport Shared Telephone System Terms of Usage. Airline understands that it shall be billed monthly for its PDS and STS charges under this Article.  Payment for PDS and STS charges is not included in the monthly Premises rent and must be paid by Airline as provided in the STS Terms of Usage. Non-payment of telephone service charges shall be grounds for discontinuance of service and an event of default under this Agreement.

(7)   Computer Networks.   Airline shall, at its sole expense, procure, install and maintain all computer networks within the Premises.

## ARTICLE 13 - INDEMNITY

A.   **Indemnity.**   AIRLINE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS LESSOR AND ITS EMPLOYEES, AGENTS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "INDEMNIFIED PARTIES"), FROM AND AGAINST ALL COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES, EXPENSES, AND COURT COSTS), LIABILITIES, DAMAGES, CLAIMS, SUITS, ACTIONS, AND CAUSES OF ACTIONS WHATSOEVER ("CLAIMS"), TO THE FULL EXTENT ARISING OUT OF (A) ANY BREACH OF THIS AGREEMENT BY AIRLINE OR ITS AGENTS, EMPLOYEES, AFFILIATES, SUBTENANTS, OR CONTRACTORS, (COLLECTIVELY THE "AIRLINE PARTIES") (B) ANY

that instituted or threatened to institute any type of action or proceeding, the basis of such claim, action, or proceeding; and the name of any person against whom such claim is being made or threatened. Such written notice shall be delivered either personally or by mail and shall be directly sent to the Austin City Attorney, 301 West 2nd Street, Austin, Texas 78701, and to Lessor.

## ARTICLE 14.  INSURANCE

A.    Airline shall, without expense to Lessor, obtain and cause to be kept in force throughout the term of this Agreement, including any renewals, or extensions thereof, the insurance policies and coverages as provided in this Article.  Airline shall deliver certificates of insurance, for itself and its contractors, verifying the coverage listed below to the Director prior to commencing operations pursuant to this Agreement.  If coverage period ends during the Term of the Agreement, Airline shall, prior to the end of the coverage period, forward a new Certificate of Insurance to Lessor as verification of continuing coverage for the duration of the Term of this Agreement.

(1)    Workers' Compensation and Employers' Liability.  Worker's compensation insurance shall be provided with limits consistent with statutory benefits outlined in the Texas Workers' Compensation Act (Texas Labor Code Title 5) and minimum policy limits for employers' liability of $1,000,000 bodily injury each accident, $1,000,000 bodily injury by disease policy limit and $1,000,000 bodily injury by disease each employee.

(2)    Commercial General Liability Insurance.  Commercial General Liability Insurance shall be provided with a minimum bodily injury and property damage per occurrence limit of $250,000,000 for coverage A (Bodily Injury and Property Damage) and coverage B (Personal and Advertising Injury); Personal Injury with respect to other than passengers limited to $25,000,000; and $1,000,000 product/completed operations minimum limit of liability.   The policy shall contain blanket contractual liability coverage for liability assumed under this contract.

(3)    Hangarskeepers Insurance.  Hangarskeepers Liability shall be provided with a minimum limit of $10,000,000.

additional insured shown on any policy. It is intended that policies required in this Agreement covering Lessor and the Airline, shall be considered primary coverage as applicable.

(d)     If insurance policies are not written for amounts specified above, the Airline shall carry Umbrella or Excess Liability Insurance for any differences in amounts specified. If Excess Liability Insurance is provided, it shall follow the form of the primary coverage.

(e)     Lessor shall be entitled, upon request to inspect copies of policies and endorsements thereto at a mutually acceptable location and time, and may make any reasonable requests for deletion or revision or modification of particular policy terms, conditions, limitations, or exclusions except where policy provisions are established by law or regulations binding upon either of the parties hereto or the underwriter on any such policies or if the change would result in the imposition of an additional premium or cost which neither the Airline or Lessor is willing to assume.

(f)     Lessor reserves the right to review insurance requirements set forth during the Term of this Agreement and to make reasonable adjustments to insurance coverage, limits, and exclusions when deemed necessary and prudent by Lessor based upon changes in statutory law, court decisions, the claims history of the industry or financial condition of the insurance company as well as the Airline. Airline shall have ninety (90) days in which to implement any changes under this section.

(g)     The Airline shall not cause any insurance to be canceled nor permit any insurance to lapse during the term of this Agreement that is related to Airline's operations at the Airport. All policies shall be endorsed to require thirty (30) days' prior notice to Lessor before cancellation or termination.

(h)     Airline shall be responsible for deductibles and self-insured retentions, if any, stated in policies. All deductibles or self-insured retentions shall be disclosed on the certificates of insurance.

responsible Governmental Authority as being hazardous, toxic, radioactive, or that presents an actual or potential hazard to human health or the environment if improperly used, handled, treated, stored, disposed, discharged, generated or released. Hazardous Materials specifically include, without limitation, asbestos and asbestos-containing materials, petroleum products, solvents, and pesticides.

(3) Environmental Claims – shall refer to all claims, demands, suits, actions, judgments, and liability arising out of the use, handling, treatment, storage, disposal, discharge, or transportation of Hazardous Materials for: (i) removal, remediation, assessment, transportation, testing and disposal of Hazardous Materials as directed by any Government Authority, court order, or Environmental Law; (ii) bodily injury, or death; (iii) damage to or loss of use of property of any person; (iv) injury to natural resources; (v) fines, penalties, costs, fees, assessments, taxes, demands orders, directives or any other requirements imposed in any manner by any Governmental Authority under Environmental Laws; and (vi) costs and expenses of cleanup, remediation, assessment testing, investigation, transportation and disposal of a Hazardous Material spill, release, or discharge that is material or reportable under Environmental Law or the SWPPP.

(4) Lessor Environmental Party – shall include the Lessor, and its elected and non-elected officials, officers, agents, employees, contractors, successors, and assigns.

(5) Airline Environmental Party - shall include the Airline, and its directors, officers, agents, employees, contractors, successors, and assigns.

(6) SWPPP – means the Airport Storm Water Pollution Prevention Plan and Spill Response Plan, which is incorporated by reference. The SWPPP is posted on the Lessor's website at www.ci.austin.tx.us/austinairport/swppp.htm (as of the Effective Date).

B. **Compliance.** In its operations at the Airport, Airline shall strictly comply with applicable Environmental Laws, including any permits, licenses or authorizations granted thereunder, the Airport Environmental Policies and Procedures including the SWPPP, and generally accepted industry environmental practices and standards. Without limiting the generality of the foregoing provision, Airline shall not use or store Hazardous Materials on or at the Airport except as reasonably necessary in the ordinary course of Airline's permitted activities at the Airport, and

responsible for Hazardous Materials that

    (a)    exist on the Airport prior to the date that Airline commenced air operations at the Airport, except to the extent that an Airline Environmental Party disturbed or caused known pre-existing Hazardous Materials to migrate so as to give rise to an Environmental Claim, or

    (b)    are generated, used, handled, treated, stored, disposed, released, discharged or transported on the Airport by a person other than an Airline Environmental Party.

    (3)    All reporting requirements under Environmental Laws with respect to Hazardous Materials generated, used, handled, treated, stored, disposed, discharged, spilled, released, or transported to spills, releases, or discharges of by an Airline Environmental Party at the Airport under any law are the responsibility of Airline.

**D.**    **Indemnity.** IN ADDITION TO ANY OTHER INDEMNITIES IN THIS AGREEMENT, AIRLINE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE LESSOR ENVIRONMENTAL PARTIES FROM ANY AND ALL ENVIRONMENTAL CLAIMS (INCLUDING REASONABLE ATTORNEY'S FEES, LITIGATION AND INVESTIGATION EXPENSES, AND COURT COSTS) TO THE EXTENT ARISING FROM OR CAUSED BY THE USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE, OR TRANSPORTATION OF HAZARDOUS MATERIALS BY AN AIRLINE ENVIRONMENTAL PARTY ON OR AT THE AIRPORT, THE VIOLATION OF ANY ENVIRONMENTAL LAW BY AN AIRLINE ENVIRONMENTAL PARTY, OR THE FAILURE OF AN AIRLINE ENVIRONMENTAL PARTY TO COMPLY WITH THE TERMS, CONDITIONS AND COVENANTS OF THIS ARTICLE.

THE FOREGOING INDEMNITY SHALL NOT APPLY TO ENVIRONMENTAL CLAIMS TO THE EXTENT ARISING FROM OR CAUSED BY:

    (1)    ENVIRONMENTAL CONDITIONS EXISTING ON THE AIRPORT PRIOR TO THE DATE AIRLINE COMMENCED OPERATIONS AT THE AIRPORT, EXCEPT TO THE EXTENT THAT AN AIRLINE ENVIRONMENTAL PARTY EITHER DISTURBED OR CAUSED KNOWN PRE-EXISTING HAZARDOUS MATERIALS TO MIGRATE, SO AS TO GIVE RISE TO AN ENVIRONMENTAL CLAIM, OR

    (2)    THE USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE, OR

Lessor shall provide Airline with written notice of those NPDES and TPDES stormwater discharge permit requirements that Airline shall be obligated to perform from time to time at the Airport, including, but not limited to: certification of non-stormwater discharges; collection of stormwater samples in the event of an actual or threatened Hazardous Material spill, release, or discharge; assistance in development, implementation, or preparation of stormwater pollution prevention or similar plans; implementation of "good housekeeping" measures or "Best Management Practices"; implement SWPPP policies and procedures, train staff as required by its TPDES permit, perform SWPPP inspections, provide de-icing usage records to the Department, report large releases immediately as defined by the Spill Response Plan, and maintenance of necessary records.  Such written notice shall include applicable deadlines. Airline, within thirty (30) days of receipt of such written notice, shall notify Lessor in writing if it disputes any of the stormwater discharge permit requirements it is being directed to undertake. If Airline does not provide such timely notice, it is deemed to assent to undertake such requirements.  If Airline provides Lessor with written notice, as required above, that it disputes such NPDES or TPDES stormwater discharge permit requirements, Lessor and Airline agree to negotiate a prompt resolution of their differences.  Airline warrants that it will not object to Lessor notices required pursuant to this paragraph unless Airline has a good faith basis to do so.

Lessor and Airline agree to provide each other upon request, with any non-privileged information collected and submitted to any Government Authority pursuant to applicable NPDES or TPDES stormwater regulations.

Airline agrees to participate in any reasonable manner requested by Lessor in any Lessor organized task force or other work group established to coordinate stormwater activities at the Airport.

G.   **Natural Resource and Energy Conservation and Management**.  Airline shall comply with Applicable Law pertaining to recycling and energy or natural resource conservation and management.  Lessor may establish and implement an Environmental Management System for the Airport after notice to, and consultation with, the Signatory Airlines.  Airline shall cooperate with Lessor in the implementation of such conservation and management policies and programs.

of the Premises leased hereunder without the prior written approval of Lessor.  If Airline voluntarily suspends, or abandons service to the Airport for a period of sixty (60) days or longer, Airline may, subject to the prior consent of the Director, sublease all, or any part of the Premises leased to it hereunder to another scheduled Air Carrier providing daily service to the Airport; provided, however, Airline shall continue to be responsible to Lessor for the payment of all rentals and other charges for commonly and preferentially leased areas, when such are due hereunder, for the full term of this Agreement.  Nothing contained in this Article shall affect the rights of Lessor to (i) terminate this Agreement pursuant to Article 22 if Airline voluntarily abandons its conduct of its Air Carrier Service at the Airport for a period of thirty (30) days, or (ii) reassign Airline's Gates under Article 7 D if Airline discontinues commercial air service to the Airport.

## ARTICLE 19 - SURRENDER OF POSSESSION

Airline shall peaceably, quit, deliver up and surrender to Lessor the possession of the Premises leased to Airline, or to Airline in common with others, at the termination of Agreement, by expiration, or otherwise, or of any renewal, or extension thereof.  Airline shall restore the Premises and make such repairs as may be necessary to restore the Premises to substantially the same condition as the Premises were upon inception of Airline's occupancy thereof, reasonable wear and tear, fire or other casualty, and Lessor-authorized improvements excepted. Airline may at any time during the term, or any renewal, or extension hereof, and for thirty (30) days after the termination hereof, remove its trade fixtures and equipment situated on the Premises which were installed, or placed by it, at its expense in, on or about the Premises; subject, however, to any valid lien which Lessor may have thereon for unpaid rents, fees or charges, and further provided that Airline shall repair any damage to the Premises cause by such removal. If Airline fails or neglects to remove all or any portion of its trade fixtures or equipment within such thirty (30) day period, Lessor, at Lessor's option, may:

A.     Remove such property to a public warehouse for storage, or retain the same in Lessor's possession, and after the expiration of thirty (30) days sell the same, with or without notice and at public or private sale, in accordance with Applicable Law, the proceeds of which shall be applied first to the expenses of the removal, storage and sale, second to any sum owed by Airline to Lessor, and any balance remaining shall be paid to Airline.  If the expenses of such removal, storage and sale exceed the proceeds of the sale, then Airline shall pay such excess to the Lessor

(1)     Airline shall fail to pay any installment of Rent, Additional Rent, Landing Fees, or PFCs when due, and such failure shall continue for thirty (30) days after delivery by Lessor to Airline of written notice specifying such failure;

(2)     Airline shall fail to keep, perform, or observe any of the non-monetary covenants, agreements, terms, or provisions contained in this Agreement that are to be kept or performed by Airline, and Airline shall fail to cure such failure within thirty (30) days after delivery by Lessor to Airline of written notice specifying the failure; provided, however, if the failure is curable, but cannot be cured within such 30-day period, a Airline Default shall not occur if Airline commences the cure of the failure during such 30-day period and thereafter diligently and continuously pursues the cure to completion;

(3)     An involuntary petition shall be filed against Airline under applicable Bankruptcy Law, and such petition or appointment is not discharged or stayed within one hundred twenty (120) days after the happening of such event; or

(4)     Airline shall make an assignment of its interest in the Premises for the benefit of creditors, shall file a voluntary petition under applicable Bankruptcy law, or seek relief under any other law for the benefit of debtors; or

(5)     A receiver of Airline, or of all or substantially all of the assets of Airline, shall be appointed; or

(6)     Airline shall be lawfully divested of, or prevented by any final action of any Governmental Authority, from conducting and operating its Air Carrier Service at the Airport; or

(7)     Airline voluntarily abandons its conduct of its Air Carrier Service at the Airport for a period of thirty (30) days for any reason not excused under Article 20.

B.     **Remedies of Lessor.** If an Airline Default occurs, Lessor may at any time thereafter and without waiving any other rights hereunder or available to Lessor at law or in equity (Lessor's rights being cumulative), do any one or more of the following:

(1)     Lessor may terminate this Agreement by giving Airline not less than ten (10) days' prior written notice of termination, in which event this Agreement and the rights and interest

default, and all costs and expenses incurred by Lessor in performing such obligations of Airline (Lessor's administrative and overhead costs) shall be deemed Additional Rent payable by Airline to Lessor.

(4)    Lessor may exercise any other right or remedy available to Lessor under this Agreement or at law or in equity.

(5)    All Rent and other sums not paid on or before the date due shall bear interest at the lesser of one and one half percent (1 ½%) per month, or the maximum lawful rate, from the date due until paid in full.

C.    **Default by Lessor.**    The following shall be deemed a default by Lessor ("Lessor Default") and a material breach of this Agreement:

(1)    Lessor shall fail to keep, perform, or observe any of the covenants, agreements, terms, or provisions contained in this Agreement that are to be kept or performed by Lessor, and Lessor shall fail to cure such failure within thirty (30) days after delivery by Airline to Lessor of written notice specifying the failure; provided, however, if the failure is curable, but cannot be cured within such 30-day period, a Lessor Default shall not occur if Lessor commences the cure of the failure during such 30-day period and thereafter diligently and continuously pursues the cure to its completion.

D.    **Airline's Remedies.**    If a Lessor Default occurs, Airline may, at any time thereafter and without waiving any other rights hereunder or available to Airline at law or in equity (Airline's rights being cumulative), do any one or more of the following:

(1)    Airline may terminate this Agreement by giving Lessor written notice thereof, in which event this Agreement and the leasehold estate hereby created and all interest of Airline and all parties claiming by, through, or under Airline shall automatically terminate upon the effective date of such notice; and Airline shall thereafter be released of all other duties, obligations and responsibilities with respect to this Agreement, except such provisions, including, but not limited to, Airline's indemnity obligations that shall survive termination.

(2)    Airline may exercise any other right or remedy available to Airline, except as limited by Applicable Law or the terms of this Agreement.

twenty (120) days, the same shall be repaired with due diligence by Lessor, and the rental allocable to that portion of Airline's Premises rendered untenantable shall be abated for the period from the occurrence of the casualty to the completion of the repairs.

C.   If the damage arising from a casualty is so extensive as to render a material part, or all, of Airline's Premises untenantable, and not reasonably capable of being repaired within one hundred twenty (120) days, or such Premises, or material part thereof, is completely destroyed, Lessor shall notify Airline whether the space shall be repaired.  If Lessor elects to repair the space, it shall be repaired with due diligence by Lessor, and the rental allocable to that portion of Airline's Premises rendered untenantable, shall be abated for a period from the occurrence of the casualty to the completion of the repairs. If Lessor elects not to repair, or during the time that repairs are being made, Lessor shall use commercially reasonable efforts to provide Airline with temporary substitute space, if available, at such rent as is reasonable for comparable space otherwise leased by Lessor. If Lessor elects not to repair the damage, and is unable to provide Airline with adequate substitute premises, Airline may terminate this Agreement without penalty upon thirty (30) days written notice to Lessor.

D.   The damaged areas shall be restored to substantially the same condition as they were in prior to the casualty.  The cost of repair or reconstruction of the Premises under this Article shall be paid by Lessor, to the extent of insurance proceeds received by Lessor; except if the casualty was caused by the negligence or willful misconduct of Airline, or Airline's agents, sublessees, employees, or contractors, the cost of repair and reconstruction shall be paid by Airline. The cost of repair or restoration performed by Lessor in excess of the amount of insurance proceeds, if any, shall be recoverable from the Air Carriers operating from the Terminal in accordance with the Agreement and Applicable Law.

## ARTICLE 23 - NON WAIVER OF RIGHTS

Continued performance by either party hereto pursuant to the terms of this Agreement after a default of any of the terms, covenants and conditions herein contained to be performed, kept, or observed, by the other party hereto, shall not be deemed a waiver of any right to terminate this Agreement for any subsequent default and no waiver of any such default shall be construed, or act, as a waiver of any subsequent default.

including the expenditure of federal funds for the development of the Airport in accordance with the provisions of the FAA's Airport Improvement Program, or in order to impose and use passenger facilities charges under 49 U.S.C. Section 40117 or any successor thereto.

B.  **Compliance with Law.**  At all times during the term of this Agreement, Airline shall, in connection with its activities and operations at the Airport comply with and conform to Applicable Law.  Airline shall comply with all applicable provisions of the Americans With Disabilities Act of 1990 (42 U.S.C. Section 12101), as may be amended from time to time, and federal regulations promulgated thereunder.  Subject to prior approval of the Director, Airline shall make, at its own expense, all non-structural improvements, repairs and alterations to its Preferential Use Space, equipment, and personal property that are required to comply with or conform to any of such statutes, ordinances, or regulations.

C.  **Non-discrimination**

    (1)  <u>General</u>.  In the use and occupation of the Airport, Airline shall not unlawfully discriminate against any person or class of persons by reason of race, color, religion, sex, national origin or ancestry, age, or physical or mental handicap.

    (2)  <u>Civil/Human Rights Laws</u>.  In its operations at the Airport and in its use of the Airport, Airline shall not, on the grounds of race, color, religion, sex, national origin or ancestry, or age, discriminate or permit discrimination against any person or group of persons in any manner prohibited by Part 21 of the Federal Aviation Regulations, the Civil Rights Act of 1964, as amended, the Equal Pay Act of 1963, the Rehabilitation Act of 1973, and Chapter 5-4 of the Austin City Code.  Without limiting the generality of the foregoing, Airline agrees to not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or ancestry, or age, in accordance with Applicable Law.  Airline agrees to take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, national origin or ancestry, age, or physical or mental handicap.  Such action shall include, but not be limited to: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; selection for training; and

or receiving the services or benefits of any program or activity covered by this Section 14.03. Airline assures that it will require that any covered suborganization similarly will undertake affirmative action programs and that the suborganization will require assurance from the suborganizations' suborganization, as required by 14 CFR, Part 1 52, Subpart E, to the same effect.

## ARTICLE 28 – TITLE TO AIRLINE INSTALLED IMPROVEMENTS AND PROPERTY

As to improvements and property installed and paid for by Airline under the terms of this Agreement, Airline will retain title to all of its trade fixtures and equipment only, except as may otherwise be provided for in this Agreement, or other agreements between the parties hereto, and Airline shall have the right any time during the term of this Agreement and prior to its expiration or early termination to remove any and all of its trade fixtures and equipment from the Airport, provided Airline is not in default in its payments hereunder.   All Lessor property damaged by or as a result of the removal of Airline's property shall be restored at Airline's expense to the same or better condition that it was prior to such damage.   Any and all property not removed by Airline prior to the expiration or early termination of this Agreement as provided herein, shall thereupon become a part of the land upon which it is located and title thereto shall thereupon vest in the Lessor; provided, however, Airline shall not abandon any of its property on the Leased Premises without prior written consent of the Director, and Lessor reserves the right to remove any property abandoned by Airline at Airline's expense.

## ARTICLE 29 – NOTICES

Any notice provided for or permitted to be given hereunder must be in writing and may be given by (a) depositing same in the United States Mail, postage prepaid, registered or certified, with return receipt requested, addressed as set forth in this Article 30; (b) hand delivering the same to the party to be notified; or (c) overnight courier of general use in the business community of Austin, Texas.   Notice given in accordance herewith shall be deemed delivered and effective on the earlier of actual receipt or three (3) business days next following deposit thereof in accordance with the requirements above.

Notices shall be sent to the following persons and addresses, or to such other person and address

(1)     that this Agreement is unmodified and in full force and effect (or if there have been modifications, a description of such modifications and that the Agreement as modified is in full force and effect);

(2)     that the Lessor is not in default under any provision of this Agreement, or if in default, the nature thereof in detail; and

(3)     such further matters as may be reasonably requested by the Lessor, it being intended that such statements may be relied upon by the parties involved in such issuance of Bonds.

C.     **Bond Covenants.** Airline understands and agrees that the City of Austin has covenanted in its Bond Ordinances authorizing the issuance of prior lien bonds that it will at all times fix, charge, impose, and collect rentals, rates, fees, and other charges for the use of the Airport system, and, to the extent it may legally do so, revise the same as may be necessary or appropriate, in order that in each Fiscal Year the net revenues will be at least sufficient to equal the larger of either:

(1)     all amounts required to be deposited in such Fiscal Year to the credit of the debt service fund and the debt service reserve fund, and any debt service or debt service reserve fund or account referred to in the Bond Ordinance for revenue bonds and subordinate obligations, or

(2)     an amount, together with other available funds, not less than 125% of the debt service requirements for the prior lien bonds for such Fiscal Year.

Therefore, the Lessor and Airline agree that the Lessor may adjust Airline rentals, rates, fees, and other charges at the Airport system if such adjustment is necessary to enable the Lessor to meet the rate covenant contained in the ordinance authorizing the issuance of the prior lien bonds, as follows:

(3)     The Lessor will increase total Airfield Area costs by the amount necessary, if any, such that Net Revenues  equal 125% of the Prior Lien Bonds debt service requirements. Such amount shall be referred to as the Incremental Landing Fee Charge.

(4)     As soon as possible following the close of any Fiscal Year in which there was an Incremental Landing Fee Charge, the Lessor will refund Airline's landing fees by an

F.   **Governing Law.** This Agreement shall be deemed to have been made in, and be construed in accordance with the laws of the State of Texas.

G    **Inspection of Lessor Records.** Airline, at its expense and upon reasonable notice, shall have the right to inspect the books, records, and other data of the Lessor relating to the provisions and requirements hereof provided such inspection is made during regular business hours.

H.   **Successors and Assigns.** All of the terms, provisions, covenants, stipulations, conditions, and considerations in this Agreement shall extend to and bind the legal representatives, successors, and permitted assigns of the respective parties hereto.

I.   **Entire Agreement.** This Agreement, together with all exhibits attached hereto, constitutes the entire Agreement between the parties on the subject matter hereof. This Agreement supersedes and replaces all prior agreements between the parties hereto with respect to the leasing by Airline of the Premises, including the Amended and Restated Austin-Bergstrom International

**EXHIBITS**

| | |
|---|---|
| A-1 | Description of Premises |
| A-2 | Premises Drawings - Terminal Area |
| B | Airport Layout Plan - Airfield Area Description |
| C | Airport Layout Plan - Apron Description |
| D-0 | Airport Rates and Charges - General Principles and Methodology |
| D-1 | Basic Project Costs and Funding Sources |
| D-2 | Allocation of Project Costs to Cost Centers - Debt Service |
| D-3 | Acreage Allocation Worksheet |
| D-4 | Summary of Debt Service |
| D-5 | Operations and Maintenance Expenses |
| D-6 | Terminal Space Analysis |
| D-7 | Terminal Space Allocations |
| D-8 | Terminal Rental Rates |
| D-9 | Terminal Apron Fees |
| D-10 | Terminal Equipment Fees |
| D-11 | Landing Fees |

**Exhibit A-1**
**Description of Premises**

**Exhibit A-2**
**Premises Drawings - Terminal Area**



CONCOURSE

**Exhibit B**
**Airport Layout Plan – Airfield Area Description**

**Exhibit C**
**Airport Layout Plan - Apron Description**

**Exhibit D-0**
**Airport Rates and Charges - General Principles**
**and Methodology**

(a) any allowance for depreciation;

(b) costs of capital improvements;

(c) reserves for major capital improvements, Airport System operations, maintenance or repair;

(d) any allowance for redemption of, or payment of interest or premium on, Prior Lien Bonds, Revenue Bonds and Subordinate Obligations;

(e) any liabilities incurred in acquiring or improving properties of the Airport System;

(f) expenses of lessees under Special Facilities Leases and operation and maintenance expenses pertaining to Special Facilities to the extent they are required to be paid by such lessees pursuant to the terms of the Special Facilities Leases;

(g) any charges or obligations incurred in connection with any lawful Airport System purpose, including the lease, acquisition, operation or maintenance of any facility or property benefiting the Airport System, provided that the payment of such charges or obligations is expressly agreed by the payee to be payable solely from proceeds of the Capital Fund;

(h) liabilities based upon the City's negligence or other ground not based on contract; and

(i) so long as Federal Payments are excluded from Gross Revenues, an amount of expenses that would otherwise constitute Operation and Maintenance Expenses for such period equal to the Federal Payments for such period.

8. Productive Space shall mean the total useable space in the Terminal, excluding Support Space, leasable lessee maintained space, and space related to the EDS baggage handling system, as more particularly shown and described on Exhibit D-6, attached hereto. Productive Space includes airline leasable space (e.g. ticket counters, back offices and holdrooms), concession space, restrooms, circulation space, security checkpoints, and the inbound baggage area.

9. Support Space shall mean all space in the Terminal other than Productive Space and leasable lessee maintained space, as more particularly shown and described on Exhibit D-6, attached hereto. Support Space includes common service areas, apron level service roadway, rooftop mechanical room/storage space, and areas used for administrative services.

## II.

The Terminal conditioned space rental rate for the Fiscal Year shall be the sum of the Operations and Maintenance Rate and the Capital Cost Recovery Rate, which shall be calculated as follows and as illustrated in Exhibit D-8:

1. The Operations and Maintenance Rate shall be calculated by dividing the estimated Operation and Maintenance Expenses, Operation and Maintenance Reserve Fund and bad debt expense allocable to the Terminal Building by the total Productive Space in the Terminal Building.

2. The Capital Cost Recovery Rate shall be calculated by dividing the total annual capital cost recovery charges allocable to Airline Leasable Space by the total amount

    c.    Debt Service and Coverage attributed to Terminal Equipment, and

    d.    Terminal Equipment prorata share of any fund deposits required by the Bond Ordinance.

2.    The estimated Terminal Equipment Fee per gate required shall then be determined by dividing the Terminal Equipment costs by the number of leased aircraft gates.

### VI.

Landing fees shall be determined by multiplying the landing fee rate as forecasted and shown on Exhibit D-11, times the total number of thousand pound units of Maximum Certified Gross Landing Weight of Airline's aircraft making Fee Landings at Airport during the preceding month.

The Landing Fee rate for the Fiscal Year shall be calculated as follows and as illustrated in Exhibit D-11:

1.    The estimated total Airfield Area costs shall be calculated by adding:

    a.    Direct and indirect operations and maintenance costs allocable to the Airfield Area, and

    b.    Annual Amortization charges attributed to the Airfield Area.

    c.    Debt Service and Coverage attributed to the Airfield Area, and

    d.    Airfield Area prorata share of any fund deposits required by the Bond Ordinance.

2.    The revenues estimated from fuel flowage fees shall then be subtracted from the total Airfield Area cost to determine the estimated net Airfield Area cost.

3.    The estimated net Airfield Area costs shall be divided by the composite landed weight forecast of the Signatory Airlines and other airlines under agreement with the Lessor for the ensuing Fiscal Year to determine the Signatory Airline landing fee rate for the Fiscal Year. In the Year-end Adjustment to Actual computation described in Article 5.I.(2), Lessor shall use actual total landed weight (including non-signatory carriers) as the basis for computing the Landing Fee.

EXHIBIT B-4

BASIC PROJECT COSTS ALLOCATION METHODOLOGY

Actual Indirect Costs as of September 30, 2006

Austin-Bergstrom International Airport

City of Austin, Department of Aviation

EXHIBIT [2A (page 2 of 2)]

BASIC PROJECT COSTS AND FUNDING SOURCES
City of Austin Department of Aviation

| | Forecast project cost | Gross project cost | AIP grant Part 139 | Letter of Intent (a) | USA Grant (b) | Noise Program (c) | Prior provision airport costs | Leverage act (f) | Special Facility Bonds (g) | Airport Bonds (h) | Other Funds (i) | Transfer Funding (j) | Contributions-Airport (k) | Total costs — Funded with Basics (1) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| City landfill access | $4,760,000 | $1,450,000 | | | | | | | | | | | | |
| Prior landfill access — Land costs | 1,900,000 | | | | | | | | | | | | | |
| Airport electrical improvements | 3,650,000 | 1,422,547 | | | | | | | | | | | | |
| Other equipment costs | 2,446,000 | 1,668,531 | | | | | | | | | | | | |
| Noise program reserve | | | | | | | | | | | | | | |
| Subtotal capital | | | | | | | | | | | | | | |
| Capitalized interest | | | | | | | | | | 1,232,747 | | 1,646,521 | | |
| | 12,516,000 | $31,132,241 | | | | | | | | | | | | |
| | $250,346,000 | $332,271,374 | $6,248,623 | $340,749,661 | $216,846,1 | $25,081,894 | $17,181,422 | $345,336,586 | $23,456,893 | $57,699,518 | $59,496 | | $353,727,347 | $590,994,641 |

(a) Letter of Intent (LOI) was executed on September 29, 1994 and provides funding through 2006.
(b) The City landfill access is based upon Part 64.74 of a July 1990 bill $2.5 million and a total Amendment of $21.98 million in June 1992. Additional grants of $26.6 million were received in 1992.
(c) The City received an LOI grant direct in the total amount under the Second Amendment of Part 139 ... Additional grants of Part 139 ...
(d) Approved FMC revenue financing in the amount under the Noise of Revenue, dated April 29, 1992.
(e) Final project costs, based on final project service from FMC service, which will be funded with long-term bonds.
(f) Estimated project costs approved by FMC revenue service (April 1992).
(g) Special facility bonds to be issued in the total amount that will be compensated for the small ... with the stated use service costs, including bookkeeping and schedules.
(h) Airport bonds include those portions of all projects which are to be funded by the small ... proceeds.
(i) The City's Planning, Environmental and Aviation ... General Obligation Bonds reflected in table.
(j) The amount for transfer is in relation to AHA CIP Noise costs including all CIP programs so that a further use service costs, including bookkeeping and schedules.
(k) The airport provided funding for Aviation ($1.5 million) ... the project.

EXHIBIT E-3

ALLOCATION OF PROJECT COSTS TO COST CENTERS

COST SERVICE

Austin-Bergstrom International Airport

City of Austin, Department of Aviation

| | Total allocable project costs | Airline Terminal | Airline Airfield | Airline Apron | Curbside Concourse | Fuel Facility | Non-Airline (commercial) Cargo | Non-Airline (commercial) GA | Non-Airline (commercial) Other | Non-transient Terminal | Non-transient Parking | PRM/OTS | FIDS | North Infrastructure | South Infrastructure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Costs** | | | | | | | | | | | | | | | |
| Land acquisition | 10,634,198 | — | — | — | — | — | — | — | — | — | — | — | — | — | 10,113,155 |
| Noise mitigation (Acquisition of Schools) | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Demolition | 14,473,379 | — | — | — | — | — | — | — | — | — | — | — | — | 4,647,279 | 1,427,329 |
| Airport utilities | 7,379,251 | — | — | — | — | — | — | — | — | — | — | — | — | 1,444,511 | — |
| Telecommunications | 8,421,777 | — | — | — | — | — | — | — | — | — | — | 1,238,636 | 881,487 | 6,330,668 | — |
| Security system | 3,764,829 | — | — | — | — | — | — | — | — | 2,526,880 | — | — | — | 5,565,167 | — |
| **Passenger Terminal Complex** | | | | | | | | | | | | | | | |
| Terminal complex | 40,279,653 | 17,646,476 | — | — | — | — | — | — | — | 22,463,536 | — | — | — | — | — |
| Concession kiosks | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Terminal equipment | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Parking structures | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| **Airfield Facilities** | | | | | | | | | | | | | | | |
| Terminal apron | 664,741 | — | — | 664,741 | — | — | — | — | — | — | — | — | — | — | — |
| Terminal apron expansion | 2,186,658 | — | 2,186,658 | — | — | — | — | — | — | — | — | — | — | — | — |
| Air cargo apron | 2,376,322 | — | 2,376,322 | — | — | — | — | — | — | — | — | — | — | — | — |
| Elot survey system | 406,242 | — | 406,242 | — | — | — | — | — | — | — | — | — | — | — | — |
| Airfield service roads | 249,253 | — | 249,253 | — | — | — | — | — | — | — | — | — | — | — | — |
| Airfield cross taxiway | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| West runway and taxiway | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Steel Parking (base) apron | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| General aviation | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| GSA/seat operation | 1,637,743 | — | — | — | — | — | — | — | — | — | — | — | — | — | 1,637,743 |
| Airfield lighting and equipment | 1,543,787 | 1,543,787 | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Miscellaneous airfield costs | 44,511 | 44,511 | — | — | — | — | — | — | — | — | — | — | — | — | — |
| **Landside Facilities** | | | | | | | | | | | | | | | |
| Terminal access road | 29,796,541 | — | — | — | — | — | — | — | — | — | 29,796,541 | — | — | — | — |
| Terminal parking/loading/storage | 2,393,568 | — | — | — | — | — | — | — | — | — | — | — | — | 2,393,568 | — |

EXHIBIT D-6 (page 3 of 3)
ALLOCATION OF PROJECT COSTS TO COST CENTERS - DEBT SERVICE
Austin-Bergstrom International Airport
City of Austin, Department of Aviation

| Indirect Costs (a) | Total allocable project costs | Airlines Terminal | AirEast | Apron | Central Corridor | Fuel Facility | Non-Airline Commercial Cargo | GA | Other | Non-commercial Terminal | Parking | PROCSTS | PES | North Infrastructure | South Infrastructure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program management services | 115,632,746 | 53,321,341 | 82,984,507 | 196,723 | $ | — | 3773,341 | $ | — | $ | 3,049,374 | 3,476,649 | 3176,191 | $123,303 | $ | — | $ | — | $ |
| Financial and legal services | 2,299,033 | 494,318 | 456,423 | 14,793 | | | 114,453 | | | | 353,208 | 722,803 | 26,992 | 19,141 | | | | |
| Preliminary planning services | 712,444 | 148,428 | 126,723 | 4,453 | | | 33,577 | | | | 180,349 | 219,514 | 8,073 | 3,746 | | | | |
| Majority, growth, materials testing | 3,792,443 | 1,392,146 | 1,180,429 | 23,669 | | | 286,812 | | | | 1,290,382 | 1,792,724 | 44,649 | 40,342 | | | | |
| Owner-controlled insurance program | 3,520,271 | 1,698,238 | 976,294 | 23,429 | | | 203,497 | | | | 1,144,684 | 1,827,181 | 37,611 | 41,018 | | | | |
| Small business assistance program | 3,486,440 | 1,311,783 | 1,046,034 | 33,833 | | | 271,363 | | | | 1,234,132 | 1,873,803 | 61,609 | 43,864 | | | | |
| DOC Program | 33,323 | 10,979 | 10,235 | 328 | | | 2,632 | | | | 11,425 | 16,327 | 986 | 436 | | | | |
| ADA, relocation test equipment | — | — | — | — | | | — | | | | — | — | — | — | | | | |
| Once replacement costs | 1,018,832 | 294,542 | 103,175 | 4,234 | | | 40,398 | | | | 223,599 | 304,370 | 11,332 | 8,982 | | | | |
| Management interest (b) | — | — | — | — | | | — | | | | — | — | — | — | | | | |
| Total Indirect Costs | 130,263,529 | 57,681,614 | 54,984,289 | 303,343 | $ | — | 3,734,364 | $ | — | $ | 5,382,142 | 5,460,609 | 5,347,327 | 5289,961 | $ | — | $ | — | $ |
| Direct and Indirect Costs | 3178,284,160 | 53,923,101 | 337,431,289 | 3888,411 | $ | — | 39,333,976 | $ | — | $ | 3181,117,735 | 33,017,852 | 5,147,063 | 3,635,726 | $33,830,439 | $ | — | $ |
| Allocated infrastructure costs | n/a | 3552,112 | 3242,708,171 | 32,812,499 | $ | — | 37,249,195 | $ | — | $ | 353,142,423 | 34,240,604 | 5,147,063 | 3,635,726 | -23,937,739,819 | -7,342,340,198 | $ |
| Total service allocation | 3178,284,160 | 3523,923,101 | 3247,832,446 | 31,768,073 | $ | — | 37,369,195 | $ | — | $ | 353,142,423 | 34,240,604 | 5,147,063 | 3,635,726 | 33,830,439 | 33,830,439 | $ |
| | 100.0000% | 16.7497% | 26.6077% | 1.1743% | | | 4.0502% | 0.0000% | 0.0000% | | 17.3999% | 24.6007% | 9.9035% | 0.6450% | -4.3363% | 2.8211% |

**ACREAGE ALLOCATION WORKSHEET**

EXHIBIT D-3

| Rentable acreage by Area | Total allocable acreage | Terminal | Airfield | Apron | Fuel Facility | Cargo | GA | Other | Non-terminal Terminal | Non-terminal Parking | Unrentable acreage | Rentable non-office area North area | Rentable non-office area South area | For O&M Allocation Rentable non-office area (O&M only) North area | South area |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Terminal building | 6.9 | 3.0 | | | | | | | 3.9 | | | | | | |
| Central Plant | 2.5 | 1.0 | | | | | | | 1.5 | | | | | | |
| Roadways | 100.7 | | | | | | | | | | 100.7 | | | | |
| Airfield | 843.7 | | 722.6 | | | | | | | | | | | | |
| Air cargo | 66.7 | | | 20.0 | | | | | | | | | | | |
| Terminal apron | 50.2 | | | 60.7 | | 50.2 | | | | | | 50.2 | | 50.2 | |
| General aviation | 18.4 | | | | | | 18.4 | | | | | 18.4 | 18.4 | | 18.4 |
| State Fueling Board | 13.8 | | | | | | | 13.8 | | | | 13.8 | | 13.8 | |
| National Guard | 51.8 | | | | | | | 51.8 | | | | 51.8 | 51.8 | | 51.8 |
| Airport maintenance complex | 14.7 | | 7.4 | 1.6 | | | | | 4.2 | | | | | | |
| Fuel farm | 6.9 | | | | 6.9 | | | | | | | | | | |
| In-flight catering | 3.0 | | | | | | | 3.0 | | | | 3.0 | | 3.0 | |
| Car rental | 37.5 | | | | | | | | | 37.5 | | 37.5 | | 37.5 | |
| Parking garage | 9.2 | | | | | | | | | 9.2 | 92.8 | 9.2 | | | |
| Surface parking | 92.8 | | | | | | | | | 92.8 | 92.8 | | | | |
| ARFF | 2.8 | | 2.8 | | | | | | | | | | | | |
| FAA | 1.1 | | | | | | | | | | | | | | |
| GSEM | 3.4 | | 3.4 | | | | | | | | | | | | |
| Belly freight | 3.4 | | 3.4 | | | | | | | | | | | | |
| RCF | 4.8 | | | | | | | 4.8 | | | | 4.8 | | 4.8 | |
| Other buildings and areas | 260.1 | | | | | | | | | | 2,980.1 | | | | |
| Total rentable acreage | 4,242.2 | 7.2 | 751.7 | 82.3 | 6.9 | 50.2 | 18.4 | 80.3 | 9.4 | 139.5 | 3,185.8 | 104.5 | 75.0 | 104.5 | 75.0 |
| Rentable % by cost center | 297.8 | 0.6327% | 66.1431% | 7.2419% | 0.6072% | 4.4175% | 1.6191% | 7.0842% | 0.8327% | 12.2756% | | 58.22% | 41.78% | 58.22% | 41.78% |
| Non-office rentable acreage | 1134.4 | n.a. | | | | 16.8392% | 6.1792% | 26.9680% | 3.1628% | 46.8498% | n.a. | | | | |
| Rentable % for non-office cost centers | | n.a. | n.a. | n.a. | n.a. | | | | | | n.a. | | | | |

EXHIBIT B-4

**SUMMARY OF DEBT SERVICE, NEW AIRPORT**
Austin-Bergstrom International Airport
City of Austin, Department of Aviation
For Fiscal Years ending September 30

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|
| | | | Actual | | | |
| **NEW AIRPORT** | | | | | | |
| Prior First Lien Bonds | | | | | | |
| Total Prior First Lien Bonds Debt Service | | | | | | |
| **Total Prior Lien Bonds debt service** | | | | | | |
| Less PFC revenue (a) | | | | | | |
| Less debt service reduction (deferrances) (b) | | | | | | |
| Debt Service Requirements | | | | | | |
| Debt service coverage (c) | | | | | | |
| Variable Rate Revenue Notes, Series A (d) | | | | | | |
| General Obligation Airport Bonds (e) | | | | | | |
| **Total** | | | | | | |
| Alternative to interest rates | | | | | | |
| Terminal area | | | | | | |
| Airfield area | | | | | | |
| Fuel facility | | | | | | |
| Other automotive area (f) | | | | | | |
| Total non-airline cost centers | | | | | | |
| Parking | | | | | | |
| Other non-terminal areas (g) | | | | | | |
| **PFC/GTC** | | | | | | |
| PFC | | | | | | |
| **General Obligation Airport Bonds (e)** | | | | | | |
| **Total** | | | | | | |

OPERATION AND MAINTENANCE EXPENSES
Atlanta-Hartsfield International Airport
City of Atlanta, Department of Aviation
For Fiscal Years ending September 30

EXHIBIT 5-5

| | Actual | | | | | |
|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
| **By function** | | | | | | |
| **Administration** | | | | | | |
| Administration/Management | $4,666,840 | $4,173,634 | $4,203,856 | $4,423,571 | $4,886,151 | $4,183,924 |
| PRVDTS | 381,626 | 407,462 | 402,511 | 477,306 | 429,339 | 378,944 |
| City support services | 3,623,313 | 3,043,741 | 3,351,111 | 3,431,286 | 2,740,209 | 2,951,130 |
| **Commercial and Operations** | | | | | | |
| Landside operation | 777,815 | 1,014,007 | 907,453 | 1,153,467 | 1,161,088 | 832,206 |
| Operations | 6,356,897 | 6,373,634 | 7,101,069 | 7,218,675 | 7,254,617 | 7,755,027 |
| Parking | 4,134,973 | 4,133,758 | 4,328,562 | 4,744,885 | 5,279,127 | 5,906,519 |
| Custodial services | 961,179 | 883,368 | 973,893 | 1,050,672 | 5,239,127 | 1,085,442 |
| Airfield maintenance | 2,847,062 | 2,352,332 | 2,472,266 | 4,076,549 | 2,228,746 | 2,229,514 |
| Grnd environment/Landside mgmt | 1,468,237 | 1,244,799 | 1,868,649 | 3,918,355 | 2,252,609 | 1,902,606 |
| Airfield operation | 3,287,829 | 3,256,564 | 4,833,460 | 3,957,411 | 1,389,991 | 1,755,220 |
| Building maintenance | | | | | 4,039,809 | 4,276,065 |
| Utilities | 3,847,262 | 3,441,568 | 3,505,843 | 3,957,411 | 4,664,725 | 4,799,233 |
| Airlines maintenance | 3,301,771 | 3,440,574 | 3,305,842 | | 4,891,617 | 6,193,379 |
| AMFE | 5,583,064 | 2,735,119 | 6,442,316 | 4,280,732 | 1,250,342 | 1,260,349 |
| Security | 703,874 | 949,962 | 813,362 | 941,797 | 1,250,342 | 925,266,465 |
| Planning, engineering, construction | | | | | | |
| **Total expenses by function** | $40,794,807 | $35,940,391 | $43,784,083 | $44,474,741 | $48,879,336 | $52,566,466 |
| | | | | | | |
| **By object** | | | | | | |
| Salaries | $17,820,884 | $19,071,077 | $19,306,066 | $17,593,321 | $19,610,501 | $21,168,546 |
| Contractual services | 20,721,090 | 10,996,064 | 21,674,103 | 26,185,666 | 25,257,611 | 27,572,794 |
| Commodities | 1,770,157 | 1,223,299 | 1,879,333 | 1,660,166 | 1,935,755 | 2,643,993 |
| Capital | 483,300 | 876,420 | 1,090,278 | 1,097,588 | 1,112,462 | 1,283,352 |
| **Total expenses by object** | $40,794,803 | $35,940,391 | $43,784,083 | $44,474,741 | $48,879,336 | $52,566,466 |
| | | | | | | |
| **By cost center** | | | | | | |
| Airfield area | $8,688,713 | $8,703,647 | $9,460,812 | $10,170,539 | $10,441,039 | $11,247,836 |
| Terminal operation | 2,869,264 | 2,564,624 | 3,026,427 | 3,446,461 | 3,544,817 | 3,710,796 |
| Terminal equipment | 916,808 | 892,211 | 1,184,887 | 1,411,999 | 1,943,947 | 2,306,228 |
| Terminal complex | 17,311,843 | 17,443,256 | 19,324,478 | 19,832,381 | 22,379,413 | 22,056,412 |
| Parking | 7,972,036 | 7,798,579 | 8,455,229 | 5,981,568 | 8,676,416 | 9,635,792 |
| Other buildings and area | 1,388,773 | 1,690,133 | 1,766,497 | 1,999,231 | 2,076,191 | 3,254,803 |
| PRVDTS | 381,626 | 407,462 | 402,511 | 477,306 | 429,339 | 378,944 |
| Remaining/other (a) | 126,006 | 177,503 | 173,281 | 156,912 | 195,761 | 129,361 |
| **Total expenses by cost center** | $40,794,807 | $35,940,391 | $43,784,083 | $44,474,741 | $48,879,336 | $52,566,466 |

(a) Represents O&M costs associated with remaining (or variable) cost items and adjusted accordingly (see Debt Service exhibit).

**EXHIBIT E-A**

**TERMINAL SPACE ANALYSIS**

**After**

| | Total space (sf) | Productive space (b) | Leased Leased Maintained | Support space (a) | Leased Confidential space | Leased Unconfidential space | Unassigned space | Concession space (b) | Public space (b) | PFC-eligible square feet |
|---|---|---|---|---|---|---|---|---|---|---|
| **Customer Level** | | | | | | | | | | |
| Ticketing | | | | | | | | | | |
| Ticket counters | 4,500 | 4,500 | | | | | | | | |
| Ticket counter – queuing | 11,589 | 11,589 | | | | | | | 11,589 | |
| Ticket lobby | 11,589 | 11,589 | | | | | | | 11,589 | |
| Airline ticket offices | 28,253 | 28,253 | | | | | | | | 28,253 |
| Travel lobby – public | 0 | 0 | | | | | | | | |
| Concourse | 14,963 | 14,963 | | | | | | | 14,963 | 14,963 |
| Restrooms | 1,080 | 1,080 | | | | | | | 1,080 | 1,080 |
| Vertical | 71,135 | 71,135 | | | | | | | 71,135 | 71,135 |
| Professional and fullroom | 1,023 | 1,023 | | | | | | | 1,023 | 1,023 |
| Institutional and fullroom | 2,079 | 2,079 | | | | | | | 2,079 | 2,079 |
| TA-walk | 1,247 | 1,247 | | | | | | | | |
| TA-walk-queue | 389 | 389 | | | | | | | | |
| Security type 1 | 3,323 | 3,323 | | | | | | | 3,323 | 3,323 |
| Security type 2 | 3,323 | 3,323 | | | | | | | 3,323 | 3,323 |
| Security type 3 | 3,508 | 3,508 | | | | | | | 3,508 | 3,508 |
| FIS | 4,704 | 4,704 | | | | | | | 4,704 | |
| Gateway (concourse) | 164 | 164 | | | | | | 164 | 164 | 164 |
| Common outbound baggage conveyor | 50 | 50 | | | | | | | | |
| Common service areas | | | | | | | | | | |
| Cart Racks | | | | | | | | | | |
| **Total concourse level** | 271,623 | 264,543 | 0 | 6,466 | 284,832 | 0 | 11,412 | 7,232 | 182,790 | 203,647 |
| **Bagside level** | | | | | | | | | | |
| Baggage claim | | | | | | | | | | |
| Claim lobby | 29,761 | 29,761 | | | | | | | 29,761 | 29,761 |
| Claim room | 22,084 | 22,084 | | | 22,084 | | | | 22,084 | 22,084 |
| Claim device area | 6,542 | 6,542 | | | 6,542 | | | | 6,542 | 6,542 |
| Baggage service office | 2,217 | 2,217 | | | 2,246 | | | | | |
| Rental car offices | 1,364 | 1,364 | | | | | | | | |
| Rental car... | 2,366 | 2,366 | | | | | | | | |
| Rental car... | 2,366 | 2,366 | | | | | | | | |
| Rental car queuing | 2,895 | 2,895 | | | | 2,895 | | | 2,895 | |
| Restrooms | 490 | 490 | | | | | | 490 | | |
| Vestibules | 3,646 | 3,646 | | | | | | | 3,646 | 3,646 |
| Vending | 450 | 450 | | | | | | | | |
| Visitor's unconfined based | 184 | 184 | | | | 171 | | | 184 | 184 |
| **Total** | 43,732 | 43,732 | 0 | 34,570 | 34,832 | 0 | 171 | 7,132 | 29,261 | 35,698 |
| Admin Back of House | 1,261 | 1,261 | | | | | | | | 0 |
| Restrooms | 9,552 | 9,552 | | | 2,244 | | | | 6,744 | 6,542 |
| Toilet | 461 | 461 | | | 116 | | | | 347 | 463 |
| Dock Utility/storage space | 24,141 | 24,141 | | | 24,141 | | | | | 24,141 |
| Tenant | 968 | 968 | | | | | 648 | | | |
| Common service area | | | | | | | | | 164 | |
| Concession sell space | | | | | | | | | | |
| Concession mezzanine seating | 4,506 | 4,506 | | | | | | | | |
| | 47,242 | 13,763 | 0 | 36,059 | | 0 | | 3,432 | 7,391 | 24,629 |

**Exhibit D-7**
**Terminal Space Allocations**

**Exhibit D-8**
**Terminal Rental Rates**

**Exhibit D-9**
**Terminal Apron Fees**

**Exhibit D-10**
**Terminal Equipment Fees**

**Exhibit D-11**
**Landing Fees**

# FRONTIER
## A I R L I N E S

**Index ID:** /0. 5̶70. 1884

# Contract Approval Form

| Step 1 – State Business Case | Rev. 02/01/10 |
|---|---|

| | | | | |
|---|---|---|---|---|
| Department: | FAC - Properties & Facilities  STD | | Contract With: | **City of Austin, Texas** |
| Dept Contact: | Jeff Campbell | | Address: | Austin-Bergstrom International Airport |
| Phone: | 720-374-4466 | | | 3600 Presidential Blvd. Suite 411 |
| | | | | Austin, Texas 78719 |
| Required Approval Completion Date: | mid April | | Vendor Contact: | Frederick Scott |
| Reason for date: | Prior agreement to be cancelled | | Vendor Phone: | 512-530-7507 |

### Financial Data

| | |
|---|---|
| Financial Impact: | Expense to F9 |
| Total **Annual** Amount of Contract: | $1,073,533 |
| If Barter, list commitment: | |

### Contract Term

| | | | |
|---|---|---|---|
| Term: | 5 year  D9 | Effective Date: | 10.01.10 |
| Start Date: | 10.01.10  D9 | Expiration Date: | 09.30.16  14 |

| If Expense: | • Choose payment frequency: | Monthly | $89,461 |
|---|---|---|---|
| | • Was the transaction approved in current FY budget? | Yes (Attach Budget Page) | |
| | • Does this transaction involve Capital Budget: | No | EJ Number: |

### Contract Description

| | | |
|---|---|---|
| Contract Type: | New Agreement | Use and Lease Agreement |

**Describe Agreement's Purpose:**   Provides supply, procedure and definition regarding use and lease of AUS Airport. Frontier leases
certain areas preferrentially (attached profile & exhibit A-2) and Landing fees.

**Give Justification for Approval:**   Continuing operations in AUS

**List Downsides to Agreement:**   Yet to reach concurrence with the Airport on additional ATO space.

| Step 2 – Obtain Departmental Approval | | | | |
|---|---|---|---|---|

I confirm this project is in budget, otherwise justified, and represents a business transaction that supports this department's strategic business goals.

| Date Submitted | Title | Name | Signature | Date Approved |
|---|---|---|---|---|
| 3-26-10 | Manager/Director | Jeff Campbell | J Campbell | 3-26-10 |
| 3-26-10 | SVP/VP | Scott Durgin | OK via Email | 3-26-10 |

| Step 3 – Submit to Contracts Administrator for Legal/Officer Review & Approval | | | | |
|---|---|---|---|---|
| Requirements | Title | Name | Signature | Date Approved |
| All Contracts | Legal | Val Tyler | | |
| All Contracts | VP - Administration | Scott Durgin | | |
| As Needed | CFO - Republic | Hal Cooper | | |

| Step 4 – Sponsor Obtains Signature on Agreement from Authorized VP/Officer |
|---|

| Step 5 – Agreement Routing |
|---|

Two (2) original sets of the Agreement should be fully-executed for every transaction.  Frontier will retain one (1) fully-executed original set and the other party will retain one (1) fully-executed original set.  Contracts Administration maintains all original fully-executed documents (including the Contract Approval Form and associated Budget Documentation) by scanning a copy into the Alchemy document repository and storing the hardcopy at an off-site document storage facility.

**It is important to remember that without a fully-executed contract, services should not commence nor should payment be remitted.**

**Campbell, Jeff**

| | |
|---|---|
| **From:** | Chris Czarnecki [Chris.Czarnecki@wnco.com] |
| **Sent:** | Monday, March 15, 2010 11:10 AM |
| **To:** | Anastas, Mike; chris.collison@aa.com; christopher.sandifer@united.com; hal.fahrenbruch@usairways.com; Campbell, Jeff; kenneth.gregg@coair.com; Stine, Mike |
| **Subject:** | AUS Lease/execution |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Just wanted to give you a heads-up that the airport will send everyone a letter soon asking for signed leases by mid-April.  The letter will also provide written 30 day notice that the month-to-month extension will terminate.

Chris

1

| Cost Center # | 3439 |
|---|---|
| Account # | 6502010 |
| Fleet Type | 000 |
| Account Description | Landing Fees |

Back to: summary\A1

| COMPONENTS OF ACCOUNT | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | 2010 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A320 | $ - | $ - | $ - | $ - | $ 7,768 | $13,709 | $14,166 | $14,166 | $13,709 | $14,166 | $13,709 | $14,166 | $105,558 |
| A319 | $28,955 | $32,412 | $28,523 | $26,362 | $18,583 | $12,965 | $13,397 | $13,397 | $12,965 | $14,261 | $14,693 | $15,126 | $231,638 |
| A318 | $10,591 | $ 3,666 | $10,999 | $11,814 | $13,443 | $12,221 | $12,628 | $12,628 | $12,221 | $11,814 | $10,591 | $10,999 | $133,615 |
| TOTAL | $39,546 | $36,078 | $39,521 | $38,175 | $39,794 | $38,895 | $40,191 | $40,191 | $38,895 | $40,241 | $38,994 | $40,290 | $ 470,811 |

COMPONENT DETAIL & COMPUTATIONS

| | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-320 Departs@100% | 0 | 0 | 0 | 0 | 17 | 30 | 31 | 31 | 30 | 31 | 30 | 31 |
| A-319 Departs@100% | 67 | 75 | 66 | 61 | 43 | 30 | 31 | 31 | 30 | 33 | 34 | 35 |
| A-318 Departs@100% | 25 | 9 | 27 | 29 | 33 | 30 | 31 | 31 | 30 | 29 | 26 | 27 |
| | | | | | | | | | | | | |
| A-320 Departs@99.8% | 0 | 0 | 0 | 0 | 16.966 | 29.94 | 30.938 | 30.938 | 29.94 | 30.938 | 29.94 | 30.938 |
| A-319 Departs@99.8% | 66.866 | 74.85 | 65.868 | 60.878 | 42.914 | 29.94 | 30.938 | 30.938 | 29.94 | 32.934 | 33.932 | 34.93 |
| A-318 Departs@99.8% | 25.948 | 8.982 | 26.946 | 28.942 | 32.934 | 29.94 | 30.938 | 30.938 | 29.94 | 28.942 | 25.948 | 26.946 |

| A320 weight | 142,198 |
|---|---|
| A319 weight | 134,480 |
| A318 weight | 126,764 |

| Landing Fee rate per 1,000 lbs. | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 | $ 3.22 |

29-April-2010

To:   Jeff Campbell
      Properties & Facilities

RE:   The Agreement between Frontier Airlines and
      City of Austin, TX

IID:   10.STO.1884

---

The above mentioned Agreement has successfully completed the internal review process.  Since the appropriate Frontier Officer has already signed the Agreement, please forward two (2) original sets to the outside party with the requirement that they countersign and return one (1) original to you.  I will need the fully executed original documents (including the Contract Approval Form) to satisfy Frontier's Contract Retention requirements.  If you have any questions, please let me know.

Thanks,


Jeremy S. Craft
Contracts Administrator

**FRONTIER AIRLINES**
7001 Tower Road
Denver, CO    80249
☎: 720.374.4427

# Incident Detail Report

Data Source: Data Warehouse
Incident Status: Closed
Incident number: 15057338
Case Numbers: AFD -2015-0044246
Incident Date: 6/10/2015 17:55:21
Last Updated: 4/10/2017 14:34:29

## Incident Information

| | | | |
|---|---|---|---|
| Incident Type: | C - Medical Priority 5 | Alarm Level: | |
| Priority: | 4F | Problem: | LAC1 - Lift Assist Code 1 |
| Determinant: | | Agency: | FIRE |
| Base Response#: | 2015-161-0096527 | Jurisdiction: | AFD |
| Confirmation#: | | Division: | AFD_B05 |
| Taken By: | RANGEL, PHILLIP | Battalion: | AFD_BAT05 |
| Response Area: | 00-4205 | Response Plan: | 00*ABIA-C - Medical Priority 5 |
| Disposition: | SrvOth - Services Other | Command Ch: | |
| Cancel Reason: | | Primary TAC: | AT FCOM S |
| Incident Status: | Closed | Secondary TAC: | AT MCOM-S |
| Certification: | ENG | Delay Reason (if any): | |
| Longitude: | 97664696 | Latitude: | 30202205 |

## Incident Location

| | | | |
|---|---|---|---|
| Location Name: | GATE 5 ABIA | County: | TRAVIS |
| Address: | 545 Abia Way | Location Type: | Airport Boarding Gate |
| Apartment: | | Cross Street: | APRON WAY/PRESIDENTIAL BLVD |
| Building: | | Map Reference: | 647S |
| City, State, Zip: | AUSTIN TX 78719 | | |

## Call Receipt

| | | |
|---|---|---|
| Caller Name: | | |
| Method Received: | | Call Back Phone: |
| Caller Type: | | Caller Location: |

## Time Stamps

| Description | Date | Time | User | Elapsed Times Description | Time |
|---|---|---|---|---|---|
| Phone Pickup | 6/10/2015 | 17:55:20 | | | |
| 1st Key Stroke | 6/10/2015 | 17:55:21 | | Received to In Queue | 00:00:28 |
| In Waiting Queue | 6/10/2015 | 17:55:50 | | Call Taking | 00:01:37 |
| Call Taking Complete | 6/10/2015 | 17:56:58 | RANGEL, PHILLIP | In Queue to 1st Assign | 00:00:25 |
| 1st Unit Assigned | 6/10/2015 | 17:56:16 | | Call Received to 1st Assign | 00:00:55 |
| 1st Unit Enroute | | | | Assigned to 1st Enroute | |
| 1st Unit Arrived | 6/10/2015 | 17:56:35 | | Enroute to 1st Arrived | |
| Closed | 6/10/2015 | 18:28:02 | VisiNetMobileInterface | Incident Duration | 00:32:42 |

## Resources Assigned

| Unit | Primary Flag | Assigned | Disposition | Enroute | Staged | Arrived | At Patient Avail | Delay Complete | Odm. Enroute | Odm. Arrived | Cancel Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AFR02 | Y | 17:56:16 | SrvOth - Services Other | | | 17:56:47 | | 18:28:02 | | | |
| AFR05 | N | 17:56:16 | SrvOth - Services Other | | | 17:56:35 | | 18:17:27 | | | |

## Personnel Assigned

| Unit | Name |
|---|---|
| AFR02 | RUIZ, LORENZO E (FD000682) - AFD - Active |
| AFR05 | CRAIG, STEVEN W (FD001295) - AFD - Active; HINOJOSA, STEVEN M (FD000868) - AFD - Active; TRECKMAN, TIMOTHY J (FD000767) - AFD - Active |

## Pre-Scheduled Information
No Pre-Scheduled Information

## Transports
No Transports Information

## Transport Legs
No Transports Information

## Comments

| Date | Time | User | Type | Conf. | Comments |
|---|---|---|---|---|---|
| 6/10/2015 | 17:56:16 | TSSIntRMS: ZollFireRMS_Ne | Response | | External Case Number 'AFD -2015-0044246' added for AFD. |
| 6/10/2015 | 17:56:32 | FD001430 | Response | | Updated SOP information is available |
| 6/10/2015 | 17:56:32 | FD001430 | Response | | [Notification] [FIRE]-Problem changed from HOLD to LAC1 - Lift Assist Code 1 by FIRE |
| 6/10/2015 | 17:57:26 | FD001430 | Response | | Lift assist at Gate 05 per Afr02 |

## Address Changes
No Address Changes

## Priority Changes

| Date | Time | Changed from Priority | Reason | User |
|---|---|---|---|---|
| 6/10/2015 | 17:56:32 | 6H | ADDL - Additional Information | PR |

## Alarm Level Changes
No Alarm Level Changes

## Activity Log

EXHIBIT B

| Date | Time | Radio | Activity | Location | Log Entry | User |
|------|------|-------|----------|----------|-----------|------|
| 6/10/2015 | 17:55:50 | | Incident in Waiting Queue | | | |
| 6/10/2015 | 17:55:50 | | SOP Displayed | | HOLD | FD001430 |
| 6/10/2015 | 17:55:50 | | CN:AlertSent (ID=1) | | [IN QUEUE] Inc# (15057338) 545 Abia Way : 6H | CN:AS |
| 6/10/2015 | 17:55:50 | | CN:AlertACK (ID=1) | | Alert ACK via [Auto-ACK (Sound Only)] by [NOFFSINGER, DOYLE G] (PerID=6252) | CN:AL |
| 6/10/2015 | 17:55:50 | | CN:AlertACK (ID=1) | | Alert ACK via [Auto-ACK (Sound Only)] by [STEPHENSON, LAURA L] (PerID=6314) | CN:AL |
| 6/10/2015 | 17:55:50 | | CN:AlertACK (ID=1) | | Alert ACK via [Auto-ACK (Sound Only)] by [PETTIT, MICHAEL J] (PerID=6503) | CN:AL |
| 6/10/2015 | 17:55:50 | | CN:AlertACK (ID=1) | | Alert ACK via [Auto-ACK (Sound Only)] by [CRUM, ROBERT E] (PerID=6939) | CN:AL |
| 6/10/2015 | 17:55:51 | | Incident in Waiting Queue Timer Clear | | | |
| 6/10/2015 | 17:56:16 | AFR02 | DISP | 545 Abia Way [GATE 5 ABIA] | Response Number (2015-161-0096527) | FD001430 |
| 6/10/2015 | 17:56:16 | AFR05 | DISP | 545 Abia Way [GATE 5 ABIA] | Response Number (2015-161-0096528) | FD001430 |
| 6/10/2015 | 17:56:16 | | Read Incident | | Incident 864 was Marked as Read. | FD001430 |
| 6/10/2015 | 17:56:26 | | MultiAgencyResponse | | A Change in the Problem from HOLD to LAC1 - Lift Assist Code 1 has resulted in the recommendation of the following additional agencies AUSTIN-TRAVIS COUNTY EMS | FD001430 |
| 6/10/2015 | 17:56:32 | | MultiAgencyResponse | | The following additional Agencies have been sent because of a Problem/Nature change:AUSTIN-TRAVIS COUNTY EMS | FD001430 |
| 6/10/2015 | 17:56:32 | | SOP Updated | | Updated SOP information is available | FD001430 |
| 6/10/2015 | 17:56:32 | | CN:AlertSent (ID=2) | | [PROBLEM CHANGE] Units (AFR02,AFR05) 545 Abia Way : To (LAC1 - Lift Assist Code 1) | CN:AS |
| 6/10/2015 | 17:56:32 | | SOP Displayed | | LAC1 | FD001430 |
| 6/10/2015 | 17:56:32 | AFR02 | Change Unit Priority | | Change Unit Priority from 6H to 4F | FD001430 |
| 6/10/2015 | 17:56:32 | AFR05 | Change Unit Priority | | Change Unit Priority from 6H to 4F | FD001430 |
| 6/10/2015 | 17:56:35 | AFR05 | ONSC | 545 Abia Way | | FD001430 |
| 6/10/2015 | 17:56:47 | AFR02 | ONSC | 545 Abia Way | | FD001430 |
| 6/10/2015 | 17:56:58 | | UserAction | | User clicked Exit/Save | FD001430 |
| 6/10/2015 | 17:57:09 | | CN:AlertACK (ID=2) | | Alert ACK via [Checkbox Click] by [RANGEL, PHILLIP] (PerID=6665) | CN:AL |
| 6/10/2015 | 17:57:28 | | UserAction | | User clicked Exit/Save | FD001430 |
| 6/10/2015 | 17:58:20 | | CN:AlertACK (ID=2) | | Alert ACK via [Checkbox Click] by [PETTIT, MICHAEL J] (PerID=6503) | CN:AL |
| 6/10/2015 | 17:58:59 | | CN:AlertACK (ID=2) | | Alert ACK via [Checkbox Click] by [STEPHENSON, LAURA L] (PerID=6314) | CN:AL |
| 6/10/2015 | 18:17:27 | AFR05 | AVCL | 545 Abia Way [GATE 5 ABIA] | | VisiNet |
| 6/10/2015 | 18:28:02 | AFR02 | AVCL | 545 Abia Way [GATE 5 ABIA] | | VisiNet |
| 6/10/2015 | 18:28:02 | | Response Closed | GATE 5 ABIA | | VisiNet |
| 6/10/2015 | 19:41:02 | | CN:AlertACK (ID=2) | | Alert ACK via [Checkbox Click] by [CRUM, ROBERT E] (PerID=6939) | CN:AL |
| 6/10/2015 | 20:32:07 | | CN:AlertACK (ID=2) | | Alert ACK via [Checkbox Click] by [NOFFSINGER, DOYLE G] (PerID=6252) | CN:AL |

**Edit Log**

| Date | Time | Field | Changed From | Changed To | Reason | Table | Workstation | User |
|------|------|-------|--------------|------------|--------|-------|-------------|------|
| 6/10/2015 | 17:55:24 | Address | (Blank) | abia | New Entry | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Jurisdiction | | AFD | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Division | | AFD_B05 | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Battalion | | AFD_BAT05 | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Response_Area | | 00-4205 | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | ResponsePlanType 0 | | 0 | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Primary_TAC_Channel | | AT FCOM S | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Alternate_TAC_Channel | | AT MCOM-S | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Address | abia | 545 ABIA WAY | Premise Verified | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | City | | AUSTIN | Updated City | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Latitude | 0 | 30202205 | Premise Verified | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:43 | Longitude | 0 | 97664896 | Premise Verified | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:49 | Problem | | HOLD | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:50 | Pickup_Map_Info | | 647S | | Response_Transports | AFD04 | FD001430 |
| 6/10/2015 | 17:55:50 | Map_Info | | 647S | | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:55:50 | Caller_Building | | 2 | Polygon Lookup | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:56:16 | Read Call | False | True | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:56:32 | Current_UnitRespPrAFR02: 6H iorityDesc | | 4F | ADDL - Additional Information | Response_Vehicles_Assigned | AFD04 | FD001430 |
| 6/10/2015 | 17:56:32 | Current_UnitRespPrAFR05: 6H iorityDesc | | 4F | ADDL - Additional Information | Response_Vehicles_Assigned | AFD04 | FD001430 |
| 6/10/2015 | 17:56:32 | Problem | HOLD | LAC1 - Lift Assist Code 1 | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:56:32 | Response_Plan | 00*ABIA-X - No Response | 00*ABIA-C - Medical Priority 5 | (Response Viewer) | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:56:32 | Priority_Description 6H | | 4F | ADDL - Additional Information | Response_Master_Incident | AFD04 | FD001430 |
| 6/10/2015 | 17:56:32 | Priority_Number | 13 | 10 | ADDL - | Response_Master_Incident | AFD04 | FD001430 |

Case 1:16-cv-01266-AWA  Document 42-1  Filed 12/13/17  Page 84 of 167

| 6/10/2015 | 17:56:32 | Incident_Type | X - No Response | C - Medical Priority 5 | Additional Information (Response Viewer) | Response_Master_Incident AFD04 | FD001430 |
| 6/10/2015 | 17:56:32 | Certification_Level | HOLD | ENG | (Response Viewer) | Response_Master_Incident AFD04 | FD001430 |

**Custom Time Stamps**
**No Custom Time Stamps**

**Custom Data Fields**
**No Custom Data Fields**

**Attachments**
**No Attachment**



**Incident Detail Report**
No PCR
Data Source: **RMS**
Incident #: **15057338**

Data Source: **RMS**       Incident Date: **06/10/2015 17:55:20**       http://172.20.68.129/freepub/

## INCIDENT INFORMATION

| | | | |
|---|---|---|---|
| IncidentType | C - Medical Priority 5 | Alarm Level | |
| Priority | 4F | Problem | LAC1 - Lift Assist Code 1 |
| Base Response # | 2015-161-0096527 | Agency | FIRE |
| Taken By | RANGEL, PHILLIP | jurisdiction | AFD |
| Response Area | 00-4205 | Division | AFD_B05 |
| Disposition | SrvOth - Services Other | Battalion | AFD_BAT05 |
| Cancel Reason | | Response Plan | 00*ABIA-C - Medical Priority 5 |
| | | Command Ch | |
| Certification | ENG | Primary TAC | AT FCOM S |
| | | Secondary TAC | AT MCOM-S |

## INCIDENT LOCATION

| | | | |
|---|---|---|---|
| Location name | GATE 5 ABIA | County | Travis |
| Address | 545 Abia Way | Location Type | Airport Boarding Gate |
| Apartment | | Cross Street | APRON WAY/PRESIDENTIAL BLVD |
| Building | | | |
| City, State, Zip | AUSTIN, TX 78719 | Map Reference | 647S |
| | | Fire Box | |

## CALL RECEIPT

| | | | |
|---|---|---|---|
| Method Rcvd. | | Call Back Phone | |
| Caller Type | | Caller Location | |

## TIME STAMPS                                           ELAPSED TIMES

| Description | Date | Time | Description | Time |
|---|---|---|---|---|
| Phone Pickup | 06/10/2015 | 17:55:20 | Received to In Queue | 00:00:00 |
| 1st Key Stroke | 06/10/2015 | 17:55:21 | Call Taking | 00:01:38 |
| In Waiting Queue | 06/10/2015 | 17:55:50 | In Queue to 1st Assign | 00:00:00 |
| Call Taking Complete | 06/10/2015 | 17:56:58 | Call Received to 1st Assign | 00:00:00 |
| First Unit Assigned | 06/10/2015 | 17:56:16 | Assigned to 1st Enroute | 00:00:00 |
| First Unit Enroute | | | Enroute to 1st Arrived | 00:00:00 |
| First Unit Arrived | 06/10/2015 | 17:56:35 | Incident Duration | 00:32:42 |
| Closed | 06/10/2015 | 18:28:02 | | |

## RESOURCES ASSIGNED

| Unit | Assigned | Enroute | Staged | Arrived | At Patient | Delay Avail | Complete | Cancel Reason |
|---|---|---|---|---|---|---|---|---|
| AFR 05 | 17:56:16 | | | 17:56:35 | | | 18:17:27 | |
| AFR 02/Ramp | 17:56:16 | | | 17:56:47 | | | 18:28:02 | |

## ADDRESS DESCRIPTION

| Incident Type | Dates / Times | Special Studies |
|---|---|---|
| 500 Service Call, other | Incident Begin Time 06/10/2015 17:55:20 | |

| N None | Controlled | |
|---|---|---|
| AidType | Incident End Time    06/10/2015 18:28:02 | |

| Actions Taken | Resources | Suppression | EMS | Other |
|---|---|---|---|---|
| (1)  71 Assist physically disabled | Apparatus | 2 | 0 | 0 |
| (2) | Personnel | 4 | 0 | 0 |
| (3) | (Includes Aid Totals) | | | |



**Incident Detail Report**
No PCR
Data Source:  **RMS**
Incident #:  **15057338**

Data Source:  **RMS**

Incident Date:  **06/10/2015 17:55:20**       http://172.20.68.129/freepub/

| Casualties | | | Estimated Dollar Losses/Values | | Hazmat Released |
|---|---|---|---|---|---|
| | **Deaths** | **Injuries** | **Losses** | | |
| FireService | 0 | 0 | Property | | **Mixed Use Property** |
| Civilian | 0 | 0 | Contents | | |
| **Detector Alerted Occupant** | | | **Pre-Incident Value** | | |
| | | | Property | | **Property Use** |
| | | | Contents | | 974 Aircraft loading area |

**Remarks**

| **Officer In Charge** | **Position or Rank** | **Assignment** | **Report Date** |
|---|---|---|---|
| JENNINGS, JAY | | | 06/11/2015 |
| **Officer Reporting** | **Reporting Officer Rank** | **Assignment** | **Report Date** |
| [None selected], [None selected] | | | 06/11/2015 |

**Incident Narrative**
AFR2 and AFR5 responded to Gate 1 as requested by a phone call from Frontier Airlines for assistance helping a disabled passenger board the 737. The aircraft was parked on the Ron out from Gate 2 and with an air-stair attached. We used an aisle chair to take the patient up the stairs.

**APPARATUS INFORMATION**

| **Unit** AFR 05 | **Dispatch** | **Responding** | **Onscene** | **Clear** |
|---|---|---|---|---|
| Not Cancelled | 06/10/2015 17:56:16 | | 06/10/2015 17:56:35 | 06/10/2015 18:17:27 |

**Apparatus Narrative**
AFR 05 provided manpower for a lift assist onto Frontier Airlines aircraft located at the hardstand using an aisle chair provided by AirOps.

| **ATTENDEES** | **Last Name** | **First Name** | **(TXFR)** | **Rank / Title** | **Unit** |
|---|---|---|---|---|---|
| | | TIM | | | AFR 05 |
| | | STEVEN | | | AFR 05 |
| | | STEVEN | | | AFR 05 |

**APPARATUS INFORMATION**

| **Unit** AFR 02/Ramp | **Dispatch** | **Responding** | **Onscene** | **Clear** |
|---|---|---|---|---|
| Not Cancelled | 06/10/2015 17:56:16 | | 06/10/2015 17:56:47 | 06/10/2015 18:28:02 |

**Apparatus Narrative**
See NFIRS.

**Citizen Assistance Form**
**CAF #8592 – Email Response**
July 20, 2015

Citizen: Maxine White
Maxwhite50@yahoo.com

Dear Ms. White,

Thank you for contacting us to communicate your concerns with regards to your recent flight into Austin-Bergstrom International Airport (ABIA). We strive to provide all customers with excellent service and value feedback to assist us in further improving our operations.

With regards to your specific incident with flying with Frontier Airlines, we have followed up with the airline to ensure they are aware of their requirements to provide sufficient equipment to support their operations.

In addition to meeting with the airline, the Aviation Department has purchased an air stair with a wheelchair lift. The air stair is designed to accommodate various aircraft classes that operate at the airport. The lift will be used in anomalies and emergencies to ensure the safe loading and disembarkation of passengers from planes.

The Aviation Department is committed to providing excellent customer service to all users at ABIA. Our staff is dedicated to working to ensure that everyone that comes through the airport is treated with respect and dignity.

Sincerely,


Stephanie Tucker
Airport Property Manager

cc: Steve Adler, Mayor, City of Austin
    Marc A. Ott, City Manager
    Jim Smith, Executive Director, Department of Aviation
    Patti Edwards, Chief Operations Officer, Department of Aviation
    Susana Carbajal, Assistant Director, Department of Aviation
    Robert Mercado, Project Manager, Department of Aviation
    Judy Wallace, Assistant Director, Human Resources Department



**HUNTLEIGH**

**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable     8909 Purdue Rd,
Indianapolis          IN     46268

| | Invoice |
|---|---|

**Special Instructions:**

EMAIL: AP@FLYFRONTIER.COM

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 2/2/2015 |
| Inv. No.: | 0000080690 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin          TX     78719

Period of service 01/01/15 - 01/31/15

| Description | | Quantity | Rate | Amount |
|---|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT | FRONTIER AIRLINES | 1 | $3,115.16 | $3,115.16 |
| Passenger Alloc, Passenger Count = 6161 | AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

## PASSENGER COUNT SUMMARY

| SERVICE LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN 01/01/15 - 01/31/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 3,672.76 | 87.75 | 126.00 | $39,335.18 | $1,410.14 | $2,024.82 | $42,770.11 |
| | MANAGEMENT FEE | $16.66 | $18.66 | $16.66 | 173.36 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 557.25 | 0.75 | 15.25 | $6,352.65 | $12.83 | $260.78 | $6,626.26 |
| Sub-total | | | | | 4,403.34 | 88.50 | 141.25 | $48,384.97 | $1,422.97 | $2,285.60 | $52,093.54 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $52,093.54 |

Total Carriers:          7
Base percentage:     20%          Base Amount:     $10,418.71          BILLING BASED ON PASSENGER COUNTS AND / OR BASE PERCENTAGE
Amt by Pac:          $41,674.83

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svs | | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 47,561 | 30.3236% | $12,637.31 | $1,488.38 | | | | | $14,125.69 |
| CONTINENTAL | 0000090008 | 18,059 | 11.4416% | $4,768.35 | $1,488.38 | | | | | $6,256.73 |
| JETBLUE | 0000090009 | 18,576 | 11.8327% | $4,931.26 | $1,488.38 | | | | | $6,419.64 |
| FRONTIER | 0000090012 | 6,161 | 3.9036% | $1,626.78 | $1,488.38 | | | | | $3,115.16 |
| UNITED | 0000090013 | 49,319 | 31.2474% | $13,022.30 | $1,488.38 | | | | | $14,510.68 |
| MESA/USAIR | 0000090014 | 10,916 | 6.9161% | $2,882.27 | $1,488.38 | | | | | $4,370.65 |
| USAIR | 0000090017 | 6,842 | 4.3349% | $1,806.56 | $1,488.38 | | | | | $3,294.94 |
| Totals for Pac distribution | | 157,834 | 100.00% | $41,674.83 | $10,418.66 | | | | | $52,093.49 |

**Period of service 01/01/15 - 01/31/15**

| | |
|---|---|
| Subtotal: | $3,115.16 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $3,115.16 |
| Payments/Credits: | $0.00 |
| Balance: | $3,115.16 |

Huntleigh USA
(972)915-1247

## Remittance Advice:
### (PLEASE NOTE NEW ADDRESS)
Remit To:   Huntleigh USA Corp
Dept# 96-0429
Oklahoma City, OK 73196-0429

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 2/11/2015 |
| Inv. No.: | 0000080690 |
| Job Number: | 0000090012 |
| | 02/11 |

Amount Paid: _____

EXHIBIT C



**HUNTLEIGH**

Bill To:
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis          IN     46268

8909 Purdue Rd,

**Invoice**

Special Instructions:

EMAIL: AP@FLYFRONTIER.COM

| | |
|---|---|
| Account: | FRONTIER |
| Inv. Date: | 2/2/2015 |
| Inv. No.: | 0000080690 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin              TX     78719

Period of service 01/01/15 - 01/31/15

| Description | | Quantity | Rate | Amount |
|---|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT | FRONTIER AIRLINES | 1 | $3,115.16 | $3,115.16 |
| Passenger Alloc, Passenger Count = 6161 | AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

## PASSENGER COUNT SUMMARY

| SERVICE/LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN 01/01/15 - 01/31/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 3,672.76 | 87.75 | 126.00 | $39,335.15 | $1,410.14 | $2,024.82 | $42,770.11 |
| | MANAGEMENT FEE | $16.66 | $16.66 | $16.66 | 173.34 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 557.25 | 0.75 | 15.25 | $6,352.65 | $12.83 | $260.78 | $6,626.26 |
| Sub-total | | | | | 4,403.34 | 88.50 | 141.25 | $48,384.97 | $1,422.97 | $2,285.60 | $52,093.54 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $52,093.54 |

| Total Carriers: | 7 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 157,834 | BILLING BASED ON PASSENGER COUNTS AND/OR BASE PERCENTAGE | | | | | | | |
| Base percentage: | 20% | Base Amount: | $10,418.71 | | | | | | |
| | | Amt by Pac: | $41,674.83 | | | | | | |

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svcs | | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 47,801 | 30.3236% | $12,637.31 | $1,488.38 | | | | | $14,125.69 |
| CONTINENTAL | 0000090008 | 18,059 | 11.4418% | $4,768.35 | $1,488.38 | | | | | $6,256.73 |
| JETBLUE | 0000090009 | 18,676 | 11.8327% | $4,931.26 | $1,488.38 | | | | | $6,419.64 |
| FRONTIER | 0000090012 | 6,161 | 3.9035% | $1,626.78 | $1,488.38 | | | | | $3,115.16 |
| UNITED | 0000090013 | 49,319 | 31.2474% | $13,022.30 | $1,488.38 | | | | | $14,510.68 |
| MESA/ USAIR | 0000090014 | 10,916 | 6.9161% | $2,882.27 | $1,488.38 | | | | | $4,370.65 |
| USAIR | 0000090017 | 6,842 | 4.3349% | $1,806.66 | $1,488.38 | | | | | $3,294.94 |
| Totals for Pac distribution | | 157,834 | 100.00% | $41,674.63 | $10,418.66 | | | | | $52,093.49 |

**Period of service 01/01/15 - 01/31/15**

| | |
|---|---|
| Subtotal: | $3,115.16 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $3,115.16 |
| Payments/Credits: | $0.00 |
| Balance: | $3,115.16 |

Huntleigh USA

(972)915-1247

## Remittance Advice:

**(PLEASE NOTE NEW ADDRESS)**

Remit To:   Huntleigh USA Corp
Dept# 96-0429
Oklahoma City, OK 73196-0429

| | |
|---|---|
| Account: | FRONTIER |
| Inv. Date: | 2/11/2015 |
| Inv. No.: | 0000080690 |
| Job Number: | 0000090012 |
| | 02/11 |

**Amount Paid:** _____



**HUNTLEIGH**

Bill To:
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis    IN    46268

8909 Purdue Rd,

| **Invoice** | |
|---|---|

Special Instructions:

EMAIL: AP@FLYFRONTIER.COM

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 3/5/2015 |
| Inv. No.: | 0000081594 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin          TX     78719

Period of service 02/01/15 - 02/28/15

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| 251-0601    AUS - PASSENGER COUNT                          FRONTIER AIRLINES | 1 | $2,733.94 | $2,733.94 |
| Passenger Alloc, Passenger Count = 5576          AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

## PASSENGER COUNT SUMMARY

| SERVICE LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN | | | | | | | | | | | |
| 02/01/15 - 02/28/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 3,358.76 | 146.00 | 0.00 | $35,940.06 | $2,346.22 | $0.00 | $38,286.30 |
| | MANAGEMENT FEE | $15.56 | $15.56 | $15.56 | 173.34 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 506.60 | 0.00 | 0.00 | $5,774.10 | $0.00 | $0.00 | $5,774.10 |
| Sub-total | | | | | 4,035.69 | 146.00 | 0.00 | $44,411.36 | $2,346.22 | $0.00 | $46,757.57 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $46,757.57 |
| Total Carriers: | 7 | | | | | | | | | | |
| | 149,196 | | BILLING BASED ON PASSENGER COUNTS AND / OR BASE PERCENTAGE | | | | | | | | |
| Base percentage: | 20% | | Base Amount: | $9,351.51 | | | | | | | |
| | | | Amt by Pac : | $37,406.06 | | | | | | | |

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Save | | | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 45,692 | 30.6256% | $11,455.79 | $1,335.93 | | | | | | $12,791.72 |
| CONTINENTAL | 0000090008 | 17,301 | 11.5962% | $4,337.68 | $1,335.93 | | | | | | $5,673.61 |
| JETBLUE | 0000090009 | 17,767 | 11.9085% | $4,454.50 | $1,335.93 | | | | | | $5,790.43 |
| FRONTIER | 0000090012 | 5,576 | 3.7374% | $1,398.01 | $1,335.93 | | | | | | $2,733.94 |
| UNITED | 0000090013 | 45,159 | 30.2682% | $11,322.14 | $1,335.93 | | | | | | $12,658.07 |
| MESA/ USAIR | 0000090014 | 11,047 | 7.4044% | $2,769.69 | $1,335.93 | | | | | | $4,105.62 |
| USAIR | 0000090017 | 6,654 | 4.4599% | $1,668.27 | $1,335.93 | | | | | | $3,004.20 |
| Totals for Pac distribution | | 149,196 | 100.00% | $37,406.08 | $9,351.51 | | | | | | $46,757.59 |

**Period of service 02/01/15 – 02/28/15**

| | |
|---|---|
| Subtotal: | $2,733.94 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $2,733.94 |
| Payments/Credits: | $0.00 |
| Balance: | $2,733.94 |

Huntleigh USA

(972)915-1247

## Remittance Advice:
### (PLEASE NOTE NEW ADDRESS)

Remit To:   Huntleigh USA Corp
Dept# 96-0429
Oklahoma City, OK 73196-0429

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 3/13/2015 |
| Inv. No.: | 0000081594 |
| Job Number: | 0000090012 |
| | 03/13 |

**Amount Paid:** _____



**HUNTLEIGH**

**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis        IN    46268

| | Invoice | |
|---|---|---|

8909 Purdue Rd, Ste 300

**Special Instructions:**

EMAIL: AP@FLYFRONTIER.COM

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 4/2/2015 |
| Inv. No.: | 0000082323 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin          TX    78719

Period of service 03/01/15 - 03/31/15

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| 251-0601    AUS - PASSENGER COUNT    FRONTIER AIRLINES | 1 | $2,888.66 | $2,888.66 |
| Passenger Alloc. Passenger Count = 9097    AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

## PASSENGER COUNT SUMMARY

| SERVICE/LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN 03/01/15 - 03/31/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 3,351.76 | 23.00 | 0.00 | $35,897.24 | $369.61 | $0.00 | $36,266.85 |
| | MANAGEMENT FEE | $15.56 | $15.56 | $15.56 | 173.34 | 0.00 | 0.00 | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 570.26 | 0.00 | 0.00 | $6,500.85 | $0.00 | $0.00 | $6,500.85 |
| Sub-total | | | | | 4,095.34 | 23.00 | 0.00 | $45,095.26 | $369.61 | $0.00 | $45,464.87 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $45,464.87 |

| Total Carriers: | 7 | | | | | |
|---|---|---|---|---|---|---|
| | 208,143 | BILLING BASED ON PASSENGER COUNTS AND / OR BASE PERCENTAGE | | | | |
| Base percentage: | 20% | Base Amount: | $9,092.97 | | | |
| | | Amt by Pac : | $36,371.90 | | | |

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svcs | | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 61,363 | 29.4812% | $10,722.87 | $1,298.99 | | | | | $12,021.86 |
| CONTINENTAL | 0000090008 | 21,304 | 10.2353% | $3,722.77 | $1,298.99 | | | | | $5,021.76 |
| JETBLUE | 0000090009 | 29,216 | 14.0360% | $5,105.16 | $1,298.99 | | | | | $6,404.15 |
| FRONTIER | 0000090012 | 9,097 | 4.3706% | $1,589.67 | $1,298.99 | | | | | $2,888.66 |
| UNITED | 0000090013 | 64,498 | 30.9874% | $11,270.71 | $1,298.99 | | | | | $12,569.70 |
| MESA/USAIR | 0000090014 | 13,846 | 6.6522% | $2,419.63 | $1,298.99 | | | | | $3,718.62 |
| USAIR | 0000090017 | 8,820 | 4.2376% | $1,541.26 | $1,298.99 | | | | | $2,840.25 |
| Totals for Pac distribution | | 208,143 | 100.00% | $36,371.97 | $9,092.93 | | | | | $45,464.90 |

**Period of service 03/01/15 - 03/31/15**

| | |
|---|---|
| Subtotal: | $2,888.66 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $2,888.66 |
| Payments/Credits: | $0.00 |
| Balance: | $2,888.66 |

Huntleigh USA

(972)915-1247

## Remittance Advice:

Remit To:  Huntleigh USA Corp
           Dept# 96-0429
           Oklahoma City, OK 73196-0429

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 4/13/2015 |
| Inv. No.: | 0000082323 |
| Job Number: | 0000090012 |
| | 04/13 |

**Amount Paid:** _____



**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis          IN          46268

### Invoice

8909 Purdue Rd, Ste 300

**Special Instructions:**

EMAIL: AP@FLYFRONTIER.COM

| | |
|---|---|
| **Account:** | FRONTIER |
| **Inv. Date:** | 5/3/2015 |
| **Inv. No.:** | 0000083079 |
| **Job Number:** | 0000090012 |
| **Master Job:** | 0000251101 |
| **Contract:** | |

AUSTIN, TX
AUS AIRPORT

Austin          TX          78719

Period of service 04/01/15 - 04/30/15

| Description | | Quantity | Rate | Amount |
|---|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT | FRONTIER AIRLINES | 1 | $3,712.63 | $3,712.63 |
| Passenger Alloc, Passenger Count = 13859 | AUS – WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

## PASSENGER COUNT SUMMARY

| SERVICE/LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN 04/01/15 - 04/30/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 3,186.75 | 35.25 | 0.00 | $34,130.09 | $566.47 | $0.00 | $34,696.56 |
| | MANAGEMENT FEE | $15.56 | $15.56 | $15.56 | 173.34 | | 0.00 | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 563.50 | 0.00 | 0.00 | $6,423.90 | $0.00 | $0.00 | $6,423.90 |
| Sub-total | | | | | 3,923.59 | 35.25 | 0.00 | $43,251.16 | $566.47 | $0.00 | $43,817.63 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $43,817.63 |

| Total Carriers: | 7 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 197,430 | | BILLING BASED ON PASSENGER COUNTS AND / OR BASE PERCENTAGE | | | | | | | | |
| Base percentage: | 20% | | Base Amount : | $8,763.53 | | | | | | | |
| | | | Amt by Pac : | $35,054.10 | | | | | | | |

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svcs | | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 60,905 | 30.8499% | $10,813.81 | $1,251.93 | | | | | $12,065.74 |
| CONTINENTAL | 0000090008 | 23,051 | 11.6765% | $4,092.75 | $1,251.93 | | | | | $5,344.68 |
| JETBLUE | 0000080009 | 21,675 | 10.9786% | $3,848.44 | $1,251.93 | | | | | $5,100.37 |
| FRONTIER | 0000090012 | 13,859 | 7.0197% | $2,460.69 | $1,251.93 | | | | | $3,712.63 |
| UNITED | 0000090013 | 56,633 | 28.6349% | $10,037.55 | $1,251.93 | | | | | $11,289.48 |
| MESA/USAIR | 0000090014 | 12,069 | 6.1131% | $2,142.97 | $1,251.93 | | | | | $3,394.91 |
| USAIR | 0000090017 | 9,338 | 4.7298% | $1,657.96 | $1,251.93 | | | | | $2,909.91 |
| Totals for Pac distribution | | 197,430 | 100.00% | $35,054.10 | $8,763.53 | | | | | $43,817.63 |

**Period of service 04/01/15 - 04/30/15**

| | |
|---|---|
| Subtotal: | $3,712.63 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $3,712.63 |
| Payments/Credits: | $0.00 |
| Balance: | $3,712.63 |

Huntleigh USA

(972)915-1247

### Remittance Advice:

Remit To:  Huntleigh USA Corp
              Dept# 96-0429
              Oklahoma City, OK 73196-0429

| | |
|---|---|
| **Account:** | FRONTIER |
| **Inv. Date:** | 5/19/2015 |
| **Inv. No.:** | 0000083079 |
| **Job Number:** | 0000090012 |
| | 05/19 |

**Amount Paid:**_____



**HUNTLEIGH**

**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis          IN     46268

8909 Purdue Rd, Ste 300

**Special Instructions:**

EMAIL: AP@FLYFRONTIER.COM

| | Invoice | |
|---|---|---|
| **Account:** | FRONTIER | |
| **Inv. Date:** | 6/2/2015 | |
| **Inv. No.:** | 0000083791 | |
| **Job Number:** | 0000090012 | |
| **Master Job:** | 0000251101 | |
| **Contract:** | | |

AUSTIN, TX
AUS AIRPORT

Austin                    TX      78719

Period of service 05/01/15 - 05/31/15

| Description | | Quantity | Rate | Amount |
|---|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT<br>Passenger Alloc, Passenger Count = 20189 | FRONTIER AIRLINES<br>AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | 1 | $5,270.93 | $5,270.93 |

### PASSENGER COUNT SUMMARY

| SERVICE LOCATION<br>PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL<br>TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN<br>05/01/15 - 05/31/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 3,678.25 | 53.00 | 153.25 | $39,394.06 | $851.71 | $2,462.73 | $42,708.50 |
| | MANAGEMENT FEE | $15.56 | $15.56 | $15.56 | 173.34 | 0.00 | 0.00 | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 454.00 | 0.00 | 17.50 | $5,175.60 | $0.00 | $299.25 | $5,474.85 |
| Sub-total | | | | | 4,305.59 | 53.00 | 170.75 | $47,266.83 | $851.71 | $2,761.98 | $50,880.52 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $50,880.52 |

| Total Carriers: | 7 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 215,284 | BILLING BASED ON PASSENGER COUNTS AND/OR BASE PERCENTAGE | | | | | | | | |
| Base percentage: | 20% | Base Amount: | $10,176.10 | | | | | | | |
| | | Amt by Pax : | $40,704.42 | | | | | | | |

| CLIENT NAME | Job No | Board<br>count | Board Pct | Board Amt | Shared<br>Svcs | | | | Tax<br>Amount | Invoice<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 62,542 | 29.0974% | $11,843.92 | $1,453.73 | | | | | $13,297.65 |
| CONTINENTAL | 0000090008 | 12,464 | 5.7899% | $2,356.61 | $1,453.73 | | | | | $3,810.34 |
| JETBLUE | 0000090009 | 27,423 | 12.7381% | $5,184.95 | $1,453.73 | | | | | $6,638.68 |
| FRONTIER | 0000090012 | 20,189 | 9.3779% | $3,817.20 | $1,453.73 | | | | | $5,270.93 |
| UNITED | 0000090013 | 71,643 | 33.2784% | $13,545.77 | $1,453.73 | | | | | $14,999.50 |
| MESA/ USAIR | 0000090014 | 11,953 | 5.5522% | $2,259.99 | $1,453.73 | | | | | $3,713.72 |
| USAIR | 0000090017 | 8,970 | 4.1666% | $1,695.99 | $1,453.73 | | | | | $3,149.71 |
| Totals for Pax distribution | | 215,284 | 100.00% | $40,704.42 | $10,176.10 | | | | | $50,880.52 |

**Period of service 05/01/15 - 05/31/15**

| | |
|---|---|
| **Subtotal:** | $5,270.93 |
| **Tax and/or User fee:** | $0.00 |
| **Freight:** | $0.00 |
| **Total:** | $5,270.93 |
| **Payments/Credits:** | $0.00 |
| **Balance:** | $5,270.93 |

Huntleigh USA
(972)915-1247

### Remittance Advice:

Remit To:   Huntleigh USA Corp
            Dept# 96-0429
            Oklahoma City, OK 73196-0429

| | |
|---|---|
| **Account:** | FRONTIER |
| **Inv. Date:** | 6/22/2015 |
| **Inv. No.:** | 0000083791 |
| **Job Number:** | 0000090012<br>06/22 |

**Amount Paid:** _____



**HUNTLEIGH**

Bill To:
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis          IN      46268

**Invoice**

8909 Purdue Rd, Ste 300

Special Instructions:

EMAIL: AP@FLYFRONTIER.COM

Account: FRONTIER
Inv. Date: 7/28/2015
Inv. No.: 0000084398
Job Number: 0000090012
Master Job: 0000251101
Contract:

AUSTIN, TX
AUS AIRPORT

Austin                TX      78719

Period of service 06/01/15 to 06/30/15

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT          FRONTIER AIRLINES | 1 | $5,811.86 | $5,811.86 |
| Passenger Alloc, Passenger Count = 21346     AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

## PASSENGER COUNT SUMMARY

| SERVICE LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN 06/01/15 - 06/30/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 4,632.75 | 0.00 | 0.00 | $48,645.75 | $0.00 | $0.00 | $48,645.75 |
| | MANAGEMENT FEE | $15.55 | $15.55 | $15.55 | 173.34 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 574.75 | 0.00 | 0.00 | $6,552.15 | $0.00 | $0.00 | $6,552.15 |
| Sub-total | | | | | 5,280.84 | 0.00 | 0.00 | $57,795.07 | $0.00 | | $57,795.07 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL. | | | | | | | | | | | $57,795.07 |

Total Carriers:       8
                     226,004            BILLING BASED ON PASSENGER COUNTS AND / OR BASE PERCENTAGE
Base percentage:      20%          Base Amount:     $11,559.01
                                   Amt by Pac:      $46,236.06

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Save | | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 68,230 | 30.1933% | $13,960.19 | $1,444.88 | | | | | $15,405.05 |
| CONTINENTAL | 0000090008 | 26,138 | 11.5653% | $5,347.33 | $1,444.88 | | | | | $6,792.21 |
| JETBLUE | 0000090009 | 26,412 | 11.6865% | $5,403.30 | $1,444.88 | | | | | $6,848.20 |
| FRONTIER | 0000090012 | 21,346 | 9.4450% | $4,366.98 | $1,444.88 | | | | | $5,811.86 |
| UNITED | 0000090013 | 62,030 | 27.4484% | $12,690.14 | $1,444.88 | | | | | $14,135.02 |
| MESA/ USAIR | 0000090014 | 11,255 | 4.9800% | $2,302.56 | $1,444.88 | | | | | $3,747.43 |
| USAIR | 0000090017 | 8,635 | 3.8207% | $1,766.56 | $1,444.88 | | | | | $3,211.43 |
| PSA/ USAIR | 0000091387 | 1,950 | 0.8628% | $398.93 | $1,444.88 | | | | | $1,843.81 |
| Totals for Pac distribution | | 226,004 | 100.00% | $46,236.06 | $11,559.01 ·· | | | | | $57,795.07 |

**Period of service 06/01/15 to 06/30/15**

| | |
|---|---|
| Subtotal: | $5,811.86 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $5,811.86 |
| Payments/Credits: | $0.00 |
| Balance: | $5,811.86 |

Huntleigh USA

(972)915-1247

## Remittance Advice:

Remit To:   Huntleigh USA Corp
            Dept# 96-0429
            Oklahoma City, OK 73196-0429

Account: FRONTIER
Inv. Date: 7/28/2015
Inv. No.: 0000084398
Job Number: 0000090012
07/28

Amount Paid:_____



**HUNTLEIGH**

**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable          8909 Purdue Rd, Ste 300
Indianapolis                    IN          46268

| **Invoice** | |
|---|---|

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 8/2/2015 |
| Inv. No.: | 0000084983 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin                    TX          78719

**Special Instructions:**

EMAIL: AP@FLYFRONTIER.COM

Period of service 07/01/15 - 07/31/15

| Description | | Quantity | Rate | Amount |
|---|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT | FRONTIER AIRLINES | 1 | $5,386.51 | $5,386.51 |
| Passenger Alloc, Passenger Count = 22263 | AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

## PASSENGER COUNT SUMMARY

| SERVICE LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN 07/01/15 - 07/31/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 6,451.75 | 0.00 | 152.75 | $69,390.24 | $0.00 | $2,454.69 | $60,942.93 |
| | MANAGEMENT FEE | $16.56 | $16.56 | $16.56 | 173.34 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 670.75 | 0.00 | 18.25 | $6,506.55 | $0.00 | $312.00 | $6,618.63 |
| Sub-total | | | | | 6,195.84 | 0.00 | 171.00 | $67,591.96 | $0.00 | $2,766.77 | $70,358.73 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $70,358.73 |

| Total Carriers: | 9 | | | | | | |
|---|---|---|---|---|---|---|---|
| Base percentage: | 20% | Base Amount: | $14,071.75 | | | | |
| | | Amt by Pac: | $56,286.98 | | | | |

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svcs | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 67,957 | 20.6186% | $11,649.32 | $1,563.63 | | | | $13,112.84 |
| CONTINENTAL | 0000090008 | 22,950 | 6.9710% | $3,923.78 | $1,563.63 | | | | $5,487.31 |
| JETBLUE | 0000090009 | 24,537 | 7.4857% | $4,213.47 | $1,563.63 | | | | $5,777.00 |
| FRONTIER | 0000090012 | 22,263 | 6.7920% | $3,822.96 | $1,563.63 | | | | $5,386.51 |
| UNITED | 0000090013 | 70,195 | 21.3876% | $12,038.37 | $1,563.63 | | | | $13,601.99 |
| MESA/ USAIR | 0000090014 | 8,673 | 2.6459% | $1,489.32 | $1,563.63 | | | | $3,052.85 |
| USAIR | 0000090017 | 11,024 | 3.3632% | $1,893.03 | $1,563.63 | | | | $3,456.66 |
| PSA/ USAIR | 0000091367 | 6,590 | 1.7176% | $966.70 | $1,563.63 | | | | $2,530.31 |
| AMERICAN | 0000091395 | 95,646 | 29.1186% | $16,389.91 | $1,563.63 | | | | $17,953.44 |
| Totals for Pac distribution | | 327,765 | 100.00% | $56,286.97 | $14,071.75 | | | | $70,358.72 |

**Period of service 07/01/15 - 07/31/15**

| Subtotal: | $5,386.51 |
|---|---|
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $5,386.51 |
| Payments/Credits: | $0.00 |
| Balance: | $5,386.51 |

Huntleigh USA

(972)915-1247

## Remittance Advice:

Remit To:   Huntleigh USA Corp
                Dept# 96-0429
                Oklahoma City, OK 73196-0429

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 8/21/2015 |
| Inv. No.: | 0000084983 |
| Job Number: | 0000090012 |
| | 08/21 |

**Amount Paid:** _____



**HUNTLEIGH**

Bill To:
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis        IN        46268

| **Invoice** | |
| --- | --- |

8909 Purdue Rd, Ste 300

*Special Instructions:*

EMAIL: AP@FLYFRONTIER.COM

| Account: | FRONTIER |
| --- | --- |
| Inv. Date: | 9/2/2015 |
| Inv. No.: | 0000085517 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin        TX        78719        Period of service 08/01/15 - 08/31/15

| Description | | Quantity | Rate | Amount |
| --- | --- | --- | --- | --- |
| 251-0601  AUS - PASSENGER COUNT | FRONTIER AIRLINES | 1 | $5,770.83 | $5,770.83 |
| Passenger Alloc, Passenger Count = 19570 | AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

## PASSENGER COUNT SUMMARY

| SERVICE/LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| AUS-AUSTIN 0601/15 - 08/31/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 6,062.00 | 0.00 | 0.00 | $64,924.02 | $0.00 | $0.00 | $64,924.02 |
| | MANAGEMENT FEE | $15.56 | $15.56 | $15.56 | 173.34 | 0.00 | 0.00 | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 817.50 | 0.00 | 0.00 | $9,319.50 | $0.00 | $0.00 | $9,319.50 |
| Sub-total | | | | | 7,052.84 | 0.00 | 0.00 | $76,940.69 | $0.00 | $0.00 | $76,940.69 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $76,940.69 |
| Total Carriers: | 9 | | | | | | | | | | |
| Base percentage: | 20% | Base Amount: | | $15,388.14 | | | | | | | |
| | | Amt by Pax : | | $61,552.55 | | | | | | | |

BILLING BASED ON PASSENGER COUNTS AND / OR BASE PERCENTAGE

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Scvs | | Tax Amount | Invoice Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| DELTA | 0000251101 | 61,485 | 20.7285% | $12,759.94 | $1,709.79 | | | $14,469.74 |
| CONTINENTAL | 0000000006 | 24,862 | 8.3818% | $5,159.19 | $1,709.79 | | | $6,868.99 |
| JETBLUE | 0000000009 | 22,985 | 7.7490% | $4,769.69 | $1,709.79 | | | $6,479.48 |
| FRONTIER | 0000090012 | 19,570 | 6.5977% | $4,061.03 | $1,709.79 | | | $5,770.83 |
| UNITED | 0000090013 | 61,401 | 20.7002% | $12,741.51 | $1,709.79 | | | $14,451.31 |
| MESA/ USAIR | 0000090014 | 5,279 | 1.7797% | $1,095.46 | $1,709.79 | | | $2,805.26 |
| USAIR | 0000090017 | 10,412 | 3.5102% | $2,160.63 | $1,709.79 | | | $3,870.42 |
| PSA/ USAIR | 0000091387 | 5,397 | 1.8195% | $1,119.95 | $1,709.79 | | | $2,829.74 |
| AMERICAN | 0000091386 | 85,229 | 28.7334% | $17,686.14 | $1,709.79 | | | $19,395.93 |
| Totals for Pax distribution | | 296,620 | 100.00% | $61,552.56 | $15,388.14 | | | $76,940.70 |

Period of service 08/01/15 - 08/31/15

| Subtotal: | $5,770.83 |
| --- | --- |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $5,770.83 |
| Payments/Credits: | $0.00 |
| Balance: | $5,770.83 |

Huntleigh USA

(972)915-1247

## Remittance Advice:

Remit To:  Huntleigh USA Corp
                   Dept# 96-0429
                   Oklahoma City, OK 73196-0429

| Account: | FRONTIER |
| --- | --- |
| Inv. Date: | 9/17/2015 |
| Inv. No.: | 0000085517 |
| Job Number: | 0000090012 |
| | 09/17 |

**Amount Paid:** _____



**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis          IN     46268

## Invoice

8909 Purdue Rd, Ste 300

**Special Instructions:**

EMAIL: AP@FLYFRONTIER.COM

| | |
|---|---|
| Account: | FRONTIER |
| Inv. Date: | 10/3/2015 |
| Inv. No.: | 0000086134 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin            TX      78719

Period of service 09/01/15 - 09/30/15

| Description | | Quantity | Rate | Amount |
|---|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT | FRONTIER AIRLINES | 1 | $5,593.64 | $5,593.64 |
| Passenger Alloc, Passenger Count = 18382 | AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | |

### PASSENGER COUNT SUMMARY

| SERVICE LOCATION PERIOD | DESCRIPTION | REG. RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN 09/01/15 - 09/30/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 5,434.50 | 0.00 | 195.76 | $58,203.00 | $0.00 | $3,145.70 | $61,349.20 |
| | MANAGEMENT FEE | $16.56 | $16.56 | $16.56 | 173.34 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 834.00 | 0.00 | 43.25 | $9,607.60 | $0.00 | $739.68 | $10,347.18 |
| Sub-total | | | | | 6,441.84 | 0.00 | 239.00 | $70,498.27 | $0.00 | $3,885.28 | $74,293.55 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $74,293.55 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Carriers: | 9 | | | | | |
| | 277,104 | BILLING BASED ON PASSENGER COUNTS AND/OR BASE PERCENTAGE | | | | |
| Base percentage: | 20% | Base Amount | $14,858.71 | | | |
| | | Amt by Pax : | $59,434.84 | | | |

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svcs | | | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 53,697 | 19.3779% | $11,517.24 | $1,650.97 | | | | | | $13,166.20 |
| CONTINENTAL | 0000090008 | 26,293 | 9.4885% | $5,639.47 | $1,650.97 | | | | | | $7,290.44 |
| JETBLUE | 0000090009 | 20,092 | 7.2507% | $4,309.45 | $1,650.97 | | | | | | $5,960.42 |
| FRONTIER | 0000090012 | 18,382 | 6.6336% | $3,942.69 | $1,650.97 | | | | | | $5,593.64 |
| UNITED | 0000090013 | 53,695 | 19.3411% | $11,495.36 | $1,650.97 | | | | | | $13,146.33 |
| MESA/ USAIR | 0000090014 | 6,342 | 2.2887% | $1,360.27 | $1,650.97 | | | | | | $3,011.24 |
| USAIR | 0000090017 | 12,606 | 4.5492% | $2,703.00 | $1,650.97 | | | | | | $4,354.77 |
| PSA/ USAIR | 0000091387 | 3,242 | 1.1700% | $695.36 | $1,650.97 | | | | | | $2,346.33 |
| AMERICAN | 0000091395 | 82,655 | 29.9003% | $17,771.21 | $1,650.97 | | | | | | $19,422.18 |
| Totals for Pax distribution | | 277,104 | 100.00% | $59,434.04 | $14,858.71 | | | | | | $74,293.55 |

---

**Period of service 09/01/15 - 09/30/15**

| | |
|---|---|
| Subtotal: | $5,593.64 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $5,593.64 |
| Payments/Credits: | $0.00 |
| $USD Balance: | $5,593.64 |

---

Huntleigh USA

(972)915-1247

### Remittance Advice:

Remit To:   Huntleigh USA Corp
           Dept# 96-0429
           Oklahoma City, OK 73196-0429

| | |
|---|---|
| Account: | FRONTIER |
| Inv. Date: | 10/13/2015 |
| Inv. No.: | 0000086134 |
| Job Number: | 0000090012 |
| | 10/13 |

**Amount Paid:** _____



# HUNTLEIGH

**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis          IN          46268

| | **Invoice** | |
|---|---|---|

8909 Purdue Rd, Ste 300

**Special Instructions:**

EMAIL: AP@FLYFRONTIER.COM

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 11/2/2015 |
| Inv. No.: | 0000086692 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin                    TX          78719                                                          Period of service 10/01/15 - 10/31/15

| Description | | Quantity | Rate | Amount |
|---|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT                    FRONTIER AIRLINES | | 1 | $6,203.24 | $6,203.24 |
| Passenger Alloc, Passenger Count = 17786          AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | | |

## PASSENGER COUNT SUMMARY

| SERVICE LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN | | | | | | | | | | | |
| 10/01/15 - 10/31/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 6,712.25 | 15.42 | 0.00 | $71,888.20 | $247.80 | $0.00 | $72,136.00 |
| | MANAGEMENT FEE | $15.56 | $15.56 | $15.56 | 173.34 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 896.50 | 0.00 | 0.00 | $10,220.10 | $0.00 | $0.00 | $10,220.10 |
| Sub-total | | | | | 7,782.09 | 15.42 | 0.00 | $84,805.47 | $247.80 | $0.00 | $85,053.27 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $85,053.27 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total Carriers: | 8 | | | | | | | | |
| Base percentage: | 20% | Base Amount: $17,010.65 | | | | | | | |
| | | Amt by Pac : $68,042.62 | | | | | | | |

BILLING BASED ON PASSENGER COUNTS AND / OR BASE PERCENTAGE

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svcs | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 62,829 | 21.1857% | $14,401.67 | $2,126.33 | | | | $16,528.00 |
| CONTINENTAL | 0000090006 | 32,766 | 11.0349% | $7,508.33 | $2,126.33 | | | | $9,634.66 |
| JETBLUE | 0000090009 | 20,732 | 6.9841% | $4,752.19 | $2,126.33 | | | | $6,878.52 |
| FRONTIER | 0000090012 | 17,786 | 5.9917% | $4,076.91 | $2,126.33 | | | | $6,203.24 |
| UNITED | 0000090013 | 56,034 | 18.8706% | $12,844.12 | $2,126.33 | | | | $14,970.45 |
| MESA/ AMERICAN | 0000090014 | 3,449 | 1.1619% | $790.58 | $2,126.33 | | | | $2,916.91 |
| PSA/ AMERICAN | 0000091387 | 2,259 | 0.7610% | $517.91 | $2,126.33 | | | | $2,644.14 |
| AMERICAN | 0000091395 | 100,989 | 34.0243% | $23,151.00 | $2,126.33 | | | | $25,277.34 |
| Totals for Pac distribution | | 296,644 | 100.00% | $68,042.62 | $17,010.65 | | | | $85,053.27 |

---

**Period of service 10/01/15 - 10/31/15**

| | |
|---|---|
| Subtotal: | $6,203.24 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $6,203.24 |
| Payments/Credits: | $0.00 |
| $USD Balance: | $6,203.24 |

---

Huntleigh USA

(972)915-1247

## Remittance Advice:

Remit To:  Huntleigh USA Corp
Dept# 96-0429
Oklahoma City, OK 73196-0429

| Account: | FRONTIER |
|---|---|
| Inv. Date: | 11/11/2015 |
| Inv. No.: | 0000086692 |
| Job Number: | 0000090012 |
| | 11/11 |

**Amount Paid:** _____



**HUNTLEIGH**

**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis          IN

8909 Purdue Rd, Ste 300
46268

| **Invoice** |

**Special Instructions:**

EMAIL: AP@FLYFRONTIER.COM

| Account: | FRONTIER |
| Inv. Date: | 12/3/2015 |
| Inv. No.: | 0000087712 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin          TX      78719

Period of service 11/01/15 - 11/30/15

| Description | | Quantity | Rate | Amount |
|---|---|---|---|---|
| 251-0601   AUS - PASSENGER COUNT          FRONTIER AIRLINES | | 1 | $5,402.85 | $5,402.85 |
| Passenger Alloc, Passenger Count = 11493          AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | | | | |

## PASSENGER COUNT SUMMARY

| SERVICE LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS-AUSTIN 11/01/15 - 11/30/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 6,823.71 | 100.00 | 207.50 | $73,081.93 | $1,607.00 | $3,334.53 | $78,023.46 |
| | MANAGEMENT FEE | $16.66 | $16.66 | $16.66 | 173.34 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 766.50 | 0.00 | 23.75 | $8,738.10 | $0.00 | $406.13 | $9,144.23 |
| Sub-total | | | | | 7,763.55 | 100.00 | 231.25 | $84,517.20 | $1,607.00 | $3,740.66 | $89,864.86 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $89,864.86 |

| Total Carriers: | 7 | | | | | | | | | | |
| Base percentage: | 20% | Base Amount: | $17,972.97 | | | | | | | | |
| | | Amt by Pac: | $71,891.69 | | | | | | | | |

BILLING BASED ON PASSENGER COUNTS AND/OR BASE PERCENTAGE

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svcs | | | | Tax Amount | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|
| DELTA | 0000251101 | 57,638 | 19.8471% | $14,268.45 | $2,567.57 | | | | | $16,836.02 |
| CONTINENTAL | 0000090006 | 29,973 | 10.2662% | $7,394.25 | $2,567.57 | | | | | $9,961.81 |
| JETBLUE | 0000090009 | 20,126 | 6.9062% | $4,965.02 | $2,567.57 | | | | | $7,532.59 |
| FRONTIER | 0000090012 | 11,493 | 3.9439% | $2,835.29 | $2,567.57 | | | | | $5,402.85 |
| UNITED | 0000090013 | 52,007 | 17.8462% | $12,829.96 | $2,567.57 | | | | | $15,397.53 |
| PSA/ AMERICAN | 0000091367 | 2,052 | 0.7041% | $506.22 | $2,567.57 | | | | | $3,073.79 |
| AMERICAN | 0000091395 | 117,929 | 40.4573% | $29,092.71 | $2,567.57 | | | | | $31,660.27 |
| Totals for Pac distribution | | 291,418 | 100.00% | $71,891.69 | $17,972.97 | | | | | $89,864.86 |

**Period of service 11/01/15 - 11/30/15**

| Subtotal: | $5,402.85 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $5,402.85 |
| Payments/Credits: | $0.00 |
| $USD Balance: | $5,402.85 |

Huntleigh USA

(972)915-1247

## Remittance Advice:

Remit To:   Huntleigh USA Corp
Dept# 96-0429
Oklahoma City, OK 73196-0429

| Account: | FRONTIER |
| Inv. Date: | 12/11/2015 |
| Inv. No.: | 0000087712 |
| Job Number: | 0000090012 |
| | 12/11 |

**Amount Paid:** _____



**HUNTLEIGH**

**Bill To:**
Frontier Airline Inc
Republic Airways Holdings
C/O Frontier Accounts Payable
Indianapolis          IN          46268

### Invoice

8909 Purdue Rd, Ste 300

_Special Instructions:_

EMAIL: AP@FLYFRONTIER.COM

| Account: | FRONTIER |
| --- | --- |
| Inv. Date: | 1/2/2016 |
| Inv. No.: | 0000088348 |
| Job Number: | 0000090012 |
| Master Job: | 0000251101 |
| Contract: | |

AUSTIN, TX
AUS AIRPORT

Austin          TX          78719          Period of service 12/01/15 - 12/31/15

| Description | | Quantity | Rate | Amount |
| --- | --- | --- | --- | --- |
| 251-0601   AUS - PASSENGER COUNT<br>Passenger Alloc, Passenger Count = 12471 | FRONTIER AIRLINES<br>AUS - WHEELCHAIR/ SUPV (FIXED) (SUBCAR | 1 | $5,537.50 | $5,537.50 |

## PASSENGER COUNT SUMMARY

| SERVICE LOCATION PERIOD | DESCRIPTION | REG RATE | OT RATE | HOL RATE | REG HOURS | OT HOURS | HOL HOURS | REG TOTAL | OT TOTAL | HOL TOTAL | TOTAL |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| AUS-AUSTIN<br>12/01/15 - 12/31/15 | WHEELCHAIR AGT | $10.71 | $16.07 | $16.07 | 6,444.40 | 191.67 | 227.00 | $69,019.52 | $1,633.84 | $3,647.88 | $74,301.25 |
| | MANAGEMENT FEE | $15.56 | $15.56 | $15.56 | 173.34 | | | $2,697.17 | $0.00 | $0.00 | $2,697.17 |
| | SUPERVISOR | $11.40 | $17.10 | $17.10 | 857.50 | 1.25 | 34.60 | $9,775.50 | $21.38 | $589.95 | $10,386.83 |
| Sub-total | | | | | 7,475.24 | 192.92 | 261.60 | $81,492.19 | $1,655.22 | $4,237.84 | $87,385.26 |
| User Fee | | | | | | | | | | | $0.00 |
| Total Admin. Fee | | | | | | | | | | | $0.00 |
| Total Expenses | | | | | | | | | | | $0.00 |
| TOTAL | | | | | | | | | | | $87,385.26 |

| Total Carriers: | 7 | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Base percentage: | 286,711<br>20% | BILLING BASED ON PASSENGER COUNTS AND/ OR BASE PERCENTAGE<br>Base Amount:   $17,477.05<br>Amt by Pac :   $69,908.20 | | | | | | | | |

| CLIENT NAME | Job No | Board count | Board Pct | Board Amt | Shared Svcs | | | | Tax Amount | Invoice Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| DELTA | 0000251101 | 59,085 | 20.2521% | $14,157.86 | $2,496.72 | | | | | $16,654.60 |
| CONTINENTAL | 0000000008 | 28,555 | 9.9596% | $6,962.51 | $2,496.72 | | | | | $9,459.24 |
| JETBLUE | 0000000009 | 21,881 | 7.6317% | $5,335.21 | $2,496.72 | | | | | $7,831.93 |
| FRONTIER | 0000090012 | 12,471 | 4.3497% | $3,040.78 | $2,496.72 | | | | | $5,537.50 |
| UNITED | 0000090013 | 55,229 | 19.2630% | $13,466.38 | $2,496.72 | | | | | $15,963.10 |
| PSA/ USAIR | 0000091397 | 3,840 | 1.3393% | $936.30 | $2,496.72 | | | | | $3,433.02 |
| AMERICAN | 0000091395 | 106,670 | 37.2047% | $26,009.14 | $2,496.72 | | | | | $28,505.86 |
| Totals for Pac distribution | | 286,711 | 100.00% | $69,908.21 | $17,477.05 | | | | | $87,385.26 |

---

**Period of service 12/01/15 - 12/31/15**

| | |
| --- | --- |
| Subtotal: | $5,537.50 |
| Tax and/or User fee: | $0.00 |
| Freight: | $0.00 |
| Total: | $5,537.50 |
| Payments/Credits: | $0.00 |
| $USD Balance: | $5,537.50 |

---

Huntleigh USA

(972)915-1247

### Remittance Advice:

Remit To:   Huntleigh USA Corp
Dept# 96-0429
Oklahoma City, OK 73196-0429

| Account: | FRONTIER |
| --- | --- |
| Inv. Date: | 1/12/2016 |
| Inv. No.: | 0000088348 |
| Job Number: | 0000090012 |
| | 01/12 |

**Amount Paid:** _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **MAXINE WHITE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **FRONTIER AIRLINES, INC.,** | § | |
| | § | |
| **Defendant/Third Party Plaintiff,** | § | |
| | § | **CIVIL ACTION NO.  1:16-CV-1266(LY)** |
| **v.** | § | |
| | § | **JURY DEMAND** |
| **THE AUSTIN FIRE DEPARTMENT,** | § | |
| **THE CITY OF AUSTIN AVIATION** | § | |
| **DEPARTMENT,          AUSTIN-** | § | |
| **BERGSTROM     INTERNATIONAL** | § | |
| **AIRPORT,** | § | |
| **THE CITY OF AUSTIN AND** | § | |
| **HUNTLEIGH USA CORPORATION,** | § | |
| | § | |
| **Third-Party Defendants.** | | |

---

### AFFIDAVIT OF TIMOTHY S. POLGAR

---

| | |
|---|---|
| **STATE OF COLORADO** | § |
| | § |
| **COUNTY OF DENVER** | § |

**BEFORE ME**, the undersigned authority, on this day personally appeared Timothy S. Polgar, who under oath stated as follows:

1.      My name is Timothy S. Polgar, Director of Ground Handling Contracts for Frontier Airlines, Inc. ("Frontier"). I am over eighteen (18) years of age. I have never been convicted of a crime and am legally competent to make this Affidavit, which is true and correct, is based on my personal knowledge, and is made voluntarily and not under duress.

---

EXHIBIT D

2.      I have been in this position since October 5, 2015.  I have worked in the airline industry for over 15 years.

3.      I have reviewed the Motion to Dismiss filed by Huntleigh USA Corporation ("Huntleigh"), Frontier's documents related to the incident, Frontier's invoices from Huntleigh, Plaintiff's Complaint, Frontier's Third-Party Complaint and various contracts between Huntleigh and Frontier.

4.      Frontier flies to over 60 airports.  At each of those airports, wheelchair services are available to Frontier's customers and are provided by various outside vendors hired by Frontier. To be clear, Frontier outsources the entirety of wheelchair services to third-party vendors and does not, at any airport where it flies, provide any such services directly to its customers.

5.      Frontier currently uses Huntleigh as its wheelchair service provider at several airport locations, including Austin, Cleveland, Portland, Colorado Springs, Kansas City, New Orleans, and Washington (DCA). In fact, Huntleigh recently executed the proposed renewal of the Frontier/Huntleigh contract for Austin Bergstrom International Airport ("AUS"), attached hereto as Exhibit 1.

6.      Frontier regularly extends to Huntleigh opportunities to obtain additional business by providing wheelchair services to Frontier's customers at other airports.

7.      At each airport, Huntleigh is retained to provide wheelchair services that comport with industry standards, including, without limitation, compliance with 14 CFR 382[1], which includes providing special equipment and specially trained personnel to assist persons with

---

[1] Huntleigh's own website identifies that its personnel training comports and complies with 14 CFR 382. http://www.huntleighusa.com/aviationrelatedservices.html.

reduced mobility in accordance with all Federal, State, local, and airport rules and regulations, as well as the CFR requirements that apply to those services.

8.     Frontier does not provide any wheelchair services through any of its own personnel.  On the day of the alleged incident involving Ms. Maxine White, Huntleigh provided the wheelchair services to Frontier's customers, and Flight Services & Systems ("FSS") provided the ramp handling and customer support (check-in, ticketing, gate functions, etc.) services. FSS is also an independent contractor to Frontier. No Frontier employees were directly involved with the interactions with Ms. White on the day of the alleged incident.

9.     On the day of the alleged incident involving Ms. White, Frontier had not retained, formally or informally, directly or indirectly, any party other than Huntleigh to provide wheelchair services to Frontier's customers.

10.    As of the date of this Affidavit, Frontier has been unable to locate the written agreement between Frontier and Huntleigh for the wheelchair services that Huntleigh provided to Frontier's customers at AUS which was in effect on the date of the alleged incident.

11.    However, as a sample of the contractual terms into which Frontier regularly enters with Huntleigh, attached hereto as <u>Exhibit 2</u> are currently binding written contracts executed by Huntleigh for the performance of services at the Austin, Cleveland, Kansas City, New Orleans, Portland, and Colorado Springs airports, all of which contain almost identical indemnification and services provisions that are consistent with terms agreed upon between Frontier and other wheelchair service providers.

12.    In relevant part, each and every contract provides that Huntleigh will:

    (p)rovide special equipment, facilities, and specially trained personnel, for assistance to persons with reduced mobility (PRMs) ("Wheelchair Services").

_____

13.   With respect to liability, indemnity and insurance, Huntleigh regularly agrees to:

indemnify, defend and hold harmless Frontier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by Huntleigh (or anyone directly or indirectly employed by Huntleigh or anyone for whose acts Huntleigh may be liable) in the performance or non-performance of services, including but not limited to death of or injury to any person or persons….

14.   Additionally, Huntleigh regularly agrees to:

Defend, indemnify and hold (Frontier) harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services under Annex B including, without limitation, DOT, FAA, CBP, EPA or any Airport Authority and/or any violation of any environmental laws or regulations, arising out of the acts or omissions of (Huntleigh's) employees, agents or subcontractors.

15.   With respect to insurance, Huntleigh regularly agrees to provide insurance for Frontier and Frontier is listed as an Additional Insured under Huntleigh's insurance policy.

16.   With respect to subcontracting, Huntleigh regularly agrees that they will not subcontract wheelchair services out to another party.

17.   While Frontier was the carrier with which Plaintiff chose to travel, Huntleigh was (and still is) responsible under contract, express or implied, to ensure all of Frontier's customers, including the Plaintiff, are safely transported, without injury, between the terminal and the airplane.

18.   Frontier's Federal Aviation Administration accepted Customer Service Manual permits the carrying of a passenger, strapped into an aisle chair, up the stairs to an aircraft when boarding from the ramp is necessitated and a boarding ramp is not available.

19.   If there was, or is, ever an issue or concern with boarding a customer onto a Frontier airplane at AUS, it was, and is, Huntleigh's responsibility to provide the service and to

obtain the passenger's consent to such service.  If the passenger did, or does, not consent, it was, and is, Huntleigh's obligation to involve a Frontier Complaint Resolution Officer to resolve the issue with the customer, and to instruct Frontier on what requirements and protocol must be followed pursuant to Huntleigh's service guidelines.

20.     On the day of the alleged incident, Huntleigh was the only company that Frontier retained to provide wheelchair services to Frontier's customers at AUS.

21.     Frontier paid Huntleigh for providing wheelchair services to Frontier's customers at AUS on the day of the alleged incident.

22.     When Maxine White arrived at AUS on the day of the alleged incident, the only service provider from whom she could have received wheelchair services was Huntleigh. Similarly, the only customer service representative with which she could have engaged in connection with her Frontier flight was FSS, as Frontier's engaged independent contractor. Frontier had no other representatives on site at AUS on the day in question.

23.     If Huntleigh did not provide wheelchair services to the Plaintiff when the Plaintiff was a traveling customer of Frontier's on the day of the alleged incident, then Huntleigh's omission would have been in breach of its agreement (express or implied) with Frontier for Huntleigh to provide such services for which Frontier paid Huntleigh. With respect to Maxine White, it was Huntleigh's responsibility to provide wheelchair services to her on Frontier's behalf as Frontier's engaged third party vendor. Any failure by Huntleigh to provide wheelchair services to Maxine White (as Frontier's customer) is in violation of that responsibility. Allowing an improperly trained third party (public servant or otherwise) to provide wheelchair services to a Frontier customer is a violation of that responsibility.

*[Signature Carried Forward on Following Page]*

Further Affiant sayeth not.

Timothy S. Polgar, Affiant

**SUBSCRIBED AND SWORN TO** before me, the undersigned authority, on this _15ᵗʰ_ day of November, 2017, to certify which witness my hand and official seal.

Notary Public – State of _Colorado_

```
LINDSAY RYAN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20084019924
MY COMMISSION EXPIRES JUNE 12, 2020
```

**STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE**

**ANNEX B5.0 – LOCATION(s), AGREED SERVICES AND CHARGES**

to the Standard Ground Handling Agreement (SGHA) of 2013

| | |
|---|---|
| between: | **Frontier Airlines, Inc.** |
| having its principal office at: | 4545 Airport Way<br>Denver, CO 80239 |

and hereinafter referred to as the "Carrier"

| | |
|---|---|
| and: | **Huntleigh USA Corporation** |
| having its principal office at: | 545 E. John Carpenter Freeway, Suite 175<br>Irving, TX 75062 |

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

| | |
|---|---|
| effective from | September 16, 2017 |
| This Annex B5.0 for | |
| the location(s): | Austin-Bergstrom International Airport (the "Airport" and "AUS") |
| is valid from: | September 16, 2017 |
| and replaces: | N/A |

_____

**PREAMBLE:**

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full.  By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

_____

EXHIBIT 1

## PARAGRAPH 1.  HANDLING SERVICES AND CHARGES

1.1.  For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 2. PASSENGER SERVICES
**2.1.3**  When requested by the Carrier,
(a)  provide
special equipment and specially trained personnel, for assistance to
2.  persons with reduced mobility (PRMs) ("Wheelchair Services")
7.  other – line coordinator services

### SECTION 6. SUPPORT SERVICES
**6.2**      **Automated/Computer or Manual Recording Systems**
**6.2.2**  Perform the following functions in
(b)  Handling Company's system
for
(11) Other functions – Wheelchair Services dispatch, tracking, data compilation (request times, response times, move information, compliments, complaints, etc.)

1.2.      Rates (in USD) for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

| Hourly Resources | Regular Rate/Hr | Holiday/Overtime Rate/Hr |
|---|---|---|
| Wheelchair Agent | $10.71 | $16.07 |
| Supervisor | $11.40 | $17.10 |
| Management Fee | $15.56 | $15.56 |

Twenty percent (20%) of the total cost for the airport will be split evenly amongst all airlines/companies that are a party to the services and eighty percent (80%) of the cost will be allocated to the airlines/companies based on the proportion of the passengers such airline/company has out of the total number of passengers. For avoidance of doubt, the exact monthly amount that carrier will be charged may vary each month depending on the number of parties to the services and the total number of passengers each month.

Performance Credits (Effective October 1, 2017)

Monthly Performance

| | | Station Monthly Departures | | |
|---|---|---|---|---|
| | | <63 | 63-212 | >212 |
| Wheelchairs | <95% of Planned Pushes w/in 10 mins. | 1% off of monthly invoice | | |
| | <97% of Unplanned Pushes w/in 20 mins. | 1% off of monthly invoice | | |
| | >30 Minute Unattended or Wait(s) | $200 per Occurrence | | |
| | Missing Wheelchair Data | $200/Day | $500/Day | $1,000/Day |
| Complaint(s) | Verified complaint re service for which the Handling Company can't disprove | $50 per Occurrence | | |

| Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint |
|---|---|---|

1.3.   In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling Company may request a renegotiation of rates upon ninety (90) days' written notice to the Carrier.

1.4.   No extra charges beyond what is specifically stated above will be made for providing services on ~~legal holidays~~, weekends, evenings, or at night.

1.5.   Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

## PARAGRAPH 2.  ADDITIONAL SERVICES AND CHARGES

2.1.   All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3.  DISBURSEMENTS

3.1.   Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

## PARAGRAPH 4.  LIMIT OF LIABILITY AND INDEMNIFICATION

4.1    Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:
- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors.  However, nothing contained in this section shall be construed as an indemnity by the Handling Company against any loss, liability or claim caused solely by the acts or omissions of the

Carrier, its directors, officers, employees and agents, unless caused by the negligence or misconduct of Contractor, its directors, officers, employees or agents."

4.2    The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.

## PARAGRAPH 5.  INSURANCE

5.1.    The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1)    The Carrier is included as an Additional Insured as their interests may appear.

2)    All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3)    This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4)    Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5)    In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6)      Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6.  AREA OF RESPONSIBILITY

6.1     The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: None.

## PARAGRAPH 7.  TRANSFER OF SERVICES

7.1     Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

## PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT

8.1     Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH).  The Handling Company's invoices shall include the following information for payment:
         Bank Name: Bank of Texas
         ABA No. 111014325
         Credit the Account of: Huntleigh USA Corporation, 545 E. John Carpenter Freeway, Suite 175, Irving, TX 75062
         Acct. No. 8094121172
         Ref: _____
         Invoice Number(s):  _____

8.2     With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier through the Coupa Supplier Network.  All invoices must contain a description of the goods and/or services, the applicable pricing, and the purchase order number.  Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier on a monthly basis, after the completion of each calendar month of service.  Payment of undisputed amounts will be due thirty (30) days after the Carrier's receipt of each invoice.  In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing.  Both Parties shall then seek in good faith to resolve the disputed amount(s).  Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

## PARAGRAPH 9.  SUPERVISION AND ADMINISTRATION

9.1     The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for

the Carrier by other organization(s) under cover of separate agreement(s):  All Airport services.

## PARAGRAPH 10.  DURATION, MODIFICATION, AND TERMINATION

10.1   Duration

10.1.1 Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from September 16, 2017 through September 15, 2020 (the "Initial Term") and thereafter until terminated by either Party upon ninety (90) days' prior written notice to the other Party.

10.1.2 In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.2   Modification

10.2.1 Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3   Termination

10.3.1 Notwithstanding Sub-Paragraph 10.1.1 of this Annex B, this Annex B may be terminated by Carrier upon one-hundred-twenty (120) days' written notice to the Handling Company.

10.3.2 The Carrier will provide notice to the Handling Company of any service failures.  The Handling Company shall have thirty (30) days from written notice to cure any deficiencies.  After thirty (30) days if the deficiencies have not been sufficiently corrected to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement for cause upon 30 days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

10.3.3 In the event that the Handling Company plans to cease operations at the Airport, the Handling Company may terminate this Agreement without penalty upon ninety (90) days' written notice to the Carrier, on that condition that such termination shall not take place prior to the Handling Company's ceasing of all operations at the Airport.

## PARAGRAPH 11.  NOTIFICATION

11.1   In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

      To Carrier:
      Frontier Airlines, Inc.
      4545 Airport Way
      Denver, Colorado 80239
      U.S.A.
      Telephone:  720-374-4200
      Facsimile:  Not Authorized for Notification
      Attn:  General Counsel
      Attn:  Director, Ground Handling Contracts

To Handling Company:
Huntleigh USA Corporation
545 E. John Carpenter Freeway, Suite 175
Irving, TX 75062
U.S.A.
Telephone:  972-719-9182
Facsimile:  972-719-9181
Electronic Mail:  rsporn@huntleighusa.com
Attn:  Richard Sporn

## PARAGRAPH 12.  GOVERNING LAW

12.1    In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2    In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13.  FORCE MAJEURE

13.1    Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2    If either Party is affected by a Force Majeure event, such affected Party shall promptly notify the other Party of the nature and extent of the circumstances in question.

13.3    Notwithstanding any other provision of this Agreement neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, for any delay in performance or other non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to a Force Majeure event.

13.4    If any event of Force Majeure occurs, the date(s) for performance of the obligation(s) affected shall be postponed for so long as is made necessary by the event of Force Majeure, provided that if any Force Majeure event continues for a period exceeding one (1) month, either Party shall have the right to terminate this Annex B forthwith on written notice to the other Party.

13.5    The Party affected by Force Majeure shall take all reasonable steps available to it to minimize the effects of Force Majeure on the performance of its obligations under this Agreement.

13.6    For the purpose of this Agreement "Force Majeure" means any circumstances that is not reasonably foreseeable and beyond the reasonable control of the Party relating to its performance of this Annex B, including: acts of God, fires, floods, explosions, acts or restraints of governments or public authorities, war, revolution, riot or civil commotion, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences.

## PARAGRAPH 14.  TRAINING

14.1   All training shall be provided by the Handling Company and the Handling Company's sole expense.

14.2   No employee of the Handling Company may work a flight of the Carrier's unless training has been received, completed, and passed in accordance with the Handling Company's training policy.  Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

## PARAGRAPH 15.  COMPLIANCE WITH LAWS

15.1   The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

15.2   The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

15.3   Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B.  In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

15.4   Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

## PARAGRAPH 16.  CONFIDENTIALITY AND DATA PROTECTION

16.1   The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a

Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3    Prior written consent to any disclosure shall be obtained from the Carrier. In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

16.4    The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5    To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier. Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6    The obligations in this Paragraph 16 shall continue to bind the Parties after the
        expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17.  ANTI BRIBERY AND CORRUPTION

17.1    The Carrier has strict anti-corruption policies and practices. The Handling Company
        undertakes that it will not, at any time before, during, or after the term of this
        Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in
        relation to the transaction which is the subject of this agreement or the provision of the
        services which is capable of being interpreted as a corrupt practice or bribery for the
        purpose of any applicable law, US or other.

17.2    Each Party shall promptly report to the other Party any request or demand for any undue
        financial or other advantage of any kind received by it in connection with the
        performance of this Agreement or additional/other business.

## PARAGRAPH 18.  MISCELLANEOUS

18.1    Each provision of this Agreement is severable and distinct from the others.  Both Parties
        intend that every such provision shall be and remain valid and enforceable to the fullest
        extent permitted by law.  If any such provision is or at any time becomes to any extent
        invalid, illegal or unenforceable under any enactment or rule of law, it shall to that
        extent be deemed not to form part of this Agreement but (except to that extent in the
        case of that provision) it and all other provisions of this Agreement shall continue in full
        force and effect and their validity, legality and enforceability shall not be thereby
        affected or impaired.

18.2    In case of any inconsistency between this Annex B and the Main Agreement, the
        provisions of this Annex B shall prevail.

18.3    The relationship of the Parties is that of independent contractors dealing at arm's length.
        Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall
        constitute the Parties as partners, joint venturers or co-owners, or constitute either Party
        as the agent, employee or representative of the other, or empower either Party to act for,
        bind or otherwise create or assume any obligation on behalf of the other, and neither
        Party shall hold itself out as having authority to do the same. This Agreement does not
        prevent either of the Parties from entering into similar agreement with third parties in
        respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to
        this Agreement.

18.4    The Parties acknowledge and agree that a breach by the other Party of any of the terms
        of this Agreement may result in irreparable and continuing damage to the other for
        which there may or will be no adequate remedy at law, and that in the event of such
        breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a
        decree for specific performance and such other and further relief as may be appropriate.

18.5    This Agreement may be entered into in the form of two or more counterparts each
        executed by one or both of the Parties but, taken together, executed by both and,
        provided that both the Handling Company and the Carrier so enter into the Agreement,

each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6    All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program.  The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred.  The Handling Company is required to go through setup, maintain compliance, and will be responsible for all associated fees.  More information can be obtained at http://frontier.globalrms.com/.

Signed the ____ day of _____, 2017

At Denver, Colorado, U.S.A.

for and on behalf of
**Frontier Airlines, Inc.**

By: _____
Name: Howard Diamond
Title: SVP & General Counsel

Signed the 26 day of September, 2017

at _____ Irving , TX _____

for and on behalf of
**Huntleigh USA Corporation**

By: _____
Name: Richard Sporn
Title: CEO

# Frontier Airlines, Inc.

### Standard Agreement
### For
### Wheelchair Services
### For location
### Cleveland Hopkins International Airport ("CLE")

STANDARD GROUND HANDLING AGREEMENT — SIMPLIFIED PROCEDURE Annex B — Location(s), Agreed Services and Charges

to the Standard Ground Handling Agreement (SGHA) of January 2008

between:      FRONTIER AIRLINES, INC.

having its principal office at:    7001 TOWER ROAD, DENVER, CO 80249

and hereinafter referred to as 'the Carrier'

and:      HUNTLEIGH USA CORPORATION

having its principal office at:    545 E. JOHN CARPENTER FREEWAY, SUITE 175, IRVING, TX  75062


and hereinafter referred to as 'the Handling Company'

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

effective from: 12/16/15

This Annex B for the location(s):      CLE

replaces:      N/A

and is valid from:      12/16/15

PREAMBLE:

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of January 2008 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties mentioned confirm that they are familiar with the aforementioned Main Agreement and Annex A.

EXHIBIT 2

PARAGRAPH 1: HANDLING SERVICES AND CHARGES

1.1 For a single ground handling consisting of the arrival and the subsequent departure at agreed timings of the same aircraft, Handling Company shall provide the following services of Annex A at the following rates.

1.1.1     Section 2.1.3 as follows:

2.1.3 (a)(2) – Provide special equipment, facilities and specially trained personnel, for assistance to persons with reduced mobility (PRMs) ( "Wheelchair Services")

1.1.2     Service Level Agreement

Any "offsets," or credits, relating to the SLAs below shall be made no later than two months after the calendar month in which the SLA offset was incurred.  For example, if Wheelchair Service Request Responsiveness fell below 95 for the month of January, then the credit would appear in the March invoice sent to Carrier.

- Passenger Complaints – Handling Company shall provide an offset in the amount of $50 to Carrier for each passenger complaint submitted or received for which Handling Company was alleged at fault and for which Handling Company can't disprove.

- Wheelchair moves/pushes – the target service level for passenger wait time is 95% within 10 minutes of the request for Wheelchair Services.  The following scale will be used to determine service levels and associated Incentives / Penalties:

|  | Planned pushes | Unplanned pushes | Incentives / Penalties |
|---|---|---|---|
| Goal | Within 10 min. | Within 20 min. |  |
| Performance Level | <95% | <97% | (-1%) |
|  | 95.1% - 105% | 97.1 – 105% | 0% |
|  | >105.1% | No incentive due to incremental time | 1% |

1.2 Charges

1.2.1     For Wheelchair Services, Carrier shall pay Handling Company $ 50.00 per turn (flight arrival and departure).

1.2.2     In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling company will have the right to negotiate the per turn rates with 90 days advance written notice.

1.3 Handling Company will perform all the required security, background and drug checks according to the requirements of the U.S. Department of Transportation and Safety Administration and the United States Customs and Border Protection.

1.4 Handling Company will provide all wheelchairs required for the Wheelchair Services provided to the Carrier.  The Handling Company will be responsible for any Operational and Maintenance requirements for the wheelchairs and warrant their serviceability at all times

1.5 No extra charges shall apply for services provided at night, on Saturday or Sunday and legal holidays.

PARAGRAPH 2: ADDITIONAL SERVICES AND CHARGES

2.1 All services not included in Paragraph 1 of this Annex will be charged at the current market rate. The rate will reflect the time parameters of the agreement and be agreed upon in writing by both parties. Email notification and the corresponding conference will be validated by use of signed, copied, and scanned electronic documentation and provide satisfactory evidence of the arrangement.

PARAGRAPH 3: DISBURSEMENTS

3.1 Any disbursements made by the Handling Company on behalf of the Carrier will be reimbursed by the Carrier at cost price.

PARAGRAPH 4: LIABILITY, INDEMNITY AND INSURANCE

4.1 Sub-Article 8.5 of the Main Agreement is modified to read in full as follows: "Notwithstanding Sub-Article 8.1, Handling Company shall indemnify, defend and hold harmless Carrier, its directors, officers, employees and agents from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by Handling Company (or anyone directly or indirectly employed by Handling Company or anyone for whose acts Handling Company may be liable) in the performance or nonperformance of services under this Annex B, including but not limited to: death of or injury to any person or persons; false arrest, detention, imprisonment, searches or malicious prosecution; libel, slander and/or defamation of character; violations of the right of privacy; or the loss, theft, damage or destruction of property, including the property of Carrier, Handling Company and third persons

Furthermore, Handling Company shall defend, indemnify and hold Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors."

4.3 Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at Handling Company's expense, not less than $10,000,000 Combined Single Limit, each occurrence, aggregate where applicable, or such higher limit as may be carried, and as respects Personal Injury Liability $25,000,000 each offense providing Comprehensive General Liability, including Bodily Injury, Property Damage, Products and Completed Operations, Hangarkeepers Legal, Premises, Contractual Liability, on restrictive premises auto and mobile equipment. Handling Company will issue a certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions;

1) Carrier is included as an Additional Insured as their interests may appear.
2) All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.
3) This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.
4) Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.
5) In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).
6) Provide a waiver of subrogation against the Additional Insureds.
7) Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

4.4 Handling Company must also obtain and maintain in full force and effect during the term of this Agreement, at Handling Company's expense, Workers Compensation and Employers Liability Insurance in an amount not less

than $1,000,000 each accident/injury /disease covering its employees. Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

PARAGRAPH 5: TRANSFER OF SERVICES

5.1 For purposes of the location(s) specified in this Annex B, Sub-Article 3.1. of the Main Agreement is hereby deleted and replaced by the following:

    3.1    Upon the Carrier's written authorization only, the Handling Company may delegate any of the agreed services to subcontractors who provide the same services on the same basis to Handling Company in connection with its own operations. Handling Company shall nevertheless be responsible to Carrier for the proper rendering of such services as if they had been performed by Handling Company itself.

PARAGRAPH 6: ACCOUNTING AND SETTLEMENT

6.1 Notwithstanding the provisions of Article 7 of the Main Agreement to which this Annex B refers, all accounts shall be settled between the local offices of Carrier and the Handling Company. Handling Company shall invoice Carrier once each month. All invoices will be settled within forty-five (45) days of the date of invoice.

6.2 Handling Company shall invoice Carrier monthly with the charges arising from the provisions of the handling services of Annex A and as listed in this Annex B at the rates and charges in the Annex B. Invoices shall be sent electronically to: APInvoices@flyfrontier.com.

Carrier shall remit the total amount of such invoice in United States funds via Automated Clearing House ("ACH") to:

                Bank of Texas
                Dallas, Texas
                ABA/Routing # 111014325
                Beneficiary Account # _8094121172
                Beneficiary Name and Address:
                Huntleigh USA Corporation
                545 E John Carpenter Fwy, Ste 175
                Irving, TX  75062

PARAGRAPH 7: SUPERVISION AND ADMINISTRATION

7.1 The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for Carrier by the organization(s) under this agreement:

PARAGRAPH 8: TRAINING

8.1 Carrier acknowledges and agrees that the training provided by Handling Company to Handling Company's employees and subcontractors with respect to Handling Company's own operations is equal to or greater than the training provided by Carrier for its operations. In the event (i) Carrier operates an aircraft type that is different from the aircraft types operated by Handling Company or (ii) Carrier's handling procedures differ from those covered under Handling Company's training and the Carrier wants Handling Company to observe such differences, then Carrier shall document said differences and provide the differences training to Handling Company's employees and subcontractors. Carrier agrees to provide Handling Company with documented training records indicating that Handling Company's employees and subcontractors have been provided adequate differences training prior to start-up of services.

    **\*For all training requirements; refer to Station Administration Manual, Chapter 40 for details**

8.2 All training of Handling Company's employees and subcontractors that may be required by Handling Company or by Carrier for Handling Company to perform the services covered by this Annex B shall be provided by Carrier at the airport specified in this Annex B, or such other location as mutually agreed, at Carrier's sole cost and expense. Carrier shall be invoiced by Handling Company for the time required for such training in an amount equal to Handling Company's hourly labor rate at the applicable straight or overtime rate plus Handling Company's costs and expenses.

PARAGRAPH 9: DURATION, MODIFICATION AND TERMINATION

9.1 Notwithstanding Sub-Articles 11.4 & 11.5 of the Main Agreement, this Annex B shall continue in force for a period of three years after the effective date, and thereafter until terminated by either party giving 60 (sixty) days prior written notice to the other party.

9.1.1 The duration of this agreement shall be seasonal in nature as it pertains to climatic need. This Annex B shall be reviewed and revalidated on an annual basis in concordance with the dates noted in the preamble of this agreement.

9.1.2 notwithstanding Sub-Article 11.4 and 11.5 of the Main Agreement, or any other provision to the contrary and without prejudice to any other rights and remedies pursuant to this Agreement, in the event Handling Company fails or neglects to observe or perform any obligation in this Agreement, Carrier may terminate the Agreement by giving thirty (30) days prior written notice to Handling Company.

9.2 Any modification to this Annex B shall be made by a written amendment signed by both Parties.

PARAGRAPH 10: NOTIFICATION

10.1   In accordance Sub-article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective parties as follows:

To Carrier:

Frontier Airlines, Inc.
7001 Tower Road
Denver, CO – USA 80249
Telephone: 720-374-4367
Fax: 720-374-9297
Email: howard.diamond@FLYFRONTIER.COM
Attn:  General Counsel

To Handling Company:

Huntleigh USA Corporation
545 E. John Carpenter Freeway, Suite 175
Irving, TX - USA 75062
Telephone: 972-719-9182
Fax: 972-719-9181
Email: rsporn@huntleighusa.com
Attn: Richard Sporn

PARAGRAPH 11: GOVERNING LAW

11.1   In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the state of Colorado.

11.2   In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Courts of Colorado.

| | |
|---|---|
| Signed on  12 / 23 / 2015 | Signed on  12 / 4 / 15 |
| at    Denver, Colorado | at   Irving, TX |
| for and on behalf of   **Frontier Airlines, Inc.** | for and on behalf of   **Huntleigh USA Corporation** |
| by _Howard Diamond_  SVP & General Counsel | by _Richard Sporn_ |

**AMENDMENT NO. 1 to ANNEX B2.0**
between
**HUNTLEIGH USA CORPORATION**
and
**FRONTIER AIRLINES**
for
**COLORADO SPRINGS MUNCIPAL AIRPORT - COS**
valid from April 14, 2016

This Amendment No. 1, effective from February 1, 2017, is for the purpose of adding revised pricing for COS.

The per rate flight stated in Paragraph 1.2 is revised to read as follows:

"USD $60.34 per flight (a 2% reduction from $61.57 due to payments based on projected costs)"

Except as expressly amended above, all other terms and conditions of the Annex B shall remain in full force and effect.

On behalf of:

**FRONTIER AIRLINES.**

By: _____
            Howard Diamond

Title: SVP & General Counsel

Date: _____2-14-17_____

On behalf of:

**HUNTLEIGH USA CORPORATION**

By: _____
            Richard Sporn

Title: CEO

Date: _____1/23/17_____

1

# STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE

## ANNEX B3.0 – LOCATION(s), AGREED SERVICES AND CHARGES

to the Standard Ground Handling Agreement (SGHA) of 2013

between:                              **Frontier Airlines, Inc.**

having its principal office at:       7001 Tower Road
                                      Denver, CO 80249

and hereinafter referred to as the "Carrier"

and:                                  **Huntleigh USA Corporation**

having its principal office at:       545 E. John Carpenter Freeway, Suite 175
                                      Irving, TX 75062

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

effective from                        July 16, 2016

This Annex B3.0 for

the location(s):                      Kansas City International Airport (the "Airport" and
                                      "MCI")

is valid from:                        July 16, 2016

and replaces:                         N/A

---

**PREAMBLE:**

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

---

## PARAGRAPH I.  HANDLING SERVICES AND CHARGES

1.1.   For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 2. PASSENGER SERVICES
2.1.3   When requested by the Carrier,
    (a) provide
    special equipment and specially trained personnel, for assistance to
    2.  persons with reduced mobility (PRMs) ("Wheelchair Services")

### SECTION 6. SUPPORT SERVICES
6.2    Automated/Computer or Manual Recording Systems
6.2.2   Perform the following functions in
    (b) Handling Company's system
    for
    (11) Other functions – Wheelchair Services dispatch, tracking, data compilation (request times, response times, move information, compliments, complaints, etc.)

STAFFING: Hourly coverage and agent quantity will be set by the Carrier's General Manager for MCI and such coverage may change from time to time.  The initial coverage shall be two (2) agents for each flight from two (2) hours prior to the scheduled departure times until thirty (30) minutes after the actual departure times.

1.2.   Rates for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

    USD $11.00 per labor hour – non Holidays
    USD $16.50 per labor hour – Holidays

Performance Credits (Effective August 1, 2016)

Monthly Performance

| | | Station Monthly Departures | | |
|---|---|---|---|---|
| | | <63 | 63-212 | >212 |
| Wheelchairs | <95% of Planned Pushes w/in 10 mins. | 1% off of monthly invoice | | |
| | <97% of Unplanned Pushes w/in 20 mins. | 1% off of monthly invoice | | |
| | >30 Minute Unattended or Wait(s) | $200 per Occurrence | | |
| | Missing Wheelchair Data | $200/Day | $500/Day | $1,000/Day |
| Complaint(s) | Verified complaint re service for which the Handling Company can't disprove | $50 per Occurrence | | |
| Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint | | |

1.3.   In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling Company may request a renegotiation of rates upon ninety (90) days' written notice to the Carrier.

1.4.   No extra charges will be made for providing services on legal holidays, weekends, evenings, or at night.

1.5.   Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

## PARAGRAPH 2.  ADDITIONAL SERVICES AND CHARGES

2.1.   All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3.  DISBURSEMENTS

3.1.   Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

## PARAGRAPH 4.  LIMIT OF LIABILITY AND INDEMNIFICATION

4.1   Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:
- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors.  However, nothing contained in this section shall be construed as an indemnity by the Handling Company against any loss, liability or claim caused solely by the acts or omissions of the Carrier, its directors, officers, employees and agents, unless caused by the negligence or misconduct of Contractor, its directors, officers, employees or agents."

4.2   The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.

## PARAGRAPH 5. INSURANCE

5.1.   The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1)   The Carrier is included as an Additional Insured as their interests may appear.

2)   All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3)   This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4)   Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5)   In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6)   Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6. AREA OF RESPONSIBILITY

6.1    The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: None.

## PARAGRAPH 7. TRANSFER OF SERVICES

7.1    Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

## PARAGRAPH 8. PAYMENT, INVOICING, SETTLEMENT

8.1    Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH). The Handling Company's invoices shall include the following information for payment:

Bank Name: Bank of Texas
ABA No. 111014325
Credit the Account of: Huntleigh USA Corporation, 545 E. John Carpenter Freeway, Suite 175, Irving, TX 75062
Acct. No. 8094121172
Ref: _____
Invoice Number(s): _____

8.2    With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier via email at apinvoices@flyfrontier.com.

Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier on a monthly basis, after the completion of each calendar month of service. Payment of undisputed amounts will be due thirty (30) days after the Carrier's receipt of each invoice. In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing. Both Parties shall then seek in good faith to resolve the disputed amount(s). Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

## PARAGRAPH 9. SUPERVISION AND ADMINISTRATION

9.1    The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for the Carrier by other organization(s) under cover of separate agreement(s): All Airport services.

## PARAGRAPH 10. DURATION, MODIFICATION, AND TERMINATION

10.1    Duration

10.1.1 Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from July 16, 2016 through July 31, 2019 (the "Initial Term") and thereafter until terminated by either Party upon sixty (60) days' prior written notice to the other Party.

10.1.2 In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.2    Modification

10.2.1 Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3    Termination

10.3.1 The Carrier will provide notice to the Handling Company of any service failures. The Handling Company shall have thirty (30) days from written notice to cure any deficiencies. After thirty (30) days if the deficiencies have not been sufficiently corrected to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement for cause upon 30 days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

10.3.2 In the event that the Handling Company plans to cease operations at the Airport, the Handling Company may terminate this Agreement without penalty upon ninety (90) days' written notice to the Carrier, on that condition that such termination shall not take place prior to the Handling Company's ceasing of operations at the Airport.

## PARAGRAPH 11. NOTIFICATION

11.1    In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

> To Carrier:
> Frontier Airlines, Inc.
> 7001 Tower Road
> Denver, Colorado 80249
> U.S.A.
> Telephone:  720-374-4200
> Facsimile:  Not Authorized for Notification
> Electronic Mail:  howard.diamond@flyfrontier.com
> Attn:  General Counsel
>         -and-
> Electronic Mail:  timothy.polgar@flyfrontier.com
> Attn:  Director, Ground Handling Contracts

> To Handling Company:
> Huntleigh USA Corporation
> 545 E. John Carpenter Freeway, Suite 175
> Irving, TX 75062
> U.S.A.

Telephone: 972-719-9182
Facsimile: 972-719-9181
Electronic Mail: rsporn@huntleighusa.com
Attn: Richard Sporn

## PARAGRAPH 12. GOVERNING LAW

12.1   In accordance with Article 9 of the Main Agreement, this Annex B shall be governed
by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2   In accordance with Article 9 of the Main Agreement, courts for the resolution of
disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13. FORCE MAJEURE

13.1   Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2   If either Party is affected by a Force Majeure event, such affected Party shall promptly
notify the other Party of the nature and extent of the circumstances in question.

13.3   Notwithstanding any other provision of this Agreement neither Party shall be deemed
to be in breach of this Agreement, or otherwise be liable to the other, for any delay in
performance or other non-performance of any of its obligations under this Agreement
to the extent that the delay or non-performance is due to a Force Majeure event.

13.4   If any event of Force Majeure occurs, the date(s) for performance of the obligation(s)
affected shall be postponed for so long as is made necessary by the event of Force
Majeure, provided that if any Force Majeure event continues for a period exceeding one
(1) month, either Party shall have the right to terminate this Annex B forthwith on
written notice to the other Party.

13.5   The Party affected by Force Majeure shall take all reasonable steps available to it to
minimize the effects of Force Majeure on the performance of its obligations under this
Agreement.

13.6   For the purpose of this Agreement "Force Majeure" means any circumstances that is
not reasonably foreseeable and beyond the reasonable control of the Party relating to its
performance of this Annex B, including: acts of God, fires, floods, explosions, acts or
restraints of governments or public authorities, war, revolution, riot or civil commotion,
despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of
such acts, events or occurrences.

## PARAGRAPH 14. TRAINING

14.1   All training shall be provided by the Handling Company and the Handling Company's
sole expense.

14.2   No employee of the Handling Company may work a flight of the Carrier's unless
training has been received, completed, and passed in accordance with the Handling

Company's training policy.  Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

## PARAGRAPH 15.  COMPLIANCE WITH LAWS

15.1   The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

15.2   The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

15.3   Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B.  In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

15.4   Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

## PARAGRAPH 16.  CONFIDENTIALITY AND DATA PROTECTION

16.1   The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2   The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any

aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3   Prior written consent to any disclosure shall be obtained from the Carrier.  In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

16.4   The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5   To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier. Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6   The obligations in this Paragraph 16 shall continue to bind the Parties after the expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17.  ANTI BRIBERY AND CORRUPTION

17.1   The Carrier has strict anti-corruption policies and practices. The Handling Company undertakes that it will not, at any time before, during, or after the term of this

Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in relation to the transaction which is the subject of this agreement or the provision of the services which is capable of being interpreted as a corrupt practice or bribery for the purpose of any applicable law, US or other.

17.2    Each Party shall promptly report to the other Party any request or demand for any undue financial or other advantage of any kind received by it in connection with the performance of this Agreement or additional/other business.

## PARAGRAPH 18.  MISCELLANEOUS

18.1    Each provision of this Agreement is severable and distinct from the others.  Both Parties intend that every such provision shall be and remain valid and enforceable to the fullest extent permitted by law.  If any such provision is or at any time becomes to any extent invalid, illegal or unenforceable under any enactment or rule of law, it shall to that extent be deemed not to form part of this Agreement but (except to that extent in the case of that provision) it and all other provisions of this Agreement shall continue in full force and effect and their validity, legality and enforceability shall not be thereby affected or impaired.

18.2    In case of any inconsistency between this Annex B and the Main Agreement, the provisions of this Annex B shall prevail.

18.3    The relationship of the Parties is that of independent contractors dealing at arm's length. Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall constitute the Parties as partners, joint venturers or co-owners, or constitute either Party as the agent, employee or representative of the other, or empower either Party to act for, bind or otherwise create or assume any obligation on behalf of the other, and neither Party shall hold itself out as having authority to do the same. This Agreement does not prevent either of the Parties from entering into similar agreement with third parties in respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to this Agreement.

18.4    The Parties acknowledge and agree that a breach by the other Party of any of the terms of this Agreement may result in irreparable and continuing damage to the other for which there may or will be no adequate remedy at law, and that in the event of such breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a decree for specific performance and such other and further relief as may be appropriate.

18.5    This Agreement may be entered into in the form of two or more counterparts each executed by one or both of the Parties but, taken together, executed by both and, provided that both the Handling Company and the Carrier so enter into the Agreement, each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6    All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program.  The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred.  The Handling

Company is required to go through setup, maintain compliance, and will be responsible for all associated fees. More information can be obtained at http://frontier.globalrms.com/.

Signed the _30th_ day of _August_ , 2016

At Denver, Colorado, U.S.A.

for and on behalf of
**Frontier Airlines, Inc.**

By: _____

Name: Howard Diamond
Title: SVP & General Counsel

Signed the _11_ day of _July_ , 2016

at _Irving, TX_ _____

for and on behalf of
**Huntleigh USA Corporation**

By: _____

Name: Richard Sporn
Title: CEO

### STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE

### ANNEX B – LOCATION(s), AGREED SERVICES AND CHARGES

to the Standard Ground Handling Agreement (SGHA) of 2013

| | |
|---|---|
| between: | **Frontier Airlines, Inc.** |
| having its principal office at: | 7001 Tower Road<br>Denver, CO 80249 |

and hereinafter referred to as the "Carrier"

| | |
|---|---|
| and: | **Huntleigh USA Corporation** |
| having its principal office at: | 545 E. John Carpenter Freeway, Suite 175<br>Irving, TX 75062 |

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

| | |
|---|---|
| effective from | March 17, 2016 |
| This Annex B 1.0 for | |
| the location(s): | Louis Armstrong New Orleans International Airport (the "Airport" and "MSY") |
| is valid from: | March 17, 2016 |
| and replaces: | N/A |

---

**PREAMBLE:**

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

---

## PARAGRAPH 1. HANDLING SERVICES AND CHARGES

1.1.   For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 2. PASSENGER SERVICES
2.1.3   When requested by the Carrier,
(a) provide
special equipment and specially trained personnel, for assistance to
2. persons with reduced mobility (PRMs) ("Wheelchair Services")

### SECTION 6. SUPPORT SERVICES
6.2      **Automation/Computer Systems**
6.2.2   Perform the following functions in
(b) Handling Company's system
for
(11) Other functions – Wheelchair Services dispatch, tracking, data compilation (request times, response times, move information, compliments, complaints, etc.)

1.2.   Rates for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

USD $53.90 per flight (a 2% reduction from $55.00 due to payments based on projected costs)

Performance Credits (Effective April 1, 2016)

Monthly Performance

| | | Station Monthly Departures | | |
|---|---|---|---|---|
| | | <63 | 63-212 | >212 |
| Wheelchairs | <95% of Planned Pushes w/in 10 mins. | 1% off of monthly invoice | | |
| | <97% of Unplanned Pushes w/in 20 mins. | 1% off of monthly invoice | | |
| | >30 Minute Unattended or Wait(s) | $200 per Occurrence | | |
| | Missing Wheelchair Data | $200/Day | $500/Day | $1,000/Day |
| Complaint(s) | Verified complaint re service for which the Handling Company can't disprove | $50 per Occurrence | | |
| Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint | | |

1.3.   In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling Company may request a renegotiation of rates upon ninety (90) days' written notice to the Carrier.

1.4.   No extra charges will be made for providing services on legal holidays, weekends, evenings, or at night.

1.5.   Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

## PARAGRAPH 2. ADDITIONAL SERVICES AND CHARGES

2.1.     All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3. DISBURSEMENTS

3.1.     Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

## PARAGRAPH 4. LIMIT OF LIABILITY AND INDEMNIFICATION

4.1     Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:

- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors. However, nothing contained in this section shall be construed as an indemnity by the Handling Company against any loss, liability or claim caused solely by the acts or omissions of the Carrier, its directors, officers, employees and agents, unless caused by the negligence or misconduct of Contractor, its directors, officers, employees or agents."

4.2     The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.

## PARAGRAPH 5. INSURANCE

5.1. The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1) The Carrier is included as an Additional Insured as their interests may appear.

2) All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3) This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4) Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5) In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6) Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

**PARAGRAPH 6.  AREA OF RESPONSIBILITY**

6.1    The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: None.

**PARAGRAPH 7.  TRANSFER OF SERVICES**

7.1    Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

**PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT**

8.1    Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH).  The Handling Company's invoices shall include the following information for payment:

       Bank Name: Bank of Texas
       ABA No. 111014325
       Credit the Account of: Huntleigh USA Corporation, 545 E. John Carpenter Freeway, Suite 175, Irving, TX 75062
       Acct. No. 8094121172
       Ref: _____
       Invoice Number(s): _____

8.2    With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier via email at apinvoices@flyfrontier.com.

Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier approximately fifteen (15) days in advance of each month's scheduled service and the Carrier shall pay the Handling Company the projected costs within thirty (30) days of receipt of the Handling Company's invoice. Any overpayment or underpayment as a result of schedule changes, etc., shall be addressed in the following month's projected invoice.  In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing.  Both Parties shall then seek in good faith to resolve the disputed amount(s).  Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

**PARAGRAPH 9.  SUPERVISION AND ADMINISTRATION**

9.1    The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for the Carrier by other organization(s) under cover of separate agreement(s):  All Airport services.

**PARAGRAPH 10.  DURATION, MODIFICATION, AND TERMINATION**

10.1    Duration
10.1.1  Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from March 17, 2016 through March 31, 2019 (the

"Initial Term") and thereafter until terminated by either Party upon sixty (60) days' prior written notice to the other Party.

10.1.2 In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.2   Modification

10.2.1 Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3   Termination

10.3.1 The Carrier will provide notice to the Handling Company of any service failures. The Handling Company shall have thirty (30) days from written notice to cure any deficiencies. After thirty (30) days if the deficiencies have not been sufficiently corrected to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement for cause upon 30 days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

10.3.2 In the event that the Handling Company plans to cease operations at the Airport, the Handling Company may terminate this Agreement without penalty upon ninety (90) days' written notice to the Carrier, on that condition that such termination shall not take place prior to the Handling Company's ceasing of operations at the Airport.

## PARAGRAPH 11. NOTIFICATION

11.1   In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

To Carrier:
Frontier Airlines, Inc.
7001 Tower Road
Denver, Colorado 80249
U.S.A.
Telephone:  720-374-4200
Facsimile:  Not Authorized for Notification
Electronic Mail:  howard.diamond@flyfrontier.com
Attn:  General Counsel
        -and-
Electronic Mail:  timothy.polgar@flyfrontier.com
Attn:  Director, Ground Handling Contracts

To Handling Company:
Huntleigh USA Corporation
545 E. John Carpenter Freeway, Suite 175
Irving, TX 75062
U.S.A.
Telephone:  972-719-9182
Facsimile:  972-719-9181

Electronic Mail: rsporn@huntleighusa.com
Attn: Richard Sporn

## PARAGRAPH 12.  GOVERNING LAW

12.1   In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2   In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13.  FORCE MAJEURE

13.1   Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2   If either Party is affected by a Force Majeure event, such affected Party shall promptly notify the other Party of the nature and extent of the circumstances in question.

13.3   Notwithstanding any other provision of this Agreement neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, for any delay in performance or other non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to a Force Majeure event.

13.4   If any event of Force Majeure occurs, the date(s) for performance of the obligation(s) affected shall be postponed for so long as is made necessary by the event of Force Majeure, provided that if any Force Majeure event continues for a period exceeding one (1) month, either Party shall have the right to terminate this Annex B forthwith on written notice to the other Party.

13.5   The Party affected by Force Majeure shall take all reasonable steps available to it to minimize the effects of Force Majeure on the performance of its obligations under this Agreement.

13.6   For the purpose of this Agreement "Force Majeure" means any circumstances that is not reasonably foreseeable and beyond the reasonable control of the Party relating to its performance of this Annex B, including: acts of God, fires, floods, explosions, acts or restraints of governments or public authorities, war, revolution, riot or civil commotion, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences.

## PARAGRAPH 14.  TRAINING

14.1   All training shall be provided by the Handling Company and the Handling Company's sole expense.

14.2   No employee of the Handling Company may work a flight of the Carrier's unless training has been received, completed, and passed in accordance with the Handling Company's training policy.  Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

## PARAGRAPH 15.  COMPLIANCE WITH LAWS

15.1    The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

15.2    The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

15.3    Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B. In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

15.4    Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

## PARAGRAPH 16.  CONFIDENTIALITY AND DATA PROTECTION

16.1    The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the

Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3    Prior written consent to any disclosure shall be obtained from the Carrier.  In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

16.4    The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("**Data**") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5    To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier.  Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6    The obligations in this Paragraph 16 shall continue to bind the Parties after the expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17. ANTI BRIBERY AND CORRUPTION

17.1    The Carrier has strict anti-corruption policies and practices. The Handling Company undertakes that it will not, at any time before, during, or after the term of this Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in relation to the transaction which is the subject of this agreement or the provision of the

services which is capable of being interpreted as a corrupt practice or bribery for the purpose of any applicable law, US or other.

17.2    Each Party shall promptly report to the other Party any request or demand for any undue financial or other advantage of any kind received by it in connection with the performance of this Agreement or additional/other business.

## PARAGRAPH 18. MISCELLANEOUS

18.1    Each provision of this Agreement is severable and distinct from the others.  Both Parties intend that every such provision shall be and remain valid and enforceable to the fullest extent permitted by law.  If any such provision is or at any time becomes to any extent invalid, illegal or unenforceable under any enactment or rule of law, it shall to that extent be deemed not to form part of this Agreement but (except to that extent in the case of that provision) it and all other provisions of this Agreement shall continue in full force and effect and their validity, legality and enforceability shall not be thereby affected or impaired.

18.2    In case of any inconsistency between this Annex B and the Main Agreement, the provisions of this Annex B shall prevail.

18.3    The relationship of the Parties is that of independent contractors dealing at arm's length. Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall constitute the Parties as partners, joint venturers or co-owners, or constitute either Party as the agent, employee or representative of the other, or empower either Party to act for, bind or otherwise create or assume any obligation on behalf of the other, and neither Party shall hold itself out as having authority to do the same. This Agreement does not prevent either of the Parties from entering into similar agreement with third parties in respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to this Agreement.

18.4    The Parties acknowledge and agree that a breach by the other Party of any of the terms of this Agreement may result in irreparable and continuing damage to the other for which there may or will be no adequate remedy at law, and that in the event of such breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a decree for specific performance and such other and further relief as may be appropriate.

18.5    This Agreement may be entered into in the form of two or more counterparts each executed by one or both of the Parties but, taken together, executed by both and, provided that both the Handling Company and the Carrier so enter into the Agreement, each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6    All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program.  The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred.  The Handling Company is required to go through setup, maintain compliance, and will be

responsible for all associated fees.  More information can be obtained at
http://frontier.globalrms.com/.

Signed the _____ day of _____, 2016      Signed the 16 day of ___April___, 2016

At Denver, Colorado, U.S.A.                      at ___Irving, TX_____

for and on behalf of                             for and on behalf of
**Frontier Airlines, Inc.**                      **Huntleigh USA Corporation**

By: _Howard Diamond_____               By: _____
Name: Howard Diamond                             Name: Richard Sporn
Title: SVP & General Counsel                     Title: CEO

**STANDARD GROUND HANDLING AGREEMENT - SIMPLIFIED PROCEDURE**

**ANNEX B4.0 – LOCATION(s), AGREED SERVICES AND CHARGES**

to the Standard Ground Handling Agreement (SGHA) of 2013

| | |
|---|---|
| between: | **Frontier Airlines, Inc.** |
| having its principal office at: | 4545 Airport Way<br>Denver, CO 80239 |

and hereinafter referred to as the "Carrier"

| | |
|---|---|
| and: | **Huntleigh USA Corporation** |
| having its principal office at: | 545 E. John Carpenter Freeway, Suite 175<br>Irving, TX 75062 |

and hereinafter referred to as the "Handling Company"

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

| | |
|---|---|
| effective from | September 16, 2017 |
| This Annex B4.0 for | |
| the location(s): | Portland International Airport (the "Airport" and "PDX") |
| is valid from: | September 16, 2017 |
| and replaces: | N/A |

**PREAMBLE:**

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of 2013 as published by the International Air Transport Association shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

## PARAGRAPH 1.  HANDLING SERVICES AND CHARGES

1.1.   For a single ground handling consisting of the arrival and subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A:

### SECTION 2. PASSENGER SERVICES
**2.1.3**   When requested by the Carrier,
  (a)  provide
  special equipment and specially trained personnel, for assistance to
  2.  persons with reduced mobility (PRMs) ("Wheelchair Services")
  7.  other – line coordinator services

### SECTION 6. SUPPORT SERVICES
**6.2**        **Automated/Computer or Manual Recording Systems**
**6.2.2**   Perform the following functions in
  (b)  Handling Company's system
  for
  (11) Other functions – Wheelchair Services dispatch, tracking, data compilation (request times, response times, move information, compliments, complaints, etc.)

1.2.   Rates (in USD) for the services defined in sub-paragraph 1.1.of this Annex B are as follows:

| Hourly Resources | Regular Rate/Hr | Holiday/Overtime Rate/Hr |
|---|---|---|
| Wheelchair Agent | $14.84 | $22.25 |
| Dispatcher | $17.47 | $26.20 |
| Line Coordinator | $15.39 | $23.08 |

One-hundred percent (100%) of the cost will be allocated to the airlines/companies serviced by the Handling Company based on the proportion of the passengers such airline/company has out of the total number of passengers of all airlines/companies serviced by the Handling Company, as applicable to each service type (Wheelchair Services and Line Coordinator Services). For avoidance of doubt, the exact monthly amount that carrier will be charged may vary each month depending on the number of parties to the services and the total number of passengers each month.

Performance Credits (Effective October 1, 2017)

Monthly Performance

| | | Station Monthly Departures | | |
|---|---|---|---|---|
| | | <63 | 63-212 | >212 |
| Wheelchairs | <95% of Planned Pushes w/in 10 mins. | 1% off of monthly invoice | | |
| | <97% of Unplanned Pushes w/in 20 mins. | 1% off of monthly invoice | | |
| | >30 Minute Unattended or Wait(s) | $200 per Occurrence | | |
| | Missing Wheelchair Data | $200/Day | $500/Day | $1,000/Day |
| Complaint(s) | Verified complaint re service for which the Handling Company can't disprove | $50 per Occurrence | | |

| Uniforms | Incomplete, dirty, untidy | $25 per Occurrence or Complaint |
|---|---|---|

1.3. In case of a change in mandated regulations effecting pay rates, hours/scope of operation, or employee benefits, the Handling Company may request a renegotiation of rates upon ninety (90) days' written notice to the Carrier.

1.4. No extra charges beyond what is specifically stated above will be made for providing services on ~~legal holidays~~, weekends, evenings, or at night.

1.5. Above indicated rates will be applicable for non-scheduled/diverted flights as well during the term of this Agreement.

## PARAGRAPH 2.  ADDITIONAL SERVICES AND CHARGES

2.1. All services not included in Paragraph 1 of this Annex that the Carrier requests will be charged at the rate(s) agreed to by the Parties.

## PARAGRAPH 3.  DISBURSEMENTS

3.1. Any disbursements made by the Handling Company on behalf of the Carrier, must be preapproved in writing by the Carrier, will be reimbursed by the Carrier at cost price (no mark-up or surcharge).

## PARAGRAPH 4.  LIMIT OF LIABILITY AND INDEMNIFICATION

4.1 Sub-Article 8.5 of the Main Agreement is modified to read in full as follows:

"Notwithstanding Sub-Article 8.1, the Handling Company shall indemnify, defend and hold harmless the Carrier from and against any and all claims, damages, losses, fines, civil penalties, liabilities, judgments, costs and expenses of any kind or nature whatsoever, including, but not limited to, interest, court costs and attorney's fees, which in any way arise out of or result from any act(s) or omission(s) by the Handling Company (or anyone directly or indirectly employed by the Handling Company or anyone for whose acts the Handling Company may be liable) in the performance or non-performance of services under this Annex B, including but not limited to:

- Death of or injury to any person or persons;
- False arrest, detention, imprisonment, searches or malicious prosecution;
- Libel, slander and/or defamation of character;
- Violations of the right of privacy; or
- The loss, theft, damage or destruction of property, including the property of the Carrier, the Handling Company and third persons.

Furthermore, the Handling Company shall defend, indemnify and hold the Carrier harmless from all fines and/or penalties imposed by any governmental agency or entity governing the services provided under this Annex B, including, without limitation, DOT, FAA, CBP, EPA and/or any Airport Authority, and/or violation of any environmental laws or regulations, arising out of the acts or omissions of the Handling Company's employees, agents or subcontractors. However, nothing contained in this section shall be construed as an indemnity by the Handling Company against any loss, liability or claim caused solely by the acts or omissions of the

Carrier, its directors, officers, employees and agents, unless caused by the negligence or misconduct of Contractor, its directors, officers, employees or agents."

4.2     The indemnification obligation of the Handling Company referred to in Article 8 of the Main Agreement shall be modified so as to include any loss or damage resulting from flight delays or cancellations caused by the performance or nonperformance of services under this Annex B.

## PARAGRAPH 5. INSURANCE

5.1.    The Handling Company must obtain and maintain in full force and effect during the term of this Agreement, at the Handling Company's sole expense, the following insurance coverage: (a) Commercial General Liability (including Premises, Products and Completed Operations, Hangarkeepers, Personal/Advertising Injury, and Contractual coverages) for bodily injury, including personal injury, and property damage, (b) Automobile Liability for owned, non-owned and hired vehicles and trailers, (c) Employer's Liability, and (d) Workers' Compensation, with the coverages and limits of liability not less than shown below.

| | |
|---|---|
| Commercial General Liability: | $25,000,000 OCC/AGG |
| Premises: | $25,000,000 OCC |
| Products & Completed Operations: | $25,000,000 OCC |
| Hangarkeepers: | $5,000,000 OCC |
| Personal/Advertising Injury: | $5,000,000 OCC |
| Contractual: | $5,000,000 OCC |
| Automobile Liability: | $1,000,000 OCC |
| Employer's Liability: | $1,000,000 OCC |
| Workers' Compensation: | Per State/Federal Requirements, but not less than $1,000,000 OCC |

The Handling Company will issue a Certificate of Insurance prior to the start of any services, and annually thereafter, containing the following provisions.

1)      The Carrier is included as an Additional Insured as their interests may appear.

2)      All provisions of the above Liability insurance policies shall apply separately to the Named Insured and each Additional Insured against whom claim is made or suit is brought except with respect to the Limits of Liability.

3)      This insurance is primary without right of contribution from any other insurance as may be carried by the Additional Insureds.

4)      Such insurance as is afforded the Additional Insureds shall not be invalidated and shall protect their interests regardless of any action or inaction of the Named Insured or any other person or party whether or not such action or inaction is a breach or violation of any warranties, declarations or conditions of the policies, provided that the Additional Insured so protected has not caused, contributed to or knowingly condoned said act or omission, but in no event shall this clause apply in the event of exhaustion of policy limits, nor to losses, claims, expenses, etc., excluded from coverage under the policies.

5)      In the event of cancellation or material changes of the policies by insurers which would adversely affect the interests of the Additional Insureds, Insurers agree to provide 30 days (ten (10) days in the event of cancellation for non-payment of premiums) prior written notice to the Certificate Holder(s).

6)      Provide a waiver of subrogation against the Additional Insureds.

All policies must be written by insurance companies of recognized reputation and responsibility, reasonably satisfactory to the Carrier, and licensed to do business in the state(s) of the location(s) covered by this Agreement.

The Handling Company is solely and fully responsible for the payment of all Workers Compensation benefits for its employees.

## PARAGRAPH 6.  AREA OF RESPONSIBILITY

6.1     The area of responsibility as mentioned in Sub-Section 4.3 of Annex A is: None.

## PARAGRAPH 7.  TRANSFER OF SERVICES

7.1     Notwithstanding Sub-Article 3.1 of the Main Agreement, the Handling Company shall not subcontract the services of Annex A to another party.

## PARAGRAPH 8.  PAYMENT, INVOICING, SETTLEMENT

8.1     Notwithstanding Sub-Article 7.2 of the Main Agreement, payment shall be effected through the Automated Clearing House (ACH).  The Handling Company's invoices shall include the following information for payment:
          Bank Name: Bank of Texas
          ABA No. 111014325
          Credit the Account of: Huntleigh USA Corporation, 545 E. John Carpenter Freeway, Suite 175, Irving, TX 75062
          Acct. No. 8094121172
          Ref: _____
          Invoice Number(s): _____

8.2     With reference to Sub-Article 7.3 of the Main Agreement, the Parties establish the following payment terms:

The Handling Company will send invoices to the Carrier through the Coupa Supplier Network.  All invoices must contain a description of the goods and/or services, the applicable pricing, and the purchase order number.  Notwithstanding Sub-Article 7.1 of the Main Agreement, the Handling Company shall submit invoices to the Carrier on a monthly basis, after the completion of each calendar month of service.  Payment of undisputed amounts will be due thirty (30) days after the Carrier's receipt of each invoice.  In the event the Carrier disputes any charge or fee set forth in any invoice, the Carrier shall notify the Handling Company of the discrepancy in billing.  Both Parties shall then seek in good faith to resolve the disputed amount(s).  Upon the resolution of any disputed amount, the Carrier shall promptly pay the balance due to the Handling Company.

## PARAGRAPH 9.  SUPERVISION AND ADMINISTRATION

9.1     The services of Annex A, Section 1, Sub-Section 1.3 covered by Sub-Paragraph 1.1 of this Annex B, refer only to the following services of Annex A which are performed for

the Carrier by other organization(s) under cover of separate agreement(s):  All Airport services.

## PARAGRAPH 10.  DURATION, MODIFICATION, AND TERMINATION

10.1    Duration

10.1.1  Notwithstanding anything to the contrary in the Main Agreement or in this Annex B, this Annex B shall remain in effect from September 16, 2017 through September 15, 2020 (the "Initial Term") and thereafter until terminated by either Party upon ninety (90) days' prior written notice to the other Party.

10.1.2  In the event that the Carrier's flight operations at the Airport are halted or substantially decreased for any reason, this Agreement (and payment for services hereunder) may be suspended for the duration of such halts or decreases, on twenty-four (24) hour notice by the Carrier to the Handling Company.

10.2    Modification

10.2.1  Any modification to this Annex B shall be made by a written amendment signed by both Parties.

10.3    Termination

10.3.1  Notwithstanding Sub-Paragraph 10.1.1 of this Annex B, this Annex B may be terminated by Carrier upon one-hundred-twenty (120) days' written notice to the Handling Company.

10.3.2  The Carrier will provide notice to the Handling Company of any service failures.  The Handling Company shall have thirty (30) days from written notice to cure any deficiencies.  After thirty (30) days if the deficiencies have not been sufficiently corrected to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement for cause upon 30 days' written notice to the Handling Company and the Carrier shall be entitled to receive its cost of cover from the Handling Company for the remainder of the Initial Term.

10.3.3  In the event that the Handling Company plans to cease operations at the Airport, the Handling Company may terminate this Agreement without penalty upon ninety (90) days' written notice to the Carrier, on that condition that such termination shall not take place prior to the Handling Company's ceasing of all operations at the Airport.

## PARAGRAPH 11.  NOTIFICATION

11.1    In accordance with Sub-Article 11.3 of the Main Agreement, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

> To Carrier:
> Frontier Airlines, Inc.
> 4545 Airport Way
> Denver, Colorado 80239
> U.S.A.
> Telephone:  720-374-4200
> Facsimile:  Not Authorized for Notification
> Attn:  General Counsel
> Attn:  Director, Ground Handling Contracts

To Handling Company:
Huntleigh USA Corporation
545 E. John Carpenter Freeway, Suite 175
Irving, TX 75062
U.S.A.
Telephone:  972-719-9182
Facsimile:  972-719-9181
Electronic Mail:  rsporn@huntleighusa.com
Attn:  Richard Sporn

## PARAGRAPH 12.  GOVERNING LAW

12.1    In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of the State of Delaware, U.S.A.

12.2    In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Federal and/or State Courts of the State of Colorado, U.S.A.

## PARAGRAPH 13.  FORCE MAJEURE

13.1    Article 11.9 of the Main Agreement shall not apply to this Agreement.

13.2    If either Party is affected by a Force Majeure event, such affected Party shall promptly notify the other Party of the nature and extent of the circumstances in question.

13.3    Notwithstanding any other provision of this Agreement neither Party shall be deemed to be in breach of this Agreement, or otherwise be liable to the other, for any delay in performance or other non-performance of any of its obligations under this Agreement to the extent that the delay or non-performance is due to a Force Majeure event.

13.4    If any event of Force Majeure occurs, the date(s) for performance of the obligation(s) affected shall be postponed for so long as is made necessary by the event of Force Majeure, provided that if any Force Majeure event continues for a period exceeding one (1) month, either Party shall have the right to terminate this Annex B forthwith on written notice to the other Party.

13.5    The Party affected by Force Majeure shall take all reasonable steps available to it to minimize the effects of Force Majeure on the performance of its obligations under this Agreement.

13.6    For the purpose of this Agreement "Force Majeure" means any circumstances that is not reasonably foreseeable and beyond the reasonable control of the Party relating to its performance of this Annex B, including: acts of God, fires, floods, explosions, acts or restraints of governments or public authorities, war, revolution, riot or civil commotion, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences.

## PARAGRAPH 14.  TRAINING

14.1   All training shall be provided by the Handling Company and the Handling Company's sole expense.

14.2   No employee of the Handling Company may work a flight of the Carrier's unless training has been received, completed, and passed in accordance with the Handling Company's training policy.  Fill-ins are not acceptable if they are not properly trained and appropriately signed-off to handle the Carrier's flight(s).

## PARAGRAPH 15.  COMPLIANCE WITH LAWS

15.1   The Handling Company shall comply with all applicable federal, state and local laws and executive orders and regulations issued pursuant thereto, including without limitation Airport rules and to the extent applicable to this Annex B, the provisions contained within Section 202 of the Executive Order 11246, as amended (41 C.F.R. § 60-1.4), Section 4.2 of the Vietnam Era Veterans Readjustment Act (41 C.F.R. § 60-300.4), Section 503 of the Rehabilitation Act of 1973 (41 CFR § 60-741.4), the Air Carrier Access Act of 1986 (14 C.F.R. Part 382, Non-discrimination on the Basis of Handicap in Air Travel), the Americans with Disabilities Act, as amended (28 C.F.R. Part 35).

15.2   The Handling Company shall secure any and all permits or licenses that may be required by any governmental or Airport authority in order to perform the Handling Services, shall comply with all workers' compensation, employer's liability and other Federal, State, County, Municipal, or Airport laws, ordinances, rules and regulations required of an employer performing the Services. The Handling Company shall also make all reports and remit all withholding or other reductions from the compensation paid its employees as may be required by any Federal, State, County, Municipal, or Airport law, ordinance, rule or regulation. The foregoing obligations are in addition to those provided elsewhere in this Annex B.

15.3   Consistent with the Air Carrier Access Act of 1986 and 14 CFR Part 382, the Handling Company shall not discriminate against any otherwise qualified individual with a disability, by reason of such disability, in performing services under this Annex B.  In any matter relating to the Handling Company's provision of services under this Annex B to qualified individuals with a disability, the Handling Company's employees shall comply with any directives of the Carrier.

15.4   Failure to comply with any provision of this Paragraph 15 by the Handling Company shall constitute a breach of this Annex B and the Carrier shall have the right to immediately terminate this Annex B.

## PARAGRAPH 16.  CONFIDENTIALITY AND DATA PROTECTION

16.1   The information contained in this Agreement and any subsequent amendments or supplements hereto, as well as any other information relating to the Parties' business (including, but not limited to, financial, operational, personal data of the Parties' respective employees, officers or customers, operating manuals, procedures and know-how) is strictly confidential and must not be shared with any third party other than a

Party's legal and financial advisers and auditors who are bound by professional confidentiality rules, or as may be required by relevant laws and orders of courts or administrative bodies.

16.2    The Handling Company hereby agrees and undertakes not to make, issue or dispatch any public announcement or public communication (including, but not limited to responding to inquiries by any press, radio, television or other media) relating to any aspect of the Carrier's business or operations (including, but not limited to, the number of passengers carried, any incidents, accidents or occurrences involving the Carrier's aircraft, passengers or employees) without the prior written consent of the Carrier, except responding to inquiries by authorities conducting an official investigation where the Handling Company is required by law to make such statements. In the case of any such disclosure to regulatory authorities, the Handling Company shall notify the Carrier in advance of such disclosure and consult with the Carrier over the need for and scope of any such disclosure and where disclosure is required, the Handling Company shall seek to impose a confidentiality requirement where the confidential information is not subject to statutory restrictions on disclosure by the recipient. The Handling Company will be responsible for any breach of the foregoing provision by its employees, officers, representatives, agents or subcontractors.

16.3    Prior written consent to any disclosure shall be obtained from the Carrier.  In the event of any breach of the publicity restrictions set out in Section 16.2 above, the Handling Company will be liable to pay a lump sum compensation to the Carrier as indemnification, in the amount of USD 10,000 (ten thousand US Dollars) per event. This does not preclude the Carrier from seeking compensation for damages in excess of the amount of the lump sum compensation.

16.4    The Handling Company is responsible for the security of the personal data, including but not limited to personally identifiable information, of the Carrier's passengers ("Data") in its custody and possession. The Handling Company agrees that beginning on the date that the services commence under this Agreement, and continuing as long as the Handling Company possesses, stores, transmits or processes Data, the Handling Company shall not do or omit to do anything which may cause the Carrier to be in breach of any applicable privacy and security laws (including but not limited to data protection laws and electronic communications data protection and privacy laws) and shall employ and maintain appropriate and adequate technological, physical, administrative, organizational and procedural safeguards so as to: (a) protect the confidentiality, integrity or availability of Data and (b) comply with the requirements of all privacy and security laws.

16.5    To the extent that the Handling Company processes Data as the Carrier's data processor under this Agreement, the Handling Company shall (i) only act on the instruction of the Carrier in accordance with this Agreement provided that such instruction is in compliance with the applicable law; and (ii) not process Data outside of the Airport without the prior written consent of the Carrier.  Notwithstanding any other provisions of this Agreement, the Handling Company shall be liable for and shall indemnify the Carrier against any loss or damages arising from the breach of the obligations defined in this Paragraph 16 by the Handling Company.

16.6    The obligations in this Paragraph 16 shall continue to bind the Parties after the
        expiration or termination of this Agreement, for whatever reason.

## PARAGRAPH 17.  ANTI BRIBERY AND CORRUPTION

17.1    The Carrier has strict anti-corruption policies and practices. The Handling Company
        undertakes that it will not, at any time before, during, or after the term of this
        Agreement, do anything whether on behalf (expressly or implicitly) of the Carrier or in
        relation to the transaction which is the subject of this agreement or the provision of the
        services which is capable of being interpreted as a corrupt practice or bribery for the
        purpose of any applicable law, US or other.

17.2    Each Party shall promptly report to the other Party any request or demand for any undue
        financial or other advantage of any kind received by it in connection with the
        performance of this Agreement or additional/other business.

## PARAGRAPH 18.  MISCELLANEOUS

18.1    Each provision of this Agreement is severable and distinct from the others.  Both Parties
        intend that every such provision shall be and remain valid and enforceable to the fullest
        extent permitted by law.  If any such provision is or at any time becomes to any extent
        invalid, illegal or unenforceable under any enactment or rule of law, it shall to that
        extent be deemed not to form part of this Agreement but (except to that extent in the
        case of that provision) it and all other provisions of this Agreement shall continue in full
        force and effect and their validity, legality and enforceability shall not be thereby
        affected or impaired.

18.2    In case of any inconsistency between this Annex B and the Main Agreement, the
        provisions of this Annex B shall prevail.

18.3    The relationship of the Parties is that of independent contractors dealing at arm's length.
        Except expressly agreed by the Parties otherwise herein, nothing in this Agreement shall
        constitute the Parties as partners, joint venturers or co-owners, or constitute either Party
        as the agent, employee or representative of the other, or empower either Party to act for,
        bind or otherwise create or assume any obligation on behalf of the other, and neither
        Party shall hold itself out as having authority to do the same. This Agreement does not
        prevent either of the Parties from entering into similar agreement with third parties in
        respect of services defined herein.  Article 3.2 of the Main Agreement shall not apply to
        this Agreement.

18.4    The Parties acknowledge and agree that a breach by the other Party of any of the terms
        of this Agreement may result in irreparable and continuing damage to the other for
        which there may or will be no adequate remedy at law, and that in the event of such
        breach, the non-breaching Party shall be entitled to apply for injunctive relief and/or a
        decree for specific performance and such other and further relief as may be appropriate.

18.5    This Agreement may be entered into in the form of two or more counterparts each
        executed by one or both of the Parties but, taken together, executed by both and,
        provided that both the Handling Company and the Carrier so enter into the Agreement,

each of the executed counterparts, when duly exchanged or delivered, shall be deemed to be an original, but, taken together, they shall constitute one instrument.

18.6    All vendors that do business with the Carrier are required to enroll in the Frontier Airlines Vendor Screening Program.  The Handling Company's completion and approval of the vendor screening program is required prior to the Carrier's accounts payable department issuing payment for any invoices or debts incurred.  The Handling Company is required to go through setup, maintain compliance, and will be responsible for all associated fees.  More information can be obtained at http://frontier.globalrms.com/.

Signed the ____ day of _____, 2017       Signed the _26_ day of _September_, 2017

At Denver, Colorado, U.S.A.                     at ___Irving, TX_____

for and on behalf of                            for and on behalf of
**Frontier Airlines, Inc.**                         **Huntleigh USA Corporation**


By: _____                    By: _____
Name: Howard Diamond                            Name: Richard Sporn
Title: SVP & General Counsel                    Title: CEO

## STANDARD GROUND HANDLING AGREEMENT SIMPLIFIED PROCEDURE

ANNEX B - LOCATION(S), AGREED SERVICES AND CHARGES

To the Standard Ground Handling Agreement (SGHA) of January 2008

between:      Frontier Airlines, Inc.
Having its principle office at:
8909 Purdue Road #300
Indianapolis, IN 46268
United States of America


and hereinafter referred to as "the Carrier"

and:      Flight Services & Systems, Inc.
Having its principal office at:
6100 Rockside Woods Blvd.
Cleveland OH, 44131
United States of America

and hereinafter referred to as "the Handling Company"

effective from:  July 1,2012
This Annex B for

the location(s): Austin Bergstrom International Airport (AUS)

is valid from: July 1, 2012

and replaces: None

**Preamble:**

This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of January, 2004 as published by the International Air Transport Association shall apply as if such terms were repeated here in full.  By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

EXHIBIT E

**Paragraph 1. Handling Services and Charges**

1.1   For a single ground handling consisting of the arrival and the subsequent departure at agreed timings of the same aircraft, the Handling Company shall provide the following services of Annex A, at the following rates:

**Section 1:**   1.1.2, 1.1.3, 1.1.4, 1.2.1, 1.2.2, 1.2.3, 1.2.4, 1.3.2, 1.3.3, 1.3.5, 1.3.7, 1.3.8

**Section 2:**   2.1.1 (update FIDS), 2.1.2, 2.1.3(b), 2.1.4, 2.1.5, 2.1.6, 2.1.7(a,b,c,e,f) (initial PIR and tracing up to 24h), 2.1.8, 2, 2.2.3, 2.2.4, 2.2.5(a)(b)(1), 2.2.6, 2.2.7, 2.2.9 (oversize only through use of bag room agent), 2.2.11(a)(c)(1), 2.2.12(a) (using Carrier provided funds), 2.2.13, 2.2.14(g,h), 2.3.1, 2.3.2.

**Section 3:**   3.1.1, 3.1.2(a), 3.1.3(a), 3.1.4(a), 3.1.5, 3.1.6, 3.1.7(a,b − 1,3), 3.2.1(a), 3.3.1, 3.3.2(f − safety cones), 3.3.3(b), 3.6.3(a), 3.6.4(a), 3.6.5(a), 3.6.6(a,b), 3.6.8(a), 3.6.10(a), 3.7.1(b), 3.9.1(a), 3.9.2(b), 3.9.3(a,d), 3.11.10, 3.12.1(a), 3.12.2, 3.13.1(a), 3.13.2, 3.14.1(c), 13.15.1(a).

**Section 4:**   4.1.1, 4.1.2(e,2), 4.1.3(a), 4.2.1(a,b,d), 4.2.2, 4.4.2, 4.4.7.

**Section 5:**   5.1.1, 5.1.2(a) (1,2,3), 5.1.3(a), 5.1.4(a,b), 5.1.5, 5.1.6, 5.3.1, 5.3.2, 5.3.3, 5.3.4(a), 5.3.5, 5.4.1(b,c,d,e,f), 5.4.2(a,b), 5.4.3(a) (1,3), 5.5.1(a,b,c,d,e), 5.5.2, 5.5.3(a), 5.5.4(a), 5.5.5(a,c), 5.5.6.

**Section 6:**   6.2.1(c,1), 6.2.2(a,3,5), 6.7.1(b)(3)(c), 6.7.2.

**Section 7:**   7.1.2(b), 7.1.4(a,4).

| Service | Rate | Remarks |
| --- | --- | --- |
| Below Wing Turn | $315.00 | E-170/190, A-3/19/20/21 |
| Above Wing Turn | $135.00 | E-170/190, A-3/19/20/21 |
| RON Cleaning | $85.00 | A-3/19/20/21 |
| RON Cleaning | $55.00 | E-170/190 |
| Ad-Hoc Security Check | $29.00 | E-170/190, A-3/19/20/21 |
| Tow | $55.00 | Per event |
| Air Start | $65.00 | Per event |
| GPU | $27.00 | Per ½ hour |
| Ad-Hoc Agent Hour | $12.67 STD, $19.00 OT | |
| Ad-Hoc Supervisor Hour | $18.62 STD, $28.00 OT | |
| Agent Initial Training Hour | $15.50 | |

1.2   Additional Charges listed in 1.1 above for Ramp/Passenger Agents or Supervisors may be applicable as a result of delayed flight (s), a cancelled flight (s), delays due to weather, diversion, technical landing, return to gate, and delays due to the result of aircraft maintenance and/or taxi times, which result in scheduled flight deviating by greater than forty-five (45) minutes from the scheduled times.  STD rates will apply, however if agent exceeds 40 hours per work week as a result of working CARRIER flights, then OT rates may be applicable or  the specific employee (s) working the flight may not otherwise be on the clock.

1.3     Handling in case of technical landing for other than commercial purposes will be charged at 50 % of the above rates, provided that a physical change of load is not involved.

1.4     Handling in case of return to ramp will not be charged extra, provided that a physical change of load is not involved.

1.5     Handling in case of return to ramp involving a physical change of load will be charged as for handling in case of technical landing in accordance with Sub-Paragraph 1.2 of this Annex.

1.6     Handling Company requires flight schedule change notifications twelve (12) hours in advance. Cancellations with less than 12 hours prior to flight time may be charged at 100% of the above rates.

1.7     Handling Company will charge all Initial Training hours for Ramp and Passenger Service Agents at the above rates. All travel and per diem charges associated with Train The Trainer (TTT) Training will be billed to Carrier. Recurrent Training and Training as a result of turnover will not be charged unless agreed to by the parties.

### Paragraph 2.  Additional Services and Charges

2.1     All services not included in Paragraph 1 of this Annex will be charged for as follows:

### Paragraph 3.  Disbursements

3.1     Any disbursements made by the Handling Company on behalf of the Carrier will be reimbursed by the Carrier at cost price plus an accounting surcharge of 15%.

### Paragraph 4.  Limit of Liability

4.1     The limit of liability referred to in Sub-Article 8.5 of the Main Agreement shall be as follows:

| Aircraft Type | Limit (per incident) |
|---|---|
| E-170/E-190, A319, A320, A321 | $25,000,000 |

### Paragraph 5.  Area of Responsibility

5.1     The area of responsibility as mentioned in Sub-Sections 4.3 and 4.6 of Annex A is

See Attachment Specifications Frontier

### Paragraph 6.  Transfer of Services

6.1     In accordance with Sub-Article 3.1 of the Main Agreement, the Handling Company subcontracts the services of Annex A Section (s) ___ to ___

**Paragraph 7.  Settlement**

7.1     Notwithstanding Sub-Article 7.2 of the Main Agreement, settlement of account shall be effected in 30 days from invoice date. The Handling Company shall invoice the Carrier semi-monthly for all services to be rendered in accordance with this Annex B1.0. Payments for Invoices shall be made via ACH AND ELECTRONIC FUNDS TRANSFERS:

> FirstMerit Bank, N.A.
> Account No: 5830001110
> ABA Routing No: 041200555

> If the company's bank does not have a New York correspondent bank, they will need a SWIFT code to instruct payment. Instructions are as follows:

> FirstMerit Bank, N.A.
> SWIFT CODE: FNBAUS3A
> For further credit to FirstMerit Bank, N.A., Canton, OH
> ABA No: 041200555
> For final Credit to:  Flight Services & Systems, Inc.
> Account No: 5830001110
> Reference (P.O. or invoice #)

7.2     Invoices will be addressed and delivered to:

> Frontier Airlines, Inc.
> Attn: AP Manager
> 8909 Purdue Road, Suite 300
> Indianapolis, IN 46268
> FAX: 317.484.4746
> EMAIL:ap@rjet.com

**Paragraph 8.  Supervision and Administration**

8.1     The services of Annex A, Section 2 Sub-Section 2.1, covered by Sub-Paragraph 1.1   of this Annex B, refer only to the following services of Annex A which are performed for the Carrier by other organization(s) under cover of separate agreement(s):

Section (s) _____

Section (s) _____

**Paragraph 9.  Duration, Modification and Termination**
Any change to Article 11 of the Main Agreement, in particular to the duration of the Main Agreement, validity of rates or rights of termination shall be recorded below, notwithstanding the corresponding Sub-Articles of the Main Agreement. For example:

**9.1   Duration**

9.1.1   Notwithstanding Sub-Article 11.4 and 11.5 of the Main Agreement 60 days notice

9.1.2   Notwithstanding Sub-Article 11.11 of the Main Agreement the rates contained in Paragraph 1 shall be 30 days notice

**9.2   Modification**

9.2.1   Any modification to this Annex B shall be made by a written amendment signed   by both Parties.

**9.3 Termination**

9.3.1   Notwithstanding Sub-Paragraph 9.1.1 of this Annex B, this Annex B may be terminated upon 60 days written notice.

*The number of these clauses can be extended as far as necessary.*

**Paragraph 10. Notification**

10.1   In   accordance   Sub-article   11.3   of   the   Main   Agreement,   any   notice   or communication to be given hereunder shall be addressed to the respective         parties as follows:


To Carrier:

          Frontier Airlines, Inc.
          8909 Purdue Road # 300
          Indianapolis, IN 46268
          Attn: VP Administration

To Handling Company:

          Fight Service & Systems, Inc.
          6100 Rockside Woods Blvd., Suite 355
          Cleveland OH, 44131

          Telephone: 216-328-0090 x 1025
          Fax:   216-328-0091
          E-mail: bweitzel@fsspeople.com

          Attn: Robert P. Weitzel

**Paragraph 11.  Governing Law**

11.1    In accordance with Article 9 of the Main Agreement, this Annex B shall be governed by and interpreted in accordance with the laws of:        Ohio

In accordance with Article 9 of the Main Agreement, courts for the resolution of disputes shall be the Courts of:        Cuyahoga

Signed the *14th of August 2012*  Signed the President

for and on behalf of

Frontier Airlines, Inc.

by _____

for and on behalf of

Flight Services & Systems, Inc.

by _____
Robert P. Weitzel            8/16/12

**From:** Ernestine louise trejo [mailto:etrejo@fsspeople.com]
**Sent:** Tuesday, June 09, 2015 11:27 AM
**To:** Hughes, Darrin <DHughes@flyfrontier.com>
**Subject:** RE: Good Morning

Everyday



**Ernestine Trejo, AUS  General Manager**
Flight Services & Systems
512-530-3340 (o)
512-585-0224 (c)
etrejo@fsspeople.com
**FSSPeople.com**
Austin Bergstom International Airport
3600 Presidential Blvd. Suite 505
Austin, Texas  78719



**From:** Hughes, Darrin [mailto:DHughes@flyfrontier.com]
**Sent:** Tuesday, June 09, 2015 8:51 AM
**To:** Ernestine louise trejo
**Subject:** RE: Good Morning

Are we ground boarding 223 every day?

**From:** Ernestine louise trejo [mailto:etrejo@fsspeople.com]
**Sent:** Tuesday, June 09, 2015 8:45 AM
**To:** Hughes, Darrin
**Subject:** RE: Good Morning

I asked Scott Modale , why he can not have Delta allow us to use gate 4, their flight arrives around 18pm.
Open gate. He stated they lease the gate. I stated I understand that, but then why allow them to use
Gate #2 daily. But for every wheelchair pax that cannot walk down the stairs, and we have to call for EMS
To assist us, I will. Yesterday it actually took 3 men (EMS) to carry a female down.  We can only go as fast
As the buses will upload and download. It take 3.5 bus loads for our pax to arrive and depart on. = about 40-45min.
That's not including any wheelchairs.

EXHIBIT F



**Ernestine Trejo, AUS  General Manager**
Flight Services & Systems
512-530-3340 (o)
512-585-0224 (c)
etrejo@fsspeople.com
**FSSPeople.com**
Austin Bergstom International Airport
3600 Presidential Blvd. Suite 505
Austin, Texas  78719

**From:** Hughes, Darrin [mailto:DHughes@flyfrontier.com]
**Sent:** Tuesday, June 09, 2015 8:34 AM
**To:** Ernestine louise trejo
**Cc:** Hughes, Darrin
**Subject:** RE: Good Morning

It'll get better…. The airport is not doing us any favors.

**From:** Ernestine louise trejo [mailto:etrejo@fsspeople.com]
**Sent:** Tuesday, June 09, 2015 8:33 AM
**To:** Hughes, Darrin
**Subject:** RE: Good Morning

It's not a good day sir, tired of delayed flights, it's kicking our A _ _.

No bags left off.



**Ernestine Trejo, AUS  General Manager**
Flight Services & Systems
512-530-3340 (o)
512-585-0224 (c)
etrejo@fsspeople.com
**FSSPeople.com**
Austin Bergstom International Airport
3600 Presidential Blvd. Suite 505
Austin, Texas  78719

**From:** Hughes, Darrin [mailto:DHughes@flyfrontier.com]
**Sent:** Tuesday, June 09, 2015 8:18 AM
**To:** Ernestine louise trejo
**Subject:** RE: Good Morning

Did we leave any bags off?  Also, could this have contributed to our delay or was it  all LAE and security search?
Thanks!

D

**From:** Ernestine louise trejo [mailto:etrejo@fsspeople.com]
**Sent:** Tuesday, June 09, 2015 8:13 AM

**To:** Hughes, Darrin
**Subject:** FW: Good Morning



**Ernestine Trejo, AUS  General Manager**
Flight Services & Systems
512-530-3340 (o)
512-585-0224 (c)
etrejo@fsspeople.com
**FSSPeople.com**
Austin Bergstom International Airport
3600 Presidential Blvd. Suite 505
Austin, Texas  78719

**From:** Ernestine louise trejo [mailto:etrejo@fsspeople.com]
**Sent:** Thursday, June 11, 2015 8:47 PM
**To:** Hughes, Darrin <DHughes@flyfrontier.com>
**Subject:** RE: AUS - Services for Reduced Mobility Passengers

2..1.3 – I did arrange for specially trained personal to assist – EMS..( Okay joking)
  I should be able to arrange for assistance from the airport, due to they are my landlords. ( I will stop now)
  Our delayed, ground stop F9223 is finally boarding and getting ready to leave.
  I will do my best to figure it out or something.



**Ernestine Trejo, AUS  General Manager**
Flight Services & Systems
512-530-3340 (o)
512-585-0224 (c)
etrejo@fsspeople.com
**FSSPeople.com**
Austin Bergstom International Airport
3600 Presidential Blvd. Suite 505
Austin, Texas  78719


**From:** Hughes, Darrin [mailto:DHughes@flyfrontier.com]
**Sent:** Thursday, June 11, 2015 2:35 PM
**To:** Ernestine louise trejo
**Cc:** Morahan, Sean; Phil Armstrong; Belt, Dallas F.
**Subject:** FW: AUS - Services for Reduced Mobility Passengers

Tina,

ABIA ARFF has balked at moving our passengers up and down the airstair.  I asked our properties folks to dig into the FSS contract, and while FSS is not obligated to provide the carry on/off service, it does read that FSS must arrange for the service.  You did a good job of getting ABIA EMS to help but it looks like that door is now closed.   If FSS can't provide the carry on/off service, please reach out to other vendors on the field.  I am working to sublease a DL gate but until that happens, the ADA has us on the hook to get disabled passengers on and off the aircraft.  Thanks again for dealing with this troublesome situation.  It is appreciated.  Please let me know if FSS or another vendor will be providing this service.

Attached are pertinent excerpts from the FSS contract.

Darrin



Darrin Hughes
Regional Manager
(210) 723-7078
dhughes@flyfrontier.com
www.flyfrontier.com