# AUSTIN- BERGSTROM INTERNATIONAL AIRPORT USE AND LEASE AGREEMENT



# THE CITY OF AUSTIN, TEXAS

# &

# FRONTIER AIRLINES, INC.

## AUSTIN-BERGSTROM INTERNATIONAL AIRPORT

## AUSTIN, TEXAS

**FRONTIER AIRLINES, INC.**
**USE AND LEASE AGREEMENT**

**AUSTIN-BERGSTROM INTERNATIONAL AIRPORT**

**TABLE OF CONTENTS**

**ARTICLE 1 – DEFINITIONS AND INTERPRETATIONS**.................................................................... 1

**ARTICLE 2 - TERM OF AGREEMENT**................................................................................................ 6

**ARTICLE 3 - AIRPORT OPERATION AND MAINTENANCE**........................................................ 6

**ARTICLE 4 - RIGHTS OF AIRLINE** ................................................................................................... 7

**ARTICLE 5 - RENTALS AND FEES** .................................................................................................... 11

**ARTICLE 6 - PASSENGER FACILITY CHARGES  (PFC)** ............................................................. 20

**ARTICLE 7- ASSIGNMENT AND USE OF TERMINAL GATES, TICKET COUNTER POSITIONS AND OTHER LEASED SPACE**.................................................................... 22

**ARTICLE 8 - ACCOMMODATION OF REQUESTING AIRLINES**................................................ 26

**ARTICLE 9 – AIRLINE ALTERATIONS AND ADDITIONS**.......................................................... 28

**ARTICLE 10 – TERMINAL DEVELOPMENT SND CONSTRUCTION/RELOCATION OF AIRLINE PREMISES**............................................................................................................ 30

**ARTICLE  11 - AIRPORT SECURITY AND SAFETY** ...................................................................... 32

**ARTICLE 12 – COMMON USE SYSTEMS AND COMMUNICATIONS SERVICES**.................... 33

**ARTICLE 13 – INDEMNITY** ................................................................................................................. 36

**ARTICLE 14 – INSURANCE**.................................................................................................................. 38

**ARTICLE 15 - ENVIRONMENTAL MATTERS**................................................................................ 41

**ARTICLE 16 -  INSPECTION BY LESSOR** ....................................................................................... 47

**ARTICLE 17 -  RULES AND REGULATIONS**................................................................................... 47

**ARTICLE 18 -  ASSIGNMENT AND SUBLETTING** ........................................................................ 47

**ARTICLE 19 -  SURRENDER OF POSSESSION** .............................................................................. 48

**ARTICLE 20 - FORCE MAJEURE** ...................................................................................................... 49

**ARTICLE 21 – DEFAULT AND REMEDIES**..................................................................................... 49

**ARTICLE 22 - DAMAGE OR DESTRUCTION OF LEASED PREMISES** ..................................... 53

**ARTICLE 23 - NON WAIVER OF RIGHTS** ................................................................. 54

**ARTICLE 24 - INVALIDITY OF CLAUSES** ................................................................. 55

**ARTICLE 25 - APPROVAL BY LESSOR** ................................................................. 55

**ARTICLE 26 - ECONOMIC NON-DISCRIMINATION** ................................................. 55

**ARTICLE 27 - PUBLIC USE, FEDERAL GRANTS AND NONDISCRIMINATION** ............... 55

**ARTICLE 28 - TITLE TO AIRLINE INSTALLED IMPROVEMENTS AND PROPERTY** ........... 58

**ARTICLE 29 - NOTICES** ................................................................. 58

**ARTICLE 30 – BOND ORDINANCES** ................................................................. 59

**ARTICLE 31 - MISCELLANEOUS PROVISIONS** ................................................................. 61

## AUSTIN-BERGSTROM INTERNATIONAL AIRPORT
## USE AND LEASE AGREEMENT

**THIS AGREEMENT** ("Agreement") is made and entered into by and between the CITY OF AUSTIN, TEXAS (the "Lessor"), acting by and through the Executive Director of the Department of Aviation ("Department") and Frontier Airlines, Inc., a corporation, organized and existing under the laws of the State of Colorado ("Airline") with its principal place of business at 7001 Tower Road, Denver, Colorado 80134 as of the 1st day of October 2009 (the "Effective Date").

### ARTICLE 1 – DEFINITIONS AND INTERPRETATIONS

A.  **Definitions.** In this Agreement, the following words and phrases shall be defined as follows:

   (1)  Additional Rent means any fees, charges, or other amounts payable by Airline to Lessor under this Agreement other than Rent, Landing Fees, and PFCs.

   (2)  Affiliate means an Air Carrier that does not have in effect a use and lease agreement or airline operating agreement with Lessor for operations at the Airport, and (a) is the parent or a subsidiary of Airline, (b) shares an International Air Transport Association flight designator code with Airline at the Airport, or (c) otherwise operates under essentially the same trade name, and uses essentially the same livery, as Airline at the Airport; provided, however, a major airline, as such term is defined by the FAA, may be not considered an Affiliate of another major airline if such classification is based solely on a code-share arrangement described in clause (b) of this definition.

   (3)  Air Carrier means an air transportation company, as defined in 49 U.S.C. §40102, which has been granted an operating certificate under 49 U.S.C. Chapter 411.

   (4)  Air Carrier Service means Airline's business of a scheduled air carrier, certificated or otherwise authorized by the United States Government to engage in the business of commercial air transportation of persons, property, cargo, and mail.

   (5)  Airfield Area means the airfield area described on **Exhibit B** and, except as otherwise provided herein, all facilities, equipment, and improvements now or hereafter located thereon, including the runways, taxiways, and facilities at the Airport for the purpose of controlling and assisting arrivals, departures and operations of aircraft using the Airport.

(6)     Airport means Austin-Bergstrom International Airport.

(7)     Applicable Law means all federal, state and local laws, codes, ordinances, rules, regulations, judgments, decrees, or directives of any Governmental Authority applicable to the parties, the Airport, or the Premises during the term of this Agreement.

(8)     Apron mean the paved aircraft parking apron extending from the outside wall of the Terminal building used to park aircraft and to load and unload passengers and cargo, as the same may be expanded or altered from time to time.  The Apron is depicted in **Exhibit C.**

(9)     Apron Fee means the fee charged for the use of aircraft loading and unloading positions on the Terminal Apron, as described in Article 5.

(10)    Bond Ordinance means any ordinance or indenture or both, adopted by the City Council of the City authorizing the issuance of bonds, notes, or other obligations for the Airport and securing such obligations by a pledge of revenues or net revenues of the Airport, or any ordinance or indenture supplemental thereto.

(11)    Common Space means any space in the Terminal excluding Joint Use Premises that is used for a common purpose by multiple Air Carriers, and includes the baggage claim circulation area, baggage claim device area, and common baggage storage area, and the areas used for screening of passengers and baggage at the Terminal.

(12)    CUPPS means Common Use Passenger Processing Systems generally accepted in the commercial aviation industry, including associated self service kiosks and other equipment.

(13)    Director means the Executive Director of Aviation for the City of Austin or his or her designee, or such other officer to whom the duties and authority of the Director may be assigned by the City Manager of the City, or by any agency, board or authority which may subsequently succeed to the jurisdiction of City over the Airport.

(14)    Exclusive Use means the right of Airline to exclusively use those areas of the Premises leased to Airline for its sole use and occupancy, subject to the terms, covenants, and conditions of this Agreement, including administrative office space, lost and unclaimed

baggage offices, airline operations space, and airline clubs.

(15) Federal Aviation Administration or FAA means the agency of the United States Department of Transportation that regulates aviation and airports, or successor agency.

(16) Fee Landings (in the singular, or in the plural form) shall mean the actual landings of aircraft by the Airline at Airport, whether such be in revenue, or non-revenue service, except those which return to Airport prior to landing at another airport for weather, mechanical, or emergency reasons.

(17) Fiscal Year means the Lessor's fiscal year.  As of the Effective Date, the Fiscal Year begins on October 1 and ends the following September 30. Lessor shall give Airline written notice of any change to its Fiscal Year.

(18) Gate means a passenger hold room and associated aircraft loading position including loading bridge (if so equipped) at the Terminal.

(19) Governmental Authority means any governmental, judicial or administrative entity, body or authority having authority over the parties or the Airport, including the FAA and the TSA. Governmental Authority includes the City of Austin when it is acting in its governmental capacity, but not when it is acting in its capacity as Lessor,

(20) Joint Use Premises means Gates, ticket counters, aircraft parking positions, and other operations or office space at the Terminal that are not leased to a single Air Carrier, but are made available by Lessor for use by multiple Air Carriers.

(21) Landing Fees means the fees paid by an Air Carrier for the privilege of landing an aircraft at the Airport, as described in Article 5.

(22) Maximum Certificated Gross Landing Weight shall mean the maximum landing weight of Airline's aircraft approved by the FAA.

(23) PFC means Passenger Facility Charge, as defined in Article 6.

(24) Preferential Use shall mean the right of Airline to first priority in the use of those areas of the Premises preferentially leased to Airline to accommodate its flights and those of Airline's Affiliates subject to the terms, covenants, and conditions of this Agreement. Premises leased to Airline on a Preferential Use basis include aircraft loading positions,

passenger hold rooms, and ticket counter space.

(25)   Premises shall mean the space in the Terminal and associated aircraft loading positions leased to Airline, as described on **Exhibit A-1** and shown on **Exhibit A-2**, attached hereto and incorporated herein.

(26)   Rent means any fee or charge payable by Airline under this Agreement for the use or occupancy of the Premises or other space at the Airport, including rentals for the Premises and Aircraft Loading Positions, Apron Fees, RON Fees, and Terminal Equipment Fees.

(27)   RON Fee means the fee payable by Airline for the use of an Aircraft parking position other than a Gate leased to Airline for a period equal to or greater than four (4) hours, as described in Article 5.

(28)   Signatory Airline means an Air Carrier with scheduled air service to and from the Airport which has executed an Airport Use and Lease Agreement in a form substantially the same as this Agreement.

(29)   Terminal shall mean the Barbara Jordan Terminal at the Airport, including its appurtenant and ancillary facilities.

(30)   Terminal Equipment Fees means the fees payable by Airline for the use of Lessor-provided terminal equipment as described in Article 5.

(31)   Transportation Security Administration or TSA shall mean the agency of the United States Department of Homeland Security that regulates airport and aviation security, or successor agency.

B.   **Interpretations** – In this Agreement, the following rules of interpretation shall apply:

(1)   Headings and underlinings are for convenience only and do not affect the interpretation of an agreement.

(2)   Words importing the singular include the plural and vice versa and the masculine, feminine or neuter gender shall include all genders.  The word "or" is not exclusive.

(3)   The words "hereof," "herein," and "hereunder" and words of similar import when used

in any agreement shall refer to such agreement as a whole and not to any particular provision of such agreement, unless otherwise expressly stated in the relevant provision.

(4)    Any reference to an agreement shall include a reference to each exhibit, annex, schedule and other attachment thereto.

(5)    Any reference in an agreement to an Article, Section, Clause, subsection, sub-clause, paragraph, party, Exhibit, Annex or Schedule is a reference to that Section, Clause, subsection, sub-clause or paragraph of, or that party, Exhibit, Annex or Schedule to, such agreement unless otherwise specified.

(6)    Any reference to an agreement or document is to such agreement or document as amended, varied, supplemented, replaced, novated or modified from time to time in accordance with the terms of such agreement or document.

(7)    Any reference to any Applicable Law shall be construed so as to include such Applicable Laws as amended, modified, extended, re enacted, redesignated or replaced from time to time.

(8)    A reference to a person or entity includes that person's or entity's successors and permitted assigns.

(9)    The term "including" shall mean "including without limitation" and any list of examples following such term shall in no way restrict or limit the generality of the word or provision in respect of which such examples are provided.

(10)    References to "days" shall mean calendar days and references to a time of day shall mean such time in Austin, Texas.

(11)    The Agreement is the result of negotiations among, and has been reviewed by each party and their respective counsel.  Accordingly, the Agreement shall be deemed to be the product of all parties thereto, and no ambiguity shall be construed in favor of or against any of them.

## ARTICLE 2 - TERM OF AGREEMENT

The term of this Agreement shall commence on the Effective Date, and subject to the parties rights of termination hereunder, remain in effect for a term of five (5) years.  If, upon expiration of the primary five year term, the parties have not entered into a new use and lease agreement, this Agreement shall remain in effect from month to month thereafter until terminated by either party upon thirty (30) days' prior written notice.

## ARTICLE 3 - AIRPORT OPERATION AND MAINTENANCE

A.   Throughout the term of this Agreement, Lessor shall operate, maintain, manage and control the Airport in a first class, efficient, economical and businesslike manner, and in accordance with Applicable Law. Lessor shall operate and maintain the land, runways, taxiways (including keeping runways, taxiways and public ramp areas reasonably free and clear of foreign objects that may be harmful to aircraft and aircraft engines), navigation aids, lighting, equipment, entrances, exits, roads, parking areas and all other public facilities and appurtenances within the boundaries of the Airport.

B.   Airline shall operate and maintain at its own expense its leased conditioned and unconditioned space on the apron level of the Terminal Building, but excluding Common Space and Joint Use Facilities.  Airline shall operate any Terminal Equipment under its control, including loading bridges, in accordance with the manufacturer's specifications and Lessor's published operating procedures.  Airline may not modify or alter any Terminal Equipment, or operate such Terminal Equipment in any other or alternative manner without the prior written approval of the Director.  Airline, at Airline's expense, must return the Terminal Equipment to the condition that existed just prior to the Airline's use, normal wear and tear and Lessor approved modifications excepted, upon request from the Lessor.  Lessor may charge Airline for any additional costs incurred by Lessor due to the failure of Airline to comply with the requirements of this Section.

C.   Lessor shall own, operate and maintain the baggage handling systems; the cost of which shall be recovered through the Terminal Equipment Fee.

D.   Lessor agrees to use commercially reasonable efforts to obtain the maximum amount of grants and participating funds for the Airport from the United States of America (or any agency

.

thereof) and the State of Texas (or any agency thereof).

E.   Lessor agrees to use commercially reasonable efforts to maximize net concession revenue and ancillary income, to help defray the costs and expenses of the Airport.

F.   Lessor agrees to use generally accepted accounting principles applicable to governmental entities, consistently applied, recognizing the special requirements of airports, for keeping the books, accounts and records of the Airport.

G.   The overhead and indirect expenses of Lessor shall be determined and allocated equitably to the various cost centers of the Airport in accordance with **Exhibits D-0** through **D-11**.

H.   Lessor shall exercise prudence in the financing, operation, maintenance, improvement, expansion, and management, of the Airport.

I.   Projects required by a Governmental Authority for safety or security, or required by Applicable Law will be undertaken by Lessor when it is prudent to do so and the amortization of reasonably necessary and documented costs, plus all reasonably necessary and documented expenses associated therewith, not covered by grants and participating funds from the United States of America (or any agency thereof) or the State of Texas (or any agency thereof) will be considered an Airport expense, including all payments, deposits and other requirements of the authorization for the issuance of bonds.

## ARTICLE 4 - RIGHTS OF AIRLINE

A.   **Lease of Premises.**  Subject to (1) the terms, conditions, and covenants of this Agreement, and (2) all rights, restrictions, encumbrances and matters of record to the extent the same are valid and enforceable, Lessor hereby leases the Premises to Airline.  Lessor grants Airline the non-exclusive right to use the Common Space and Joint Use Facilities, if any, identified on **Exhibit A**.  Airline shall pay the applicable terminal rates and charges established herein for the Premises, and the Common Space and Joint Use Facilities.

B.   **Rights of Airline**.  Subject to the covenants, agreements, terms, provisions, and limitations of this Agreement, Lessor grants to Airline the nonexclusive use of the Airport.  In addition, but not as a limitation upon the generality of any other provisions hereof, Airline may use the Airport for the operation of its Air Carrier Service which includes the following:

(1)   The landing, taking off, flying over, taxiing, pushing, towing, parking, loading and unloading of aircraft of its choice; including the right to handle other airlines;

(2)   The repairing, maintaining, conditioning and servicing of aircraft and other equipment in areas designated by Lessor;

(3)   The sale of air transportation tickets and services, conveniences and facilities related to air travel and the processing of passengers and their baggage for air travel; the sale, handling and providing of mail, freight and express services and conveniences related thereto and the performance of other activities connected with the operation of its Air Carrier Service;

(4)   The training at the Airport of personnel in the employ of, or to be employed by Airline and the testing of aircraft and other equipment owned, or operated by Airline; provided, that (1) such training and testing to be incidental to the use of the Airport in the operation by Airline of its Air Carrier Service, and (b) such training and testing will not unreasonably hamper, or interfere with the use of the Airport and its facilities by other users entitled to the use thereof;

(5)   The sale, disposal, or exchange, of Airline's aircraft, engines, accessories, aviation fuels, ground vehicle fuels, oil, greases, lubricants and other materials, supplies and equipment related to its Air Carrier Service;

(6)   The right to purchase at the Airport, or elsewhere, from any person, or company of its choice, the requirements of aviation fuel, ground vehicle fuel, lubricating oil, greases and all other such materials and supplies and services; and except for a reasonable annual permit fee, no charges, fees, licenses, excise taxes, tolls or other charges upon any such purchases shall be charged, or collected by Lessor from Airline, or from any other person: for the privilege of or in connection with the purchasing, handling, loading, unloading, servicing, storing, using, or transporting to, from, or at the Airport, such materials and supplies or other property in connection with Airline's business;

(7)   The servicing by Airline, or its suppliers, at appropriate locations, of aircraft and other equipment owned, or operated by Airline, or its suppliers of materials and furnisher of services, by truck, or otherwise; with aviation fuel, ground vehicle fuel, lubricating oil,

grease, and all other such materials and supplies and services required by Airline in the conduct of its Air Carrier Service; such right shall include, without limiting the generality hereof, the right to install, maintain and operate a fuel consortium, without cost to the Lessor, by Airline alone or in conjunction with any other Air Carriers on the Airport, for such aviation fuel, ground vehicle fuel, lubricating oil, greases and other such materials and supplies at locations reasonably acceptable to Lessor, in accordance with insurance underwriters' standards and Applicable Law; together with the necessary pipes, pumps, motors, filters and other appurtenances incidental to the use thereof; such structures and appurtenances to be and remain the severable property of Airline;

(8)   The loading and unloading of persons, property and mail by such motor vehicles, or other means of conveyance as Airline may require in the operation of its Air Carrier Service and Airline may designate the particular ground carrier or carriers, which may transport Airline's employees, property, mail, express and freight to, from and on the Airport.

(9)   The right to install, maintain and operate advertising or identifying signs representing its business on the Airport subject to the approval of Lessor in accordance with published Department signage criteria;

(10)  The right to install, maintain and operate in, on, or about the Airport, such radio communications, meteorological and aerial navigation equipment and facilities as may be necessary, or convenient for its operations; such equipment and facilities to be located in areas leased to Airline for its Exclusive Use, or on such other portions of the Airport as may be designated for that purpose by Lessor.  Airline shall notify and coordinate all installations or modifications of equipment or facilities with Lessor's Manager of Information Technology prior to the installation or change. Nothing herein shall be construed to grant Airline the right to install, maintain or operate, or to grant any third party the right to install, maintain or operate, wireless telecommunications or internet access equipment systems or wireless local area networks in the Airport terminal without the prior consent of the Director. Airline radio communications facilities shall not interfere with radio communications systems and facilities of the Airport, other airlines, or commercial licensed telecommunications providers.   If Airline's radio

communications facilities are demonstrated to cause radio interference, Airline shall modify or cease its use of such radio facilities to eliminate the interference;

(11)  The conduct of any other function, or operation reasonably necessary to the proper performance and operation by Airline of its Air Carrier Service;

(12)  The right of reasonable ingress to and egress from the Airport and the Premises leased to Airline, or used by Airline in common with others; subject to the provisions of this Agreement; for Airline, its employees, passengers, invitees, suppliers of materials and furnisher of services; its or their aircraft, equipment, vehicles, or machinery and other property; without charge to Airline, its employees, suppliers of materials and furnisher of services.

(13)  Subject to availability, the right to lease space in the Terminal Building on an Exclusive Use basis to operate and maintain club rooms ("Airline Club") for Airline's guests, invitees, and passengers and the right to serve food and beverages, including alcoholic beverages in the Airline Club with or without charge.  Airline shall comply with all Applicable Law pertaining to the operation and maintenance of the Airline Club, the sale or serving of food and beverages (including alcoholic beverages), sanitation, and public health and safety. Airline shall obtain and maintain in force and effect all licenses and permits necessary for the operation of an Airline Club from the applicable Governmental Authorities. Airline shall pay to the appropriate Governmental Authority when due all occupation, sales and use taxes arising out of the operation of the Airline Club. Airline shall provide, at its sole expense, complete and proper arrangements for cleaning the Airline Club and for the proper handling and disposal of garbage and other Airline Club trash and refuse.  The Lessor reserves the right to charge Airline applicable percentages of its gross revenues from the sale of food and beverages consistent with the percentages charged to food and beverage concessionaires at the Airport.

(14)  The rights granted herein to Airline may be exercised by Airline or by an Affiliate. Airline shall give the Director written notice of any Affiliates that will be operating at the Airport at least three (3) business days before the Affiliate commences service at the Airport. As between the Lessor and Airline, an Affiliate shall be considered Airline's

agent, and Airline shall be responsible for the actions of its Affiliates, and for the performance of all duties and obligations of its Affiliates, while operating at the Airport, including, but not limited to, payment of all fees, charges and deposits, and reporting of all landings, enplanements and other required data, attributable to the Affiliate's operations at the Airport. Airline's insurance policies must be endorsed to cover its Affiliates operating at the Airport, or Airline must provide proof of the required insurance coverages in the Affiliate's name. Airline may withdraw its designation of another Air Carrier as an Affiliate upon not less than sixty (60) days' prior written notice to the Director; in which event the former Affiliate must enter into a separate use and lease agreement on its own behalf to have signatory rights to operate at the Airport.

(15)    The rights granted herein to Airline include the ability of Airline to handle its Affiliates, and have the operations of its Affiliates treated as signatory operations of the Airline.

C.    **Prohibited Uses.** Airline may use the Premises and the Airport for the purposes expressed in this Agreement, and for no other purpose without the prior written consent of the Director. Nothing herein contained shall be construed to authorize Airline to conduct a business of any kind on the Airport, except its Air Carrier Service, and nothing herein contained shall be construed to authorize Airline, in its conduct of its business, to interfere, unreasonably, with other persons, or tenants, lawfully using, or leasing, Airport facilities. In no event may Airline use the Premises or the Airport for an unlawful purpose.

D.    **Quiet Enjoyment.** Subject to the payment of the rents, fees and other charges provided for herein and the performance of the covenants and agreements on the part of Airline to be performed hereunder, Lessor agrees that Airline shall peaceably have and enjoy the Premises, appurtenances, facilities, right, license and privileges granted herein.

## ARTICLE 5 - RENTALS AND FEES

In consideration of the use of the leased Premises, facilities, rights, privileges and licenses granted hereunder and the undertakings of Lessor, Airline shall pay Lessor during the term of this Agreement, without deduction or set-off, Rent, and other fees and charges as set forth in this Article.

A.    **Establishment of Rates and Charges**

Beginning on the Effective Date, and each Fiscal Year thereafter, Landing Fees, terminal

.

buildings rentals, Apron Fees, terminal equipment fees, fuel facility fees and other charges to be paid by Airline to Lessor for the various facilities and services of the Airport, shall be established.  In establishing such fees, rentals and charges, Lessor shall observe the principles and the methodology contained in this Article and Exhibit D-0 through D-11, attached and incorporated herein.

| | |
|---|---|
| **Exhibit D-0** | General Principles and Methodology |
| **Exhibit D-1** | Basic Project Costs and Funding Sources |
| **Exhibit D-2** | Allocation of Project Costs to Cost Centers - Debt Service |
| **Exhibit D-3** | Acreage Allocation Worksheet |
| **Exhibit D-4** | Summary of Debt Service |
| **Exhibit D-5** | Operations and Maintenance Expenses |
| **Exhibit D-6** | Terminal Space Analysis |
| **Exhibit D-7** | Terminal Space Allocations |
| **Exhibit D-8** | Terminal Rental Rates |
| **Exhibit D-9** | Terminal Apron Fees |
| **Exhibit D-10** | Terminal Equipment Fees |
| **Exhibit D-11** | Landing Fees |

**B.**     **Passenger Terminal Building**

Airline shall pay Lessor Rent for those areas of the Terminal used or occupied by Airline, including Passenger Holdrooms, Ticket Counter Space, Ticket Counter Queuing Space, Airline Ticket Office Space, and Airline operations space.  Rent for space leased to Airline on a Preferential Use or Exclusive Use basis is stated in terms of a price per square foot per year in accordance with **Exhibits D-0 and D-6, D7 and D-8.**  Lessor may establish a per use fee for Terminal Joint Use Facilities in accordance with the allocation of costs set forth in such Exhibits.

**C.**     **Apron Fee**

Airline shall pay an Apron Fee for the Preferential or Joint Use of the aircraft loading and unloading positions serving the Terminal.  The computation for the Apron Fee is shown on **Exhibit D-0 and D-9.**  The Apron Fee is in addition to, and is not included in, the Landing Fee.  The Apron Fee for Joint Use aircraft loading and unloading positions will be a per use

charge. Costs associated with over night or other aircraft parking at a location other than that Airline's assigned aircraft loading position at the Terminal are included in the Apron Fee calculation; however Lessor will recover the pro-rata share of these costs through the RON Fee.

**D.  Terminal Equipment Fees**

Airline shall pay a Terminal Equipment Fee for the use of Lessor-provided terminal equipment including the baggage handling systems, loading bridges, the Multiple-User Flight Information Display System (MUFIDS), and CUPPS. The Terminal Equipment Fee will be in addition to and is not included in any other fee or charge imposed under this Agreement.  The computation for the Terminal Equipment Fee is shown on **Exhibits D-0 and D-10**. The loading bridge component of the Terminal Equipment Fee shall be separately stated on Exhibit D and on Airline's Rent invoices.

**E.  Landing Fees and Landing Fee Rates**

Airline shall pay Landing Fees to Lessor for its use of the Airfield each month. The Landing Fees shall be based on the Landing Fee rate calculated each Fiscal Year. Lessor will use commercially reasonable efforts  to charge and collect Landing Fees from all commercial air transportation users of the Airfield as Lessor may determine to be reasonable.  Commercial air transportation users shall include air cargo operators, charters, and non-signatory passenger and cargo airlines.  Landing Fees for non-signatory passenger and cargo airlines without a written agreement with the Lessor shall be not less than 125% of the Signatory Airlines Landing Fee. As determined by the Lessor, the fees payable by noncommercial air transportation users for the use of the Airfield may be based on some method other than aircraft landed weight, including the imposition of fuel flowage fees. The computation for Landing Fees is shown on **Exhibits D-0 and D-11**.

**F.  Fuel Facility Fees**

Airline shall pay its proportionate share of the costs of the Lessor-provided Fuel Facility as provided in a separate fuel system lease with an Airline fuel consortium.

**G.  RON Fee**

Airline shall pay a RON Fee for the use of an Aircraft parking position, other than a Gate leased

to Airline, for a period equal to or greater than four (4) hours.

**H.    Other Fees**

Lessor reserves the right to assess, and Airline agrees to pay ground rentals and/or reasonable charges in an amount to recover costs and expenses for the use of Lessor-provided facilities after consultation with Airline.

**I.    Employee Ground Vehicle Parking**

Lessor shall make available to Airline's employees who are based or employed at the Airport reasonably adequate automobile parking facilities on or near the Airport.  Subject to availability of space, Lessor may make available parking to Airline's flight crews or other employees (commonly referred to as "commuters") who live in the Austin area, but are based at another airport. Lessor may charge a vehicular parking fee, in an amount sufficient to cover return on capital investment and costs associated with the development, operation, supervision, and maintenance of the parking facilities. Lessor may charge different parking fees to Airline's airport employees and to commuters.

**J.    Initial And Final Computation Of Fees And Charges**

(1)    <u>Initial Computation</u>.

(a)    No later than ninety (90) days before the end of each Fiscal Year, the Signatory Airlines, including Airline, shall submit to Lessor in writing their composite landed weight forecast for the ensuing Fiscal Year.  If landed weight forecasts are not received by the Lessor, Lessor may make its own calculations of landing weights.  No later than sixty (60) days before the end of each Fiscal Year and within thirty (30) days after submission of a draft budget to the City Council, Lessor shall submit in writing to the Signatory Airlines its budgetary forecast of Airport operating expenses for the ensuing Fiscal Year and its calculation of proposed Signatory Airline landing fee and terminal building rental rates for the ensuing Fiscal Year, all in a manner consistent with this Article and the cost accounting principles and procedures currently used by Lessor at the Airport, which principles and procedures shall be consistently applied from year to year throughout the term hereof.

(b)      Lessor shall then schedule a meeting with the Signatory Airlines, to be held as soon as practicable after forwarding the budgetary forecast and rate calculations for the ensuing Fiscal Year, for the purpose of reviewing the budgetary forecast and proposed rates with the Signatory Airlines. Lessor shall give due consideration to the comments of Airline and the other Signatory Airlines in reviewing the proposed rates. Such rates, as may be modified by Lessor as a result of this review process, or as modified by Lessor's final budget adopted by City Council shall become effective as of October 1, of the ensuing Fiscal Year.

(2)      Year-end Adjustment to Actual.  Upon completion of the Lessor's annual audit for the Fiscal Year, Lessor shall recompute the Signatory Airline rents and fees required for such Fiscal Year using actual revenues billed, actual operations and maintenance expenses incurred, and the actual landed weights of all airlines.

In the event that, for each type of rental or fee, the amounts billed to Airline were less than the amounts required, the shortfall shall be charged to Airline on a pro rata basis in equal monthly installments over the remaining months of the then-current Fiscal Year or other means as agreed to by the parties in writing.

In the event that, for each type of rental or fee, the amounts billed to Airline were more than the amounts required, the excess shall be credited back to Airline on a pro rata basis in equal monthly installments over the remaining months of the then-current Fiscal Year or other means as agreed to by the parties in writing.

**K.      Payment of Rent and Other Charges When Due**

(1)      Terminal Rent for Exclusive and Preferential Space, Joint Use Facilities, Apron Fees, Terminal Equipment Fees. Rent for Exclusive and Preferential Space, Joint Use Facilities, Apron Fees, Terminal Equipment Fees is due and payable by Airline in advance on the first day of each month, without being invoiced for such by Lessor.

(2)      Terminal Rent for Common Space Charges.  Airline shall report in writing the number of passengers that it enplaned at Airport in the preceding month to Lessor, by no later than the fifth workday of the following month, in order that Lessor may prorate the Common Space rentals and other charges among the users thereof. On, or before, the

20th day of the month and following receipt of a written report from Airline, Lessor will transmit to Airline an invoice for Common Space charges due for the preceding month. Airline shall pay to Lessor the rentals and other charges due for the preceding month within thirty (30) days following the date of the invoice for Common Space charges from Lessor.

(3)    <u>Landing Fees</u>. Airline shall furnish to Lessor on, or before, the fifth workday of each month during the term hereof, a written report, in a form approved by Lessor, showing Airline's Fee Landings at Airport during the preceding month. Such report shall include (a) the number and the type of aircraft and the Maximum Certificated Gross Landing Weight thereof, (b) the number of aircraft landings, by types of aircraft, for which it provided ground handling services of any kind of others which do not have written agreements with Lessor to use the airport, and (c) the names and addresses of operators of such aircraft, in order that Lessor may submit to such operators appropriate invoices for landing fees and other charges as applicable.

Airline shall calculate and pay to Lessor the monthly Landing Fees within twenty (20) days following the date of Airline's landing fee report for a month, without notice, demand, or invoice. Lessor shall notify Airline in writing if it disputes the amount or calculation of the Landing Fee.

(4)    <u>Disputes.</u> If a dispute arises between the Lessor and Airline with respect to any obligation or alleged obligation of the Airline to pay money to the Lessor, the Airline shall pay the full amount, subject to the right of Airline to protest the amount claimed in writing to the Director. The payment under protest by the Airline of the amount claimed by the Lessor to be due shall not waive any of Airline's rights. If a court or other body having jurisdiction determines that all or any part of the protested payment was not due, then the Lessor shall promptly reimburse the airline any amount determined as not due plus interest at the lesser of the rate specified in Texas Government Code Section 2251.025 or the maximum lawful rate ("Statutory Rate").

(5)    <u>Late Payment Penalty</u>. If Airline fails to pay Rent, Landing Fees, or any other, charge or fee under this Agreement in full within five (5) business days of the due date, Lessor

.

may assess a late payment penalty in the amount of Fifty Dollars ($50.00). If payment in full is not received within thirty (30) days after the due date, interest shall accrue on the amount outstanding at the lesser of one and one-half percent (1.5%) per month or the highest non-usurious amount permitted by law per month (the "Contract Rate").

**L.   Security Deposits**

(1)   In the event Airline fails to pay in full when due Rent or other fee or charge under this Agreement twice during any twelve month period, Airline shall, within thirty (30) days of written demand from the Lessor, deliver to Lessor a security deposit in an amount equal to three times Airline's average monthly amount of rentals and fees payable under this Agreement during the immediately preceding twelve month period. The security deposit shall be held by Lessor until Airline has made timely payment of all Rent and other fees payable under this Agreement for a period of twelve (12) consecutive months at which time such security deposit shall be returned to Airline, less any amounts applied by Lessor under Article 5 L (4) below, subject to the continuing right of Lessor to require Airline to post security for future failures to make timely payments under this Agreement.

(2)   The Security Deposit shall be in the form of cash, or an irrevocable letter of credit. The Security Deposit shall not be considered an advance payment of rent or other fees or charges payable under this Agreement, or a measure of damages in the event of default by Airline. If the Security Deposit is in the form of cash, Lessor shall not be required to earn or pay interest to Airline on the Security Deposit, or to keep the Security Deposit in a separate fund apart from other Lessor funds. If the Security Deposit is in the form of a letter of credit, the credit must be in a form, and drawn on a bank, reasonably acceptable to Lessor, and must remain in effect throughout the term of this Agreement and for a period of sixty (60) days thereafter. If a letter of credit expires in accordance with its terms prior to such time, Airline must provide a replacement letter of credit to Lessor at least thirty (30) days before its expiration date.

(3)   As the Rent and other fees and charges payable by Airline under this Agreement change during the Term of this Agreement, Lessor shall periodically review the adequacy of the

Security Deposit, and may, by written notice to Airline, reasonably increase the amount of the Security Deposit to an amount equal to three times Airline's average monthly amount of rentals and fees payable under this Agreement during the immediately preceding twelve month period. Such notice shall include a calculation of the revised Security Deposit. Airline shall within thirty (30) days of receipt of such written notice from Lessor increasing the Security Deposit, deposit the additional security with Lessor by certified check or supplemental or amended letter of credit.

(4) Lessor shall have the right, but not the obligation, to apply all or any part of the Security Deposit to cure any default of Airline under this Agreement, including, but not limited to, (a) any arrearages of Rent, Landing Fees, and other fees and charges payable by Airline under this Agreement, (b) the cost to repair or restore any damage to the Premises, or (c) any other amounts due from Airline under this Agreement. In such event, Airline must deposit with Lessor an amount equal to the amount so applied by Lessor within ten (10) business days of written notice from Lessor of the nature and amount of the application.

(5) Lessor shall return the Security Deposit to Airline in accordance with Article 5 L (1) above or, if applicable, less any amounts applied by Lessor under Article 5 L (4), within sixty (60) days after the later of the expiration or termination date of this Agreement, or the date that Airline surrenders possession of the Premises to Lessor.

**M.     Records and Audit.**

Airline shall at all times maintain and keep true and complete books, financial records, and accounts (collectively "Records") regarding Airline's compliance with the terms of this Agreement in accordance with generally accepted accounting principles in the United States and Applicable Law, including all Records that document or relate to Airline's activities at the Airport required to be reported under this Agreement, or upon which any fee or charge payable by Airline hereunder is based. Airline shall retain such Records for the greater of (i) three (3) years from the end of the fiscal year to which they pertain, (ii) the applicable retention period provided in 14 CFR Part 249, or (iii) the period of time specified in Airline's normal document and record retention policy. If, prior to the expiration of the foregoing record retention period,

any audit, review or investigation has been commenced by the Lessor, or any claim is made or litigation commenced relating to this Agreement by the Lessor, the Airline or a third party, Airline shall maintain the Records until the audit, claim or litigation is finally resolved (including the determination of any and all appeals or the expiration of time for an appeal). Lessor and its authorized agents and representatives, upon reasonable notice from Lessor to Airline, shall have the right at any time during the term of this Agreement and for three (3) years after its termination, to inspect, reproduce or audit such Records. Airline shall make such Records available to Lessor during normal business hours at the Airport or other location designated by Lessor in Austin, Texas within thirty (30) days after written request to do so from Lessor, or Airline shall pay all reasonable expenses, including, but not limited to, travel, food and lodging, necessary for Lessor's representative or agent to inspect, reproduce, or audit such Records at another location. Airline shall cooperate with Lessor in its performance of such inspection or audit of Airline's Records. If Airline's Records are maintained in electronic or other machine-readable format, Airline shall provide the Lessor or its representative such assistance as may be required to allow complete access to such Records including providing such Records in electronic read-only format compatible with computers and software utilized by Lessor.

If Airline fails to produce, keep and maintain true and complete books and records substantially as required herein, Lessor shall have the right to reasonably estimate and recalculate the fees and charges payable by Airline for the audit period.

If, as a result of such inspection and audit, it is established that additional Rent, Landing Fees, or other fees and charges payable by Airline hereunder are due Lessor, Airline shall pay such additional amount, plus interest at the Contract Rate, within ten (10) days of receipt of written notice from Lessor. If, on the other hand, such audit determines that Airline has overpaid the fees and charges due Lessor, Lessor shall refund to Airline the amount of such overpayment, plus interest on such amount at the Statutory Rate. Except at the end of the term of the Agreement, a refund by Lessor under this Section shall be in the form of a credit against future Rent, Landing Fees, or other fees and charges payable by Lessor under this Agreement; otherwise it will be in the form of a check or wire transfer.

The audit and inspection rights of Lessor under this Article shall extend to the books and records of Airline's Affiliates operating at the Airport.

Except for the expenses referred to above, the cost of an audit of Airline records by Lessor shall be borne by Lessor; provided, however, the total cost of the audit shall be paid by Airline if:

(1)     The audit reveals an underpayment of ten percent or more by category of rentals, fees, and charges due on an annual basis, as determined by such audit, or

(2)     Airline has failed to produce and maintain true and complete records substantially in accordance with this Agreement.

### ARTICLE 6 - PASSENGER FACILITY CHARGES  (PFC)

Lessor may assess, amend and collect PFCs in accordance with Applicable Law.  The following shall apply to the collection of PFCs; provided, however, in the event of a conflict between Applicable Law related to PFCs and the provisions of this Article, Applicable law shall govern:

A.     Airline shall hold the net principal amount of all PFCs that are collected by Airline or its agents on behalf of the Lessor pursuant to Applicable Law, including 49 U.S.C. App. § 1513 and the PFC Regulations thereunder, in trust for Lessor.  No trust account shall be required except as provided in Article 6 B below.  For purposes of this section, net principal amount shall mean the total principal amount of all PFCs that are collected by Airline or its agents on behalf of the Lessor, reduced by all amounts that Airline is permitted to retain pursuant to Section 158.53(a) of the PFC Regulations.  Airline shall provide Lessor a copy of the annual audit of PFCs required by Section 158.69 of the PFC Regulations.

B.     In the event that Airline fails to make payments of PFCs to Lessor in accordance with the PFC Regulations, Director may require Airline to establish a PFC trust account pursuant to this Article 6 B.  In the event Director requires Airline to establish a PFC trust account, and notwithstanding Section 158.49 of the PFC Regulations, upon receipt of PFCs that are collected by Airline or its agents on behalf of Lessor, Airline shall establish, and shall deposit the net principal amount of such PFCs in, a trust account for Lessor's benefit ("Trust Account").  Lessor and Airline agree that the Trust Account shall be held in the name of Airline as trustee for Lessor, provided that Lessor and Airline mutually agree to terms upon which amounts may be withdrawn from such account upon the joint direction of Lessor and Airline.  If Lessor and Airline do not agree, the Trust Account shall be held by an independent third party bank trustee, in which event such trustee's fees shall be payable by the Lessor.  Lessor shall have the right to

select such trustee subject to the approval of Airline, which approval will not be unreasonably withheld.  The Trust Account shall be separate from and not commingled with all other Airline funds, including PFCs collected on behalf of other airports.  In accordance with Section 158.51 of the PFC Regulations, any amounts required to be remitted to Lessor under such Section shall be paid in any event by Airline as trustee, or by such third party bank trustee, to Lessor on or before the date specified in such Section, first out of the net principal amount, then, to the extent of any deficiency, by Airline out of income earned thereon, and then by Airline out of any available funds of Airline.  Funds in the Trust Account shall be invested solely in instruments issued or guaranteed by the United States Government or any of its agencies, commercial paper rated A1 or P1 or better by Standard & Poors or Moody's Investor Service, respectively, or federally insured bank certificates of deposit.  Any income earned on funds in the Trust Account after the date of required remittance to Lessor shall be the property of the Lessor and shall be paid immediately to Lessor.

C.    Upon the determination of a United States bankruptcy court in a final non-appealable order that a trust account is not required to establish Lessor's absolute right to immediately receive all PFCs collected for Lessor and held by Airline, Article 6 B above shall not apply.

D.    In the absence of additional regulations governing the treatment of refunds, any refunds of PFCs due to passengers as a result of changes of itinerary shall be paid proportionately out of the net principal amount attributable to such PFCs and the amount that Airline was permitted to retain under Section 158.53(a) of the PFC Regulations attributable to such PFCs.  Airline hereby acknowledges that the net principal amount of all PFCs collected on behalf of Lessor, shall remain at all times the property of Lessor, except to the extent of amounts refunded to passengers pursuant to the preceding sentence (which shall remain the property of Lessor until refunded and become the property of the passenger upon and after refund).  Other than the amounts that Airline is entitled to retain pursuant to Section 158.53 of the PFC Regulations, Airline shall be entitled to no compensation.

## ARTICLE 7- ASSIGNMENT AND USE OF TERMINAL GATES, TICKET COUNTER POSITIONS AND OTHER LEASED SPACE

A.    **Gate Assignment**.

    (1)    Subject to availability, Lessor shall assign Airline one or more Gate(s) in the Terminal on a Preferential-use basis, in accordance with the minimum Gate use requirements in Article 7.C., for all scheduled flights, subject to specific gate use procedures for off-schedule flights (resulting from ground delays, air traffic control delays, extended ground time, etc.).  Lessor may operate one or more Gates as Joint Use Facilities to serve (a) international arrivals and departures, (b) commuter operations, and (c) those Air Carriers that do not meet the minimum gate use requirements or do not otherwise have Preferential Use of a Gate. Gate procedures for off-schedule flights will be established or revised by Lessor after consultation with the Airlines.  In developing such procedures for off-schedule flights, priority will be given to assigning Airline gates nearest to Airline's preferentially assigned Gate(s).

    (2)    Airline will have priority in using Gates which are assigned to it on a Preferential Use basis to accommodate its flights.  However, Lessor may assign such Gates for use by other Air Carriers in periods when the Gates are not in use by Airline, so long as the other Air Carrier vacates Airline's Preferential Use Gate prior to Airline's flights.

    (3)    The Gate(s) to be assigned to Airline at the passenger terminal building are designated in **Exhibit A**.  Lessor may, in accordance with the procedures set forth in this Article and upon written notification to Airline, convert one or more Gate(s) assigned to Airline on a Preferential Use basis to a Joint Use Facility, or to reassign such Gate(s) to another Air Carrier if Airline's scheduled average gate utilization (including Affiliates) falls below the minimum levels established in Article 7 C.

B.    **Assignment of Ticket Counter Positions**.

    (1)    Subject to availability, Lessor shall assign Airline ticket counter positions in the passenger terminal building on a Preferential-use basis, in accordance with the minimum ticket counter use requirements in Article 7.C., for all scheduled flights.  Lessor may

operate one or more ticket counter positions as Joint Use Facilities to serve those Air Carriers that do not meet the minimum ticket counter position use requirements or do not otherwise have Preferential Use of a ticket counter.

(2)     Airline will have priority in using ticket counter positions which are assigned to it on a Preferential Use basis to accommodate its flights.  However, Lessor may assign such ticket counter positions for use by another Air Carrier in periods when the ticket counters are not in use by Airline, so long as the other Air Carrier vacates Airline's Preferential Use ticket counter position at least one hour prior to the scheduled time of departure of Airline's flights.

(3)     The ticket counter position(s) to be assigned to Airline at the passenger terminal building are designated in **Exhibit A.**  Lessor may, in accordance with the procedures set forth in this Article and upon written notification to Airline, convert one or more ticket counter position assigned to Airline on a Preferential Use basis to a Joint Use Facility, or to reassign such ticket counter(s) to another Airline(s) if Airline's scheduled average gate utilization (including Affiliates) falls below the minimum levels established in Article 7C.

**C.     Minimum Gate and Ticket Counter Usage.**

(1)     In order for Airline to qualify for the Preferential Use of a Gate, Airline's scheduled average gate utilization (including Affiliates) must be greater than or equal to five (5) departures per day.    Lessor may periodically evaluate Airline's utilization of the Terminal in terms of average number of daily departures per Gate for the immediately preceding three calendar quarters (the "Test Period").  If Airline's average gate utilization is less than five departures per day during the Test Period (determined by taking the total number of scheduled departures during the Test Period and dividing by the product of total number of Gates preferentially assigned to Airline times the number of days in the Test Period), Lessor, at its option and in order to accommodate the needs of other Air Carriers at the Airport, may upon thirty (30) days' written notice to Airline require Airline to relinquish a proportionate number of its Gates in the terminal such that, on a pro-rata basis, excluding relinquished Gates, the remaining Gates would have

demonstrated an average utilization of at least five departures per day during the Test Period. In addition, Airline must make available, as necessary, proportionate amounts of ticket counter, ticket office space, and bag makeup areas, regardless of whether such space is leased to Airline on an Exclusive or Preferential Use basis.

(2)    If Airline qualifies under Article 7.C.(1) above for the Preferential Use of a Gate, Airline may lease, subject to availability, a sufficient amount of ticket counter space to operate at least two ticketing positions. Lessor shall use reasonable efforts to accommodate Airline requests to lease additional ticket counter space or positions, subject to availability. If as a result of the periodic evaluations of Gate usage under Article 7.C.(1), above, Airline is required to relinquish one or more Gates, Lessor may be required to also relinquish a proportionate amount of ticket counter space or positions.

(3)    If Lessor requires Airline to relinquish Gates, ticket counter positions and other space, Lessor and Airline will confer to determine which Gates, ticket counters, and space will be relinquished. If after twenty (20) days of good faith negotiations, no agreement has been reached, Lessor shall select the Gates, ticket counters, ticket office space, and other space to be relinquished. The cost of any reconfiguration of Airline's Exclusive Use Space or Preferential Use Space required by this provision shall either be paid by Lessor (without subsequent charge back to the Terminal Airline Area rate base), or passed on to the Air Carrier obtaining the rights to the relinquished space. If Airline is unable to operate all of its flights from Airline's remaining Gate(s) or ticket counter positions, and:

(a)    the Gates or ticket counter space relinquished by Airline is converted into a Joint Use Facility, Airline shall have priority in the use of the relinquished Gate or ticket counter space over other users of the Joint Use Facility for those of its flights which, because of a schedule conflict, cannot be operated from Airline's remaining Gates or ticket counter space, as applicable; or

(b)    the Gates or ticket counter space relinquished by Airline is assigned to another air carrier on a Preferential Use basis, and Airline is unable to make arrangements with another Air Carrier at the Airport to accommodate those of its flights which, because of a schedule conflict, cannot be operated from

Airline's remaining Gates or ticket counter space, as applicable, Lessor shall assign such flight(s) to available Joint Use Facilities as close to Airline's Preferential Use Gate(s) or ticket counter position(s) as reasonably possible under the circumstances.

D.   **Reassignment Upon Default or Discontinuation of Service**.  Notwithstanding the above, if Airline (a) fails to pay Rent, Landing fees, or any other fees or charges in accordance with the provisions of Article 5, and the invoice(s) become delinquent beyond ninety (90) days following the receipt of said invoice(s) by the Airline from the Lessor or (b) if Airline discontinues commercial air service at the Airport, Lessor may reassign Airline's Gates, ticket counter positions, and other space leased by Airline immediately and without notice, regardless of whether such space is leased on an Exclusive or Preferential Use basis.  Airline will be deemed to have discontinued commercial air service if (i) Airline fails to operate any scheduled flights at the Airport for more than twenty (20) days for any reason other than the occurrence of an event of force majeure, (ii) provides written notice to Lessor of discontinuation, or (iii) makes a public announcement of discontinuation of commercial air service to the Airport.  A space reassignment triggered by a written notice or public announcement of discontinuation shall be effective on the earlier of the date of discontinuance stated in the notice or announcement, or the date of actual discontinuance.

E.   **Gate Usage**.

(1)   Airline shall minimize its time of usage of such Gates and shall remove its aircraft promptly, when aircraft are not being loaded or unloaded, from the aircraft loading positions and to make available the use of the related passenger hold rooms whenever Lessor notifies it that one or more of Airline's Gates are required for loading or unloading aircraft of other Air Carriers.

(2)   Whenever Lessor requires Airline to remove its aircraft from its assigned aircraft loading positions, Lessor shall provide paved aircraft parking space(s) in an area designated by Lessor for such purposes to accommodate the removed aircraft, and the expense for the paved aircraft parking space shall be charged to the area of the Airport which is supported by the RON Fee.

F.  Whenever Airline's Preferential Use Gates(s) is used by others, Airline may charge such other users a reasonable fee not to exceed its direct costs and expenses related to providing such facilities plus an administrative overhead charge up to fifteen (15%) percent.

G.  Lessor may modify, reconfigure, reassign, reallocate or relocate the ticket counter positions, ticket offices, operations space, and other terminal space Preferentially or Exclusively leased to Air Carriers serving the Airport to (a) improve the utilization or functional capacity of the Terminal (b) to implement terminal capital improvement projects, or (c) as necessary due to casualty or an event of force majeure.  If Lessor determines it is necessary to modify, reassign, reconfigure, reallocate or relocate airline terminal leased space, Lessor shall consult with the affected Air Carriers.  Lessor shall consider the input of the Air Carriers in good faith, but Lessor shall make the necessary decisions regarding modification, reconfiguration, reassignment, reallocation or relocation for each of the affected Air Carriers, including, if applicable, Airline. Lessor shall not relocate an Air Carrier against its will to premises that are materially greater in area or that would result in increased Rent when compared to the Premises under lease by that Air Carrier at the time of the relocation.  To the extent reasonably possible, Lessor shall provide the relocated Air Carriers with space that meets their operational requirements.  If Lessor implements a plan to modify, reconfigure, reassign, reallocate or relocate terminal space that is unacceptable to the affected Air Carriers, including, if applicable, Airline, and an affected Air Carrier reasonably determines that the proposed new premises are inadequate to meet its operational requirements, or to maintain its competitive position at the Airport, that Air Carrier may terminate this Agreement without penalty upon ninety (90) days' prior written notice to Lessor.

### ARTICLE 8 - ACCOMMODATION OF REQUESTING AIRLINES

Lessor shall accommodate the needs of an Air Carrier  that seeks to initiate air passenger service to the Airport, but does not then lease space at the Airport, or an incumbent Air Carrier  that seeks to expand its service to the Airport (collectively, a "Requesting Airline") as follows:

A.  If available, Lessor shall grant the Requesting Airline the use of Gates, ticket counter, office, baggage make-up, and related terminal space that are not currently under lease to another airline serving the Airport, or that are designated as Joint Use Facilities.  If there are insufficient

unleased or Joint Use Facilities available, Lessor shall direct the Requesting Airline to contact the Air Carriers serving the Airport to attempt to reach an agreement for the sublease or joint use of space leased by an Air Carrier or for handling of the Requesting Airline's passengers, baggage, freight, and aircraft. Airline agrees to reasonably consider a request by a Requesting Airline to sublease or jointly use Airline's Premises and for handling. Airline shall not impose unreasonable terms or excessive charges on the Requesting Airline for sublease, joint use or handling. All subleases, joint use agreements, and handling agreements are subject to the prior written approval of the Director, which shall not be unreasonably delayed or denied. Nothing herein shall be construed to preclude a Requesting Airline from directly entering into a sublease, joint use agreement, or handling agreement with an incumbent Air Carrier in the first instance.

B.   If a Requesting Airline notifies the Lessor in writing that it has contacted all Air Carriers at a level above the local station manager, and has exhausted all reasonable efforts to obtain accommodation for its proposed operations:

(1)   Lessor may require any Air Carrier, including Airline, having an underutilized Gate or ticket counter positions (as determined in accordance with Article 7) to accommodate the Requesting Airline, or immediately relinquish such underutilized Gate or ticket counter positions back to Lessor for reassignment to the Requesting Airline; or

(2)   If there are no underutilized Gates or ticket counter positions, and the Director determines that the Requesting Airline needs the requested space or facilities, and that to satisfy such need, it will be necessary for one or more of the Signatory Airlines to share its Premises with the Requesting Airline, the Director shall notify each of the Signatory Airlines in writing. The notice shall inform the Signatory Airlines that it is the Director's intent to make a further determination within fifteen (15) days of how the Requesting Airline will be accommodated. If the needs of the Requesting Airline have not been voluntarily accommodated by one or more of the Signatory Airlines within this period, the Director may grant the Requesting Airline the right of shared use of all or a designated portion of an airline's Premises, together with the right of access to the affected airline's Premises, and the right to use appurtenant passenger loading bridges and other equipment which is reasonably necessary for the use of such Premises. In determining which premises will be made available to a Requesting Airline, the Director

shall consider:

    (a)    the average number of flight arrivals and departures per Gate per day;

    (b)    potential flight scheduling conflicts;

    (c)    potential labor conflicts;

    (d)    the location of Gates, ticket counters and other Preferential Use Premises or Joint Use Facilities; and

    (e)    operational and other matters deemed appropriate by the Director.

(3)    In the event the Director grants a Requesting Airline the right of shared use of all or a portion of Airline's Premises:

    (a)    the Requesting Airline shall indemnify Airline in writing from claims for damages and personal injury arising out of Requesting Airline's use of Airline's Premises to the same extent as Airline indemnifies Lessor under this Agreement;

    (b)    the Requesting Airline shall reimburse Airline for Airline's direct costs and expenses related to providing such facilities plus administrative overhead not to exceed fifteen (15%) percent; and

    (c)    Airline shall be excused from its obligation to indemnify Lessor under Article 13, for claims for damages or personal injury to caused by, or resulting from, Requesting Airline's use of Airline's Premises, except to the extent caused by or resulting from the negligence or willful misconduct of Airline, or Airline's agents, employees or contractors.

## ARTICLE 9 – AIRLINE ALTERATIONS AND ADDITIONS

A.    **Airline Modification or Additions to Premises**. Airline shall make no alterations, or additions to its Premises leased hereunder without the prior written approval of Lessor. If Airline proposes to make any modification, alteration or addition to its Premises, Airline shall follow the procedures set forth in the City of Austin Airport Design Review Policies and Procedures – Policy & Procedures for the ABIA Design Review Committee, as amended or revised from time to time ("Design Review Policies"). The alterations or additions must comply

with the Austin-Bergstrom International Airport Design Guidelines ("Design Guidelines"), as amended or revised from time to time.  The Design Review Policies and the Design Guidelines are incorporated herein by reference.

B.     **Modification Required to Accommodate Disabled Persons**.  If Lessor is required by Applicable Law or an order of a Governmental Authority to modify the areas leased or occupied by Airline, or to install additional equipment therein, in order to accommodate Airline's disabled passengers during the term of this Agreement, Lessor shall give the Airline prompt notice of the receipt of such governmental order to undertake such modifications, or additions, in order that Airline may present its views, or objections, or participate in the planning of such, to the extent that its interest is involved. Then:

(1)     if the areas or equipment (including boarding assistance devices) are Exclusively or Preferentially leased to or used by Airline, the Rent paid by Airline for such areas or equipment shall be adjusted to include Lessor's cost to modify such areas or install additional equipment, amortized over a reasonable period of time in accordance with generally accepted accounting principles; and

(2)     if the areas or equipment are Common Use or Joint Use Facilities, the Rent paid by Airline and other users thereof shall be adjusted to include Lessor's cost to modify such areas or install additional equipment, amortized over a reasonable period of time in accordance with generally accepted accounting principles.

(3)     The Rent adjustment under this Article shall be effective as of the first day of the month following the completion of such modifications, or the installation of such equipment, as applicable.

Unless otherwise specified in **Exhibit A**, each of Airline's Preferential Use Gates are equipped with passenger loading bridges.  If Airline elects to operate any aircraft at the Airport which cannot be boarded using the loading bridges provided by Lessor, Airline shall be solely responsible to satisfy its obligations under the Air Carrier Access Act [49 U.S.C, 1374(c)] and the regulations promulgated thereunder (14 CFR §382.23) with respect to aircraft covered by 14 CFR Part 121.

**ARTICLE 10 - TERMINAL DEVELOPMENT AND CONSTRUCTION/RELOCATION OF AIRLINE PREMISES**

A.    **Lessor's Terminal Development and Construction Rights**.

     (1)    Airline acknowledges that, in order that the Airport and the Terminal may be suitable for the volume and character of air traffic, flight activity, and passenger traffic, Lessor may, from time to time, undertake construction, repair or other activities related to the expansion, operation, maintenance and repair of the Terminal or the Airport, which will require temporary accommodation by Airline.  In addition, Lessor reserves the right to permanently reconfigure the Terminal, in whole or in part as necessary to accommodate the construction or expansion of the Terminal, or construction of connections to other terminals or facilities at the Airport, or to relocate or reconfigure the Premises and Joint Use Facilities.  Lessor agrees to use reasonable efforts to minimize disruption in Airline's business operations during such period of construction.

     (2)    Without limiting the generality of the foregoing, Lessor may temporarily or permanently close, alter, change, modify and/or relocate any entrances, passageways, doors and doorways, corridors, elevators, escalators or other parts of the Common Areas, Joint Use Facilities or the Terminal and the Premises; and Lessor may at any time and from time to time make such changes, alterations, additions, improvements, repairs or replacements in or to the Common Areas, Joint Use Facilities, and Terminal, as well as in or to the entrances, passages, elevators, escalators, and stairways thereof, as it may deem necessary or desirable, and to change the arrangement and/or location of entrances, passageways, doors and doorways, and corridors, elevators, stairs, toilets, or other public parts of the Common Areas, Common Use Facilities or the Terminal and the Premises, and may stop or interrupt any service or utility system, when necessary by reason of accident or emergency or construction work until the necessity for the interruption or stoppage has ended.

B.    **Notice of Construction Activities**.  Except in an emergency, Lessor shall provide Airline not less than five (5) days' advance notice of construction activities.

C.    **Access**.  Lessor shall provide reasonably adequate means of ingress and egress to Airline's

Premises, or to alternate premises if Airline is relocated.

D. **Inconveniences during Construction**. Airline further acknowledges that such improvements may require substantial construction work in the Terminal during normal business hours, which may disrupt Airline's business operations and create noise, dust and other concomitants of construction work.   Airline agrees that it shall have no right (except as may otherwise be expressly provided herein) to any abatement of Rent, Additional Rent or other compensation or to any claim of breach of the Lessor's covenant of quiet enjoyment (express or implied) or to any claim of actual or constructive eviction or for loss of business or inconvenience, or in any event for consequential damages on account of any such construction work, and without incurring any liability to Airline or otherwise affecting Airline's obligations under this Agreement.  Airline agrees to accommodate the Lessor in such activities even though Airline's own operations may be inconvenienced or partially impaired. To the extent reasonably feasible, Lessor will endeavor to provide alternative accommodations to mitigate the adverse effects of such construction activities.  If such construction activities render untenantable or unusable, the Premises leased to Airline hereunder, Lessor shall grant Airline a reasonable and proportionate abatement of the rentals, fees and charges related the Premises, during the period, and to the extent, that the Premises are untenantable or unusable.

E. **Relocated Airline Premises**.  If, pursuant to this Article:

  (1)    Airline is temporarily moved to a new location in the Terminal to accommodate Terminal construction or development, Lessor shall use commercially reasonable efforts to provide Airline with substitute Premises that are suitable for Airline's operational requirements, subject to availability.

  (2)    Airline's Premises are replaced by new or reconstructed facilities, the new Premises shall be suitable for Airline's operational requirements, and shall be substantially comparable in area, functionality, and access as the original Premises, unless otherwise agreed by Airline.

F. **Relocation Costs**.  If, pursuant to this Article, Airline is moved to a new location in the Terminal, or other facilities leased, or used by Airline pursuant to this Agreement are relocated against its will, the costs of the move will be included in the costs of the project, at no expense

to Airline. If Airline reasonably expects it will directly incur relocation costs for work not included in the scope of the project, or which is not performed by Lessor or Lessor's contractors, Airline shall provide Lessor with a written estimate of its projected relocation costs for project budgeting purposes. Relocation costs include reasonable and documented costs and expenses incurred by Airline to move Airline's affected personnel, equipment, and operations to the new location, and the cost to replace Airline equipment or fixtures that are not reasonably capable of being moved. Lessor shall not be responsible to reimburse Airline, however, for (i) any costs assumed or paid directly by Lessor, or (ii) any indirect, incidental, or consequential, costs incurred by Airline as a result of the relocation, including loss of income or revenue, or increased operating or maintenance costs. To seek reimbursement of relocation costs incurred by Airline, Airline shall submit a written claim to Lessor, together with all necessary and appropriate supporting documentation within sixty (60) days after the move has been completed. Lessor shall pay relocation costs incurred by Airline within thirty (30) days after receipt of a proper claim. Reimbursement of relocation costs may be in the form of a credit against Rent or Additional Rent payable by Airline under this Agreement.

### ARTICLE 11 - AIRPORT SECURITY AND SAFETY

A. **Security**.

    (1)  <u>Compliance with Transportation Security Regulations</u>. Airline shall comply with all Applicable Laws governing airport or aviation security, including Transportation Security Regulations (Title 49 CFR Chapter XII) and the Airport Security Plan. Lessor reserves the right to install security devices in or on the Premises, as it deems necessary to comply with Transportation Security Regulations or the Airport Security Plan.

    (2)  <u>Security Costs.</u> All costs and expenses incurred by Lessor associated with screening for security reasons, of passengers and other persons, baggage and hand-carried objects entering the Sterile Areas of the Terminal, or to provide facilities to perform such screening, in order to comply with Applicable Law, including Federal Security Regulations 49 CFR Part 1544, will be paid for by Airline and other Air Carriers operating from the Terminal which are required to, or actually do, use the screening services; and such costs and expenses incurred by the Airport will be prorated among

the said Air Carriers using the formula for payment of Common Space charges.

 (3) <u>Other Airline Agreements</u>.  Lessor shall have no obligations or liability connected with or arising out of separate arrangements made by Airline or other Air Carriers serving the Airport with service companies to provide additional functions related to screening pursuant to Federal Security Regulations.

 (4) <u>Indemnification</u>.  AIRLINE SHALL INDEMNIFY AND HOLD LESSOR HARMLESS FROM AND AGAINST ALL LIABILITY, CLAIMS, PENALTIES, FINES, COST, LOSS, OR EXPENSE INCURRED BY LESSOR TO THE EXTENT ARISING OUT OF, OR CONCERNING, A BREACH BY AIRLINE, ITS AFFILIATES OR CONTRACTORS, OR THEIR RESPECTIVE EMPLOYEES OR AGENTS, OF AIRLINE'S OBLIGATIONS UNDER THIS ARTICLE.

B. **Safety**.  Lessor has, or will during the term of this Agreement, develop and implement a Safety Management System for the Airport.  Airline shall fully cooperate with Lessor in the development and implementation of such Safety Management System.

### ARTICLE 12 – COMMON USE SYSTEMS AND COMMUNICATIONS SERVICES

A. **Common User Passenger Processing Systems**.

 (1) Lessor reserves the right to develop, install and implement CUPPS at the Airport. Prior to implementation of CUPPS at the Terminal, Lessor will consult with the Signatory Airlines.  Airline agrees to cooperate with the development of CUPPS at the Airport.  If after such consultation, Lessor elects to proceed to implement CUPPS, Lessor shall give written notice to the Signatory Airlines.

 (2) Unless Airline exercises its opt-out rights under Article 12 A. (3):

  (a) Airline shall make all necessary modifications and improvements to become compatible with Lessor's CUPPS within six (6) months after receipt of written notice from Lessor, or as otherwise agreed by Lessor and Airline.  After installation, all future improvements and any new equipment of the Airline shall be compatible with the Lessor's CUPPS installations.  The Airline shall not install any proprietary terminal equipment without the prior written approval of the Director.

(b)    Airline shall utilize the Lessor's CUPPS if and when installed at the Airline's Preferential Use Premises.  The costs associated with such use, including but not limited to the periodic replacement of all required CUPPS equipment, cabling, power and ongoing maintenance, shall be assessed to Airline as a Terminal Equipment Fee, which shall be paid by Airline in accordance with Article 5 above.

(c)    Airline hereby agrees that Lessor may install CUPPS equipment at the Airline's Preferential Use Premises.  Lessor may also install CUPPS equipment in the circulation space and other public areas of the Terminal, as well as other areas on the Airport, including the parking garages and lots.  Upon installation of such CUPPS equipment by Lessor, Airline agrees to transition from the use of any existing self-service devices of Airline to Lessor's CUPPS system. The entire cost of such installation, including but not limited to the removal and disposal of existing equipment, the initial purchase and periodic replacement of all required CUPPS equipment, cabling, power and ongoing maintenance, shall be assessed to Airline as a Terminal Equipment Fee, which shall be paid by Airline to Lessor in accordance with Article 5 above.

(3)    Airline may opt out of Lessor's CUPPS program by written notice given to Lessor within thirty (30) days after receipt of the notice referred to in Article 12.A(1).  If Airline does not affirmatively opt out, Airline shall be deemed to have agreed to participate the CUPPS program.  If Airline elects to opt out, Terminal Equipment Fees assessed to Airline shall not include CUPPS costs, but (i) Airline may not install, operate or maintain any of its proprietary terminal equipment or passenger processing kiosks in the circulation space and other public areas of the Terminal, the parking garages and lots, or any location in the Terminal or on the Airport other than at Airline's leased Gates and ticket counter and ticket counter queuing space, (ii) the placement of Airline's proprietary terminal equipment or passenger processing kiosks within Airline's Premises shall comply with applicable Airport design standards, (iii) any rights hitherto granted to Airline by Lessor to place its proprietary terminal equipment or passenger processing kiosks at any other location on the Airport shall be revoked and without further force or

.

effect, and (iv) Airline, at Airline's expense, shall remove any of its proprietary terminal equipment or passenger processing kiosks located outside of Airline's Premises.

B.     **Wireless Networks**

Lessor shall have the exclusive right to install and operate a wireless LAN (Wi-Fi) at the Airport, and Airline acknowledges and agrees that Airline shall have no right to install or operate any such equipment without the prior written approval of the Director.

C.     **Communications Services**

(1)    Telecommunications Services. All external telecommunications providers will terminate at the demarcation point located in the Lessor's Communications Center. Airline will use the Lessor's fiber optics and Copper Premise Distribution System (PDS) to connect to the demarcation point. Fees for telecommunications services are set by municipal ordinance and are subject to change at any time. Lessor shall give Airline written notice prior to the effective date of any rate change.

(2)    Telephone Service. Airline may either use the Lessor's Shared Tenant Service (STS) telephone system or select another telephone service provider. To use the STS, Airline must use the Airport-provided telephone instruments, which may be purchased from the Lessor. Airline will have the option of purchasing its own telephone switch and related equipment to connect to the PDS and the Airport telecommunications demarcation point. Airline furnished telephone switches and equipment shall be located on Airline's Premises.

(3)    Telephone Service Charges. Airline shall be responsible for, and pay all telephone service charges, including installation, maintenance, moves, adds, changes, long distance and local provider service. Airline will not enter into any telephone agreement that conflicts with the Lessor's Minimum Point of Entry (MPOE), the telephone demarcation point, or STS.

(4)    Data Communications Service. The PDS carries data transmission services throughout the Airport site. Airline, at Airline's expense, must provide all equipment necessary to connect to the PDS. All data transmission and switching equipment used must comply with Lessor specifications. Airline shall pay the fees established by the Lessor for the

use of the PDS for data transmission.  Shared Tenant Services include data transmission lines (Frame Relay, ISDN, and T1) or Airline may choose to use the PDS to connect to an alternate provider at the demarcation point.  Airline shall be responsible for, and pay all data communication service charges, including installation, maintenance, moves, adds, changes; excluding, however installation and move charges that arise out a relocation of Airline's Premises under Article 10.

(5)    <u>Television Service.</u>  Airline may contract with a provider of cable access television service in the Austin area for television service in those areas of the Premises it leases on an Exclusive Use basis.  Airline may not install television sets in the passenger holdrooms, the ticket lobby, or other area accessible by the public.  Airline may not install satellite dishes, antennae or similar receiving devices on the Premises.  Airline shall be responsible for, and pay, all charges, including installation, maintenance, moves, adds, changes, PDS and cable channel charges.

(6)    <u>Invoicing and Payment</u>.  Airline must apply for and sign the Airport Shared Telephone System Terms of Usage.  Airline understands that it shall be billed monthly for its PDS and STS charges under this Article.  Payment for PDS and STS charges is not included in the monthly Premises rent and must be paid by Airline as provided in the STS Terms of Usage. Non-payment of telephone service charges shall be grounds for discontinuance of service and an event of default under this Agreement.

(7)    <u>Computer Networks</u>.  Airline shall, at its sole expense, procure, install and maintain all computer networks within the Premises.

## ARTICLE 13 - INDEMNITY

A.    **Indemnity.**  AIRLINE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS LESSOR AND ITS EMPLOYEES, AGENTS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "INDEMNIFIED PARTIES"), FROM AND AGAINST ALL COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES, EXPENSES, AND COURT COSTS), LIABILITIES, DAMAGES, CLAIMS, SUITS, ACTIONS, AND CAUSES OF ACTIONS WHATSOEVER ("CLAIMS"), TO THE FULL EXTENT ARISING OUT OF (A) ANY BREACH OF THIS AGREEMENT BY AIRLINE OR ITS AGENTS, EMPLOYEES, AFFILIATES, SUBTENANTS, OR CONTRACTORS, (COLLECTIVELY THE "AIRLINE PARTIES") (B) ANY

FALSE REPRESENTATION OR WARRANTY MADE BY THE AIRLINE PARTIES HEREUNDER, (C) NEGLIGENCE, OR WILLFUL MISCONDUCT, OF THE AIRLINE PARTIES IN CONNECTION WITH THIS AGREEMENT, THE CONSTRUCTION, DEVELOPMENT, OPERATION OR USE OF THE PREMISES, OR THE AIRPORT. THE FOREGOING INDEMNITY OBLIGATIONS OF AIRLINE DO NOT APPLY TO THE EXTENT A CLAIM ARISES OUT OF THE NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTIES; BUT AIRLINE'S OBLIGATIONS UNDER THIS ARTICLE TO INDEMNIFY TO THE FULL EXTENT OF THE AIRLINE PARTY'S FAULT ARE NOT EXCUSED IF A CLAIM IS CAUSED IN PART BY, OR ARISES OUT OF, THE CONCURRENT NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTIES. AIRLINE SHALL ASSUME ON BEHALF OF THE INDEMNIFIED PARTIES AND CONDUCT WITH DUE DILIGENCE AND IN GOOD FAITH THE DEFENSE OF ALL CLAIMS AGAINST ANY OF THE INDEMNIFIED PARTIES. MAINTENANCE OF THE INSURANCE REQUIRED UNDER THIS AGREEMENT SHALL NOT AFFECT AIRLINE'S INDEMNITY OBLIGATIONS. AIRLINE MAY CONTEST THE VALIDITY OF ANY CLAIMS, IN THE NAME OF LESSOR OR AIRLINE, AS AIRLINE MAY IN GOOD FAITH DEEM APPROPRIATE, PROVIDED THAT THE EXPENSES THEREOF SHALL BE PAID BY AIRLINE, AND AIRLINE SHALL MAINTAIN ADEQUATE INSURANCE TO COVER ANY LOSS(ES) WHICH MIGHT BE INCURRED IF SUCH CONTEST IS ULTIMATELY UNSUCCESSFUL. IN NO EVENT MAY AIRLINE ADMIT LIABILITY ON THE PART OF LESSOR WITHOUT THE PRIOR WRITTEN CONSENT OF THE AUSTIN CITY ATTORNEY.

B. **Waiver of Consequential Damages**. EACH PARTY HEREBY WAIVES ANY AND ALL RIGHTS TO RECOVER ANY CONSEQUENTIAL INCIDENTAL, EXEMPLARY OR PUNITIVE, DAMAGES FROM THE OTHER PARTY, INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR INCOME, CLAIMS OF AIRLINE'S CUSTOMERS, SUBTENANTS, AND CONTRACTORS, AND OTHER SIMILAR CLAIMS OR DAMAGES.

C. **Claims Against Airline**.        If any claim, demand, suit, or other action is made or brought by any person or entity against the Airline arising out of or concerning this Agreement, the Airport, or the Premises, Airline shall give written notice thereof to Lessor within ten (10) business days after being notified of such claim, demand, suit, or action. Such notice shall enclose a true copy of all written claims, and if the claim is not written or the information is not discernable from the written claim, state the date of notification of any such claim, demand, suit, or other action; the names and addresses of the person, firm, corporation, or other entity making such claim or

that instituted or threatened to institute any type of action or proceeding, the basis of such claim, action, or proceeding; and the name of any person against whom such claim is being made or threatened. Such written notice shall be delivered either personally or by mail and shall be directly sent to the Austin City Attorney, 301 West 2nd Street, Austin, Texas 78701, and to Lessor.

## ARTICLE 14.  INSURANCE

A.    Airline shall, without expense to Lessor, obtain and cause to be kept in force throughout the term of this Agreement, including any renewals, or extensions thereof, the insurance policies and coverages as provided in this Article.  Airline shall deliver certificates of insurance, for itself and its contractors, verifying the coverage listed below to the Director prior to commencing operations pursuant to this Agreement. If coverage period ends during the Term of the Agreement, Airline shall, prior to the end of the coverage period, forward a new Certificate of Insurance to Lessor as verification of continuing coverage for the duration of the Term of this Agreement.

(1)    <u>Workers' Compensation and Employers' Liability</u>. Worker's compensation insurance shall be provided with limits consistent with statutory benefits outlined in the Texas Workers' Compensation Act (Texas Labor Code Title 5) and minimum policy limits for employers' liability of $1,000,000 bodily injury each accident, $1,000,000 bodily injury by disease policy limit and $1,000,000 bodily injury by disease each employee.

(2)    <u>Commercial General Liability Insurance.</u> Commercial General Liability Insurance shall be provided with a minimum bodily injury and property damage per occurrence limit of $250,000,000 for coverage A (Bodily Injury and Property Damage) and coverage B (Personal and Advertising Injury); Personal Injury with respect to other than passengers limited to $25,000,000; and $1,000,000 product/completed operations minimum limit of liability.  The policy shall contain blanket contractual liability coverage for liability assumed under this contract.

(3)    <u>Hangarskeepers Insurance</u>. Hangarskeepers Liability shall be provided with a minimum limit of $10,000,000.

(4) <u>Aircraft Liability Insurance</u>.   Aircraft Liability insurance shall be provided for all operator owned or operated aircraft with a minimum bodily injury and property damage per occurrence limit of $250,000,000 for coverage Bodily Injury and Property Damage, and $250,000,000 for Personal and Advertising Injury; Personal Injury with respect to other than passengers limited to $25,000,000.  The policy shall contain:

    (a)   Non-Owned Aircraft Liability with a minimum limit of $250,000,000

    (b)   Blanket contractual liability coverage for liability assumed under the Lease or Permit

(5) In lieu of the Commercial General Liability, Hangarkeepers, and Aircraft Liability coverages described in Sections 14.A 2, 3, and 4, Airline may provide Aviation Liability Insurance having the same coverages and policy limits as described above.

(6) <u>Business Automobile Liability Insurance</u>. Business automobile liability insurance shall be provided for all owned, non-owned and hired vehicles with a minimum combined single limit of $1,000,000.

(7) <u>Insurance Ratings</u>.   Insurance coverage shall be written by financially responsible insurance companies, reasonably acceptable to Lessor, which are experienced in insuring major airlines and recognized in the aviation industry as being of sufficient size and financial strength to insure the risks identified in this Article. Lessor will accept workers' compensation coverage written by the Texas Workers' Compensation Insurance Fund.

(8) <u>General Requirements.</u>

    (a)   Approval of insurance by Lessor and the required minimums shall not relieve or decrease the liability or responsibility of the Airline hereunder and shall not be construed to be a limitation of liability on the part of the Airline.

    (b)   All endorsements naming Lessor as additional insured, i.e. waivers, and notices of cancellation endorsements as well as Certificates of Insurance shall indicate:

        Austin-Bergstrom International Airport
        Department of Aviation
        Attn:  Airport Property Management
        3600 Presidential Boulevard, Suite 411
        Austin, Texas 78719

    (c)   The "other" insurance clause shall not apply to Lessor where Lessor   is

additional insured shown on any policy.  It is intended that policies required in this Agreement covering Lessor and the Airline, shall be considered primary coverage as applicable.

(d)     If insurance policies are not written for amounts specified above, the Airline shall carry Umbrella or Excess Liability Insurance for any differences in amounts specified.  If Excess Liability Insurance is provided, it shall follow the form of the primary coverage.

(e)     Lessor shall be entitled, upon request to inspect copies of policies and endorsements thereto at a mutually acceptable location and time, and may make any reasonable requests for deletion or revision or modification of particular policy terms, conditions, limitations, or exclusions except where policy provisions are established by law or regulations binding upon either of the parties hereto or the underwriter on any such policies or if the change would result in the imposition of an additional premium or cost which neither the Airline or Lessor is willing to assume.

(f)     Lessor reserves the right to review insurance requirements set forth during the Term of this Agreement and to make reasonable adjustments to insurance coverage, limits, and exclusions when deemed necessary and prudent by Lessor based upon changes in statutory law, court decisions, the claims history of the industry or financial condition of the insurance company as well as the Airline. Airline shall have ninety (90) days in which to implement any changes under this section.

(g)     The Airline shall not cause any insurance to be canceled nor permit any insurance to lapse during the term of this Agreement that is related to Airline's operations at the Airport.  All policies shall be endorsed to require thirty (30) days' prior notice to Lessor before cancellation or termination.

(h)     Airline shall be responsible for deductibles and self-insured retentions, if any, stated in policies.  All deductibles or self-insured retentions shall be disclosed on the certificates of insurance.

> (i) All policies shall be endorsed to waive subrogation or other rights of recovery against Lessor.

(9) <u>Other</u>. Insofar as insurance provides protection against liability for damages to third parties for personal injury, death, and property damage, Lessor shall be included as an additional insured to the extent of Airline's indemnity obligations under this Agreement. Such liability insurance coverage shall also extend to damage, destruction, and injury, to Lessor-owned or Lessor-leased property and Lessor personnel, and caused by or resulting from work, acts, operations, or omissions of Airline, its officers, agents, employees, contractors or subcontractors on the Airport. Lessor shall have no liability for any premiums charged for such coverage, and the inclusion of Lessor as a named insured is not intended to, and shall not, make Lessor a partner or joint venturer with Airline in its operations on the Airport.

## ARTICLE 15 - ENVIRONMENTAL MATTERS

A. **Definitions**. In this Article:

(1) <u>Environmental Laws</u> - shall refer to all Applicable Laws intended for the protection of the environment, or that govern, control, restrict, or regulate the use, handling, treatment, storage, discharge, disposal, or transportation of Hazardous Materials. Environmental Laws, specifically include but are not limited to, the National Environmental Policy Act; the Comprehensive Environmental Response, Compensation and Liability Act; and as amended by the Superfund Amendments and Reauthorization Act of 1986; the Safe Drinking Water Act; the Oil Pollution Control Act of 1990; the Resource Conservation and Recovery Act, the Hazardous Substances Transportation Act, the Toxic Substances Control Act, the Clean Water Act, the Clean Air Act, the Superfund Authorization and Recovery Act, the Occupational Safety and Health Administration Hazard Communication Standards, the Texas Hazardous Substances Act, the Texas Water Quality Control Act.

(2) <u>Hazardous Materials</u> - shall refer to all substances whose use, handling, treatment, storage, disposal, discharge, or transportation is governed, controlled, restricted, or regulated by Environmental Laws, that have been defined, designated or listed by any

responsible Governmental Authority as being hazardous, toxic, radioactive, or that presents an actual or potential hazard to human health or the environment if improperly used, handled, treated, stored, disposed, discharged, generated or released. Hazardous Materials specifically include, without limitation, asbestos and asbestos-containing materials, petroleum products, solvents, and pesticides.

(3)   Environmental Claims – shall refer to all claims, demands, suits, actions, judgments, and liability arising out of the use, handling, treatment, storage, disposal, discharge, or transportation of Hazardous Materials for: (i) removal, remediation, assessment, transportation, testing and disposal of Hazardous Materials as directed by any Government Authority, court order, or Environmental Law; (ii) bodily injury, or death; (iii) damage to or loss of use of property of any person; (iv) injury to natural resources; (v) fines, penalties, costs, fees, assessments, taxes, demands orders, directives or any other requirements imposed in any manner by any Governmental Authority under Environmental Laws; and (vi) costs and expenses of cleanup, remediation, assessment testing, investigation, transportation and disposal of a Hazardous Material spill, release, or discharge that is material or reportable under Environmental Law or the SWPPP.

(4)   Lessor Environmental Party – shall include the Lessor, and its elected and non-elected officials, officers, agents, employees, contractors, successors, and assigns.

(5)   Airline Environmental Party - shall include the Airline, and its directors, officers, agents, employees, contractors, successors, and assigns.

(6)   SWPPP – means the Airport Storm Water Pollution Prevention Plan and Spill Response Plan, which is incorporated by reference. The SWPPP is posted on the Lessor's website at www.ci.austin.tx.us/austinairport/swppp.htm (as of the Effective Date).

B.   **Compliance**. In its operations at the Airport, Airline shall strictly comply with applicable Environmental Laws, including any permits, licenses or authorizations granted thereunder, the Airport Environmental Policies and Procedures including the SWPPP, and generally accepted industry environmental practices and standards. Without limiting the generality of the foregoing provision, Airline shall not use or store Hazardous Materials on or at the Airport except as reasonably necessary in the ordinary course of Airline's permitted activities at the Airport, and

then only if such Hazardous Materials are properly labeled and contained, and notice of and a copy of the current material safety data sheet is provided to Lessor for each such Hazardous Material. Prior to commencing operations at the Airport, Airline will complete an Airport baseline environmental questionnaire. Airline shall not discharge, release, or dispose of any Hazardous Materials on the Airport or surrounding air, lands or waters, except to the extent permitted under Environmental Laws, and then only in strict compliance with Environmental Laws. Airline shall promptly notify the Lessor of any Hazardous Material spills, releases, or other discharges by Airline at the Airport that are material or reportable under Environmental Law or the SWPPP, and promptly abate, remediate, and remove any the same. Airline shall provide the Lessor with copies of all non-privileged reports, complaints, claims, citations, demands, inquiries, or notices relating to the environmental condition of the Airport, or any alleged material noncompliance with Environmental laws by Airline at the Airport within ten (10) days after such documents are generated by or received by Airline. If Airline uses, handles, treats or stores Hazardous Materials at the Airport, and it is necessary for Airline to arrange for the disposal of the Hazardous Materials, Airline shall have a contract in place with an EPA or TCEQ approved waste transport or disposal company, and shall identify and retain spill response contractors to assist with spill response and facilitate waste characterization, transport and disposal. Complete records of all disposal manifests, receipts and other documentation shall be retained by the Airline and made available to Lessor for review upon request. Lessor shall have the right at any time to enter the Premises upon reasonable prior notice to inspect, take samples for testing, and otherwise investigate the Premises for the presence of Hazardous Materials; except that prior notice shall not be required in the event of an actual or threatened Hazardous Material spill, release, or discharge by an Airline Environmental Party at the Airport. In exercising its right of access, Lessor shall endeavor to minimize disruption of or interference with Airline's operations or use of the Premises.

C.   **Responsibility**.

(1)   Hazardous Materials that are generated, used, handled, treated, stored, disposed, released, discharged or transported on the Airport by an Airline Environmental Party are the responsibility of Airline.

(2)   Except as expressly assumed by Airline under this Agreement, Airline shall not be

.

responsible for Hazardous Materials that

 (a) exist on the Airport prior to the date that Airline commenced air operations at the Airport, except to the extent that an Airline Environmental Party disturbed or caused known pre-existing Hazardous Materials to migrate so as to give rise to an Environmental Claim, or

 (b) are generated, used, handled, treated, stored, disposed, released, discharged or transported on the Airport by a person other than an Airline Environmental Party.

(3) All reporting requirements under Environmental Laws with respect to Hazardous Materials generated, used, handled, treated, stored, disposed, discharged, spilled, released, or transported to spills, releases, or discharges of by an Airline Environmental Party at the Airport under any law are the responsibility of Airline.

D. **Indemnity.** IN ADDITION TO ANY OTHER INDEMNITIES IN THIS AGREEMENT, AIRLINE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE LESSOR ENVIRONMENTAL PARTIES FROM ANY AND ALL ENVIRONMENTAL CLAIMS (INCLUDING REASONABLE ATTORNEY'S FEES, LITIGATION AND INVESTIGATION EXPENSES, AND COURT COSTS) TO THE EXTENT ARISING FROM OR CAUSED BY THE USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE, OR TRANSPORTATION OF HAZARDOUS MATERIALS BY AN AIRLINE ENVIRONMENTAL PARTY ON OR AT THE AIRPORT, THE VIOLATION OF ANY ENVIRONMENTAL LAW BY AN AIRLINE ENVIRONMENTAL PARTY, OR THE FAILURE OF AN AIRLINE ENVIRONMENTAL PARTY TO COMPLY WITH THE TERMS, CONDITIONS AND COVENANTS OF THIS ARTICLE.

THE FOREGOING INDEMNITY SHALL NOT APPLY TO ENVIRONMENTAL CLAIMS TO THE EXTENT ARISING FROM OR CAUSED BY:

(1) ENVIRONMENTAL CONDITIONS EXISTING ON THE AIRPORT PRIOR TO THE DATE AIRLINE COMMENCED OPERATIONS AT THE AIRPORT, EXCEPT TO THE EXTENT THAT AN AIRLINE ENVIRONMENTAL PARTY EITHER DISTURBED OR CAUSED KNOWN PRE-EXISTING HAZARDOUS MATERIALS TO MIGRATE, SO AS TO GIVE RISE TO AN ENVIRONMENTAL CLAIM, OR

(2) THE USE, HANDLING, TREATMENT, STORAGE, DISPOSAL, DISCHARGE, OR

.

TRANSPORTATION OF HAZARDOUS MATERIALS BY A PERSON OTHER THAN AN AIRLINE ENVIRONMENTAL PARTY.

E.     **Removal**.  Prior to expiration or earlier termination of Agreement, Airline shall remove from the Premises, the Airport, and surrounding lands and waters, or remediate in accordance with applicable Environmental Laws and the Airport Environmental Rules and Policies, all Hazardous Materials for which an Airline Environmental Party is responsible under Section 15.C. Unless instructed otherwise by the Lessor, Airline shall also, prior to vacating the Airport, remove or remediate (at Lessor's option) all tanks, piping and other equipment installed or operated by an Airline Environmental Party which stored, or which are contaminated by, Hazardous Materials.

F.     **Stormwater Requirements**.  Airline acknowledges that the Airport is subject to the National Pollution Discharge Elimination System Program ("NPDES") and Federal Stormwater Regulations (40 CFR Part 122) and the Texas Pollution Discharge Elimination System Program ("TPDES"). In its operations at the Airport, Airline shall comply with Applicable Law, including NPDES, TPDES, Federal and State Stormwater Regulations, including any permits issued thereunder, and the SWPPP.

Lessor and Airline both acknowledge that close cooperation is necessary to ensure compliance with any stormwater discharge permit terms and conditions, as well as to ensure safety and to minimize costs.  Airline acknowledges that it may be necessary to undertake to minimize the exposure of stormwater to significant materials generated, stored, handled or otherwise used by Airline as defined in the Federal Stormwater Regulations, by implementing and maintaining "Best Management Practices", as defined in 40 CFR, Part 122.2. Airline shall apply for, obtain, and maintain in force and effect its own TPDES stormwater discharge permit while performing regulated activities at the Airport.   TPDES regulated activities include vehicle fueling, maintenance, rehabilitation, mechanical repairs, painting, washing, and de-icing; vehicles include aircraft, ground support equipment, and passenger vehicles.  Lessor shall give Airline reasonable notice of any changes to those portions of Lessor's stormwater discharge permits applicable to, or that effect, Airline's operations at the Airport, but Airline is ultimately responsible for its own TPDES compliance.

Lessor shall provide Airline with written notice of those NPDES and TPDES stormwater discharge permit requirements that Airline shall be obligated to perform from time to time at the Airport, including, but not limited to: certification of non-stormwater discharges; collection of stormwater samples in the event of an actual or threatened Hazardous Material spill, release, or discharge; assistance in development, implementation, or preparation of stormwater pollution prevention or similar plans; implementation of "good housekeeping" measures or "Best Management Practices"; implement SWPPP policies and procedures, train staff as required by its TPDES permit, perform SWPPP inspections, provide de-icing usage records to the Department, report large releases immediately as defined by the Spill Response Plan, and maintenance of necessary records. Such written notice shall include applicable deadlines. Airline, within thirty (30) days of receipt of such written notice, shall notify Lessor in writing if it disputes any of the stormwater discharge permit requirements it is being directed to undertake. If Airline does not provide such timely notice, it is deemed to assent to undertake such requirements. If Airline provides Lessor with written notice, as required above, that it disputes such NPDES or TPDES stormwater discharge permit requirements, Lessor and Airline agree to negotiate a prompt resolution of their differences. Airline warrants that it will not object to Lessor notices required pursuant to this paragraph unless Airline has a good faith basis to do so.

Lessor and Airline agree to provide each other upon request, with any non-privileged information collected and submitted to any Government Authority pursuant to applicable NPDES or TPDES stormwater regulations.

Airline agrees to participate in any reasonable manner requested by Lessor in any Lessor organized task force or other work group established to coordinate stormwater activities at the Airport.

G.   **Natural Resource and Energy Conservation and Management.** Airline shall comply with Applicable Law pertaining to recycling and energy or natural resource conservation and management. Lessor may establish and implement an Environmental Management System for the Airport after notice to, and consultation with, the Signatory Airlines. Airline shall cooperate with Lessor in the implementation of such conservation and management policies and programs.

H.   **Survival**.  The covenants, conditions, and indemnities in this Article shall survive termination of this Agreement.

### ARTICLE 16 -  INSPECTION BY LESSOR

Lessor may enter upon any premises which are leased to Airline, or jointly to Airline and others, at any reasonable time, for any purpose necessary, incidental to, or connection with, the performance of its obligations hereunder, or in the exercise of its governmental functions as it relates to public health, security, safety and the general welfare of the Airport and the proper conduct of operations thereon. Except in an emergency, Lessor shall give Airline reasonable notice prior to such inspection.

### ARTICLE 17 -  RULES AND REGULATIONS

Lessor may adopt and enforce reasonable rules and regulations, with respect to the use of the Airport and its appurtenances, together with all facilities, improvements, equipment and services of the Airport, for the purpose of providing for safety, security, good order, good conduct, sanitation and preservation of the Airport and its facilities; provided that such rules and regulations are consistent with Applicable Law and the provisions of this Agreement, or other agreements with Airline at the Airport.  Airline shall observe and obey such Airport rules and regulations.

### ARTICLE 18 -  ASSIGNMENT AND SUBLETTING

A.   Except as otherwise expressly permitted in this Article, Airline shall not assign or transfer this Agreement, or any part thereof, nor may this Agreement be assigned or transferred in whole or in part by operation of law, without the prior written approval of the Director.

B.   The prior written consent of  the Director is not required for an assignment or transfer of this Agreement to any person or entity which acquires or succeeds to Airline's rights hereunder and substantially all Airline's assets at the Airport through merger, acquisition or consolidation; provided that within thirty (30) days after the effective date of the transaction, (i) Airline shall give Lessor notice in writing of such transfer or assignment together with a copy of the agreement or other document evidencing such assignment or transfer, and (ii) the successor provides a replacement security deposit (if required under Article 5) and proof of insurance and commits in writing to assume Airline's duties and obligations under this Agreement.

C.   Except as otherwise expressly provided in this Agreement, Airline shall not sublet all, or any part

of the Premises leased hereunder without the prior written approval of Lessor.  If Airline voluntarily suspends, or abandons service to the Airport for a period of sixty (60) days or longer, Airline may, subject to the prior consent of the Director, sublease all, or any part of the Premises leased to it hereunder to another scheduled Air Carrier providing daily service to the Airport; provided, however, Airline shall continue to be responsible to Lessor for the payment of all rentals and other charges for commonly and preferentially leased areas, when such are due hereunder, for the full term of this Agreement.  Nothing contained in this Article shall affect the rights of Lessor to (i) terminate this Agreement pursuant to Article 22 if Airline voluntarily abandons its conduct of its Air Carrier Service at the Airport for a period of thirty (30) days, or (ii) reassign Airline's Gates under Article 7 D if Airline discontinues commercial air service to the Airport.

## ARTICLE 19 -  SURRENDER OF POSSESSION

Airline shall peaceably, quit, deliver up and surrender to Lessor the possession of the Premises leased to Airline, or to Airline in common with others, at the termination of Agreement, by expiration, or otherwise, or of any renewal, or extension thereof.  Airline shall restore the Premises and make such repairs as may be necessary to restore the Premises to substantially the same condition as the Premises were upon inception of Airline's occupancy thereof, reasonable wear and tear, fire or other casualty, and Lessor-authorized improvements excepted. Airline may at any time during the term, or any renewal, or extension hereof, and for thirty (30) days after the termination hereof, remove its trade fixtures and equipment situated on the Premises which were installed, or placed by it, at its expense in, on or about the Premises; subject, however, to any valid lien which Lessor may have thereon for unpaid rents, fees or charges, and further provided that Airline shall repair any damage to the Premises cause by such removal. If Airline fails or neglects to remove all or any portion of its trade fixtures or equipment within such thirty (30) day period, Lessor, at Lessor's option, may:

A.      Remove such property to a public warehouse for storage, or retain the same in Lessor's possession, and after the expiration of thirty (30) days sell the same, with or without notice and at public or private sale, in accordance with Applicable Law, the proceeds of which shall be applied first to the expenses of the removal, storage and sale, second to any sum owed by Airline to Lessor, and any balance remaining shall be paid to Airline.  If the expenses of such removal, storage and sale exceed the proceeds of the sale, then Airline shall pay such excess to the Lessor

upon demand; or

B.     Conclusively presume that Airline has abandoned the trade fixtures and equipment, and assume full ownership of all such property, without payment to Airline.

## ARTICLE 20 - FORCE MAJEURE

A.     The failure of a party to perform its obligations hereunder shall be excused to the extent, and for the period of time, such failure is caused by the occurrence of an event of Force Majeure. Force Majeure shall mean acts and events not within the control of the party claiming suspension, and which that party has been unable by the exercise of due diligence to avoid or prevent. Events of Force Majeure include, without limitation: Acts of God; strikes, lockouts or other industrial disputes; inability to obtain material, equipment or labor; epidemics, civil disturbances, wars, riots or insurrections; landslides, lightning, earthquakes, fires, acts of domestic or foreign terrorism, storms, floods or washouts; arrests and restraint of rulers and people; interruptions by government or court orders; present or future orders of any regulatory body having proper jurisdiction and authority; explosions; and breakage or accident to machinery.  Force Majeure does not include economic or market conditions, which affect a party's cost, but not its ability, to perform.

B.     The party invoking Force Majeure shall give prompt, timely and adequate notice to the other party, by facsimile transmission or telephone confirmed promptly thereafter in writing, and shall use due diligence to remedy the event of Force Majeure, as soon as reasonably possible. Nothing contained herein shall be construed to require a party to settle a strike or other labor dispute against its will.

C.     Except as provided in Section 22, no event of Force Majeure shall relieve Airline from its monetary obligations under this Agreement, including but not limited to Airlines obligations to pay rent or other fees and charges hereunder, nor shall the term of this Agreement be extended by any event of Force Majeure.

## ARTICLE 21 – DEFAULT AND REMEDIES

A.     **Default by Airline**.   Each of the following shall be deemed a default by Airline ("Airline Default") hereunder and a material breach of this Agreement:

---

(1)    Airline shall fail to pay any installment of Rent, Additional Rent, Landing Fees, or PFCs when due, and such failure shall continue for thirty (30) days after delivery by Lessor to Airline of written notice specifying such failure;

(2)    Airline shall fail to keep, perform, or observe any of the non-monetary covenants, agreements, terms, or provisions contained in this Agreement that are to be kept or performed by Airline, and Airline shall fail to cure such failure within thirty (30) days after delivery by Lessor to Airline of written notice specifying the failure; provided, however, if the failure is curable, but cannot be cured within such 30-day period, a Airline Default shall not occur if Airline commences the cure of the failure during such 30-day period and thereafter diligently and continuously pursues the cure to completion;

(3)    An involuntary petition shall be filed against Airline under applicable Bankruptcy Law, and such petition or appointment is not discharged or stayed within one hundred twenty (120) days after the happening of such event; or

(4)    Airline shall make an assignment of its interest in the Premises for the benefit of creditors, shall file a voluntary petition under applicable Bankruptcy law, or seek relief under any other law for the benefit of debtors; or

(5)    A receiver of Airline, or of all or substantially all of the assets of Airline, shall be appointed; or

(6)    Airline shall be lawfully divested of, or prevented by any final action of any Governmental Authority, from conducting and operating its Air Carrier Service at the Airport; or

(7)    Airline voluntarily abandons its conduct of its Air Carrier Service at the Airport for a period of thirty (30) days for any reason not excused under Article 20.

B.    **Remedies of Lessor**. If an Airline Default occurs, Lessor may at any time thereafter and without waiving any other rights hereunder or available to Lessor at law or in equity (Lessor's rights being cumulative), do any one or more of the following:

(1)    Lessor may terminate this Agreement by giving Airline not less than ten (10) days' prior written notice of termination, in which event this Agreement and the rights and interest

of Airline and all parties claiming by, through, or under Airline shall automatically terminate upon the effective date of such notice; and Lessor, its agents or representatives, may to the extent permitted by Applicable Law, without further demand or notice, reenter and take possession of the Premises and remove all persons and property there from with or without process of law, without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or existing breaches hereof.

(2)     Lessor may terminate Airline's right to possession of the Premises and enjoyment of the rents, issues, and profits there from without terminating this Agreement or the estate created hereby, and to the extent permitted by law, re-enter and take possession of the Premises, change the locks, and remove all persons and property there from (except for Subtenants permitted by the terms of this Agreement), with or without process of law, without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or existing breaches hereof. If Lessor retakes possession of the Premises as provided herein, Lessor shall have no obligation to tender to Airline new keys or other entry devices to any new locks installed in the Premises, and Lessor may lease, manage, and operate the Premises and collect the rents, issues, and profits there from for the account of Airline, and credit to the satisfaction of Airline's obligations hereunder the net rental thus received, after deducting there from all reasonable actual out of pocket third party costs and expenses of repossessing, leasing, managing, and operating the Premises.  If the net rental so received by Lessor exceeds the amounts necessary to satisfy all of Airline's obligations under this Agreement, nevertheless Lessor shall retain such excess.  In no event shall Lessor be liable for failure to so lease, manage, or operate the Premises or collect the rentals due under any subleases, and any such failure shall not reduce Airline's liability hereunder. If Lessor elects to proceed under this Article, it may at any time thereafter elect to terminate this Agreement.

(3)     Lessor shall have the right, but not the obligation, without judicial process and without incurring any liability therefore, to enter upon the Premises and perform any obligation that Airline has failed to perform. Performance by Lessor shall not cure the Airline

.

default, and all costs and expenses incurred by Lessor in performing such obligations of Airline (Lessor's administrative and overhead costs) shall be deemed Additional Rent payable by Airline to Lessor.

(4)    Lessor may exercise any other right or remedy available to Lessor under this Agreement or at law or in equity.

(5)    All Rent and other sums not paid on or before the date due shall bear interest at the lesser of one and one half percent (1 ½%) per month, or the maximum lawful rate, from the date due until paid in full.

C.    **Default by Lessor**.    The following shall be deemed a default by Lessor ("Lessor Default") and a material breach of this Agreement:

(1)    Lessor shall fail to keep, perform, or observe any of the covenants, agreements, terms, or provisions contained in this Agreement that are to be kept or performed by Lessor, and Lessor shall fail to cure such failure within thirty (30) days after delivery by Airline to Lessor of written notice specifying the failure; provided, however, if the failure is curable, but cannot be cured within such 30-day period, a Lessor Default shall not occur if Lessor commences the cure of the failure during such 30-day period and thereafter diligently and continuously pursues the cure to its completion.

D.    **Airline's Remedies**.    If a Lessor Default occurs, Airline may, at any time thereafter and without waiving any other rights hereunder or available to Airline at law or in equity (Airline's rights being cumulative), do any one or more of the following:

(1)    Airline may terminate this Agreement by giving Lessor written notice thereof, in which event this Agreement and the leasehold estate hereby created and all interest of Airline and all parties claiming by, through, or under Airline shall automatically terminate upon the effective date of such notice; and Airline shall thereafter be released of all other duties, obligations and responsibilities with respect to this Agreement, except such provisions, including, but not limited to, Airline's indemnity obligations that shall survive termination.

(2)    Airline may exercise any other right or remedy available to Airline, except as limited by Applicable Law or the terms of this Agreement.

E. **Airline's Right to Terminate for Other Events**.  Provided that Airline is not itself in default under this Agreement, Airline may terminate this Agreement by giving the Lessor written notice at least thirty (30) prior to the effective date of termination if Airline is prevented from operating its Air Carrier Service to and from the Airport by reason of any of the following events:

(1)   The lawful assumption by the United States Government, or any authorized agency thereof, of the operation, control or use of the Airport, or any substantial part or parts thereto, in such a manner as to substantially restrict Airline for a period of at least ninety (90) days from operating thereon; or

(2)   Issuance by any court of competent jurisdiction of an injunction in any way preventing or restricting the use of the Airport, and the remaining in force of such injunction for a period of at least ninety (90) days; or

(3)   The complete destruction of Airline's Premises and the Lessor's failure to repair or replace said space, as set forth in Article 23, within one hundred twenty (120) days after said destruction; or

(4)   The inability of Airline or its customers to use, for a period of ninety (90) consecutive days, the Airport or any substantial part of it due to enactment or enforcement of any Applicable Law, or because of an event of Force Majeure; or.

(5)   The permanent abandonment of the Airport by the Lessor; or.

(6)   The FAA or other Governmental Authority suspends for a period of sixty (60) days, or longer, cancels, or terminates Airline's right to serve the Airport; unless Airline voluntarily sought, or failed to take all reasonable action to prevent such suspension, cancellation or termination.

### ARTICLE 22 - DAMAGE OR DESTRUCTION OF LEASED PREMISES

A.   If any or all of the Premises leased to Airline, is partially damaged by fire, explosion, act of terrorism, or other casualty, but not rendered untenantable, the same shall be repaired with due diligence by Lessor.

B.   If the damage arising from a casualty is so extensive as to render a material part, or all, of Airline's Premises untenantable, but reasonably capable of being repaired within one hundred

---

.

twenty (120) days, the same shall be repaired with due diligence by Lessor, and the rental allocable to that portion of Airline's Premises rendered untenantable shall be abated for the period from the occurrence of the casualty to the completion of the repairs.

C.    If the damage arising from a casualty is so extensive as to render a material part, or all, of Airline's Premises untenantable, and not reasonably capable of being repaired within one hundred twenty (120) days, or such Premises, or material part thereof, is completely destroyed, Lessor shall notify Airline whether the space shall be repaired.  If Lessor elects to repair the space, it shall be repaired with due diligence by Lessor, and the rental allocable to that portion of Airline's Premises rendered untenantable, shall be abated for a period from the occurrence of the casualty to the completion of the repairs. If Lessor elects not to repair, or during the time that repairs are being made, Lessor shall use commercially reasonable efforts to provide Airline with temporary substitute space, if available, at such rent as is reasonable for comparable space otherwise leased by Lessor. If Lessor elects not to repair the damage, and is unable to provide Airline with adequate substitute premises, Airline may terminate this Agreement without penalty upon thirty (30) days written notice to Lessor.

D.    The damaged areas shall be restored to substantially the same condition as they were in prior to the casualty.  The cost of repair or reconstruction of the Premises under this Article shall be paid by Lessor, to the extent of insurance proceeds received by Lessor; except if the casualty was caused by the negligence or willful misconduct of Airline, or Airline's agents, sublessees, employees, or contractors, the cost of repair and reconstruction shall be paid by Airline. The cost of repair or restoration performed by Lessor in excess of the amount of insurance proceeds, if any, shall be recoverable from the Air Carriers operating from the Terminal in accordance with the Agreement and Applicable Law.

## ARTICLE 23 - NON WAIVER OF RIGHTS

Continued performance by either party hereto pursuant to the terms of this Agreement after a default of any of the terms, covenants and conditions herein contained to be performed, kept, or observed, by the other party hereto, shall not be deemed a waiver of any right to terminate this Agreement for any subsequent default and no waiver of any such default shall be construed, or act, as a waiver of any subsequent default.

**ARTICLE 24 - INVALIDITY OF CLAUSES**

If any covenant, condition, or provision herein contained is held to be invalid by a court of competent jurisdiction,

A.  the invalidity of any such covenant, condition, or provision shall not affect any other covenant, condition, or provision herein contained, provided the invalidity of any such covenant, condition, or provision does not materially prejudice either Lessor or Airline in its respective rights and obligations contained in the valid covenants, conditions, and provisions of this Agreement, and

B.  the parties agree to reform the Agreement to replace such invalid provision with a valid provision that comes as close as possible to the intent of the original provision.

**ARTICLE 25 - APPROVAL BY LESSOR**

Wherever the approval of Lessor is called for herein, such approval shall be in writing, in advance, and shall not be unreasonably withheld.

**ARTICLE 26 -  ECONOMIC NON-DISCRIMINATION**

Lessor shall make the Airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the Airport.  Lessor agrees that each Air Carrier using the Airport shall be subject to nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rental, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such Air Carriers which make similar use of the Airport and utilize similar facilities, subject to reasonable classifications such as tenants or non-tenants and signatory carriers and non-signatory carriers.

**ARTICLE 27 - PUBLIC USE, FEDERAL GRANTS AND NONDISCRIMINATION**

A.  **Grant Assurances.**  This Agreement and the rights and privileges granted to Airline hereunder, are subject to the provisions of any agreement made between Lessor and the United States Government relative to the operation or maintenance of the Airport, the execution of which has been required as a condition precedent to the transfer of federal rights or property to Lessor for Airport purposes, or the expenditure of federal funds for the development of the Airport,

including the expenditure of federal funds for the development of the Airport in accordance with the provisions of the FAA's Airport Improvement Program, or in order to impose and use passenger facilities charges under 49 U.S.C. Section 40117 or any successor thereto.

B.      **Compliance with Law**.   At all times during the term of this Agreement, Airline shall, in connection with its activities and operations at the Airport comply with and conform to Applicable Law.   Airline shall comply with all applicable provisions of the Americans With Disabilities Act of 1990 (42 U.S.C. Section 12101), as may be amended from time to time, and federal regulations promulgated thereunder.   Subject to prior approval of the Director, Airline shall make, at its own expense, all non-structural improvements, repairs and alterations to its Preferential Use Space, equipment, and personal property that are required to comply with or conform to any of such statutes, ordinances, or regulations.

C.      **Non-discrimination**

(1)     <u>General</u>.   In the use and occupation of the Airport, Airline shall not unlawfully discriminate against any person or class of persons by reason of race, color, religion, sex, national origin or ancestry, age, or physical or mental handicap.

(2)     <u>Civil/Human Rights Laws</u>.   In its operations at the Airport and in its use of the Airport, Airline shall not, on the grounds of race, color, religion, sex, national origin or ancestry, or age, discriminate or permit discrimination against any person or group of persons in any manner prohibited by Part 21 of the Federal Aviation Regulations, the Civil Rights Act of 1964, as amended, the Equal Pay Act of 1963, the Rehabilitation Act of 1973, and Chapter 5-4 of the Austin City Code.   Without limiting the generality of the foregoing, Airline agrees to not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or ancestry, or age, in accordance with Applicable Law.   Airline agrees to take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, national origin or ancestry, age, or physical or mental handicap.   Such action shall include, but not be limited to: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; selection for training; and

disciplinary actions and grievances.  Airline agrees to post, in conspicuous places available to employees and applicants. employment notices to be provided setting forth the provisions of this nondiscrimination clause.

(3) <u>USDOT Requirements</u>. Airline, for itself and its successors in interest, and assigns, as a part of the consideration of this Agreement, does hereby covenant and agree that, in the event improvements are constructed, maintained, or otherwise operated on the airport for a purpose for which a United States Department of Transportation program or activity is extended or for another purpose involving the provision of similar services or benefits, Airline shall maintain and operate such improvements and services in compliance with all other requirements imposed pursuant to 49 CFR, Part 21 (Non-discrimination in Federally Assisted Programs of the Department of Transportation), as said regulations may be amended.

Airline, for itself, successors in interest, and assigns, as a part of the consideration of this Agreement, does hereby covenant and agree that: (1) no person on the grounds of race, color, religion, sex, national origin or ancestry, or age, shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination in the use of said improvements; (2) that in the construction of any improvements on, over, or under such land and the furnishing of services thereon, no person on the grounds of race, color, religion, sex, national origin or ancestry, or age, shall be excluded from participation in, denied the benefits of, or otherwise be subjected to unlawful discrimination; (3) that Airline shall use the Airport facilities in compliance with all other requirements imposed by, or pursuant to, 49 CFR, Part 21 (Non-discrimination in Federally Assisted Programs of the Department of Transportation), as said regulations may be amended; and (4) Airline assures that it will undertake an affirmative action program as required by 14 CFR, Part 152, Subpart E, Non-discrimination Airport in Aid Program, to ensure that no person shall on the grounds of race, color, religion, national origin or ancestry, sex, age, or physical or mental handicap be excluded from participating in any employment activities covered in 14 CFR, Part 152, Subpart E, or such employment activities covered in Chapter 5-3 of the Code of the City of Austin. Airline assures that no person shall be excluded on these grounds from participating in

or receiving the services or benefits of any program or activity covered by this Section 14.03.  Airline assures that it will require that any covered suborganization similarly will undertake affirmative action programs and that the suborganization will require assurance from the suborganizations' suborganization, as required by 14 CFR, Part 1 52, Subpart E, to the same effect.

## ARTICLE 28 - TITLE TO AIRLINE INSTALLED IMPROVEMENTS AND PROPERTY

As to improvements and property installed and paid for by Airline under the terms of this Agreement, Airline will retain title to all of its trade fixtures and equipment only, except as may otherwise be provided for in this Agreement, or other agreements between the parties hereto, and Airline shall have the right any time during the term of this Agreement and prior to its expiration or early termination to remove any and all of its trade fixtures and equipment from the Airport, provided Airline is not in default in its payments hereunder.   All Lessor property damaged by or as a result of the removal of Airline's property shall be restored at Airline's expense to the same or better condition that it was prior to such damage.   Any and all property not removed by Airline prior to the expiration or early termination of this Agreement as provided herein, shall thereupon become a part of the land upon which it is located and title thereto shall thereupon vest in the Lessor; provided, however, Airline shall not abandon any of its property on the Leased Premises without prior written consent of the Director, and Lessor reserves the right to remove any property abandoned by Airline at Airline's expense.

## ARTICLE 29 - NOTICES

Any notice provided for or permitted to be given hereunder must be in writing and may be given by (a) depositing same in the United States Mail, postage prepaid, registered or certified, with return receipt requested, addressed as set forth in this Article 30; (b) hand delivering the same to the party to be notified; or (c) overnight courier of general use in the business community of Austin, Texas.  Notice given in accordance herewith shall be deemed delivered and effective on the earlier of actual receipt or three (3) business days next following deposit thereof in accordance with the requirements above.

Notices shall be sent to the following persons and addresses, or to such other person and address

specified in a notice given in accordance with the terms of this Article:

| Notices to Lessor | Notices to Airline |
|---|---|
| Executive Director of Aviation | Manager – Properties and Facilities |
| Austin-Bergstrom International Airport | Frontier Airlines, Inc. |
| 3600 Presidential Blvd., Suite 411 | Frontier Center One |
| Austin, Texas 78719 | 7001 Tower Road |
| | Denver, Colorado 80134 |

## ARTICLE 30 – BOND ORDINANCES

A.  **Subordination to Bond Ordinance.**  This Agreement and all rights granted to Airline hereunder are expressly subordinated and subject to the lien and provisions of the pledges, transfer, hypothecation or assignment made by the Lessor in any Bond Ordinance executed by the City to issue Bonds.  The City expressly reserves the right to make such pledges and grant such liens and enter into covenants as it may deem necessary or desirable to secure and provide for the payment of Bonds, including the creation of reserves therefor, provided that the City shall not take any actions that would be inconsistent with the terms and conditions of this Agreement.

Airline understands that the City is and will be the issuer of Bonds.  With respect to Bonds that may be issued in the future, the interest on which is intended to be excludable from gross income from the holders of such Bonds for Federal income tax purposes under the Internal Revenue Code of 1986, Airline agrees that it will not act, or fail to act (and will immediately cease and desist from any action, or failure to act) with respect to the use of the Leased Premises, if the act or failure to act may cause the City to be in non-compliance with the provisions of the Internal Revenue Code of 1986 as they may be amended, supplemented, or replaced, or the regulations or rulings issued thereunder, nor will Airline take, or persist in, any action or omission which may cause the interest on the tax-exempt Bonds either (i) not to be excludable from the gross income of the holders thereof for Federal income tax purposes; or (ii) to become subject to the alternative minimum tax for Federal income tax purposes.

B.  **Certificate in Connection with Issuance of Bonds.**  Airline agrees that in connection with any issuance of Bonds by the City, upon not less than twenty (20) days prior written request by the Lessor, Airline will deliver to the Lessor a statement in writing certifying:

(1)     that this Agreement is unmodified and in full force and effect (or if there have been modifications, a description of such modifications and that the Agreement as modified is in full force and effect);

(2)     that the Lessor is not in default under any provision of this Agreement, or if in default, the nature thereof in detail; and

(3)     such further matters as may be reasonably requested by the Lessor, it being intended that such statements may be relied upon by the parties involved in such issuance of Bonds.

C.      **Bond Covenants.**  Airline understands and agrees that the City of Austin has covenanted in its Bond Ordinances authorizing the issuance of prior lien bonds that it will at all times fix, charge, impose, and collect rentals, rates, fees, and other charges for the use of the Airport system, and, to the extent it may legally do so, revise the same as may be necessary or appropriate, in order that in each Fiscal Year the net revenues will be at least sufficient to equal the larger of either:

(1)     all amounts required to be deposited in such Fiscal Year to the credit of the debt service fund and the debt service reserve fund, and any debt service or debt service reserve fund or account referred to in the Bond Ordinance for revenue bonds and subordinate obligations, or

(2)     an amount, together with other available funds, not less than 125% of the debt service requirements for the prior lien bonds for such Fiscal Year.

Therefore, the Lessor and Airline agree that the Lessor may adjust Airline rentals, rates, fees, and other charges at the Airport system if such adjustment is necessary to enable the Lessor to meet the rate covenant contained in the ordinance authorizing the issuance of the prior lien bonds, as follows:

(3)     The Lessor will increase total Airfield Area costs by the amount necessary, if any, such that Net Revenues  equal 125% of the Prior Lien Bonds debt service requirements. Such amount shall be referred to as the Incremental Landing Fee Charge.

(4)     As soon as possible following the close of any Fiscal Year in which there was an Incremental Landing Fee Charge, the Lessor will refund Airline's landing fees by an

.

amount equal to Airline's share of the Incremental Landing Fee Charge. The Lessor will use funds available in the Capital Fund to apply the refund.

(5)     To the extent the balance in the Capital Fund is below the minimum requirement specified in the Bond Ordinances, the Lessor may defer Airline's landing fee refunding until such balance exceeds the minimum capital fund requirement.

D.     Capitalized terms in this Article that are not otherwise defined in this Agreement shall be defined as provided in the Bond Ordinance.

## ARTICLE 31 - MISCELLANEOUS PROVISIONS

A.     **No Partnership or Agency.** Nothing herein contained is intended or shall be construed to in any respect create or establish any relationship other than that of lessor and lessee, and nothing herein shall be construed to establish any partnership, joint venture or association or make Airline the general representative or agent of the Lessor for any purpose.

B.     **Amendment.** Except as otherwise expressly provided herein, the provisions of this Agreement may be amended only by a written agreement signed by the Lessor and the Airline. Exhibits to this Use and Lease Agreement may be substituted with the mutual consent of the parties and are not amendments to the agreement.

C.     **No Third Party Beneficiaries**. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person or entity other than the parties hereto and their assigns any legal or equitable rights hereunder.

D.     **Counterparts**. This Agreement may be executed in one or more counterparts.

E.     **No Personal Liability**. No Councilmember, director, officer, agent, or employee of either party shall be charged personally or held contractually liable by or to the other party under any term or provision of this Agreement or because of any breach thereof or because of its or their execution or attempted execution.

F.  **Governing Law**.  This Agreement shall be deemed to have been made in, and be construed in accordance with the laws of the State of Texas.

G   **Inspection of Lessor Records**.  Airline, at its expense and upon reasonable notice, shall have the right to inspect the books, records, and other data of the Lessor relating to the provisions and requirements hereof provided such inspection is made during regular business hours.

H.  **Successors and Assigns**.  All of the terms, provisions, covenants, stipulations, conditions, and considerations in this Agreement shall extend to and bind the legal representatives, successors, and permitted assigns of the respective parties hereto.

I.  **Entire Agreement**.  This Agreement, together with all exhibits attached hereto, constitutes the entire Agreement between the parties on the subject matter hereof. This Agreement supersedes and replaces all prior agreements between the parties hereto with respect to the leasing by Airline of the Premises, including the Amended and Restated Austin-Bergstrom International

**EXHIBITS**

| | |
|---|---|
| A-1 | Description of Premises |
| A-2 | Premises Drawings - Terminal Area |
| B | Airport Layout Plan - Airfield Area Description |
| C | Airport Layout Plan - Apron Description |
| D-0 | Airport Rates and Charges - General Principles and Methodology |
| D-1 | Basic Project Costs and Funding Sources |
| D-2 | Allocation of Project Costs to Cost Centers - Debt Service |
| D-3 | Acreage Allocation Worksheet |
| D-4 | Summary of Debt Service |
| D-5 | Operations and Maintenance Expenses |
| D-6 | Terminal Space Analysis |
| D-7 | Terminal Space Allocations |
| D-8 | Terminal Rental Rates |
| D-9 | Terminal Apron Fees |
| D-10 | Terminal Equipment Fees |
| D-11 | Landing Fees |

**IN WITNESS WHEREOF,** the parties hereto have executed these presents to be effective as of October 1, 2009.

**APPROVED AS TO FORM:**

_____

Assistant City Attorney

**CITY OF AUSTIN, TEXAS**

By: _____

Jim Smith

Executive Director of Aviation

Date: 5/6/10

**ATTEST:**

By: _____

Name: Jeff Campbell

Title: Manager - Properties

**FRONTIER AIRLINES, INC.**

By: _____

Scott Durgin

Vice President – Customer Service

Date: 4-29-10

# Exhibit A-1
# Description of Premises

# Exhibit A-1
# Description of Premises

**EXHIBIT A-1**
**DESCRIPTION OF PREMISES**
**AIRLINE:   Frontier Airlines, Inc.**

| Terminal Space | Description | Area (Sq. Ft.) | Use Category* |
|---|---|---|---|
| Gates | Gate 24 | 1,806.00 | P |
| Ticket Counter | See Exhibit A-2 | 225.00 | P |
| Ticket Counter Queuing | See Exhibit A-2 | 576.00 | P |
| Airline Ticket Office | Room 3321A | 122.00 | P |
| Operations Space | Rooms 2000C/2000D/2000E | 772.00 | E |
| Baggage Service Office | Room 1444 | 145.00 | P |
| Baggage Make-up Space - Outbound-- Apron Level | | 1,047.00 | J |
| Baggage Make-up Belts - Outbound-- Apron Level - (Linear Feet) | | 109.34 | J |
| Airline Club | NA | NA | NA |
| Other | NA | NA | NA |

* E  = Exclusive Use, P = Preferential Use, J = Joint Use

Airport leasehold measurements follow the following guidelines:

1. Lease space will be measured from the outside of exterior wall to the outside of exterior wall where the space being measured has no adjacent airport tenants.

2. Lease space will be measured from midpoint to midpoint of each wall where such space is adjacent to another airport tenant, public areas or support areas.

3. Lease space will be measured from the outside exterior wall  to the midpoint of a wall where one of two sides of the space are public area or support area, and the other side is adjacent to airport tenants.

4.  Holdroom depth is measured from the outside of the outer terminal wall to the edge of the holdroom carpet where it meets the terrazzo tiling of the terminal walkways.  The columns located at the edge of the holdroom carpet are not part of an Airline's leased premises, but remain Aviation Department property.

5. Queuing space depth in the Ticket lobby is measured from the ticket counter to the far end of the carpeted queuing area.

# Exhibit A-2
# Premises Drawings - Terminal Area





| F9 (SEC-A2) | |
|---|---|
| LEASE AREA | SQUARE FEET |
| G24 HOLD ROOM | 1806' |
| | |
| TOTAL | 1806' |

STAIR #29

STAIR #28

F9
GATE 24

CO
GATE 22

CO
HLDRM
3278'

US
GATE 20

US
HLDRM
3278'

85

WO

F9
HLDRM
1806'

ELEC
3029
109'

SEC-A2
CIRCULATION
4516'

JAN
3028
77'

VACANT
HLDRM
1804'

UA
HLDRM
3277'

UA
HLDRM
3274'

84'

VACANT
GATE 25

UA
GATE 23

UA
GATE 21

STAIR #30

ELEV
#14
88'

ELEC
3072
109'

STAIR
#31

STAIR #32

AUSTIN—BERGSTROM INTERNATIONAL AIRPORT

PASSENGER TERMINAL
FACILITY

PLANNING & ENGINEERING
DEPARTMENT OF AVIATION
CITY OF AUSTIN, TEXAS

DRAWING DESCRIPTION:
TERMINAL - CONCOURSE LEVEL
SECTOR A2- FLOOR PLAN

CONCOURSE

A2
SECTOR

A0217A

KEY MAP

| 1 | 25NOV09 | UPDATE TERMINAL MAP | KD |
| No. | Date | Issue Description | By |



CO
GATE 22

US
GATE 20

UNLEASED
656'

F9
2000E
196'

F9
2000C
336'

F9
2000F
38'

VACANT
2000A
1028'

F9
2000D
203'

VACANT
2000B
135'

UNLEASED
2008'

US
2005A
165'

US
2005
124'

US
2005E
143'

US MECH
2013
181'

UNLEASED
120'

DO
96

US TELCOM
2005B
31'

US
2005C
115'

US
2005D
219'

US JAN
2027
92'

| F9 OPS (SEC-A2) | |
|---|---|
| LEASE AREA | SQUARE FEET |
| 2000C | 336' |
| 2000D | 203' |
| 2000E | 196' |
| 2000F | 38' |
| TOTAL | 772' |

SEC-A2
SERVICE CORRIDOR
6316'

VACANT
2001
872'

41'

DOA
2002
1493'

UNLEASED
745'

UA
2003
1280'

UA TELCOM
2021
147'

UA
2023
238'

UA
2023D
110'

B6
2031
258'

ELEC
2035
123'

UA
2023A
128'

119'

VACANT
GATE 25

UA
2023C
231'

UA MECH
2076
166'

UA
2080
175'

B6
2031A
262'

UA
2023B
142'

UA
GATE 23

ELEV
#14
88'

MECH
2201
109'

STAIR #30

STAIR #31'

UA
GATE 21

STAIR

BUILDING LINE (ABOVE)

AUSTIN–BERGSTROM INTERNATIONAL AIRPORT

PASSENGER TERMINAL
FACILITY

PLANNING & ENGINEERING
DEPARTMENT OF AVIATION
CITY OF AUSTIN, TEXAS

| | 1 | 25NOV09 | UPDATE TERMINAL MAP | KD | | | | |
|---|---|---|---|---|---|---|---|---|
| ABIA Project No. | Permit Issue No. | AP/CIP No. | No. | Date | Issue Description | By | No. | Date | Issue Description | By |

DRAWING DESCRIPTION:
TERMINAL-APRON LEVEL
SECTOR A2- FLOOR PLAN

KEY MAP

JOB NO.
DRAWN BY: KD
CHECKED BY: RTC
COORD CHECK:
FILE NAME: T30A0207A
DATE: 25NOV09
SCALE: 1/16"=1'-0"
SHEET NO.

A2
SECTOR

A0207A

# APRON

L:\T30\T3033 Terminal Drawings & Prims Conformation\Apron\25NOV09 T30a0207a.dwg

# Exhibit B
# Airport Layout Plan – Airfield Area Description



## LEGEND

Airfield    760.4 Ac.

SCALE 1:1500

AUSTIN–BERGSTROM INTERNATIONAL AIRPORT

AIRFIELD AREA DESCRIPTION

Austin-Bergstrom
International Airport

Exhibit C

# Exhibit C
# Airport Layout Plan - Apron Description



## LEGEND

| | | |
|---|---|---|
| ▮ (magenta) | Cargo Apron | 88.7 Ac. |
| ▮ (cyan) | Terminal Apron | 60.9 Ac. |

AUSTIN−BERGSTROM INTERNATIONAL AIRPORT

APRON AREA DESCRIPTION

Austin-Bergstrom
International Airport

SCALE 1:1500

1500   750   0   1500   3000

Exhibit C

DRAWING DESCRIPTION:

JOB NO.
DRAWN BY: G. NALL
CHECKED BY: T. MOORE
CODRD. CHECK:
FILE NAME: L:\M20\M20N0293
SCALE: 1:1500
SHEET NO.

| 1 | 10/29/09 | UPDATE CAMPUS MAP AND APRON AREAS | KD | | NO. | DATE | ISSUE DESCRIPTION | BY |
| NO. | DATE | ISSUE DESCRIPTION | BY | | | | | |

# Exhibit D-0
# Airport Rates and Charges - General Principles and Methodology

# EXHIBIT D-0
# Airport Rates and Charges - General Principles and Methodology

I.

In this Exhibit, capitalized words and phrases shall be defined as provided in the Bond Ordinance, or as follows:

1. Airline Leasable Space shall mean the sum of 100% of the Productive Space that is available to be leased to airlines in the Terminal and the leasable lessee maintained space, as more particularly shown and described on Exhibit D-6, attached hereto.  Airline Leasable Space shall exclude concession space and public space.

2. Amortization means the level annual charge required to recover the net cost of a capital improvement funded by the Lessor over the useful life of the capital improvement assigned by the Director, at Lessor's Cost of Capital as of the date the capital improvement is placed in service.

3. Apron mean the paved aircraft parking apron extending from the outside wall of the Terminal building, and used for the purpose of parking aircraft, and for the loading and unloading of passengers and cargo, as the same may be expanded or altered from time to time.  Existing terminal aprons are described in **Exhibit C**.

4. Cost of Capital shall mean (a) for capital improvements financed with Airport System Revenue Bonds, the effective interest rate on the Bonds used to finance the particular capital improvement and (b) for capital improvements financed with other Airport funds, the current Bond Buyer Revenue Bond Index rate.

5. Coverage shall mean an amount equal to twenty-five (25%) of the Debt Service.

6. Debt Service shall mean principal and interest on any bonds, notes or obligations.

7. Operation and Maintenance Expenses shall be defined as provided in the Bond Ordnance; i.e.: all reasonable and necessary current expenses of the City, paid or accrued, of operating, maintaining and repairing the Airport System, including, without limitation, those reasonably allocated City overhead expenses relating to the administration, operation and maintenance of the Airport System; insurance and fidelity bond premiums; payments to pension and other funds and to any self-insurance fund; any general and excise taxes or other governmental charges imposed by entities other than the City; any required rebate of any portion of interest income to the federal government which is payable from Gross Revenues or the Revenue Fund; costs of contractual and professional services, labor, materials and supplies for current operations, including the costs of such direct City services rendered to the Airport System as are requested from the City by the Airport System and as are reasonably necessary for the operation of the Airport System; costs of issuance of Prior Lien Bonds, Revenue Bonds and Subordinate Obligations for the Airport System (except to the extent paid from the proceeds thereof); fiduciary costs; costs of collecting and refunding Gross Revenues; utility costs; any lawful refunds of any Gross Revenues; and all other administrative, general and commercial expenses, but excluding:

(a) any allowance for depreciation;

(b) costs of capital improvements;

(c) reserves for major capital improvements, Airport System operations, maintenance or repair;

(d) any allowance for redemption of, or payment of interest or premium on, Prior Lien Bonds, Revenue Bonds and Subordinate Obligations;

(e) any liabilities incurred in acquiring or improving properties of the Airport System;

(f) expenses of lessees under Special Facilities Leases and operation and maintenance expenses pertaining to Special Facilities to the extent they are required to be paid by such lessees pursuant to the terms of the Special Facilities Leases;

(g) any charges or obligations incurred in connection with any lawful Airport System purpose, including the lease, acquisition, operation or maintenance of any facility or property benefiting the Airport System, provided that the payment of such charges or obligations is expressly agreed by the payee to be payable solely from proceeds of the Capital Fund;

(h) liabilities based upon the City's negligence or other ground not based on contract; and

(i) so long as Federal Payments are excluded from Gross Revenues, an amount of expenses that would otherwise constitute Operation and Maintenance Expenses for such period equal to the Federal Payments for such period.

8. Productive Space shall mean the total useable space in the Terminal, excluding Support Space, leasable lessee maintained space, and space related to the EDS baggage handling system, as more particularly shown and described on Exhibit D-6, attached hereto. Productive Space includes airline leasable space (e.g. ticket counters, back offices and holdrooms), concession space, restrooms, circulation space, security checkpoints, and the inbound baggage area.

9. Support Space shall mean all space in the Terminal other than Productive Space and leasable lessee maintained space, as more particularly shown and described on Exhibit D-6, attached hereto. Support Space includes common service areas, apron level service roadway, rooftop mechanical room/storage space, and areas used for administrative services.

II.

The Terminal conditioned space rental rate for the Fiscal Year shall be the sum of the Operations and Maintenance Rate and the Capital Cost Recovery Rate, which shall be calculated as follows and as illustrated in Exhibit D-8:

1. The Operations and Maintenance Rate shall be calculated by dividing the estimated Operation and Maintenance Expenses, Operation and Maintenance Reserve Fund and bad debt expense allocable to the Terminal Building by the total Productive Space in the Terminal Building.

2. The Capital Cost Recovery Rate shall be calculated by dividing the total annual capital cost recovery charges allocable to Airline Leasable Space by the total amount

of Airline Leasable Space. The amount of annual capital cost recovery charges allocable to Airline Leased Space shall be the sum of:

    a.    The annual Amortization attributable to Airline Leasable Space portion of the Terminal.

    b.    Debt Service and Coverage attributable to the Airline Leasable Space portion of the Terminal.

    c.    Terminal prorata share of any other fund deposits required by the Bond Ordinance.

3.    The unconditioned space rental rate for the apron level of the Terminal for the Fiscal Year shall be 50% of the Capital Cost Recovery Rate. The conditioned space rental rate for the apron level of the Terminal for the Fiscal Year shall be 80% of the Capital Cost Recovery Rate.

### III.

The cost of the Common Space for the Fiscal Year shall be calculated by multiplying the total Common Space times the Terminal conditioned rental rate. Airline agrees to pay its share of the cost of Common Space according to the following calculation: Airline's percentage share of the total number of enplaned passengers of Signatory and other airlines with scheduled passenger service to the Airport multiplied by 80% of the cost of the Common Space plus Airline's percentage share of the number of Signatory and other airlines with scheduled passenger service to the Airport multiplied by 20% of the cost of Common Space. The calculation of the number of enplaned passengers shall include passengers of Affiliates. The calculation of the number of airlines with scheduled passenger service shall exclude Affiliates.

### IV

1.    The estimated total Apron Area costs shall be calculated by adding:

    a.    Direct and indirect operation and maintenance costs allocable to the Apron Area and RON spaces, and

    b.    Annual Amortization charges attributed to the Apron Area and RON spaces,

    c.    Debt Service and Coverage attributed to the Apron Area and RON spaces, and

    d.    Apron Area prorata share of any fund deposits required by the Bond Ordinance.

2.    The estimated Apron Fee per gate required shall then be determined by dividing the cost of the Apron Area by the number of aircraft loading positions, which includes RON spaces.

### V.

1.    The estimated total Terminal Equipment costs shall be calculated by adding:

    a.    Direct and indirect operations and maintenance costs allocable to Terminal Equipment, and

    b.    Annual Amortization charges attributed to Terminal Equipment,

      c.      Debt Service and Coverage attributed to Terminal Equipment, and

      d.      Terminal Equipment prorata share of any fund deposits required by the Bond Ordinance.

2.      The estimated Terminal Equipment Fee per gate required shall then be determined by dividing the Terminal Equipment costs by the number of leased aircraft gates.

VI.

Landing fees shall be determined by multiplying the landing fee rate as forecasted and shown on Exhibit D-11, times the total number of thousand pound units of Maximum Certified Gross Landing Weight of Airline's aircraft making Fee Landings at Airport during the preceding month.

The Landing Fee rate for the Fiscal Year shall be calculated as follows and as illustrated in Exhibit D-11:

1.      The estimated total Airfield Area costs shall be calculated by adding:

      a.      Direct and indirect operations and maintenance costs allocable to the Airfield Area, and

      b.      Annual Amortization charges attributed to the Airfield Area.

      c.      Debt Service and Coverage attributed to the Airfield Area, and

      d.      Airfield Area prorata share of any fund deposits required by the Bond Ordinance.

2.      The revenues estimated from fuel flowage fees shall then be subtracted from the total Airfield Area cost to determine the estimated net Airfield Area cost.

3.      The estimated net Airfield Area costs shall be divided by the composite landed weight forecast of the Signatory Airlines and other airlines under agreement with the Lessor for the ensuing Fiscal Year to determine the Signatory Airline landing fee rate for the Fiscal Year. In the Year-end Adjustment to Actual computation described in Article 5.I.(2), Lessor shall use actual total landed weight (including non-signatory carriers) as the basis for computing the Landing Fee.

# Exhibit D-1
# Basic Project Costs and Funding Sources

EXHIBIT D-1

**BASIC PROJECT COSTS AND FUNDING SOURCES**
**Actual Amount Spent As of September 30, 2000**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**

| | Forecast project costs | Gross actual project costs | Funding Sources | | | | | | | | | | | | Total sources of funding | Net to be funded with Bonds (e) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | AIP grants Pre-LOI | Letter of Intent (a) | OEA Grants | Noise Grants (b) | Military Airports Program (c) | PFC revenue (d) Pay pre-DBO project costs | Leveraged (e) (f) | Special Facility Bonds (g) | Airport funds (h) | Other funds (i) | Interim funding (j) | Variable-rate notes (k) | | |
| Land acquisition | $12,754,000 | $12,531,142 | $ -- | $3,892,562 | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $3,892,562 | $8,638,580 |
| Noise mitigation (acquisition of schools) | 45,748,000 | 9,130,977 | -- | -- | -- | -- | -- | -- | -- | -- | 9,130,977 | -- | -- | -- | 9,130,977 | -- |
| Noise mitigation (post-opening) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Demolition | 16,973,000 | 16,670,624 | 2,182,357 | 3,075,289 | -- | -- | -- | -- | -- | -- | 975,299 | -- | -- | 308,622 | 6,541,567 | 10,129,057 |
| Airport utilities | 9,338,000 | 9,646,226 | -- | 1,588,886 | -- | -- | -- | -- | -- | -- | 278,089 | -- | -- | 1,065,382 | 2,932,357 | 6,713,869 |
| Telecommunications | 8,695,000 | 8,612,177 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 7,926,806 | 7,926,806 | 685,371 |
| Security system | 4,376,000 | 4,112,149 | -- | 218,279 | -- | -- | -- | -- | -- | -- | 132,050 | -- | -- | 60,750 | 411,079 | 3,701,070 |
| **Passenger Terminal Complex** | | | | | | | | | | | | | | | | |
| Terminal complex | 154,283,000 | 160,607,933 | -- | -- | -- | -- | -- | 10,745,000 | 105,424,261 | -- | 3812659 | 550,000 | -- | 6,753,833 | 127,285,753 | 33,322,180 |
| Concession kiosks | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Terminal equipment | 11,035,000 | 10,752,788 | -- | 6,430,113 | -- | -- | -- | -- | 4,322,675 | -- | -- | -- | -- | -- | 10,752,788 | -- |
| Parking structure | 30,930,000 | 30,731,733 | -- | -- | -- | -- | -- | -- | -- | 9,817,953 | 20,913,780 | -- | -- | -- | 30,731,733 | -- |
| **Airfield Facilities** | | | | | | | | | | | | | | | | |
| Terminal apron | 20,478,000 | 29,793,400 | -- | 7,315,375 | -- | -- | 5,000,000 | -- | 12,817,575 | -- | 3,995,689 | -- | -- | -- | 29,128,639 | 664,761 |
| Terminal apron expansion | 9,511,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Air cargo apron | 5,885,000 | 5,886,212 | -- | 3,755,754 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2,130,458 | 5,886,212 | -- |
| East runway system | 37,160,000 | 37,096,066 | -- | 22,905,431 | -- | -- | 9,586,985 | -- | 1,795,043 | -- | 432,275 | -- | -- | -- | 34,719,734 | 2,376,332 |
| Airfield service roads | 676,000 | 675,922 | -- | 227,580 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 227,580 | 448,342 |
| Midfield cross taxiway | 16,966,000 | 16,966,281 | -- | 11,317,991 | -- | -- | 3,733,438 | -- | 346,594 | -- | 1,319,043 | -- | -- | -- | 16,717,066 | 249,215 |
| West runway and taxiway | 13,644,000 | 13,566,160 | -- | 8,498,472 | -- | -- | -- | -- | 5,027,148 | -- | 40,540 | -- | -- | -- | 13,566,160 | -- |
| State Pooling Board apron | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| General aviation | 6,210,000 | 6,136,770 | -- | 4,299,027 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 4,299,027 | 1,837,743 |
| Oil/water separators | 200,000 | 199,584 | -- | -- | -- | -- | -- | -- | -- | -- | 199,584 | -- | -- | -- | 199,584 | -- |
| Airfield lighting and equipment | 2,138,000 | 1,911,109 | -- | 747,322 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 747,322 | 1,163,787 |
| Miscellaneous airfield costs | 104000 | 44,511 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 44,848 | 44,848 | (337) |
| **Landside Facilities** | | | | | | | | | | | | | | | | |
| Terminal access road | 15535000 | 15,580,513 | -- | 5,964,865 | 6 | -- | -- | 3,136,000 | -- | 2,618,222 | 867,852 | -- | -- | -- | 12,586,945 | 2,993,568 |
| Terminal parking lots/drainage | 24,761,000 | 24,813,223 | -- | -- | -- | 4,000,000 | -- | -- | -- | -- | 16,682 | -- | -- | -- | 4,016,682 | 20,796,541 |

**EXHIBIT D-1 (page 2 of 3)**

**BASIC PROJECT COSTS AND FUNDING SOURCES**
**Actual Amount Spent As of September 30, 2000**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**

| | Forecast project costs | Gross actual project costs | AIP grants Pre-LOI | Letter of Intent (a) | OEA Grants | Noise Grants (b) | Military Airports Program (c) | Pay pre-DBO project costs | Leveraged (e)(f) | Special Facility Bonds (g) | Airport funds (h) | Other funds (i) | Interim funding (j) | Variable-rate notes (k) | Total sources of funding | Net to be funded with Bonds (e) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **Funding Sources** | | | | | | | | |
| | | | | | | | | PFC revenue (d) | | | | | | | | |
| Ground transportation staging | $1,374,000 | $1,373,575 | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $1,373,575 | $ -- | $ -- | $ -- | $1,373,575 | $ -- |
| Parking management buildings | 2,174,000 | 2,167,577 | -- | -- | -- | -- | -- | -- | -- | -- | 2,167,577 | -- | -- | -- | 2,167,577 | -- |
| South access road | 4,588,000 | 4,588,442 | -- | 3,295,577 | -- | -- | -- | -- | -- | -- | 191,208 | -- | -- | -- | 3,486,785 | 1,101,657 |
| Emergency/cantonment access roads | 210,000 | 210,478 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 210,478 |
| North access road/Golf road | 3,060,000 | 1,080,676 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,080,676 |
| Parking revenue control equipment | 2,742,000 | 2,490,701 | -- | -- | -- | -- | -- | -- | -- | -- | 2,490,701 | -- | -- | -- | 2,490,701 | -- |
| Landscaping (parking lot/rental car) | 7,749,000 | 8,834,042 | -- | -- | -- | -- | -- | -- | -- | 654,707 | -- | -- | -- | -- | 654,707 | 8,179,335 |
| Landscaping (other areas) | 1,222,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Roadway and parking signage | 2,486,000 | 2,373,456 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2,373,456 |
| Golf course/Moya Park modifications | 981,000 | 4,581,286 | -- | 571,790 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 189,416 | 761,206 | 3,820,080 |
| State Hwy. 71 modifications | 935,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| State Hwy. 71/McWhirk connector | 417,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Miscellaneous landside projects | 179,000 | 89,817 | -- | -- | -- | -- | -- | -- | -- | -- | 89,817 | -- | -- | -- | 89,817 | -- |
| **Support Facilities** | | | | | | | | | | | | | | | | |
| ARFF facility | 2,607,000 | 2,566,077 | -- | 1,628,404 | -- | -- | -- | -- | -- | -- | 87,704 | -- | -- | 481,822 | 2,197,930 | 368,147 |
| Airport maintenance complex | 700,000 | 721,385 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 721,385 |
| Vehicle fueling facilities | 207,000 | 205,939 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 205,939 | 205,939 | -- |
| Aircraft fuel storage & tank moving | 5,411,000 | 5,330,314 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 5,330,314 |
| Communications building | 1,608,000 | 1,597,467 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,597,467 |
| Miscellaneous support facilities | 4,188,000 | 3,032,549 | -- | -- | -- | -- | -- | -- | -- | -- | 48,549 | -- | -- | 2,984,000 | 3,032,549 | -- |
| Artwork | 700,000 | 410,016 | -- | -- | -- | -- | -- | -- | -- | -- | 410,016 | -- | -- | -- | 410,016 | -- |
| Program management services | 39,624,000 | 39,584,408 | 298,013 | 5,186,264 | -- | -- | -- | -- | **13,102,683** | -- | 5,313,702 | -- | -- | -- | 23,900,662 | 15,683,746 |
| Financial and legal services | 2,834,000 | 2,621,227 | -- | -- | -- | -- | -- | -- | -- | -- | 222,172 | -- | -- | 389,556 | 611,728 | 2,009,499 |
| Preliminary planning services | 3,373,000 | 3,357,965 | 1,844,152 | -- | 150,000 | -- | -- | -- | -- | -- | 645,169 | -- | -- | 618,498 | 3,257,819 | 100,146 |
| Mapping, geotech, materials testing | 6,652,000 | 6,507,842 | -- | -- | -- | -- | -- | -- | -- | -- | 723,979 | -- | -- | 569,002 | 1,292,981 | 5,214,861 |
| Owner-controlled insurance program | 13,411,000 | 10,499,898 | -- | -- | -- | -- | -- | -- | 5,090,806 | -- | 278,721 | -- | -- | -- | 5,369,527 | 5,130,371 |
| Small contractor assistance program | 5,829,000 | 5,517,666 | -- | -- | -- | -- | -- | -- | -- | -- | 31,263 | -- | -- | -- | 31,263 | 5,486,403 |
| IDC Projects | 473,000 | 53,222 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 53,222 |

EXHIBIT D-1 (page 3 of 3)

**BASIC PROJECT COSTS AND FUNDING SOURCES**
**Actual Amount Spent As of September 30, 2000**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**

| | Forecast project costs | Gross actual project costs | Funding Sources | | | | | | | | | | | | Total sources of funding | Net to be funded with Bonds (e) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | AIP grants Pre-LOI | Letter of Intent (a) | OEA Grants | Noise Grants (b) | Military Airports Program (c) | Pay pre-DBO project costs | PFC revenue (d) Leveraged (e) (f) | Special Facility Bonds (g) | Airport funds (h) | Other funds (i) | Interim funding (j) | Variable-rate notes (k) | | |
| City landfill closure | $4,700,000 | $1,658,990 | $   -- | $   -- | $   -- | $   -- | $   -- | $   -- | $   -- | $   -- | $   -- | $   -- | $   -- | $   -- | $   -- | $1,658,990 |
| Private landfill legal costs | 150,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| ABIA relocation and equipment | 2,554,000 | 2,827,392 | -- | -- | -- | -- | -- | -- | -- | -- | 2,827,392 | -- | -- | -- | 2,827,392 | -- |
| Other supplemental costs | 2,444,000 | 1,804,371 | -- | -- | -- | -- | -- | -- | -- | -- | 793,446 | -- | -- | 1,010,925 | 1,804,371 | -- |
| Management reserve Capitalized interest | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Basic project reserve | 12,108,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| | $585,090,000 | $531,552,278 | $4,324,522 | $90,918,981 | $150,006 | $   -- | $9,000,000 | $27,201,423 | $147,926,786 | $13,090,882 | $59,809,510 | $550,000 | $   -- | $24,739,857 | $376,964,645 | $153,840,311 |

(a)  Letter of Intent (LOI) was awarded on September 30, 1994 and provides funding through 2001.

(b)  The City received a noise grant from the FAA in July 1996 for $15 million and  a second installment of $15 million in June 1997.  Additional grants of $4.4 million were received in 1998.

(c)  The City received a $5 million grant under the Military Airports Program in September 1996 and a $2 million grant in both 1997 and 1998.

(d)  Approved PFC revenue forecast to be received under the Record of Decision, dated April 28, 1995.

(e)  Total Project costs funded with Bonds for purposes of debt service allocation to ABIA cost centers are the sum of the Notes and the net to be funded with long-term Bonds.

(f)  Estimated project costs supported by PFC revenue received after DBO.

(g)  Special facility bonds were issued to cover the third floor of the parking structure to be occupied by the rental car companies and site preparation for the rental car service centers, including landscaping and sunshades.

(h)  Airport funds include funds generated at Mueller and $14.8 million of the 1989 Bonds allocated to ABIA.

(i)  The City's Planning, Environmental and Conservation Services Department provided a rebate for the use of thermal storage in the heating/chilling plant..

(j)  Represents the amount to be reimbursed to ABIA CIP Fund when outstanding LOI payments are received in FY00 and FY01.

(k)  The Notes provided financing for additional projects totaling $13.0 million that were included in the opening day program.

# Exhibit D-2
# Allocation of Project Costs to Cost Centers – Debt Service

EXHIBIT D-2

ALLOCATION OF PROJECT COSTS TO COST CENTERS
DEBT SERVICE
Austin-Bergstrom International Airport
City of Austin, Department of Aviation

| | Total allocable project costs | Airline Terminal | Airline Airfield | Airline Apron | Airline Curbside Conveyor | Fuel Facility | Non-Airline Aeronautical Cargo | Non-Airline Aeronautical GA | Non-Airline Aeronautical Other | Non-Aeronautical Terminal | Non-Aeronautical Parking | PBX/STS | PDS | North Infrastructure | South Infrastructure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Costs** | | | | | | | | | | | | | | | |
| Land acquisition | $8,638,580 | $ -- | $5,465,028 | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $3,173,552 |
| Noise mitigation (acquisition of schools) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Demolition | 10,437,679 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2,763,080 | -- | -- | 6,047,279 | 1,627,320 |
| Airport utilities | 7,779,251 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 6,130,668 | 1,648,583 |
| Telecommunications | 8,612,177 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,210,436 | 861,805 | 5,265,302 | 1,274,634 |
| Security system | 3,761,820 | 3,761,820 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Passenger Terminal Complex** | | | | | | | | | | | | | | | |
| Terminal complex | 40,076,013 | 17,410,476 | -- | -- | -- | -- | -- | -- | -- | 22,665,536 | -- | -- | -- | -- | -- |
| Concession kiosks | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Terminal equipment | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Parking structure | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Airfield Facilities** | | | | | | | | | | | | | | | |
| Terminal apron | 664,761 | -- | -- | 664,761 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Terminal apron expansion | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Air cargo apron | 2,130,458 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2,130,458 | -- |
| East runway system | 2,376,332 | -- | 2,376,332 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Airfield service roads | 448,342 | -- | 448,342 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Midfield cross taxiway | 249,215 | -- | 249,215 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| West runway and taxiway | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| State Pooling Board apron | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| General aviation | 1,837,743 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,837,743 |
| Oil/water separators | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Airfield lighting and equipment | 1,163,787 | -- | 1,163,787 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Miscellaneous airfield costs | 44,511 | -- | 44,511 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Landside Facilities** | | | | | | | | | | | | | | | |
| Terminal access road | 2,993,568 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2,993,568 | -- |
| Terminal parking lots/drainage | 20,796,541 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 20,796,541 | -- | -- | -- | -- |

EXHIBIT D-2 (page 2 of 3)

**ALLOCATION OF PROJECT COSTS TO COST CENTERS - DEBT SERVICE**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**

| | Total allocable project costs | Airline — Terminal | Airfield | Apron | Curbside Conveyor | Fuel Facility | Non-Airline Aeronautical — Cargo | GA | Other | Non-Aeronautical — Terminal | Parking | PBX/STS | PDS | North Infrastructure | South Infrastructure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Direct Costs** | | | | | | | | | | | | | | | |
| Ground transportation staging | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- |
| State Hwy. 71 modifications | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Parking management buildings | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| South access road | 1,101,657 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,101,657 |
| Emergency/cantonment access roads | 210,478 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 210,478 | -- |
| State Hwy. 71/McWhirk connector | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| North access road/Golf road | 1,080,676 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | 1,080,676 | -- |
| Parking revenue control equipment | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Landscaping (parking lot/rental car) | 8,179,335 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 8,179,335 | -- | -- | -- | -- |
| Landscaping (other areas) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Roadway and parking signage | 2,373,456 | 515,558 | -- | -- | -- | -- | -- | -- | -- | 671,170 | 1,186,728 | -- | -- | -- | -- |
| Golf course/Moya Park modifications | 4,009,496 | -- | 4,009,496 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Support Facilities** | | | | | | | | | | | | | | | |
| ARFF facility | 849,969 | -- | 849,969 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Airport maintenance complex | 721,385 | 156,698 | 360,693 | -- | -- | -- | -- | -- | -- | 203,995 | -- | -- | -- | -- | -- |
| Vehicle fueling facilities | 205,939 | 44,734 | 102,970 | -- | -- | -- | -- | -- | -- | 58,236 | -- | -- | -- | -- | -- |
| Aircraft fuel storage & tank moving | 5,330,314 | -- | -- | -- | -- | 5,330,314 | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Communications building | 1,597,467 | 346,999 | 798,734 | -- | -- | -- | -- | -- | -- | 451,735 | -- | -- | -- | -- | -- |
| Miscellaneous support facilities | 2,984,000 | -- | 2,984,000 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Artwork** | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **City landfill closure** | 1,658,990 | -- | 1,658,990 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Private landfill legal costs** | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Direct Cost** | $142,313,940 | $22,236,285 | $20,512,067 | $664,761 | $ -- | $5,330,314 | $ -- | $ -- | $ -- | $24,050,672 | $32,925,684 | $1,210,436 | $861,805 | $23,858,429 | $10,663,489 |
| Percentage of total | | 15.6248% | 14.4133% | 0.4671% | 0.0000% | 3.7455% | 0.0000% | 0.0000% | 0.0000% | 16.8997% | 23.1360% | 0.8505% | 0.6056% | 16.7646% | 7.4929% |
| Percent for indirect cost allocation | | 20.6289% | 19.0293% | 0.6167% | 0.0000% | 4.9450% | 0.0000% | 0.0000% | 0.0000% | 22.3121% | 30.5456% | 1.1229% | 0.7995% | | |

**EXHIBIT D-2 (page 3 of 3)**

**ALLOCATION OF PROJECT COSTS TO COST CENTERS - DEBT SERVICE**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**

| | Total allocable project costs | Airline | | | | Fuel Facility | Non-Airline Aeronautical | | | Non-Aeronautical | | | | North Infrastructure | South Infrastructure |
| | | Terminal | Airfield | Apron | Curbside Conveyor | | Cargo | GA | Other | Terminal | Parking | PBX/STS | PDS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Indirect Costs (a)** | | | | | | | | | | | | | | | |
| Program management services | $15,683,746 | $3,235,381 | $2,984,507 | $96,723 | $ -- | $775,561 | $ -- | $ -- | $ -- | $3,499,374 | $4,790,689 | $176,119 | $125,393 | $ -- | $ -- |
| Financial and legal services | 2,399,055 | 494,898 | 456,523 | 14,795 | -- | 118,633 | -- | -- | -- | 535,280 | 732,805 | 26,940 | 19,181 | -- | -- |
| Preliminary planning services | 718,644 | 148,248 | 136,753 | 4,432 | -- | 35,537 | -- | -- | -- | 160,345 | 219,514 | 8,070 | 5,746 | -- | -- |
| Mapping, geotech, materials testing | 5,783,863 | 1,193,146 | 1,100,629 | 35,669 | -- | 286,012 | -- | -- | -- | 1,290,502 | 1,766,714 | 64,949 | 46,242 | -- | -- |
| Owner-controlled insurance program | 5,130,371 | 1,058,338 | 976,274 | 31,639 | -- | 253,697 | -- | -- | -- | 1,144,694 | 1,567,101 | 57,611 | 41,018 | -- | -- |
| Small contractor assistance program | 5,486,403 | 1,131,783 | 1,044,024 | 33,835 | -- | 271,303 | -- | -- | -- | 1,224,132 | 1,675,853 | 61,609 | 43,864 | -- | -- |
| IDC Projects | 53,222 | 10,979 | 10,128 | 328 | -- | 2,632 | -- | -- | -- | 11,875 | 16,257 | 598 | 426 | -- | -- |
| ABIA relocation and equipment | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Other supplemental costs | 1,010,925 | 208,542 | 192,372 | 6,234 | -- | 49,990 | -- | -- | -- | 225,559 | 308,793 | 11,352 | 8,082 | -- | -- |
| Management reserve | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total Indirect Costs** | **$36,266,229** | **$7,481,316** | **$6,901,209** | **$223,656** | **$ --** | **$1,793,364** | **$ --** | **$ --** | **$ --** | **$8,091,760** | **$11,077,725** | **$407,247** | **$289,951** | **$ --** | **$ --** |
| **Direct and Indirect Costs** | **$178,580,168** | **$29,717,601** | **$27,413,276** | **$888,417** | **$ --** | **$7,123,678** | **$ --** | **$ --** | **$ --** | **$32,142,432** | **$44,003,409** | **$1,617,683** | **$1,151,756** | **$23,858,429** | **$10,663,489** |
| **Allocated infrastructure costs** | n.a. | $193,311 | $20,209,171 | $2,212,659 | $ -- | $185,516 | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | -15,757,752.89 | -7,042,903.98 |
| | **$178,580,168** | **$29,910,912** | **$47,622,446** | **$3,101,076** | **$ --** | **$7,309,195** | **$ --** | **$ --** | **$ --** | **$32,142,432** | **$44,003,409** | **$1,617,683** | **$1,151,756** | **$8,100,676** | **$3,620,585** |
| **Debt service allocation** | 100.0000% | 16.7493% | 26.6673% | 1.7365% | | 4.0929% | 0.0000% | 0.0000% | 0.0000% | 17.9989% | 24.6407% | 0.9059% | 0.6450% | 4.5362% | 2.0274% |

# Exhibit D-3
# Acreage Allocation Worksheet

EXHIBIT D-3

**ACREAGE ALLOCATION WORKSHEET**

| | Total allocable acreage | Terminal | Airfield | Apron | Fuel Facility | Cargo | GA | Other | Non-Aeronautical Terminal | Non-Aeronautical Parking | Unrentable acreage | Rentable non-airline area North area | Rentable non-airline area South area | For O&M Allocation Rentable non-airline area (no parking) North area | South area |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rentable Acreage by Area** | | | | | | | | | | | | | | | |
| Terminal building | 6.9 | 3.0 | -- | -- | -- | -- | -- | -- | 3.9 | -- | -- | -- | -- | -- | -- |
| Central plant | 2.3 | 1.0 | -- | -- | -- | -- | -- | -- | 1.3 | -- | -- | -- | -- | -- | -- |
| Roadways | 100.7 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 100.7 | -- | -- | -- | -- |
| Airfield | 843.7 | -- | 722.6 | 20.0 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Terminal apron | 60.7 | -- | -- | 60.7 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Air cargo | 50.2 | -- | -- | -- | -- | 50.2 | -- | -- | -- | -- | -- | 50.2 | -- | 50.2 | -- |
| General aviation | 18.4 | -- | -- | -- | -- | -- | 18.4 | -- | -- | -- | -- | -- | 18.4 | -- | 18.4 |
| State Pooling Board | 13.8 | -- | -- | -- | -- | -- | -- | 13.8 | -- | -- | -- | 13.8 | -- | 13.8 | -- |
| National Guard | 51.8 | -- | -- | -- | -- | -- | -- | 51.8 | -- | -- | -- | -- | 51.8 | -- | 51.8 |
| Airport maintenance complex | 14.7 | 3.2 | 7.4 | 1.6 | -- | -- | -- | -- | 4.2 | -- | -- | -- | -- | -- | -- |
| Fuel farm | 6.9 | -- | -- | -- | 6.9 | -- | -- | 6.9 | -- | -- | -- | -- | -- | -- | -- |
| In-flight catering | 3.0 | -- | -- | -- | -- | -- | -- | 3.0 | -- | -- | -- | 3.0 | -- | 3.0 | -- |
| Car rental | 37.5 | -- | -- | -- | -- | -- | -- | -- | -- | 37.5 | -- | 37.5 | -- | 37.5 | -- |
| Parking garage | 9.2 | -- | -- | -- | -- | -- | -- | -- | -- | 9.2 | 9.2 | -- | -- | -- | -- |
| Surface parking | 92.8 | -- | -- | -- | -- | -- | -- | -- | -- | 92.8 | 92.8 | -- | -- | -- | -- |
| ARFF | 2.8 | -- | 2.8 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| FAA | 13.1 | -- | 13.1 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| GSEM | 3.4 | -- | 3.4 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Belly freight | 2.4 | -- | 2.4 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| RCCF | 4.8 | -- | -- | -- | -- | -- | -- | 4.8 | -- | -- | -- | -- | 4.8 | -- | 4.8 |
| Other buildings and areas | 2,903.1 | -- | -- | -- | -- | -- | -- | -- | -- | -- | 2,903.1 | -- | -- | -- | -- |
| | 4,242.2 | 7.2 | 751.7 | 82.3 | 6.9 | 50.2 | 18.4 | 80.3 | 9.4 | 139.5 | 3,105.8 | 104.5 | 75.0 | 104.5 | 75.0 |
| | | | | | | | | | | | | 58.22% | 41.78% | 58.22% | 41.78% |
| | | | | | | | | | | | | | | | |
| **Total rentable acreage** | 1136.4 | | | | | | | | | | | | | | |
| **Rentable % by cost center** | | 0.6327% | 66.1431% | 7.2419% | 0.6072% | 4.4175% | 1.6191% | 7.0662% | 0.8237% | 12.2756% | n.a. | | | | |
| **Non-airline rentable acreage** | 297.8 | | | | | | | | | | | | | | |
| **Rentable % for non-airline cost centers** | | n.a. | n.a. | n.a. | n.a. | 16.8592% | 6.1795% | 26.9680% | 3.1435% | 46.8498% | n.a. | | | | |

# Exhibit D-4
# Summary of Debt Service

**EXHIBIT D-4**

**SUMMARY OF DEBT SERVICE--NEW AIRPORT**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**
**For Fiscal Years ending September 30**

| | Actual | | | | | |
|---|---|---|---|---|---|---|
| **NEW AIRPORT** | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
| **Airport System Prior Lien Bonds** | | | | | | |
| Series 1995A | $28,618,994 | $28,617,538 | $19,641,089 | $973,144 | $ -- | $ -- |
| Series 1995B | 2,797,105 | 2,794,505 | 2,211,622 | 145,584 | -- | -- |
| Series 1989 | 73,500 | 73,500 | 73,500 | 1,061,454 | -- | -- |
| Series 2003 Refunding | -- | -- | 449,729 | 2,702,750 | 4,261,290 | 4,492,750 |
| Series 2005 Refunding | -- | -- | 4,323,826 | 23,776,418 | 22,519,076 | 26,600,372 |
| Series 2005 Refunding--Admin Expense | -- | -- | -- | -- | -- | 1,673,993 |
| Deduct for unused bond proceeds | (992,676) | (999,889) | (898,960) | (949,798) | (912,090) | (1,112,893) |
| **Total Prior Lien Bonds debt service** | $30,496,923 | $30,485,654 | $25,800,806 | $27,709,552 | $25,868,276 | $31,654,222 |
| | | | | | | |
| **Less: PFC revenue (a)** | 10,052,334 | 9,345,000 | 10,714,961 | 12,394,401 | 11,642,451 | 12,330,450 |
| | | | | | | |
| **Less: Debt service reduction (defeasance) (b)** | 2,166,167 | 1,972,500 | -- | -- | -- | -- |
| | | | | | | |
| **Debt Service Requirements** | **$18,278,422** | **$19,168,154** | **$15,085,845** | **$15,315,151** | **$14,225,825** | **$19,323,772** |
| | | | | | | |
| **Debt service coverage (c)** | 4,569,606 | 4,792,039 | 3,771,461 | 3,563,424 | 3,556,456 | 4,035,000 |
| | | | | | | |
| **Variable Rate Revenue Notes, Series A (d)** | 2,204,021 | 3,117,542 | 3,312,560 | 2,696,720 | 2,340,041 | 548,137 |
| | | | | | | |
| **General Obligation Airport Bonds (e)** | | | | | | |
| Series 1997 | $10,419 | $10,386 | $10,353 | $1,209 | $9,535 | -- |
| Series 1997 (COs) | 20,199 | 20,350 | 10,104 | -- | -- | -- |
| Series 1998 | 1,780 | 1,764 | 1,747 | 1,399 | 1,382 | 2,646 |
| Series 1998 (COs) | 29,062 | 31,232 | 33,726 | 17,892 | -- | -- |
| Series 1999 | 937 | 935 | 934 | 88 | 87 | 85 |
| Series 1999 (COs) | 23,791 | 23,851 | 23,963 | 24,010 | 12,075 | -- |
| Series 2001 | 162,089 | 111,972 | 48,503 | (6,130) | (3,894) | (19) |
| Series 2005 | -- | -- | -- | 9,511 | 9,511 | 20,488 |
| Series 2008 | -- | -- | -- | -- | -- | 1,537 |
| | $248,277 | $200,490 | $129,330 | $47,979 | $28,696 | $24,737 |
| | | | | | | |
| **Total** | **$25,300,326** | **$27,278,225** | **$22,299,196** | **$21,623,274** | **$20,151,018** | **$23,931,646** |
| | | | | | | |
| **Allocation to cost centers** | | | | | | |
| **Aeronautical cost centers** | | | | | | |
| Airfield area | $6,502,644 | $7,023,803 | $5,992,924 | $5,798,139 | $5,389,152 | $6,378,050 |
| Terminal apron | 371,201 | 401,216 | 385,092 | 374,659 | 349,428 | 415,148 |
| Terminal complex | 5,017,357 | 5,423,056 | 3,776,384 | 3,613,709 | 3,370,346 | 4,004,238 |
| Fuel facility | 851,216 | 920,107 | 907,401 | 883,066 | 823,596 | 978,498 |
| Other aeronautical areas (f) | -- | -- | -- | -- | -- | -- |
| | | | | | | |
| **Non-Aeronautical cost centers** | | | | | | |
| Terminal complex | 5,536,154 | 5,983,799 | 3,927,729 | 3,883,311 | 3,621,792 | 4,302,975 |
| Parking | 5,119,714 | 5,533,690 | 5,462,811 | 5,316,304 | 4,958,282 | 5,890,830 |
| Other non-aeronautical areas (g) | 1,417,675 | 1,532,307 | 1,454,539 | 1,416,113 | 1,320,746 | 1,569,150 |
| | | | | | | |
| **PBX/STS** | 188,214 | 203,433 | 200,828 | 195,442 | 182,280 | 216,563 |
| **PDS** | 134,005 | 144,840 | 142,985 | 139,150 | 129,779 | 154,188 |
| | | | | | | |
| **General Obligation Airport Bonds (e)** | 162,089 | 111,972 | 48,503 | 3,381 | 5,617 | 22,006 |
| **Total** | **$25,300,327** | **$27,278,223** | **$22,299,196** | **$21,623,274** | **$20,151,018** | **$23,931,646** |

(a)  PFC revenue and related interest is set-aside in the prior Fiscal Year and used to pay debt service in the following Fiscal Year. For FY2005 the amount eligible is greater than the amount
    collected in FY2004, therefore, 100 percent of FY2004 collections will be used to pay debt service. The percentage amount of PFC eligibility in other fiscal years is shown below:
    -- the percentage of 1995 Bonds eligible for payment by PFC revenue for F            **39.6%** (pre-PFC amendment)
    -- the percentage of 1995 Bonds eligible for payment by PFC revenue for F            **49.0%** (post-PFC amendment)
(b) The defeasance amount is netted against the Series 1995A debt service to determine the actual amount for FY2003 and FY2004. Due to the bond refunding completed in 2005 the
    defeasance amount is not applicable beyond FY2004.
(c)  The debt service coverage ratio is 1.25x.
(d)  Represents interest only and remarketing fees for the budget fiscal years, otherwise the actual fiscal years also include a principal amortization amount except for FY2008.
(e)  General obligation bonds are not included as allocable costs in the airline rate base.
(f)  Other aeronautical areas include cargo, general aviation, Texas Army National Guard, and the State Pooling Board areas.
(g) Other non-aeronautical areas include costs associated with general site development such as demolition, utilities, & roads.

# Exhibit D-5
# Operations and Maintenance Expenses

EXHIBIT D-5

**OPERATION AND MAINTENANCE EXPENSES**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**
**For Fiscal Years ending September 30**

| | Actual | | | | | |
|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
| **By function** | | | | | | |
| Administration | | | | | | |
|   Administration/finance | $6,886,960 | $6,217,636 | $6,502,826 | $6,672,271 | $6,886,115 | $8,182,934 |
|   PBX/STS | 381,626 | 407,462 | 402,511 | 477,360 | 420,339 | 378,944 |
|   City support services | 3,422,313 | 3,048,741 | 3,258,131 | 3,431,286 | 2,740,309 | 2,951,120 |
| Operations and maintenance | | | | | | |
|   Landside operations | -- | -- | -- | -- | -- | -- |
|   Operations | 777,475 | 1,016,007 | 987,425 | 1,133,467 | 1,151,086 | 823,206 |
|   Parking | 6,556,897 | 6,373,824 | 7,011,969 | 7,318,675 | 7,296,413 | 7,775,027 |
|   Custodial services | 4,158,972 | 4,123,758 | 4,528,582 | 4,744,885 | 5,293,327 | 5,569,519 |
|   Grnd maintenance/Landside mgmt | 901,739 | 889,268 | 952,895 | 1,050,672 | 1,056,457 | 1,005,442 |
|   Airfield operations | -- | -- | -- | -- | -- | -- |
|   Airfield maintenance | 1,468,227 | 1,546,799 | 1,899,649 | 2,194,874 | 2,320,746 | 2,229,314 |
|   Building maintenance | 3,207,629 | 3,236,964 | 4,833,605 | 3,910,353 | 3,289,411 | 3,452,480 |
|   Airlines maintenance | -- | -- | -- | -- | 1,389,991 | 1,758,228 |
|   Utilities | 2,847,062 | 3,232,283 | 2,472,286 | 4,076,549 | 4,036,866 | 4,278,865 |
|   ARFF | 3,301,171 | 3,401,568 | 3,593,842 | 3,937,817 | 4,046,751 | 4,399,819 |
|   Security | 5,683,864 | 5,725,119 | 6,447,516 | 6,580,735 | 6,891,037 | 8,193,379 |
| Planning, engineering, construction | 702,874 | 749,962 | 813,265 | 945,797 | 1,260,382 | 1,268,389 |
| **Total expenses by function** | **$40,296,809** | **$39,969,391** | **$43,704,502** | **$46,474,741** | **$48,079,230** | **$52,266,666** |
| | | | | | | |
| **By object** | | | | | | |
|   Salaries | $17,522,084 | $17,671,977 | $19,390,068 | $17,583,321 | $19,498,502 | $21,168,348 |
|   Contractual services | 20,721,090 | 19,898,064 | 21,474,533 | 26,185,666 | 25,527,511 | 27,572,984 |
|   Commodities | 1,570,435 | 1,522,930 | 1,839,323 | 1,608,166 | 1,920,755 | 2,242,582 |
|   Capital | 483,200 | 876,420 | 1,000,578 | 1,097,588 | 1,132,462 | 1,282,752 |
| **Total expenses by object** | **$40,296,809** | **$39,969,391** | **$43,704,502** | **$46,474,741** | **$48,079,230** | **$52,266,666** |
| | | | | | | |
| **By cost center** | | | | | | |
|   Airfield area | $8,688,713 | $8,703,643 | $9,460,812 | $10,172,938 | $10,413,070 | $11,247,856 |
|   Terminal apron | 2,809,854 | 2,856,024 | 3,038,927 | 3,448,401 | 3,548,417 | 3,719,790 |
|   Terminal equipment | 916,988 | 892,731 | 1,186,687 | 1,411,990 | 1,943,047 | 2,304,228 |
|   Terminal complex | 17,811,833 | 17,443,256 | 19,226,678 | 19,832,291 | 20,572,367 | 22,596,412 |
|   Parking | 7,972,026 | 7,798,539 | 8,455,229 | 8,981,568 | 8,974,038 | 9,635,792 |
|   Other buildings and areas | 1,588,773 | 1,690,233 | 1,760,457 | 1,999,281 | 2,079,191 | 2,254,603 |
| | | | | | | |
| **PBX/STS** | 381,626 | 407,462 | 402,511 | 477,360 | 420,339 | 378,944 |
| | | | | | | |
| **Remarketing fees (a)** | 126,996 | 177,503 | 173,201 | 150,912 | 128,761 | 129,041 |
| **Total expenses by cost center** | **$40,296,809** | **$39,969,391** | **$43,704,502** | **$46,474,741** | **$48,079,230** | **$52,266,666** |

(a) Represents O&M costs associated with remarketing the Variable Rate Notes and 2005 Refunding Bonds throughout the fiscal year. Therefore,
    amount added to debt service costs and allocated accordingly (see Debt Service exhibits).

# Exhibit D-6
# Terminal Space Analysis

**EXHIBIT D-6**
**TERMINAL SPACE ANALYSIS**

| | Total space (a) | Productive space (b) | Leasable Lessee Maintained | Support space (c) | Airline Leased Conditioned space | Airline Leased Un-conditioned space | Unassigned space | Concession space (b) | Public space (b) | PFC-eligible square feet |
|---|---|---|---|---|---|---|---|---|---|---|
| **Concourse Level** | | | | | | | | | | |
| Ticketing | | | | | | | | | | |
| Ticket counters | 4,800 | 4,800 | 0 | 0 | 3,886 | 0 | 914 | 0 | 0 | 0 |
| Ticket counter -- queing | 11,689 | 11,689 | 0 | 0 | 9,508 | 0 | 2,181 | 0 | 0 | 0 |
| Airline ticket offices | 11,988 | 11,988 | 0 | 0 | 10,099 | 0 | 1,889 | 0 | 0 | 0 |
| Ticket lobby -- public | 23,263 | 23,263 | 0 | 0 | 0 | 0 | 0 | 0 | 23,263 | 23,263 |
| Concessions | 38,435 | 38,435 | 0 | 0 | 0 | 0 | 0 | 38,435 | 0 | 0 |
| Restrooms | 14,983 | 14,983 | 0 | 0 | 0 | 0 | 0 | 0 | 14,983 | 14,983 |
| Vestibules | 1,800 | 1,800 | 0 | 0 | 0 | 0 | 0 | 0 | 1,800 | 1,800 |
| Preferential use holdrooms | 71,192 | 71,192 | 0 | 0 | 65,883 | 0 | 5,309 | 0 | 0 | 71,192 |
| International holdrooms | 1,453 | 1,453 | 0 | 0 | 0 | 0 | 1,453 | 0 | 0 | 1,453 |
| TSA ofcs | 2,079 | 2,079 | 0 | 0 | 0 | 0 | 0 | 2,079 | 0 | 2,079 |
| DoA ofc space | 380 | 0 | 0 | 380 | 0 | 0 | 0 | 0 | 0 | 0 |
| Security ckpt 1 | 5,223 | 5,223 | 0 | 0 | 5,223 | 0 | 0 | 0 | 0 | 5,223 |
| Security ckpt 2 | 5,223 | 5,223 | 0 | 0 | 5,223 | 0 | 0 | 0 | 0 | 5,223 |
| Security ckpt 3 | 5,030 | 5,030 | 0 | 0 | 5,030 | 0 | 0 | 0 | 0 | 5,030 |
| FIS | 1,387 | 1,387 | 0 | 0 | 0 | 0 | 0 | 1,387 | 0 | 1,387 |
| Concourse circulation | 65,744 | 65,744 | 0 | 0 | 0 | 0 | 0 | 0 | 65,744 | 65,744 |
| Common outbound baggage conveyor | 166 | 166 | 0 | 0 | 0 | 0 | 166 | 0 | 0 | 166 |
| Common service areas | 6,104 | 0 | 0 | 6,104 | 0 | 0 | 0 | 0 | 0 | 6,104 |
| Cart Racks | 90 | 90 | 0 | 0 | 0 | 0 | 0 | 0 | 90 | 0 |
| **Total concourse level** | 271,029 | 264,545 | 0 | 6,484 | 104,852 | 0 | 11,912 | 41,991 | 105,790 | 203,647 |
| **Baggage level** | | | | | | | | | | |
| Baggage claim | | | | | | | | | | |
| Claim lobby | 20,761 | 20,761 | 0 | 0 | 0 | 0 | 0 | 0 | 20,761 | 20,761 |
| Claim area | 22,044 | 22,044 | 0 | 0 | 22,044 | 0 | 0 | 0 | 0 | 22,044 |
| Claim device area | 6,562 | 6,562 | 0 | 0 | 6,562 | 0 | 0 | 0 | 0 | 6,562 |
| Baggage service office | 2,517 | 2,517 | 0 | 0 | 2,346 | 0 | 171 | 0 | 0 | 0 |
| Circulation | 2,369 | 2,369 | 0 | 0 | 0 | 0 | 0 | 0 | 2,369 | 0 |
| Rental car offices | 1,884 | 1,884 | 0 | 0 | 0 | 0 | 0 | 1,884 | 0 | 0 |
| Rental car counter | 2,063 | 2,063 | 0 | 0 | 0 | 0 | 0 | 2,063 | 0 | 0 |
| Rental car queing | 2,895 | 2,895 | 0 | 0 | 0 | 0 | 0 | 2,895 | 0 | 0 |
| Vestibules | 2,299 | 2,299 | 0 | 0 | 0 | 0 | 0 | 0 | 2,299 | 2,299 |
| Restrooms | 3,648 | 3,648 | 0 | 0 | 0 | 0 | 0 | 0 | 3,648 | 3,648 |
| Vending | 495 | 495 | 0 | 0 | 0 | 0 | 0 | 495 | 0 | 0 |
| Visitor's center/hotel board | 184 | 184 | 0 | 0 | 0 | 0 | 0 | 0 | 184 | 184 |
| | 67,721 | 67,721 | 0 | 0 | 30,952 | 0 | 171 | 7,337 | 29,261 | 55,498 |
| Admin/Back of House | | | | | | | | | | |
| Restrooms | 1,565 | 0 | 0 | 1,565 | 0 | 0 | 0 | 0 | 0 | 0 |
| DoA Ofc/Storage space | 8,992 | 6,744 | 0 | 2,248 | 0 | 0 | 0 | 0 | 6,744 | 0 |
| Police | 462 | 347 | 0 | 116 | 0 | 0 | 0 | 0 | 347 | 462 |
| Common service areas | 26,141 | 0 | 0 | 26,141 | 0 | 0 | 0 | 0 | 0 | 26,141 |
| Concession ofc space | 868 | 868 | 0 | 0 | 0 | 0 | 0 | 868 | 0 | 0 |
| Concession storage/ware washing | 4,804 | 4,804 | 0 | 0 | 0 | 0 | 0 | 4,804 | 0 | 0 |
| | 42,832 | 12,763 | 0 | 30,070 | 0 | 0 | 0 | 5,672 | 7,091 | 26,603 |

**EXHIBIT D-6**
**TERMINAL SPACE ANALYSIS**

| | Total space (a) | Productive space (b) | Leasable Lessee Maintained | Support space (c) | Airline Leased Conditioned space | Airline Leased Un-conditioned space | Unassigned space | Concession space (b) | Public space (b) | PFC-eligible square feet |
|---|---|---|---|---|---|---|---|---|---|---|
| **Baggage level con't.** | | | | | | | | | | |
| International arrival | | | | | | | | | | |
| Claim area | 2,843 | 2,843 | 0 | 0 | 0 | 0 | 2,843 | 0 | 0 | 2,843 |
| Inspection area | 5,474 | 5,474 | 0 | 0 | 0 | 0 | 5,474 | 0 | 0 | 5,474 |
| Circulation | 857 | 857 | 0 | 0 | 0 | 0 | 0 | 0 | 857 | 857 |
| Inbound baggage | 965 | 965 | 0 | 0 | 0 | 0 | 965 | 0 | 0 | 965 |
| Offices/other areas | 3,181 | 3,181 | 0 | 0 | 0 | 0 | 3,181 | 0 | 0 | 0 |
| Restrooms/lockers | 589 | 589 | 0 | 0 | 0 | 0 | 0 | 0 | 589 | 589 |
| Common service areas | 1,376 | 0 | 0 | 1,376 | 0 | 0 | 0 | 0 | 0 | 1,376 |
| | 15,285 | 13,909 | 0 | 1,376 | 0 | 0 | 12,463 | 0 | 1,446 | 12,104 |
| **Total baggage level** | 125,838 | 94,393 | 0 | 31,446 | 30,952 | 0 | 12,634 | 13,009 | 37,798 | 94,205 |
| **Apron Level** | | | | | | | | | | |
| Apron/operations | | | | | | | | | | |
| Outbound bag make-up areas | 31,344 | 0 | 31,344 | 0 | 0 | 29,206 | 2,138 | 0 | 0 | 0 |
| Apron offices | 31,641 | 0 | 31,641 | 0 | 28,204 | 0 | 3,437 | 0 | 0 | 0 |
| Future airline apron offices/storage apro | 5,907 | 0 | 5,907 | 0 | 0 | 0 | 5,907 | 0 | 0 | 0 |
| Airline apron restrooms | 2,025 | 2,025 | 0 | 0 | 0 | 0 | 0 | 0 | 2,025 | 0 |
| Circulation | 2,819 | 2,819 | 0 | 0 | 0 | 0 | 0 | 0 | 2,819 | 2,819 |
| Commuter pref. holdrooms | 2,728 | 2,728 | 0 | 0 | 0 | 0 | 2,728 | 0 | 0 | 2,728 |
| Commuter circulation/service areas | 906 | 0 | 0 | 906 | 0 | 0 | 0 | 0 | 0 | 906 |
| Commuter restrooms | 476 | 476 | 0 | 0 | 0 | 0 | 0 | 0 | 476 | 476 |
| Commuter apron offices | 525 | 525 | 0 | 0 | 0 | 0 | 525 | 0 | 0 | 0 |
| Service roadway/other | 76,199 | 0 | 0 | 76,199 | 0 | 0 | 0 | 0 | 0 | 76,199 |
| FIS circulation/mechanical | 5,447 | 0 | 0 | 5,447 | 0 | 0 | 0 | 0 | 0 | 5,447 |
| FIS restrooms | 1,365 | 1,365 | 0 | 0 | 0 | 0 | 0 | 0 | 1,365 | 1,365 |
| FIS offices | 1,427 | 1,427 | 0 | 0 | 0 | 0 | 0 | 1,427 | 0 | 0 |
| TSA Ofcs | 633 | 633 | 0 | 0 | 0 | 0 | 0 | 633 | 0 | 0 |
| EDS | 18,520 | 0 | 0 | 18,520 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interstitial space | 18,094 | 0 | 0 | 18,094 | 0 | 0 | 0 | 0 | 0 | 0 |
| Facilities services storage/ops | 1,286 | 0 | 0 | 1,286 | 0 | 0 | 0 | 0 | 0 | 0 |
| Common service areas | 7,723 | 0 | 0 | 7,723 | 0 | 0 | 0 | 0 | 0 | 7,723 |
| Storage Apron | 11,549 | 0 | 11,549 | 0 | 0 | 5,364 | 6,185 | 0 | 0 | 0 |
| Total apron level | 220,614 | 11,998 | 80,441 | 128,175 | 28,204 | 34,570 | 20,920 | 2,060 | 6,685 | 97,663 |
| **Mezzanine Level** | | | | | | | | | | |
| Airline offices/lounges | 12,190 | 12,190 | 0 | 0 | 12,190 | 0 | 0 | 0 | 0 | 0 |
| Airport Administration | 14,760 | 11,070 | 0 | 3,690 | 0 | 0 | 0 | 0 | 11,070 | 0 |
| Concessions | 1,291 | 1,291 | 0 | 0 | 0 | 0 | 0 | 1,291 | 0 | 0 |
| TSA/RAM ofcs | 5,505 | 5,505 | 0 | 0 | 0 | 0 | 0 | 5,505 | 0 | 0 |
| Circulation | 2,002 | 2,002 | 0 | 0 | 0 | 0 | 0 | 0 | 2,002 | 2,002 |
| Common service areas | 7,206 | 0 | 0 | 7,206 | 0 | 0 | 0 | 0 | 0 | 7,206 |
| Mechanical rooms | 12,097 | 0 | 0 | 12,097 | 0 | 0 | 0 | 0 | 0 | 12,097 |
| Restrooms (admin) | 684 | 684 | 0 | 0 | 0 | 0 | 0 | 0 | 684 | 0 |
| **Total mezzanine level** | 55,735 | 32,742 | 0 | 22,993 | 12,190 | 0 | 0 | 6,796 | 13,756 | 21,305 |
| **Penthouse Level** | | | | | | | | | | |
| Rooftop mechanical rooms/storage | 7,382 | 0 | 0 | 7,382 | 0 | 0 | 0 | 0 | 0 | 7,382 |
| **Total** | **680,598** | **403,678** | **80,441** | **196,480** | **176,198** | **34,570** | **45,466** | **63,856** | **164,029** | **424,202** |

Total excluding apron level

(a)  Total space = productive space + support space + leaseable lessee maintained space

(b)  Airline leasable space includes all leasable space on the concourse level, baggage level, and mezzanine level of the terminal building and 50% of the space available to be leased to the signatory air carriers on the apron level.

(c)  Total support space = All space in terminal building other than productive space, mechanical space, and common service area space, and 50% of lessor administrative space on the mezzanine level.

Percent PFC-eligible:
62.33%

# Exhibit D-7
# Terminal Space Allocations

**EXHIBIT D-7**

**TERMINAL SPACE ALLOCATION**
Austin-Bergstrom International Airport
City of Austin, Department of Aviation
For Fiscal Year ending September 30, 2009

| | Total allocated | AA American | CO Continental | DL Delta | F9 Frontier DIP | JBU JetBlue | WN Southwest | UA United | US US Airways | Rental Airlines total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Passenger enplanements (FY09)** | 3,512,011 | 910,907 | 450,920 | 254,456 | 106,496 | 199,803 | 1,493,985 | 66,957 | 28,487 | 3,512,011 |
| **Passenger market share (FY09)** | 100% | 25.94% | 12.84% | 7.25% | 3.03% | 5.69% | 42.54% | 1.91% | 0.81% | 100% |
| | | | | | | | | | | |
| Gates | 21.00 | 4.00 | 3.00 | 3.00 | 1.00 | 1.00 | 6.00 | 2.00 | 1.00 | 21.00 |
| | | | | | | | | | | |
| Bag Makeup Units ( Linear Feet ) | 2,315.00 | 318.00 | 393.00 | 290.00 | 109.33 | 109.33 | 639.00 | 347.00 | 109.33 | 2,315.00 |
| | | | | | | | | | | |
| **Shared facilities** | | | | | | | | | | |
| Baggage claim  (1) | 28,606 | 6,651 | 3,653 | 2,373 | 1,409 | 2,017 | 10,450 | 1,151 | 901 | 28,606 |
| Inbound baggage | - | - | - | | | - | - | - | | - |
| Outbound baggage conveyor | - | - | - | | | - | - | - | | - |
| Security screening/offices (1) | 15,476 | 3,598 | 1,977 | 1,284 | 762 | 1,091 | 5,654 | 623 | 487 | 15,476 |
| | | 7,411 | 3,369 | 1,731 | 511 | 1,308 | 9,447 | 957 | 905 | 25,639 |
| **Concourse level** | | | | | | | | | | |
| Ticket counters | 3,886 | 921 | 426 | 431 | 225 | 244 | 864 | 322 | 453 | 3,886 |
| Ticket counter -- queing | 9,436 | 2,274 | 978 | 950 | 576 | 669 | 2,164 | 740 | 1,085 | 9,436 |
| Airline ticket offices | 10,099 | 2,340 | 1,047 | 944 | 122 | 1,251 | 2,402 | 725 | 1,268 | 10,099 |
| Preferential use holdrooms | 65,883 | 13,039 | 9,905 | 9,308 | 1,806 | 2,345 | 19,651 | 6,551 | 3,278 | 65,883 |
| Future holdrooms | - | - | - | | | - | - | - | | 0 |
| Security checkpoint related areas | - | - | - | | | - | - | - | - | 0 |
| | | 18,574 | 12,356 | 11,633 | 2,729 | 4,509 | 25,081 | 8,338 | 6,084 | 89,304 |
| International holdroom | 1,465 | - | - | | | - | - | - | | 0 |
| | | | | | | | | | | |
| **Baggage claim areas** | | | | | | | | | | |
| Baggage service office | 2,298 | 330 | 359 | 306 | 216 | 333 | 357 | 125 | 272 | 2,298 |
| Common baggage storage | -- | -- | -- | -- | | | -- | -- | -- | -- |
| | | | | | | | | | | |
| **Apron level** | | | | | | | | | | |
| Apron offices | 27,255 | 11,364 | 2,815 | 3,176 | 773 | 787 | 5,933 | 1,337 | 1,070 | 27,255 |
| Apron restrooms | - | - | - | | | - | - | - | | 0 |
| Outbound bag make-up areas | 29,206 | 6,395 | 4,472 | 3,621 | 1,047 | 1,047 | 7,460 | 4,118 | 1,047 | 29,206 |
| Future outbound baggage | - | - | - | - | | - | - | - | - | 0 |
| Future airline offices (unfinished) | - | - | - | | | - | - | - | | 0 |
| Commuter holdroom | - | - | - | | | - | - | - | | 0 |
| Storage Apron | 5,364 | 2,286 | 1,798 | - | | - | - | 1,280 | - | 5,364 |
| | | 20,045 | 9,085 | 6,797 | 1,820 | 1,834 | 13,393 | 6,735 | 2,117 | 61,825 |
| **Mezzanine level** | | | | | | | | | | |
| Airline offices/landside | 0 | -- | -- | | | -- | -- | -- | -- | -- |
| Airline offices/lounges  (2) | 12,190 | 7,969 | 4,221 | -- | | -- | -- | -- | -- | 12,190 |

(1) Figures for individual airlines are estimates of airline share of shared baggage claim facilities and security screening.  The estimates reflect 80% of the space being allocated based on
   share of 2009 actual enplaned passengers and 20% being allocated equally among signatory airlines and commuters.

(2) Covers operations and maintenance and 75% of capital cost recovery.  Airlines finish out the space.

# Exhibit D-8
# Terminal Rental Rates

**EXHIBIT D-8**

**TERMINAL RENTAL RATES**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**
**For Fiscal Years ending September 30**

| | Actual | | | | | |
|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
| **Operations & Maintenance (O&M) rate** | | | | | | |
| Operations and Maintenance Expenses | $17,811,833 | $17,443,256 | $19,226,678 | $19,832,291 | $20,572,367 | $22,596,412 |
| Bad debt expense | -- | -- | | | | |
| O&M Reserve Account requirement | -- | -- | 95,000 | 230,000 | 97,000 | 317,000 |
| | $17,811,833 | $17,443,256 | $19,321,678 | $20,062,291 | $20,669,367 | $22,913,412 |
| Total Productive Space (a) | 386,298 | 386,298 | 386,298 | 385,239 | 385,000 | 385,000 |
| **Avg O&M rate** | **$46.11** | **$45.15** | **$50.02** | **$52.08** | **$53.69** | **$59.52** |
| | | | | | | |
| **Capital Cost Recovery Rate** | | | | | | |
| Debt service & coverage | | | | | | |
| New Airport | $5,017,357 | $5,423,056 | $3,776,384 | $3,597,903 | $3,355,605 | $4,004,238 |
| Post DBO | -- | | -- | -- | -- | 108,400 |
| Amortization of capitalized project administration | 171,782 | 171,782 | 100,207 | -- | -- | -- |
| Amortization of pre-DBO equipment & post-DBO | 83,139 | 146,423 | 99,036 | 157,948 | 296,975 | 391,216 |
| Total aeronautical capital costs and debt service | $5,272,278 | $5,741,261 | $3,975,627 | $3,755,851 | $3,652,580 | $4,503,854 |
| Airline Leasable Space (b) | 200,409 | 200,409 | 200,409 | 196,159 | 196,159 | 199,820 |
| **Avg capital cost recovery rate** | **$26.31** | **$28.65** | **$19.84** | **$19.15** | **$18.62** | **$22.54** |
| | | | | | | |
| **Avg terminal rental rate** | **$72.42** | **$73.80** | **$69.86** | **$71.22** | **$72.31** | **$82.05** |
| Airline leased conditioned space (c) | 81,753 | 81,753 | 81,754 | 87,176 | 87,176 | 87,177 |
| Leased cond. space rental revenue | $5,920,283 | $6,033,000 | $5,711,000 | $6,209,032 | $6,303,662 | $7,153,301 |
| | | | | | | |
| **Baggage claim conveyor space (d)** | 28,897 | 28,897 | 28,897 | 28,897 | 28,897 | 28,897 |
| Total baggage claim equipment O&M costs | $101,889 | $141,991 | $180,902 | $208,314 | $246,196 | $267,001 |
| Total explosive detection system equipment O&M | -- | -- | -- | $427,487 | $673,183 | $863,004 |
| Baggage claim & EDS equipment costs per square | $3.53 | $4.91 | $6.26 | $22.00 | $31.82 | $39.10 |
| Average terminal rental rate | $72.42 | 73.80 | 69.86 | 71.22 | 72.31 | 82.05 |
| Total cost per square foot for baggage claim space | **$75.94** | **$78.71** | **$76.12** | **$93.22** | **$104.13** | **$121.15** |
| Baggage claim conveyor space revenue | $2,194,516 | $2,274,483 | $2,199,507 | $2,693,908 | $3,009,045 | $3,501,013 |
| | | | | | | |
| **Leased unconditioned apron space** | 33,257 | 33,257 | 33,060 | 33,060 | 33,060 | 33,060 |
| **Uncond. apron space rental rate (e)** | **$13.15** | **$14.32** | **$9.92** | **$9.57** | **$9.31** | **$11.27** |
| Leased unconditioned apron space revenue | $437,458 | $476,240 | $327,916 | $316,499 | $307,789 | $372,579 |
| | | | | | | |
| **Leased conditioned apron space** | 21,986 | 21,986 | 21,986 | 22,518 | 22,518 | 22,519 |
| **Conditioned apron space rental rate (f)** | **$21.05** | **$22.92** | **$15.87** | **$15.32** | **$14.90** | **$18.03** |
| Leased conditioned apron space revenue | $462,721 | $503,919 | $348,920 | $344,921 | $335,518 | $406,055 |
| | | | | | | |
| **Mezzanine leased office/lounge space** | 12,192 | 12,192 | 12,192 | 11,225 | 11,225 | 11,226 |
| **Mezzanine space rental rate (g)** | **$65.84** | **$66.64** | **$64.90** | **$66.44** | **$67.65** | **$76.42** |
| Mezzanine leased office/lounge space revenue | $802,720 | $812,475 | $791,000 | $745,786 | $759,394 | $857,891 |
| | | | | | | |
| **Total airline rental revenue** | **$9,817,697** | **$10,100,117** | **$9,378,343** | **$10,310,146** | **$10,715,408** | **$12,290,839** |

(a) Includes all concourse, baggage and mezzanine level space in terminal building but specifically excludes support space (which includes 50% of lessor mezzanine level administrative space) and all apron level space maintained by lessee.
(b) Airline leasable space includes leasable terminal bldg. space on the concourse, baggage, and mezzanine levels and 50% of the space available to be leased to the Signatory Airlines on the apron level.
(c) Airline leased conditioned space is computed based on individual airline space requirements shown on the terminal maps.
(d) Baggage claim space and equipment O&M costs are recovered using the Common Space methodology as outlined in the ABIA Airline Use and Lease Agreement.
(e) Unconditioned apron level space rental rate is 50% of the capital cost recovery rate.
(f) Conditioned apron level space rental rate is 80% of the capital cost recovery rate.
(g) Mezzanine level space rental rate is 75% of capital cost recovery rate plus the O&M rate.

# Exhibit D-9
# Terminal Apron Fees

**EXHIBIT D-9**

**TERMINAL APRON FEES**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**
**For Fiscal Years ending September 30**

|  | Actual | | | | | |
|---|---|---|---|---|---|---|
|  | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
| Operation and Maintenance Expenses | $2,809,854 | $2,856,024 | $3,038,927 | $3,448,401 | $3,548,417 | $3,719,790 |
| Amortization of capitalized project administration costs | 254,609 | 254,609 | 148,522 | -- | -- | -- |
| Amortization of pre-DBO equipment & post-DBO ABIA assets | 20,777 | 102,176 | 96,309 | 96,456 | 97,694 | 17,121 |
| Bad debt expense | -- | -- | -- | -- | -- | -- |
| O&M Reserve Account requirement | -- | -- | 15,000 | 40,000 | 16,709 | 52,189 |
| Debt service & coverage |  |  |  |  |  |  |
| New Airport | 371,201 | 401,216 | 385,092 | 374,659 | 349,428 | 415,148 |
| Post DBO | -- | -- | -- | -- | -- | 84,652 |
|  | $3,456,441 | $3,614,025 | $3,683,850 | $3,959,516 | $4,012,248 | $4,288,900 |
| Aircraft parking positions | 37 | 37 | 37.33 | 41.58 | 42 | 46 |
| **Average annual apron parking fee** | **$93,417** | **$97,676** | **$98,683** | **$95,219** | **$95,530** | **$93,237** |
| Airline leased parking positions | 22.55 | 20.37 | 20 | 20.75 | 23.4 | 25 |
| **Airline terminal apron fee revenue** | **$2,106,553** | **$1,989,982** | **$1,973,660** | **$1,975,794** | **$2,235,402** | **$2,330,925** |

# Exhibit D-10
# Terminal Equipment Fees

**EXHIBIT D-10**

**TERMINAL EQUIPMENT FEES (a)**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**
**For Fiscal Years ending September 30**

| | Actual | | | | | |
|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
| **Loading Bridges and MUFIDs** | | | | | | |
| Operation and Maintenance Expenses | $694,902 | $608,748 | $832,068 | $576,875 | $681,153 | $885,611 |
| Amortization of pre-DBO equipment & post-DBO ABIA assets | -- | -- | -- | -- | -- | 8,123 |
| Bad debt expense | -- | -- | -- | -- | -- | -- |
| O&M Reserve Account requirement | -- | -- | 4,000 | 7,000 | 3,208 | 11,218 |
| | **$694,902** | **$608,748** | **$836,068** | **$583,875** | **$684,361** | **$904,952** |
| | | | | | | |
| Airline leased gates | 22.51 | 20.37 | 20 | 21.75 | 23.4 | 25 |
| Avg monthly terminal equipment fee per gate | $2,573 | $2,490 | $3,484 | $2,237 | $2,437 | $3,017 |
| Number of Months Leased | 12 | 12 | 12 | 12 | 12 | 12 |
| Annual revenue per gate | $30,871 | $29,880 | $41,808 | $26,844 | $29,244 | $36,204 |
| Airline leased gates | 22.51 | 20.37 | 20 | 21.75 | 23.4 | 25 |
| | | | | | | |
| **Baggage Makeup Units** | | | | | | |
| Operation and Maintenance Expenses | $120,196 | $141,991 | $174,717 | $206,314 | $346,617 | $407,437 |
| Amortization of pre-DBO equipment & post-DBO ABIA assets | -- | -- | -- | -- | -- | -- |
| Bad debt expense | -- | -- | -- | -- | -- | -- |
| O&M Reserve Account requirement | -- | -- | 1,000 | 2,000 | 1,632 | 5,716 |
| | **$120,196** | **$141,991** | **$175,717** | **$208,314** | **$348,249** | **$413,153** |
| | | | | | | |
| # of baggage makeup units/linear feet (b) | 11.51 | 11.37 | 11 | 11 | 2,298 | 2,298 |
| Cost per unit/linear foot (b) | $10,443 | $12,488 | $15,974 | $18,938 | $152 | $180 |
| | | | | | | |
| **Airline terminal equipment fee revenue (a)** | **$815,103** | **$750,745** | **$1,011,877** | **$792,171** | **$1,032,559** | **$1,318,253** |

(a)  Terminal equipment includes a charge for loading bridges and MUFIDs and a separate charge for the baggage makeup units.

(b)  For FY2003 through FY2006 baggage makeup units costs were allocated over the number of baggage makeup units. Beginning in FY2007, with the installation of the EDS system, baggage makeup unit costs are allocated over the number of linear feet.

# Exhibit D-11
# Landing Fees

EXHIBIT D-11

**LANDING FEES**
**Austin-Bergstrom International Airport**
**City of Austin, Department of Aviation**
**For Fiscal Years ending September 30**

| | Actual | | | | | |
|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **2008** |
| Operation and Maintenance Expenses | $8,688,713 | $8,703,643 | $9,460,812 | $10,172,938 | $10,413,070 | $11,247,856 |
| Bad debt expense | -- | -- | -- | -- | -- | -- |
| O&M Reserve Account requirement | -- | -- | 47,000 | 118,000 | 49,034 | 157,807 |
| Bergstrom master plan (a) | 39,522 | 39,522 | 39,522 | 39,522 | 39,522 | 39,522 |
| Amortization of capitalized project admin. costs | 318,261 | 318,261 | 185,652 | -- | -- | -- |
| Amortization of pre-DBO ABIA equipment | 151,964 | 151,964 | -- | -- | -- | -- |
| Amort. of post-DBO ABIA assets | 169,163 | 442,375 | 473,463 | 717,904 | 866,510 | 227,265 |
| Debt service & coverage | | | | | | |
|   New Airport | 6,502,644 | 7,023,803 | 5,992,924 | 5,798,139 | 5,389,152 | 6,378,050 |
|   Post DBO | -- | -- | -- | -- | -- | 1,051,382 |
| | $15,870,267 | $16,679,568 | $16,199,373 | $16,846,503 | $16,757,288 | $19,101,882 |
| Less: | | | | | | |
|   Fuel flowage fees | 510,234 | 548,448 | 544,063 | 562,239 | 587,307 | 599,971 |
| **Landing fee requirement** | **$15,360,033** | **$16,131,120** | **$15,655,310** | **$16,284,264** | **$16,169,981** | **$18,501,911** |
| Total aircraft landed weight (b) | 5,613,792 | 5,514,269 | 5,751,185 | 5,615,355 | 5,999,537 | 6,241,368 |
| **Average landing fee rate** | **$2.74** | **$2.93** | **$2.72** | **$2.90** | **$2.70** | **$2.96** |
| **Landing fee revenue** | **$15,381,790** | **$16,156,808** | **$15,643,223** | **$16,284,264** | **$16,198,750** | **$18,501,911** |

(a)  Agreement dated 10/31/91, specifies amortization of not-to-exceed cost of $2.4 million in landing fee over 20 years (completion in March 2013).

(b)  Includes air carrier, commuter, and air cargo carriers (no rate differential is assumed).

**AMENDMENT NO. # 1 TO THE AUSTIN-BERGSTROM INTERNATIONAL AIRPORT USE AND LEASE AGREEMENT BETWEEN THE CITY OF AUSTIN AND FRONTIER AIRLINES, INC.**

**THIS FIRST AMENDMENT** ("First Amendment") to the Austin-Bergstrom International Airport Use and Lease Agreement is made and entered to as of the date specified on the signature page (the "Effective Date") by and between the City of Austin, Texas, acting by and through its Executive Director of **Aviation** (the "City") and **Frontier Airlines, Inc.** (the "Airline").

## RECITALS

a)   City and Airline are parties to an Airport Use and Lease Agreement, dated October 1, 2009 (the "Agreement").

b)   City and Airline desire to amend the Agreement to reduce the space in the terminal exclusively leased to the Airline.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

## AGREEMENT

1) The Agreement is hereby amended to reduce the Baggage Service Office space in the terminal exclusively leased to Airline by **91** square feet to a revised total of **125** square feet, as shown on **Exhibit <u>A-1</u>** to this Amendment.

2)   The Agreement is further amended to revise the existing **Exhibit <u>A-1</u>** and **Exhibit <u>A-2</u>** attached to this Amendment, reflecting the reduction in Baggage Service Office space.

3)   This Amendment shall be effective as of April 1, 2013.

4)   Except as provided in this First Amendment, the Agreement shall remain in full force and effect in accordance with its terms.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have executed this First Amendment by their duly authorized representatives.

Approved as to form:

_____
Susana Carbajal
Assistant City Attorney

THE CITY OF AUSTIN, TEXAS

_____
Jim Smith
Executive Director of Aviation

Date: _9/10/13_____

FRONTIER AIRLINES, INC.

_____
Jeffrey Campbell
Director, Airport Planning
September 03, 2013

| EXHIBIT A-1 - REVISED DESCRIPTION OF PREMISES AIRLINE:  Frontier  Airlines, Inc. | | | | |
|---|---|---|---|---|
| **Terminal Space** | **Description** | **Effective Date of deletion of Deleted Area** | **Area Square Footage** | **Use Category*** |
| Gate | Gate 24 | | 1,806.00 | P |
| Ticket Counter | See Exhibit A.2 | | 225.00 | P |
| Ticket Counter Queuing | See Exhibit A-2 | | 576.00 | P |
| Airline Ticket Office | Rooms 3321A | | 122.00 | P |
| Operations Space | Rooms, 2000C/2000D/2000E | | 772.00 | E |
| Baggage Service Office | Room 1444 | 4/1/2013 | 216.00 | P |
| Baggage Service Office | Room 1414 | | 125.00 | P |
| Baggage Make-up Space -Outbound-- Apron Level | | | 1,047.00 | J |
| Baggage Make-up Belts -Outbound-- Apron Level -(Linear Feet) | | | 109.34 | J |
| Airline Club | **NA** | | **NA** | **NA** |
| Other | **NA** | | **NA** | **NA** |

*E =Exclusive Use, P= Preferential Use, J= Joint Use

Airport Leasehold measurements follow the following guidelines:

1. Lease space will be measured from the outside of exterior wall to the outside of exterior wall where the space being measured has no adjacent airport tenants.

2. Lease space will be measured from midpoint to midpoint of each wall where such space is adjacent to another airport tenant, public areas or support areas.

3. Lease space will be measured from the outside exterior wall to the midpoint of a wall where one of two sides of the space are public area or support area, and the other side is adjacent to airport tenants.

4. Holdroom depth is measured from the outside of the outer terminal wall to the edge of the holdroom carpet where it meets the terrazzo tiling of the terminal walkways.  The columns locate at the edge of the holdroom carpet are not part of Airline's leased premises, but remain Aviation Department property.

5.  Queuing space depth in the Ticket lobby is measured from the ticket counter to the far end of the carpeted queuing area.

**Exhibit A-2**
**Premises Drawings**
**Terminal Area**





LUGGAGE
CART RACK

CONCOURSE

AUSTIN-BERGSTROM INTERNATIONAL AIRPORT

PASSENGER TERMINAL FACILITY

A0217A



# CONCOURSE



| F9 OPS (SEC-A2) | |
|---|---|
| LEASE AREA | SQUARE FEET |
| 2000C | 336' |
| 2000D | 203' |
| 2000E | 196' |
| 2000F | 38' |
| TOTAL | 773' |

**APRON**

AUSTIN-BERGSTROM INTERNATIONAL AIRPORT

PASSENGER TERMINAL
FACILITY

PLANNING & ENGINEERING
DEPARTMENT OF AVIATION
CITY OF AUSTIN, TEXAS

KEY MAP

A2

A0207A



F9 BSO (SEC-D)

| LEASE AREA | SQUARE FEET |
|---|---|
| 1414 | 125 SQ. FT. |
| TOTAL | 125 SQ. FT. |

AUSTIN–BERGSTROM INTERNATIONAL AIRPORT

PASSENGER TERMINAL FACILITY

BAGGAGE

A0200A



APRON