IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MAXINE WHITE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| FRONTIER AIRLINES, INC., | § | |
| | § | |
| Defendant/Third Party Plaintiff, | § | CIVIL ACTION NO.  A-16-CV-1266-AWA |
| | § | |
| v. | § | JURY DEMAND |
| | § | |
| THE AUSTIN FIRE DEPARTMENT, | § | |
| THE CITY OF AUSTIN AVIATION | § | |
| DEPARTMENT, AUSTIN-BERGSTROM | § | |
| INTERNATIONAL AIRPORT, THE CITY | § | |
| OF AUSTIN, AND FLIGHT SERVICES & | § | |
| SYSTEMS, INC. | § | |
| | § | |
| Third-Party Defendants. | § | |

**DEFENDANT/THIRD-PARTY PLAINTIFF FRONTIER AIRLINES, INC.'S MOTION FOR LEAVE TO DESIGNATE RESPONSIBLE THIRD PARTIES**

**COMES NOW,** Defendant/Third-Party Plaintiff, Frontier Airlines, Inc. ("Frontier"), pursuant to Tex. Civ. Prac. & Rem. Code § 33.011, and files this Motion For Leave to Designate (the "Motion") as Responsible Third-Parties, the Austin Fire Department ("AFD"), the City of Austin Aviation Department (the "Aviation Department"), the Austin-Bergstrom International Airport ("ABIA"), the City of Austin ("City") (all of which are sometimes collectively referred to herein as the "City"), and Flight Services & Systems, Inc. ("FSS") and would respectfully show the Court as follows:

**I.
INTRODUCTION**

The Court should grant Frontier leave of Court to designate the City entities and FSS as responsible third parties. Under Chapter 33 of the Tex. Civ. Prac. & Rem. Code, sufficient evidence

exists demonstrating both the City's and FSS's negligence in the alleged incident causing Plaintiff's injuries to submit both the City and FSS as a responsible third party and assign a percentage of responsibility to each, separately, independently and respectively.  Both the City and FSS should receive a percentage of the responsibility which reflects its amount of negligence in its acts or omissions leading to the incident just as Frontier will, if the trier of fact finds any liability.

## II.
## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff's First Amended Complaint (ECF No. 11) claims that Plaintiff was injured when boarding a Frontier flight from Austin, Texas to Denver, Colorado on June 10, 2015. (ECF No. 11 at ¶¶ 5-11).  Upon checking in at Austin-Bergstrom International Airport ("ABIA"), Plaintiff requested and was provided a wheelchair and a porter.  (Exhibit A, hereto, Deposition of M. White ("White Dep.") at 100-102).

Plaintiff contends that a gate was not available to board the plane and therefore the passengers were transported by shuttle bus from a ground floor gate to the tarmac and boarded the plane by climbing sixteen stairs to the plane. (Id. at ¶¶ 7-9).  Plaintiff was transported on the shuttle bus in the wheelchair (Id. at 106-107, 110-113.)

Plaintiff contends that, while on the tarmac, she was greeted by City of Austin firemen who loaded her into a "rescue chair" and carried her up the stairs and onto the plane.  (Id.. at 112). According to Plaintiff, while being carried up the stairs, the firemen briefly stopped and lowered the rescue chair to the stairs.  (Id. at 125-26).  Plaintiff contends that when the rescue chair made contact with the stair, she experienced a "jolt," which caused her injury.  (Id.).  Plaintiff alleges that she is seeking "monetary relief over $200,000" as well as exemplary damages. (ECF No. 11 at ¶5.)

There is no dispute that the two individuals carrying Plaintiff were employees of the City.  There is no dispute that after the incident the City purchased a set of mobile boarding equipment to avoid such

a situation again.  There is no dispute that an employee of FSS made the request to the Fire Department to perform the lift assist.

Frontier removed the case to this Court on December 2, 2016.  The initial scheduling conference was held on April 25, 2017.  The Scheduling Order (ECF No. 10.) provided that any additional parties had to be added by July 21, 2017.

On July, 21, 2017, Frontier filed a Third-Party Complaint against the Austin Fire Department, the City of Austin Aviation Department, ABIA, the City of Austin and Huntleigh UISA Corp.  (ECF No. 12).  The City filed its answer on August 17, 2017.  On September 19, 2017, the Court granted Huntleigh's Motion to Dismiss.  (ECF No. 25).  On June 20, 2018, Frontier filed its Third Amended Third Party Complaint, adding claims against Flight Services & Systems, Inc. ("FSS").

Timothy S. Polgar, Director of Ground Handling Contracts for Frontier Airlines, completed an affidavit in support of the Second Amended Third Party Complaint (ECF No. 39, Exhibit D) in which he established the following:

> Frontier flies to over 60 airports.  At each of those airports, wheelchair services are available to Frontier's customers and are provided by various outside vendors hired by Frontier.  To be clear, Frontier outsources the entirety of wheelchair services to third party vendors and does not, at any airport where it flies, provide any such services directly to its customers … Frontier does not provide any wheelchair services through any of its own personnel.

Plaintiff failed to realign against the third-parties nor ever brought an action against them.

### III.
### ARGUMENT AND AUTHORITIES

**A.  Chapter 33 of the Tex. Civ. Prac. & Rem. Code Applies**

In diversity actions, federal courts should apply state law on substantive issues and federal procedural law.  *Hanna v. Plumer*, 380 U.S. 460, 466-467 (1965); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679 (5th Cir. 1991).  Further, a state rule that reflects a state substantive policy that is not in conflict

with a federal rule should be applied to the case as the rule of law. *Exxon Corp. v. Burglin*, 42 F.3rd 948, 949 (5th Cir. 1995).

Chapter 33 of the Tex. Civ. Prac. & Rem. Code was enacted to determine the percentage of responsibility in tort actions between parties and each responsible third party who has been designated under 33.004. of the Tex. Civ. Prac. & Rem. Code § 33.003. Several federal courts in Texas have found that Section 33.004 does not conflict with any federal rules. *See, e.g., Kelly v. Pac. Cycle, Inc.*, No. 3:07-CV-0607-B, 2007 WL 4226922, *1 (N.D. Tex. Nov. 29, 2007)*; Floyd v. Cannon Drilling Ltd. II,* LLP, No. 3:10-CV-00095-F, 2012 WL 13026631, *1 (N.D. Tex. May 16, 2012); *Becker v. Wabash Nat'l Corp.*, No. C-07-115, 2007 WL 2220961, *2 (S.D. Tex. July 31, 2007); *Cortez v. Frank's Casing Crew & Rental Tools*, No. V-05-125, 2007 WL 419371, *1-3 (S.D. Tex. Feb. 2, 2007).

### B. Assigning Percentage of Responsibility Under Chapter 33

Under Chapter 33 of the Tex. Civ. Prac. & Rem. Code, the trier of fact may compare a defendant's responsibility with the responsibility of the claimant, other defendants, and any responsible third parties joined by the defendant. Tex. Civ. Prac. & Rem. Code § 33.011(1). A defendant is any person from whom claimant seeks recovery of damages. Tex. Civ. Prac. & Rem. Code § 33.011(2). A responsible third party is any person who is alleged to have caused or contributed in any way the harm for which recovery of damages is sought. Tex. Civ. Prac. & Rem. Code § 33.011(6). The definition of a responsible third party was broadened in 2003 to include parties that may have otherwise be immune from suit by the claimant. With a sufficient demonstration of evidence, each of these parties should be included for the determination of responsibility and apportionment of liability on the verdict sheet by the trier of fact. Tex. Civ. Prac. & Rem. Code § 33.03(b).

Under the facts presented here, the four parties for which liability must be determined are Plaintiff, Frontier, the various City entities and FSS.

### C. Sufficient Evidence Exists to Support a Finding of Negligence Against the City and FSS

Based on the foregoing, if the Plaintiff's claims of negligence are successful before the trier of fact, the City and/or FSS, independently and respectively, were negligent and responsible for plaintiff's injuries that she alleges were suffered as a result of this accident.

### The City of Austin

Frontier operates commercial air service operations at ABIA pursuant to a contract with the City. Pursuant to the contract, attached hereto as <u>Exhibit B</u>, the City "acting by and through the Executive Director of the Department of Aviation," leases Gate 24 to Frontier for its flight operations.

Under the contract, the City must:

> operate, maintain, manage, and control the Airport in a first class, efficient, economical and businesslike manner, and in accordance with "Applicable Law." "Applicable Law" is a defined term in the contract meaning: . . . all federal, state and local laws, codes, ordinances, rules, regulations . . . of any Governmental Authority applicable to the parties, the Airport, or the Premises during the term of this Agreement.

Article 9 of the contract entitled "Airline Alterations and Additions," drafted by the City, provides in Part B:

> B. **Modification Required to Accommodate Disabled Persons.** If Lessor is required by Applicable Law or an order of a Governmental Authority to modify the areas leased or occupied by Airline, or to install additional equipment therein, in order to accommodate Airline's disabled passengers during the term of this Agreement, Lessor shall give the Airline prompt notice of the receipt of such governmental order to undertake such modifications, or additions, in order that Airline may present its views, or objections, or participate in the planning of such, to the extent that its interest is involved. Then:
> (1) if the areas or equipment (including boarding assistance devices) are Exclusively or Preferentially leased to or used by Airline, the Rent paid by Airline for such areas or equipment shall be adjusted to include Lessor's cost to modify such areas or install additional equipment, amortized over a reasonable period of time in accordance with generally accepted accounting principles; and
> (2) if the areas or equipment are Common Use or Joint Use Facilities, the Rent paid by Airline and other users thereof shall be adjusted to include Lessor's cost to modify such areas or install additional equipment, amortized over a reasonable period of time in accordance with generally accepted accounting principles.
> (3) The Rent adjustment under this Article shall be effective as of the first day of the month following the completion of such modifications, or the installation of such equipment, as applicable.
> Unless otherwise specified in **Exhibit A**, each of Airline's Preferential Use Gates are equipped with passenger loading bridges. If Airline elects to operate any aircraft at the Airport which cannot be boarded using the loading bridges provided by Lessor, Airline shall be solely responsible to satisfy its obligations under the Air Carrier Access Act [49 U.S.C, 1374(c)] and the regulations promulgated thereunder (14 CFR §382.23) with respect to aircraft covered by 14 CFR Part 121.

(Id. at 29.)

Plaintiff was a customer of Frontier who was provided assistance by the City boarding a Frontier aircraft. As such, the City owed a duty of care to Plaintiff, including the duty to act with the same degree of care for Plaintiff's safety and well-being that would be exercised by a reasonably cautious and prudent person under the same or similar circumstances.

Plaintiff alleges that she was injured during her transport between the airport terminal and the aircraft.

Frontier submitted a public information request to the City on April 17, 2017. The City responded on April 24, 2017 with an incident report and a letter to Plaintiff that had not been disclosed to Frontier prior to that date. (*See* ECF 32, Exhibit B.)

The "Incident Detail Report" (the "IDR") indicates that firemen from Austin Fire Rescue 2 and 5:

> [R]esponded to Gate 1 as requested by a phone call from Frontier Airlines for assistance helping a disabled passenger board the 737. The aircraft was parked on the RON out from Gate 2 and with an air-stair attached. We used an aisle chair to take the patient up the stairs. (*See* ECF 32, Exhibit B at p. 5.)

Further, the IDR reads that the firemen, "provided manpower for a lift assist onto Frontier Airlines aircraft located at the hardstand using an aisle chair provided by Air Ops." (*Id.*)

In addition to the IDR, the City also provided an email response to a "Citizen Assistance Form" dated July 20, 2015 (the "CAF Response"). The CAF Response was addressed to Plaintiff's email address and was authored by Stephanie Tucker, Airport Property Manager for ABIA. In relevant part, Ms. Tucker stated:

> . . .the Aviation Department has purchased an air stair with a wheelchair lift. The air stair is designed to accommodate various aircraft classes that operate at the airport. The lift will be used in anomalies and emergencies to ensure the safe loading and disembarkation of passengers from planes. (*Id.*)

Plaintiff gave her deposition on December 19, 2018. She testified that two members of the Austin Fire Department were the individuals waiting for her when she reached the plane. Initially, the firefighters planned to attempt to carry her in the wheelchair and perform a "lift assist." As she testified:

> Q   Okay.  When you get up there (to the aircraft) how many firefighters were there?
>
> A   Initially, there were the two, the Captain and a Lieutenant.  And then they asked me about carrying me up in the wheelchair, and I was like,"Oh, my god, that don't look safe."  And so he said,"Well, let's let you get out, and I'll take it up a few steps and we'll see."  And so he went backwards maybe four steps, and the other fireman was standing right there at the foot of the step.  And they were talking and saying -- I could hear them.  They were saying, "No.  This is really not going to work."  And so they came back down and brought the wheelchair back to me.  He said, "Well, just sit back down.  We have another chair that we can use to get you in the plane."  And I said, "You all don't have a ramp or a lift?"  And he said, "No.  The airport doesn't have one."  And I was like, "Okay."  I -- I didn't know what else to say or do at that point other than wait to see what the next option was.

Exhibit A, White Transcript, pp. 114-115.

The firefighters abandoned that plan and called for a "rescue chair" to be delivered to the tarmac to use instead. The firefighters strapped White into the rescue chair and carried her up the stairs. However, about halfway, White claims she was dropped and injured. As White testified:

> Q   All right.  So once the other rescue chair came, what happened?
> A   Well, the firemen told me they would carry me up to the -- into the plane.
> Q   What did you tell them?
> A   "That don't look too safe."  They said, "Oh, no.  It's fine."
> Q   And what did you say?
> A   "Okay.  We'll give it a try."  I – I wanted to go on -- on my trip and have -- be with my two sons and their wives and my grandchildren.
> Q   Did you ever tell them, no, stop?
> A   No.  I think I just told them, "This is terrifying," and I closed my eyes until the one in front of me said, "We need to stop.  I'm losing my grip."

*Id*. pp. 120-121

> Q   Okay.  Who said, "I'm losing my grip"?
> A   The gentleman in front of me.
> Q   Okay.

  A And just as -- he said, "We've got to stop.  I'm losing my grip."  And as soon as he said it, the other gentleman stopped and the gentleman that was in front started -- you could tell when he kind of lost it, because the front of the chair kind of hit.

*Id*. p. 124

  Q . . .You heard the man in front of you say, "I'm losing my grip."  After that, did you feel the chair come to the rest -- come to a rest on something?
  A Yes.  It kind of fell to the step.
  Q Okay.  How, on a scale to one to ten, would you describe that coming to a rest, one being light, ten being the worst?
  A I would say around a four.  It was – I mean, it was very frightening.  And it was like a jolt when -- when it fell.  It all happened really quickly.  He lost his grip.  He got it right back.  But the front of the chair had enough time to hit, I guess, the step in front of us.
  Q And you say the front of the chair.  Where your feet were or something else?
  A Where my feet were.
  Q Okay.  And how long would you say that took before he got his grip back?
  A Just seconds, but it -- he lost it right as he was fixing to set it down.  And so that's why it hit, I guess, the step.
  Q Okay.  And what happened to your body when you felt it come to a rest?
  A Well, when it stop -- when we stopped from the jolt, I felt, you know, like something going through my legs and to my back, of course.  My back was not happy.  And into my shoulders.  And I thought, oh, I hope we get the rest of the way up here, because I've got to get out of this chair before I pass out on them.

*Id*. pp. 126-127

  The City, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to safely transport Plaintiff onto the aircraft safely.

  The City, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to provide the necessary required equipment to safely transport Plaintiff onto the aircraft.

  The City, its agents, servants and employees breached its duties to Frontier and Plaintiff when they failed to stop an improper transport of Plaintiff onto the aircraft as required by their safety procedures and applicable law.

  The City, its agents, servants and employees acted negligently in their operation, maintenance, control, care and supervision of their airport services and premises.

  The City's negligence was the direct and proximate cause of Plaintiff's injuries.

The City's breach of contract is the direct and proximate cause of Plaintiff's injuries.

### Flight Services & Systems

Frontier hires contractors to provide wheelchair services for its customers at all airports to which it flies, including ABIA. Frontier does not provide any ground handling services through its own personnel, and in fact, does not employ any full-time Frontier personnel at ABIA at any time, including on the day of the incident. Frontier personnel were not directly involved with the interactions with Plaintiff on the day of the alleged incident.

Frontier and FSS were parties to a contract dated August 14, 2012 whereby FSS was to provide ground handling services for Frontier's customers. *See* ECF 53, Exhibit C. Such contract was in effect on the day of the alleged incident.

The contract incorporates by reference the 2004 Standard Ground Handling Agreement promulgated by the International Air Transport Association.[1]

Under the contract, FSS was obligated to provide, among other duties "passenger services," which included providing "special equipment, facilities, and specially trained personnel, for assistance to persons with reduced mobility":

---

[1] As the contract states:

> This Annex B is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of January, 2004 as published by the International Air Transport Association shall apply as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A.

```
SECTION 2. PASSENGER SERVICES
2.1     General
2.1.1   Inform passengers and/or public about time of arrival and/or departure of
        Carrier's aircraft and surface transport.
2.1.2   Make arrangements for stopover, transfer and transit passengers and their
        baggage and inform them about services available at the airport.
2.1.3   When requested by the Carrier,
        (a) provide
        special equipment, facilities and specially trained personnel, for assistance to
        1. unaccompanied minors.
        3. VIPs.
        4. transit without visa passengers (TWOVs).
        5. deportees.
        7. others, as specified by the Carrier.
        (b) arrange for
        special equipment, facilities and specially trained personnel, for assistance to
        2. persons with reduced mobility (PRMs)
        3. VIPs.
        4. transit without visa passengers (TWOVs).
        5. deportees.
        6. special medical transport.
        7. others, as specified by the Carrier.
```

With respect to departure, FSS was obligated to perform the following duties:

```
2.2.15  At the gate perform
        (a) verification of cabin baggage
        (b) boarding process
        (c) reconciliation of passenger numbers with aircraft documents prior to
            departure
        (d) other gate functions as specified by the Carrier
```

Specifically, FSS was required under the contract to provide the following for boarding of passengers:

```
3.6     Loading and Unloading
3.6.1   (a) Provide
        (c) Operate
        (1) passenger steps.
        (3) loading bridges.
3.6.3   (a) Provide
        (c) Operate
        equipment for loading and/or unloading.
3.6.4   (a) Provide
        delivery and pick-up of
        (1) Baggage
        (2) Mobility devices
        at aircraft doors or other agreed points
```

Further, FSS was obligated under the contract to have the "appropriate quantity of maintained and functioning . . . mobility assistive devices" to aid in the boarding of passengers requiring mobility assistance ("PRMs"). Plaintiff was identified as a PRM in her flight reservation.

> The Handling Company shall supply, operate, fuel, and maintain, at its own expense sufficient quantities of Ground Service Equipment (GSE) to perform the Services. Should the Carrier provide any GSE or other equipment, the Handling Company will be responsible to fuel and maintain (utilizing a progressive or preventative maintenance program approved by the Carrier) the GSE and other equipment at the Handling Company's sole expense, except that the Carrier will be responsible for all single item repairs in excess of $1,000, unless the repairs are required as a result of the Handling Company's negligence or failure to properly maintain. The minimum quantity of GSE (of appropriate specifications) shall be as follows:
> - one pushback tractor and have access to another as a spare
> - one tow bar and have access to another as a spare
> - two belt loaders
> - two baggage tractors
> - ten baggage carts
> - access to an air start unit
> - access to a GPU
> - access to a conditioned air cart
> - one lavatory service vehicle and access to another as a spare
> - one water service cart and access to another as a spare
> - access to air stairs
> - wheelchairs/aisle chairs – must have appropriate quantity of maintained and functioning wheelchairs, aisle chairs, and mobility assistive devices

FSS is, and was on the date of the alleged incident, a "contractor" as defined in the ACAA at 14 CFR 382.7, and so is (and was) responsible for providing boarding assistance to Frontier passengers compliant with ACAA requirements set forth in Chapter 5, "Assisting Air Travelers with Disabilities Boarding, Deplaning and During the Flight."

Pursuant to ACAA Chapter 5, FSS had a duty to provide trained personnel with a "proficiency in the use of the boarding assistance equipment and procedures regarding the safety and dignity of passengers receiving boarding assistance."

Contemporaneous electronic correspondence between Frontier and the FSS General Manager, Ernestine Trejo, from the day following the date of the alleged incident confirms FSS personnel controlled, supervised and maintained the necessary equipment to facilitate the boarding of all Frontier passengers, including PRMs. (*See* ECF 53, Exhibit D.)

Plaintiff alleges that she was injured during her transport between the airport terminal and the aircraft.

FSS was responsible under its contract with Frontier for ensuring Plaintiff's safe transportation from the terminal to the plane, specifically arranging for the appropriate method of transportation.

Alternatively, if FSS did not arrange for wheelchair services to be provided to Plaintiff during her transport from the terminal to the aircraft on the day of the alleged incident, then FSS's omission would have been in breach of its agreement with Frontier for FSS to make such arrangements for Plaintiff on behalf of Frontier as Frontier's engaged third-party vendor. Any failure by FSS to make such arrangements for Plaintiff (as Frontier's customer) is in breach of its responsibility. Allowing an improperly trained third party (public servant or otherwise) to transport Plaintiff from the terminal to the plane is in further breach of that responsibility.

FSS, its agents, servants and employees, owed a duty of care to Plaintiff, including the duty to act with the same degree of care for her safety and well-being that would be exercised by a reasonably cautious and prudent person under the same or similar circumstances.

FSS, its agents, servants and employees were in breach of their duty to Frontier and Plaintiff when they failed to arrange for the transport of Plaintiff, a third-party beneficiary of the contract and FSS's services, from the airport terminal to the aircraft safely.

FSS, its agents, servants and employees were in breach of their duty to Frontier and Plaintiff when they failed to provide or arrange for the necessary equipment required to safely transport Plaintiff, a third-party beneficiary of the contract and FSS's services, from the airport terminal to the aircraft.

FSS, its agents, servants and employees were in breach of their duty to Frontier and Plaintiff when they failed to stop an improper transport of Plaintiff, a third-party beneficiary of the contract and FSS's services, from the airport terminal to the aircraft as required under the contract and applicable law.

FSS, its agents, servants and employees acted negligently in their operation, maintenance, control, care and supervision of their ground-handling services.

FSS's negligence was the direct and proximate cause o Plaintiff's injuries.

FSS's breach of contract is the direct and proximate cause of Plaintiff's injuries.

## IV.
## Conclusion

Based on the foregoing, Frontier seeks leave of Court to designate the City entities and FSS as responsible third parties and assign a percentage of responsibility to each, separately, independently and respectively. Both the City and FSS should receive a percentage of the responsibility which reflects its amount of negligence in its acts or omissions leading to the incident just as Frontier will, if the trier of fact finds any liability.

## V.
## Prayer

WHEREFORE, PREMISES CONSIDERED, Frontier prays that Defendant/Third Party Plaintiff's motion be GRANTED, for the reasons set forth herein and whatever further relief, general or specific, in law or equity, to which it may prove itself to be justly entitled.

DATED:  March 5, 2019

Respectfully submitted,

By:    /s/ *Patrick J. Comerford*
      Patrick J. Comerford, Esq.
      State Bar No. 24096724

**RIGBY SLACK LAWRENCE BERGER + COMERFORD, PLLC**

6836 Austin Center Blvd., Suite 100
Austin, Texas 78731
Main: (512) 782-2060
Direct: (512) 782-2064
pcomerford@rigbyslack.com

**ATTORNEY FOR DEFENDANT/THIRD-PARTY PLAINTIFF FRONTIER AIRLINES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Joel A. Levine
Law Offices of Joel A. Levine, PLLC
5407 Parkcrest Drive, Suite 300
Austin, Texas 78731


Joanna Lippmann Salinas
Fletcher, Farley, Shipman & Salinas, L.L.P.
1717 West 6th Street, Suite 300
Austin, Texas 78703
Joanna L. Salinas, Esq.


Andrew T. Hepworth
Cozen O'Connor
1717 Main Street, Suite 3100
Dallas, Texas  75201